# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **MARCH 2021** |
| E-Filing Number: 2103024829 |
| **001454** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| PHILADELPHIA EAGLES LIMITED PARTNERSHIP | FACTORY MUTUAL INSURANCE COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1 NOVACARE WAY<br>PHILADELPHIA PA 19145 | P.O. BOX 7500<br>JOHNSTON RI 02919 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
|  |  |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
|  |  |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
|  |  |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
|  |  |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 1 | ☒ Complaint  ☐ Petition Action  ☐ Notice of Appeal<br>☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☒ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

| CASE TYPE AND CODE |
|---|
| 1D - INSURANCE, DECLARATORY JUDGMNT |

| STATUTORY BASIS FOR CAUSE OF ACTION |
|---|
|  |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | **FILED**<br>**PRO PROTHY**<br>MAR **11** 2021<br>**S. RICE** | YES        NO |

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: PHILADELPHIA EAGLES LIMITED PARTNERSHIP

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| CHARLES A. FITZPATRICK | BLANK ROME LLP<br>ONE LOGAN SQUARE<br>130 N 18TH STREET<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)569-5608 | (215)832-5608 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 309113 | Fitzpatrick-C@BlankRome.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| CHARLES FITZPATRICK | Thursday, March 11, 2021, 04:25 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

## COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____   1.   Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

_____   2.   Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

        _____   a.   Uniform Commercial Code transactions;

        _____   b.   Purchases or sales of business or the assets of businesses;

        _____   c.   Sales of goods or services by or to business enterprises;

        _____   d.   Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

        _____   e.   Surety bonds;

        _____   f.   Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

        _____   g.   Franchisor/franchisee relationships.

_____   3.   Actions relating to trade secret or non-compete agreements;

_____   4.   "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____   5.   Actions relating to intellectual property disputes;

_____   6.   Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____   7.   Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____   8.   Actions relating to corporate trust affairs;

__X__   9.   Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____   10.   Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

**BLANK ROME LLP**
CHARLES A. FITZPATRICK IV (PA Bar 309113)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  215.569.5608
Facsimile:  215.832.5608
Email: fitzpatrick-c@blankrome.com

**BLANK ROME LLP**
LINDA KORNFELD (*pro hac vice* forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434
Email: lkornfeld@blankrome.com

**BLANK ROME LLP**
JAMES R. MURRAY (*pro hac vice* forthcoming)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  202.420.2200
Facsimile:  202.420.2201
Email:  jmurray@blankrome.com

*Filed and Attested by the Office of Judicial Records 11 MAR 2021 04:25 pm S. RICE*

*Attorneys for Plaintiff Philadelphia Eagles Limited Partnership*

| | |
|---|---|
| PHILADELPHIA EAGLES LIMITED PARTNERSHIP<br>1 NovaCare Way<br>Philadelphia, PA 19145<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>FACTORY MUTUAL INSURANCE COMPANY<br>P.O. Box 7500<br>Johnston, RI 02919<br><br>　　　　　　　　　　Defendant. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>March Term, 2021<br><br>Civil Case No. _____<br><br>CIVIL ACTION – LAW<br><br>COMMERCE PROGRAM<br><br>*Jury Trial Demanded* |

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within** | **Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted** |

Case ID: 210301454

**twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

***You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.***

Philadelphia Bar Association
Lawyer Referral and Information Service
1101 Market St., 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-6333

**tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.**

***Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.***

Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
1101 Market St., 11th Piso
Filadelfia, Pennsylvania 19107
(215) 238-6333

Case ID: 210301454

TO:    Factory Mutual Insurance Company

YOU ARE HEREBY NOTIFIED TO
PLEAD TO THE ENCLOSED
COMPLAINT WITHIN TWENTY (20)
DAYS FROM SERVICE HEREOF OR A
JUDGMENT MAY BE ENTERED
AGAINST YOU.

_/s/ Charles A. Fitzpatrick IV_
*Attorney for Plaintiff*

*Filed and Attested by the Office of Judicial Records 11 MAR 2021 04:25 pm S. RICE*

**BLANK ROME LLP**
CHARLES A. FITZPATRICK IV (PA Bar
309113)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  215.569.5608
Facsimile:  215.832.5608
Email: fitzpatrick-c@blankrome.com

**BLANK ROME LLP**
JAMES R. MURRAY (*pro hac vice*
forthcoming)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  202.420.2200
Facsimile:  202.420.2201
Email:  jmurray@blankrome.com

**BLANK ROME LLP**
LINDA KORNFELD (*pro hac vice*
forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434
Email: lkornfeld@blankrome.com

*Attorneys for Plaintiff Philadelphia Eagles Limited Partnership*

| | |
|---|---|
| PHILADELPHIA EAGLES LIMITED PARTNERSHIP<br>1 NovaCare Way<br>Philadelphia, PA 19145 | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY |
|           Plaintiff, | |
|     v. | March Term, 2021 |
| | Civil Case No. _____ |
| FACTORY MUTUAL INSURANCE COMPANY<br>P.O. Box 7500<br>Johnston, RI 02919 | CIVIL ACTION – LAW |
| | COMMERCE PROGRAM |
|           Defendant. | *Jury Trial Demanded* |

1

Case ID: 210301454

## COMPLAINT – ACTION FOR DECLARATORY JUDGMENT

Plaintiff Philadelphia Eagles Limited Partnership (the "Eagles") complains of Defendant Factory Mutual Insurance Company (hereinafter "Factory Mutual") and alleges upon knowledge as to its own acts and upon information and belief as to the acts and omissions of others as follows:

## NATURE OF THIS ACTION

1.      The Eagles football organization has been a Philadelphia institution since 1933. The team maintains a large, devoted fan base, which *Forbes* magazine ranked in June 2020 as #5 in "America's Most Passionate Sports Fans 2020."[1]

2.      Fans in the stands have been the core of the Eagles' revenue since the team's inception.  Football, and specifically Eagles Football, is undoubtedly a Philadelphia and national pastime.

3.      Year after year, decade after decade, Eagles fans have flocked to the stands to cheer their team, who have appeared in the Super Bowl three times.  After Lincoln Financial Field -- the Eagles' state-of-the art stadium -- opened in 2003, loyal fans continued to purchase season tickets and fill the stadium's approximately 67,000 seats, and "Standing Room Only" sections.

4.      During the 2020-21 football season, however, the Eagles and their fans could not conduct business as usual because of the dangers of the Coronavirus pandemic.[2]

5.      Despite best efforts to navigate the pandemic, the Eagles and their insured subsidiaries have incurred and continue to incur substantial financial loss caused by the dangers of Coronavirus and the resulting interruption of the team's business activities.  Because of the near

---

[1] *See* https://www.forbes.com/sites/christinasettimi/2020/05/06/americas-most-passionate-sports-fans-2020/?sh=3ce9972b2365 (last visited March 11, 2021)

[2] The terms "COVID-19" and "Coronavirus" are frequently used interchangeably in common parlance, and will be used interchangeably throughout this Complaint.

2

Case ID: 210301454

certain risk of physical harm caused by Coronavirus, the Eagles were forced to cancel or significantly restrict in-person attendance at all games at Lincoln Financial Field stadium from August 2020 to January 2021.  Moreover, beginning in March 2020, due to actual cases of COVID-19 on the premises and the risk that instances of the presence of the disease would grow exponentially if extreme action was not taken, the Eagles were required to close entirely, or severely restrict access to their covered premises, including the NovaCare Complex (the team's corporate headquarters and training facility in Philadelphia) and team merchandise stores.  The Eagles were prevented from using their facilities not only for team events, but also for multiple other high profile and high-revenue generating events, such as other sporting events, star-studded concerts, and even for weddings and graduations.

6.     Fortunately, the Eagles purchased property insurance to protect against this type of catastrophic loss.  By the express terms of the all-risks commercial property policy (the "Policy") that Defendant Factory Mutual sold to the Eagles, Factory Mutual promised to pay for the Eagles' losses resulting from the necessary suspension of business operations, in circumstances such as those at issue, here.

7.     Befitting the top dollar that the Eagles paid for best-in-class insurance coverage, the Policy promises to afford broad protections against the risks of pandemic-related losses. Among other coverages, the Policy provides distinct coverages for (1) property loss, "Time Element" (business interruption) loss, and Extra Expenses resulting from the "risks" associated with the pandemic; and (2) "Communicable Disease Response" and "Interruption by Communicable Disease" coverages for certain narrow specified amounts incurred in response to an identified incident of communicable disease at Eagles properties.

Case ID: 210301454

8.      Factory Mutual has not honored the terms of its Policy in responding to the Eagles' coverage claim.  Specifically, Factory Mutual contends that its coverage is limited only to the "Communicable Disease Response" and "Interruption by Communicable Disease" coverages in the Policy.  More broadly, Factory Mutual has stated that it has no duty to pay for the physical loss of or damage to property and business interruption that the Eagles have incurred and continue to incur because of the risks caused by Coronavirus, even though the Policy expressly provides coverage for such risks.

9.      In total, the Policy provides coverage of up to $1 billion per occurrence for precisely the types of losses incurred by the Eagles and at issue in this Action.  But Factory Mutual stated that it intends to strictly limit coverage to the $1 million aggregate sublimit for Communicable Disease coverage.

10.     The insuring agreement in the Policy covers property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." (emphasis original).  Under the Policy's express terms, coverage is provided to the Eagles where, among other circumstances, the Eagles' use of its property is prevented, diminished or restricted to prevent the spread of Coronavirus and resulting loss or damage to the covered premises.  Due to the Coronavirus pandemic, the Eagles' covered premises have been rendered unusable in the way that they had been used before the onset of the pandemic, depriving the Eagles of traditional physical use of the insured premises.

11.     The Eagles have incurred substantial losses resulting from the dangers posed to property and persons at Eagles locations by the physical prevalence of Coronavirus.  These risks have rendered covered premises, at least temporarily, unreasonably dangerous, uninhabitable and/or unfit for their intended purposes.

Case ID: 210301454

12.     Contrary to its promise to cover such risks, Factory Mutual has failed to honor its coverage obligations under the Policy.  The Eagles thus seek the declaratory relief addressed below in this Complaint.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction pursuant to 42 Pa.C.S. § 931(a).  This Court has the power to declare the parties' rights and obligations pursuant to 42 Pa.C.S. § 7532.

14.     This Court has personal jurisdiction over Defendant Factory Mutual because it transacted and continues to transact the business of selling insurance in this Commonwealth and has purposefully availed itself of this jurisdiction.

15.     Venue is proper pursuant to Pennsylvania Rule of Civil Procedure Rule 1006 and 42 Pa.C.S. § 931(c) because Factory Mutual's business activities within this County subject it to personal jurisdiction and a substantial part of the transactions or occurrences giving rise to the claim occurred in this County, including, *inter alia*, the delivery of the Policy and the breach thereof.

16.     The Eagles brought this action in state court because it is the only appropriate forum.  Insurance is a creature of state law, and Congress has entrusted states with the responsibility for establishing a comprehensive regime of insurance regulation.  Therefore, when declaratory judgment actions involve – as here – new or unsettled matters of insurance law with significant public policy implications, federal courts have discretion to decline jurisdiction, because under such circumstances the "proper relationship between state and federal courts requires district courts to step back and allow the claims to proceed through the state courts." *Jul-Bur Associates, Inc. v. Selective Insurance Co. of America*, No. 20-1977, 2021 WL 515484, at *3 (E.D. Pa. Feb. 11, 2021) (citations and internal marks omitted).  Moreover, federal jurisdiction

Case ID: 210301454

over such actions is not required because "[t]he desire of insurance companies and their insureds to receive declarations in federal court on matters of purely state law has no special call on the federal forum." *Id.* (citations and internal marks omitted).

17.     In this regard, certain federal courts in this State have declined to exercise jurisdiction over actions regarding insurance coverage related to COVID-19 that seek only declaratory relief. *E.g.*, *Jul-Bur Associates*, 2021 WL 515484, at *5; *i2i Optique LLC v. Valley Forge Ins. Co.*, No. 20-3360, 2021 WL 268645 (E.D. Pa. Jan. 27, 2021); *V&S Elmwood Lanes v. Everest National Insurance Co.*, No. 20-3444, 2021 WL 84066 (E.D. Pa. Jan. 11, 2021); *Venezie Sporting Goods*, No. 20-cv-1066, 2020 WL 5651598 (W.D. Pa. Sept. 23, 2020); *Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, No. 20-cv-787, 2020 WL 5051459 (W.D. Pa. Aug. 27, 2020); *Greg Prosmushkin, P.C. v. Hanover Ins. Grp.*, 479 F.Supp.3d 143 (E.D. Pa. 2020). Indeed, certain federal courts have dismissed such actions *sua sponte* on jurisdictional grounds. *Jul-Bur Associates, Inc.*, 2021 WL 515484, at *5; *V&S Elmwood Lanes*, 2021 WL 84066, at *2; *see also i2i Optique*, 2021 WL 268645, at *2 ("Courts may decline jurisdiction *sua sponte* under the Declaratory Judgment Act."). Pennsylvania federal courts have also remanded declaratory judgment actions regarding COVID-19 insurance coverage that had been removed to federal court back to state court. *Venezie Sporting Goods*, 2020 WL 5651598, at *5 ("While it is undeniable that the COVID-19 pandemic presents a complex and novel factual situation, the resulting legal disputes are deeply tied to Pennsylvania public policy, as well as the intricacies of Pennsylvania insurance contract interpretation, such that the Court believes it is most appropriate to 'step back' in this instance."); *Dianoia's Eatery*, 2020 WL 5051459, at *4 ("the Commonwealth's interest in this and similar litigation is paramount such that a remand to state court is the appropriate course in this case"); *Greg Prosmushkin, P.C.*, 479 F.Supp.3d at 151 ("It is neither practical nor wise for

Case ID: 210301454

this Court to attempt to predict how Pennsylvania would decide this novel and complex issue of state law when the discretion exists to allow Pennsylvania courts to address the matter for themselves").

18.     In declining federal jurisdiction over declaratory judgment actions related to COVID-19 insurance questions, courts have cited the "novel questions of state law" involved, in which the "Commonwealth's appellate courts have not yet articulated the contours of COVID-19 related insurance coverage," with cases involving such issues "presently winding through the state courts." *Jul-Bur Associates*, 2021 WL 515484, at *3.  Although federal courts may sometimes be called upon to decide issues of state law, the situation presented by a once-in-a-century pandemic is unique, and "pose[s] a new slate of state-law specific issues," with "far-reaching consequences beyond a single covered premise," and therefore allowing for resolution by state courts.  *Jul-Bur Associates*, 2021 WL 515484, at *4.  "Given the novelty of the state law issue of insurance coverage for losses resulting from the COVID-19 pandemic, the Pennsylvania state courts are clearly better equipped to settle the uncertainty of obligation, and it is in the public's interest for them to do so."  *Greg Prosmushkin, P.C.,* 479 F.Supp.3d at 150.  Furthermore, declining jurisdiction allows federal courts to "avoid a potentially inconsistent decision with those reached by state courts."  *Jul-Bur Associates*, 2021 WL 515484, at *4.

19.     All the factors that have been cited by federal courts as a basis for declining jurisdiction over actions seeking declarations regarding COVID-19 insurance coverage apply equally here.  This case involves novel questions of state law that have not been resolved by the Commonwealth's courts.  The resolution of these issues will have far-reaching consequences beyond the litigants in this case.  The public interest will be best served by allowing the courts of this Commonwealth, which have not yet built a body of case law addressing many insurance issues

Case ID: 210301454

specific to the COVID-19 pandemic, to create uniform law on these issues.  And finally, allowing state courts to decide these questions will avoid potentially inconsistent decisions.  For all these reasons, the Eagles have properly brought this case in this state court.

## THE PARTIES

20.     Philadelphia Eagles Limited Partnership is a Pennsylvania limited partnership with its principal place of business and headquarters in Philadelphia, Pennsylvania. At all times relevant hereto, the Eagles maintained insurance to protect its property and business in the event of various losses.

21.     Factory Mutual Insurance Company is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island, and is licensed to transact, and is regularly transacting, business in the Commonwealth of Pennsylvania.

## THE PHILADELPHIA EAGLES

22.     Established July 8, 1933, the Eagles are one of the oldest continually operating franchises in the National Football League ("NFL").  The Eagles continually rank among the highest valued NFL teams and overall sports teams in the world.  *Forbes* magazine ranked the Eagles in 9th place on its September 2020 list of highest NFL team valuations, with a team value of $3.4 billion and operating income of $120 million.[3]

23.     The City of Philadelphia has always been home to the Eagles.  Eagles fans are vociferous in their support; they purchase Eagles-themed apparel and decor.  And, they attend Eagles games.

24.     The state-of-the-art training facility, NovaCare Complex, opened in the spring of

---

[3] See https://www.forbes.com/teams/philadelphia-eagles/?sh=512456442783 (last visited March 11, 2021).

Case ID: 210301454

2001 in Philadelphia.  The complex is intended to be used year-round.

25.     In 2001, the Eagles commenced construction on Lincoln Financial Field to replace their prior stadium.  The purpose of building a new stadium was to enhance fan experience, provide state-of-the art operations, and vitalize the image of the team and the city of Philadelphia.  Eagles then President Joe Banner stated, "Lincoln Financial Field will enhance the image of and economic activity within the Philadelphia region. In terms of what it will mean to the club in a macro sense, it will enable us to be competitive financially while also helping us further define ourselves as a first-class organization. Ultimately, our investment in Lincoln Financial Field will send a message about how truly driven we are with regard to achieving success and about how committed we are to enhancing the comfort and enjoyment of our fans."[4]

26.     The stadium opened on August 3, 2003 at a construction cost of $512 million. Unlike its previous stadium and many other football stadiums used in the NFL, Lincoln Financial Field was designed to have more seats along the sidelines, resulting in improved sight lines for the fans and more stadium seats for fans to purchase.

27.     In June 2013, the Eagles unveiled plans for a two-year, $131 million revitalizing project at Lincoln Financial Field.  Completed by the 2014 season, the renovation project included the addition of 1,600 seats, new HD video/scoreboards in each end-zone, pedestrian bridges connecting the upper deck concourses, upgrading luxury suites and adding historical imagery throughout the stadium.  With the completion of this expansion, Lincoln Financial Field now has approximate seating capacity of 67,000.

28.     A number of amenities for fans are located at Lincoln Financial Field, including

---

[4] *See* https://www.lincolnfinancialfield.com/stadium-facts/ (last visited March 11, 2021).

Case ID: 210301454

175 luxury suites, which seat approximately 3500 fans; approximately 8500 club seats; a 100,000 square foot fan-oriented plaza; over 300 concession points of sale; and an Eagles Pro Shop team store.

29.    Like the NovaCare Complex, Lincoln Financial Field is a year-round operation, because it hosts numerous sporting, and other events throughout the year.  Temple University's Division I college football team plays its home games at Lincoln Financial Field.  The Philadelphia Union of Major League Soccer has played exhibition games at Lincoln Financial Field against high-profile international clubs when their own stadium does not provide adequate seating. The stadium also plays host to multiple other high profile "sell out" events each year, which prior to the Coronavirus pandemic have included several soccer games, the NCAA lacrosse national championship, the National Hockey League's Stadium Series, the Army-Navy football game, star-studded concerts, Monster Jam, and other events, which did not proceed in 2020 due to the pandemic and its related dangers.

30.    Due to the COVID-19 pandemic, its physical infestation of the insured premises, the extreme threat of continued infestation as the pandemic spiked, receded and then spiked again, and its impact on the Eagles' ability to use their covered premises, the Eagles have suffered multiple millions of dollars in loss with respect to at least the following categories of income generating activities: merchandise sales, ticket sales, premium seating sales, concession sales, stadium parking, in-stadium advertising, naming rights, revenue from the other events described above, and other special events, such as weddings, corporate events, conferences and trade shows.

Case ID: 210301454

## THE FACTORY MUTUAL INSURANCE POLICY

31.     As a large international property-only insurer, Factory Mutual, part of the FM Global Group, directs substantial annual resources to studying risks and those that may in the future cause loss to policyholders and deciding which risks it is willing to cover and those that it intends to avoid. [5]

32.     In marketing its Global Advantage® All-Risk Policy, Factory Mutual advertises that, "As an FM Global client, you get an insurance policy based on engineering and research, not just on actuarial formulas. If you need the ability to scale policy options to fit your actual properties and exposures, you'll appreciate our Business Interruption Coverage. It protects against loss of income following a disaster, wherever you operate, or however indirect your connection to the loss."[6]

33.     In addition to Factory Mutual's knowledge of the sports industry business in general, and in connection with providing coverage to the Eagles, Factory Mutual engaged, or had reasonable opportunities to engage in, an extensive underwriting investigation and to become familiar with and knowledgeable about the nature and scope of the Eagles' business and the nature of the risks against which it was insuring.

---

[5] *See* https://www.fmglobal.com/about-us/why-fm-global ("You'll discover that our approach to claims is different, too. We work closely with you *before, during* and *after* a loss—no matter where in the world that loss occurs. And we ground our recommendations in world-class scientific research and on-the-ground engineering services") (emphasis original) (last visited March 11, 2021); *see also* https://www.fmglobal.com/products-and-services/our-approach ("Where other insurance companies rely primarily on actuarial tables, we use a hands-on, engineering-based approach. The result? Property insurance coverage based on the realities of your business and your particular property risk management challenges.") (last visited March 11, 2021).

[6] *See* https://www.fmglobal.com/products-and-services/products/the-fm-global-advantage-all-risk-policy (last visited March 11, 2021).

Case ID: 210301454

34.     In exchange for substantial premiums, Factory Mutual sold the Eagles the Policy, effective from June 29, 2017, to June 29, 2020.  A true and correct copy of the Policy is attached hereto as **Exhibit A** and incorporated by reference.

35.     The applicable coverages provided by the Policy include but are not limited to the following:

    a.   **Property Loss/ Time Element Losses Resulting from the Risks of Physical Loss or Damage**: The Policy provides coverage of up to $1 billion per occurrence for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE" to covered property, as well as "TIME ELEMENT loss" "directly resulting from physical loss or damage of the type insured."

    b.   **Response Costs/Time Element Losses Due to the Actual Presence of Communicable Disease at Eagles Locations**: The Policy provides up to $1,000,000 or more for cleanup, removal and/or disposal of the actual presence of communicable disease from insured property and interruption/time-element losses due to the actual presence of such communicable disease.

36.     The Policy contains sublimits for certain losses, but others are subject to the full $1 billion policy limit.  As sought by the Eagles, the limit of liability for property loss and Time Element (business interruption) at covered locations is the full $1 billion per occurrence limit.

37.     The Insuring Agreement in the Policy states: "This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy."

38.     Therefore, the Policy expressly insures against the "risks," such as, threats of physical loss or damage to property.

39.     If the Policy does not expressly exclude a particular cause of a risk of physical loss of or damage to property, then the non-excluded peril triggers coverage.

40.     The Policy covers the "risks of" direct physical "loss" _or_ "damage" to the Eagles' property.  Even if the Eagles' property did not suffer physical "damage," the Policy still provides

Case ID: 210301454

coverage for the risk of the Eagles' physical "loss" regarding its property.

41.     As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

42.     The Policy does not define "physical."

43.     The Policy does not define "loss."

44.     The Policy does not define "physical loss."

45.     The Policy does not define "damage."

46.     The Policy does not define the phrase "physical loss or damage."

47.     The Policy does not define the terms "risks" or "risks of."

48.     The Policy does not define the phrase "risks of physical loss or damage."

49.     When undefined, the phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation.

50.     When the undefined phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation, they should be construed against the drafter (which, here, is Factory Mutual).

51.     Dictionary definitions of "loss" include:

a.     "Deprivation."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

b.     "[D]ecrease in amount, magnitude, or degree."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

c.     "The fact that you no longer have something or have less of something."  Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

d.     "Having less than before."  Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss

Case ID: 210301454

e. "[T]he state of no longer having something or as much of something." Loss, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

52.    At minimum, the Eagles suffered "deprivation," "decrease," or "having less" of its covered property due to this Coronavirus pandemic.

53.    The Eagles faced and continue to face the imminent "risk" of physical loss or damage to its property because of the ongoing and increasingly dangerous Coronavirus pandemic.

54.    Over forty courts have already concluded that insureds have properly alleged or are in fact entitled to coverage for Coronavirus-related business interruption loss or damage.  Upon information and belief, Factory Mutual is aware of these court decisions.  Because numerous courts agree that Coronavirus may cause "direct physical loss or damage" to property, the Eagles' belief that the Policy provides coverage is at least reasonable even if Factory Mutual claims that it believes there is no coverage.

55.    The Court of Common Pleas of Philadelphia County (Judge Glazer presiding) recognized that the issue of whether Coronavirus causes "physical loss or damage" cannot be adjudicated based on preliminary objections, because it is a factual issue to be determined by the trier of fact.  The plaintiff's allegations in a complaint are to be taken as true.  *Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyd's London,* No. 00375 (Phila. C.C.P. Oct. 26, 2020) (attached as **Exhibit B**).

### THE INSURANCE INDUSTRY AND FACTORY MUTUAL SPECIFICALLY KNEW OF THE RISKS AND DANGERS OF THE PANDEMIC

56.    Insurers, such as Factory Mutual, were repeatedly warned, and have been aware for years, of the potential impact of pandemics. In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do – in the months and years before the Coronavirus pandemic.  For example:

14

Case ID: 210301454

a. One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[7]

b. The Insurance Library Association of Boston (founded 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early 2007 through 2018.[8]  The Association states on its website: "The past 20 years has seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well."  The webpage then lists various articles and reports discussing the risks and impacts of pandemics on the insurance industry.  For example, an article stated in 2014 that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, business interruption, travel and event cancellation and disability insurance."[9]

57.     Moreover, over the course of decades, courts have held that the presence of a hazardous substance at or on a property, including the airspace inside buildings, constitutes property damage.  Many courts have also held that the closure of property due to imminent risk of physical loss or damage or danger to inhabitants constitutes physical loss of property.  Upon information and belief, insurers, including Factory Mutual, have been and continue to be aware of these court decisions.

58.     Factory Mutual itself previously argued in court filings that mold infestation in the clean room of a laboratory caused physical loss or damage—despite not causing a structural alteration of the property—and was therefore covered.  *See Factory Mut. Ins. Co. v. Federal Ins.*

---

[7] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited March 11, 2021).

[8] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited March 11, 2021).

[9] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014).

Case ID: 210301454

*Co*., Case No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 (attached hereto as **Exhibit C**).  In support, Factory Mutual asserted that "numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage," and cited case law as referenced in paragraph 57 above.  Factory Mutual also argued that another insurer's failure to define "physical loss or damage" made that term "susceptible of more than one reasonable interpretation," rendered the policy "ambiguous," and "must be construed against" that insurer.

59.     In 2006, ISO considered the need to draft an exclusion that would bar coverage for losses caused by a virus, and in July 2006 ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to human disease-causing viruses and bacteria.  In that circular, ISO cited "rotavirus, SARS, [and] influenza" and observed that "[t]he universe of disease-causing organisms is always in evolution."

60.     ISO's circular further recognized that "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property."

61.     ISO also expressly warned of a need for its exclusion because "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent."

62.     With its circular, ISO thus acknowledged that (i) the presence of a human disease causing virus could give rise to physical loss or damage to property; (ii) such damage could trigger coverage under property policies for property losses, including business interruption losses; and

Case ID: 210301454

(iii) absent addition of ISO's exclusion, the existing language in property policies, like that issued by Factory Mutual here, did not clearly and unambiguously bar coverage for such losses.

63.     ISO therefore introduced with its circular a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  As noted in the circular, the purpose of this standard form language was to allow those insurers that chose to use it in their insurance policies, to attempt to protect themselves from coverage for loss or damage resulting from infectious material and pandemic.

64.     Accordingly, since 2006 insurers have had the opportunity to incorporate, and have incorporated, this standard virus exclusion in certain of their policies in an effort to avoid covering loss due to a disease such as COVID-19.

65.     Factory Mutual nonetheless chose to not include the ISO or other more express pandemic or similar exclusion(s) in the Policy.

66.     By expressly providing coverage for certain narrow categories of loss or expense incurred for an incident of communicable disease at a covered property, Factory Mutual recognized that communicable diseases may cause physical loss or damage.  In addition to such limited coverage for the "actual" presence of communicable disease, the Policy provides coverage for "all risks" of property loss from communicable disease (and related business interruption loss), i.e., coverage for the ***threat*** to property caused by communicable disease.

67.     In fact, Factory Mutual chose to utilize this "all risks" language, instead of more restrictive policy language drafted by the insurance industry and utilized by various insurers since in or about 2013.

68.     Prior to 2013, ISO's standard "Businessowners Coverage Form" such as ISO form BP 00 03 01 10, defined "Covered Causes of Loss" as "[r]isks of direct physical loss unless the

Case ID: 210301454

loss is…[e]xcluded…or [l]imited…."  In 2013, ISO issued revised Businessowners coverage forms, such as ISO form BP 00 03 07 13, which redefined "Covered Cause of Loss," by removing the term "risks of."  ISO now defines "Covered Causes of Loss" as "[d]irect physical loss unless the loss is excluded or limited…."

69.     ISO issued a "Notice to Policyholders" that insurers using the form could issue to its insureds to explain the changes in policy wording.  The notice expressly states that "the term 'risk of' is removed from the Covered Cause of Loss provision."

70.     Accordingly, since at least 2013, insurers have had the opportunity to incorporate, and have incorporated, an insuring agreement that deletes "risk of."  For example, Cincinnati Insurance Company, in revising its standard property policy form number FM 101, issued a "Notice to Policyholders" in 2016 stating, "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101."

71.     Factory Mutual did not remove the term "risks of" from the insuring agreement in the Policy that it sold to the Eagles for a very substantial premium.

**THE CORONAVIRUS PANDEMIC**

72.     In December 2019, the first instance of a respiratory illness caused by a novel coronavirus was identified in Wuhan, China.  In a matter of weeks, the virus quickly spread across Asia, the United States and most of the world.

73.     In January 2020, the first reported case of Coronavirus occurred in the United States.

74.     On February 11, 2020, the International Committee on Taxonomy of Viruses named this novel coronavirus "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" (the "Coronavirus").  The same day, the World Health Organization ("WHO") named the disease

Case ID: 210301454

caused by the Coronavirus, "COVID-19."

75.     On March 11, 2020, the WHO declared the Coronavirus outbreak a worldwide pandemic[10] and noted its deep concern "by the alarming levels of spread and severity [of the Coronavirus]." According to numerous public health authorities, ***everyone*** is at risk of exposure to Coronavirus and falling ill with COVID-19.  Due to its highly contagious and easily transmitted nature, a single instance of Coronavirus in a community can (and as time has progressed, does) quickly and exponentially grow into a massive, uncontainable outbreak.

76.     Coronavirus has rapidly spread and continues to spread throughout the United States and the world.  It is present in fluid particles in the air, as well as on surfaces (*e.g.*, walls, furniture, doors, fixtures, countertops and touch screens).  It is highly contagious and easily transmitted from person to person, from airspace to person, or from surface to person.

77.     Coronavirus has several modes of transmission.  According to the WHO and the Centers for Disease Control and Prevention ("CDC"), Coronavirus can spread from person to person through physical droplets from the nose or mouth that are spread when an infected person sneezes, coughs or exhales.  The physical droplets then remain in and contaminate the air, and also land on and contaminate nearby objects and surfaces, where Coronavirus remains active and dangerous (even while in the air and on inert objects and surfaces) for long periods of time.  People "catch" Coronavirus by being in the vicinity of a person who has Coronavirus and breathing in shed droplets, or by touching objects or surfaces on which droplets landed and then touching their own eyes, nose or mouth.  Those people then further spread Coronavirus throughout their

---

[10] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited March 11, 2021).

Case ID: 210301454

environments and communities in the same manner.

78.     Coronavirus has spread widely in this manner, in Pennsylvania, New Jersey, and nationwide, including through interactions with physical property inside premises, and encounters with airborne particles within premises.

79.     Importantly, even asymptomatic infected persons (*i.e.*, those who have no sign of illness) can and do spread Coronavirus.[11]  In fact, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[12]

80.     According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[13]  And, one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[14]  Thus, the WHO has reported that airborne transmission of Coronavirus may be possible in certain circumstances, and "is different from droplet transmission as it refers to the presence of microbes within droplet nuclei, which…[can] be transmitted to others over

---

[11] *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited March 11, 2021).

[12] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM)*,* https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last visited March 11, 2021).

[13] *See* Yuliya Pashina-Kottas, *et al*., *This 3-D Simulation Shows Why Social Distancing Is So Important*, *The New York Times* (April 14, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited March 11, 2021).

[14] *See* Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited March 11, 2021).

Case ID: 210301454

distances greater than 1 m."[15]

81.     Respiratory droplets expelled from infected individuals remain in the air, and land on, attach, and adhere to surfaces and objects.  In doing so, they physically change the airspace of the relevant premises and the property and its surface by becoming a part of that surface.  As a result of this physical alteration, contact with that previously safe, airspace, and inert surfaces (*e.g.,* walls, tables, countertops) has been made unsafe.

82.     At the time Factory Mutual evaluated the Eagles' claim for coverage, numerous scientific studies had documented that Coronavirus can physically remain in and alter a premises' airspace and property for extended periods of time.  For example:

a.      A study documented in the *New England Journal of Medicine* found that Coronavirus is detectable in aerosols (*i.e.*, fine solid particles in air) for up to three hours, on copper for up to four hours, on cardboard up to 24 hours and on plastic or stainless steel for **up to two to three days**.[16]

b.      Another study found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for **up to nine days**.[17]

---

[15] *See* World Health Organization, *Modes of Transmission of Virus Causing COVID-19: Implications for IPC* (Mar. 29, 2020, updated on July 9, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (last visited March 11, 2021).

[16] *See* News Release, *New Coronavirus Stable for Hours on Surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), *available at* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited March 11, 2021).

[17] *See* G. Kampf *et al., Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation with Biocidal Agents*, J. HOSPITAL INFECTION (Feb. 6, 2020), *available at* https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (last visited March 11, 2021).

Case ID: 210301454

c.      A peer-reviewed article published in *Virology Journal* on October 7, 2020 found that Coronavirus can survive on surfaces for ***up to 28 days*** at ambient temperature and humidity (20 °C [68 °F] and 50% RH).[18]  The article concludes that Coronavirus "can remain infectious for significantly longer time periods than generally considered possible."

83.      Accordingly, because an individual with no symptoms can spread Coronavirus simply by breathing or talking, and because droplets containing Coronavirus can remain in the air and land and remain infectious on surfaces for many days, ***the risks*** posed by Coronavirus are not temporary.  Even when the air and surfaces inside a building are thoroughly and effectively cleaned, each time an infected person enters that space the cycle renews such that infectious Coronavirus is likely (if not certain) to be present wherever people are located or congregate.  The world has seen communities shut down and reopen, only to be shut down again following another outbreak.  Until recently, with the advent and administration of COVID-19 vaccines to people across the country and world, the risk of spread COVID-19 wherever people gathered (whether indoors or outdoors) was a near certainty.  The virtually guaranteed risk of significant harm and damage to persons and property (including its airspace) prior to the widespread administration of the vaccine. is why it became necessary to close or strictly limit the use of indoor and outdoor spaces like those used by the Eagles; and it is why in some instances those closures and restrictions continued to remain necessary for a wholly unforeseen and extended period.  This chain of events

---

[18] *See* S. Riddell, *et al., The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited March 11, 2021).

Case ID: 210301454

created great risk to the Eagles of physical loss or damage to covered property, in addition to actual physical loss or damage to property.

84.     State and local governments and public health officials acknowledged that Coronavirus causes physical loss and damage to property.  For example:

a.  The City of Philadelphia issued an Emergency Order that states "COVID-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain ***property*** and places." (emphasis added).

b.  The Secretary of the Pennsylvania Department of Health issued an Order Directing Building Safety Measures in part because "exposure is possible by touching a ***surface or object*** that has the virus on it and then touching one's nose, mouth or eyes." (emphasis added).

c.  The State of New Jersey issued an Order requiring closures of certain "brick-and-mortar facilities" and businesses in order to minimize "contact with common surfaces."

85.     The actual and/or threatened presence of Coronavirus particles at the Eagles' premises rendered physical property within the premises damaged, unusable, uninhabitable, unfit for intended function, dangerous, and unsafe.  It impaired and diminished the value, utility and normal function of the premises (including the airspace and physical property contained within). Similarly, the presence at the Eagles' premises of individuals infected with Coronavirus, or carrying Coronavirus particles on their body (including their clothing and any other objects on their body), rendered and/or created the risk of the premises, including the airspace within those premises unusable, damaged and unsafe.  These circumstances caused and/or created the risk of

23

Case ID: 210301454

physical loss and damage to the covered premises and property. And, as to premises where Coronavirus was not in fact specifically identified, given the nature of the disease, the risk of such consequences was near certain, if not certain.

86.     The Policy expressly insures against the "risks" of Coronavirus making the Eagles' properties, among other things, unusable, damaged or unsafe.

## THE EAGLES AND GOVERNMENTAL PUBLIC HEALTH RESPONSES TO THE PANDEMIC

87.     On March 16, 2020, the CDC and the national Coronavirus Task Force issued guidance titled "30 Days to Slow the Spread" of Coronavirus.  The guidance called for extreme social distancing measures, such as working from home and avoiding gatherings of more than 10 people.

88.     On March 16, 2020, Pennsylvania Governor Tom Wolf issued guidance encouraging non-essential businesses, expressly including sporting event venues, to close.

89.     On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses to close.

90.     On March 23, 2020, Governor Wolf issued an order requiring individuals residing in certain Pennsylvania counties, including Philadelphia County, to stay at home.

91.     Governor Wolf's orders related to Coronavirus have been extended and modified from time to time, including during the Eagles' 2020-21 playing season.

92.     On March 17, 2020, the City of Philadelphia issued an Emergency Order prohibiting the operation of non-essential businesses.

93.     The City of Philadelphia further prohibited the operation of non-essential businesses by order dated March 22, 2020.

Case ID: 210301454

94.     The City of Philadelphia's orders related to Coronavirus have been extended and modified from time to time, including during the Eagles' 2020-21 playing season.

95.     Commencing in March 2020, as a result of the risks associated with the Coronavirus pandemic, including physical loss or damage to covered property, and in compliance with government guidance and orders, the Eagles limited, reduced or suspended operations at its covered premises.

96.     On March 12, 2020, the Eagles announced the closure of the NovaCare Complex and Lincoln Financial Field.

97.     The Eagles were required to close their Eagles Pro Shop retail stores located at Lincoln Financial Field, in Lancaster, Pennsylvania and in Cherry Hill, New Jersey.

98.     Over the next months, the Eagles incurred substantial costs to implement and comply with social distancing mandates and governmental guidelines at the NovaCare Complex and Lincoln Financial Field in order to ready the building for the team's training camp.  The measures included: building additional weight rooms to accommodate players; knocking down walls between meeting rooms to make them larger; removing seating in the cafeteria; putting up outdoor tents for eating and meetings; spacing out lockers in the locker room; converting windows into doors leading to outdoor tents; providing each player his own toiletries rather than shared toiletries; installing touchless dispensers; and putting up signage indicating where staff and players should walk within the building.  The Eagles incurred additional substantial expense in connection with, among other things, (1) conducting virtual off-season programs that required necessary supplies to be delivered to the players at their virtual locations, (2) performing a virtual draft, (3) addressing virtual technology issues, and (4) purchasing protective face masks, PPE, temperature check machines, and technology for COVID-19-related questionnaires.

Case ID: 210301454

99.     Beginning with the Eagles' training camp in August 2020, staff and players were tested daily for Coronavirus.  The Eagles installed new tents at the NovaCare Complex for tests and temperature screenings.  Each player was provided his own water bottle and single use towels. The complex was cleaned throughout the day and after each day's football work was done.

100.    In July 2020, the NFL formally announced that due to the Coronavirus pandemic, all pre-season games, typically held in August and September of each football season, were cancelled.  As a result, the Eagles could not sell tickets or derive revenue from any pre-season games in August and September 2020.

101.    During the summer of 2020, the Eagles worked with state and local government agencies, public health experts, and NFL officials to develop health and safety protocols for the 2020 regular football season.

102.    Ultimately, although the Eagles were permitted to conduct in-person games at the start of the regular season, attendance was limited to team personnel, league officials, and certain media personnel.  At the start of the season, no public fans were permitted to attend games at Lincoln Financial Field.  The Eagles played their games to mostly empty stadiums, and fans who otherwise would have purchased tickets were famously replaced in the stands by cardboard "cut-outs."

103.    In October 2020, the Eagles, the City of Philadelphia, and the Commonwealth of Pennsylvania developed a plan that allowed limited attendance at home games, capping attendance at Lincoln Financial Field to 7,500 individuals, including team personnel and the media, reducing by over 90% the seats that the Eagles would have been able to sell for games at the stadium.

104.    On November 16, 2020, related to renewed restrictions issued by the City of Philadelphia in response to a surge in Coronavirus cases, the Eagles announced that fans would no

Case ID: 210301454

longer be permitted to attend in-person games at Lincoln Financial Field.

105.    Despite the substantial costs incurred to guard against the risks of Coronavirus, including use limitations and closures of their properties, actual incidents of COVID-19 were detected at covered locations, including the NovaCare Complex, Lincoln Financial Field, and the Eagles ProShop in Lancaster, Pennsylvania.  Following these incidents, the Eagles incurred costs to clean the premises and perform contact tracing, among other costs.

## THE IMPACT OF CORONAVIRUS

106.    The impact of the Coronavirus pandemic has been massive and devastating to people, businesses, and local governments.

107.    As of March 11, 2021, Coronavirus has been detected in nearly every country. Total reported cases top 118 million people, and more than 2.62 million people have died.  In the United States alone, more than 29.2 million people have tested positive for COVID-19, and more than 529,000 people have died as a result of it.

108.    The states', cities' and counties' attempt at phased reopenings in the summer and fall of 2020 did not help matters.  As some visitors cautiously returned to patronize businesses, so did Coronavirus – leading many localities to reimpose restrictions on businesses, to combat later surges.

109.    For these reasons, it was virtually certain during the heights of the pandemic that Coronavirus presented an ongoing risk of physical loss or damage to the Eagles' covered premises.  Each time any person entered a place of business, so did the risks associated with Coronavirus.

110.    Indeed, if the Eagles had conducted business as usual, the disease and virus spread would have been inevitable, as well as its resulting impact on persons and property.

Case ID: 210301454

Under these circumstances, the Eagles' property could not be used according to its intended function.

### THE FACTORY MUTUAL INSURANCE POLICY APPLIES TO THE EAGLES' CORONAVIRUS LOSSES

111.    The risk of and actual spread of Coronavirus causes physical loss or damage to property, and the Policy includes no enforceable exclusion that would preclude coverage for such risks of loss or damage to covered property.

#### *The Policy's Property Coverage Applies*

112.    The Policy provides coverage of up to $1 billion per occurrence for "all risks of physical loss or damage" to Real Property and/or Personal Property (as defined in the Policy), unless such property is excluded or results from an excluded cause of loss.

113.    The Eagles faced and continue to face the imminent "risk" of, and actual, physical loss or damage to their property because of the ongoing and increasingly dangerous Coronavirus pandemic.

114.    Accordingly, the Policy has been triggered, and the Eagles' loss or damage to their property is covered by the Policy.

115.    The Eagles are entitled to recover their covered losses with respect to physical loss or damage to their property up to the full $1 billion per occurrence limits provided in the Policy.

#### *The Policy's Time Element and Extra Expense Coverages Applies*

116.    The Policy provides coverage for up to $1 billion per occurrence for "TIME ELEMENT loss" "directly resulting from physical loss or damage of the type insured" to covered Property during the "Periods of Liability" described.

117.    The term "physical loss or damage of the type insured" means "all risks of physical loss or damage" to covered property.  The Policy therefore provides business interruption coverage

Case ID: 210301454

when the insured suffers an interruption of its business activities due to the "risks" of the Coronavirus pandemic causing physical loss or damage to covered property, in addition to any actual loss or damage.

118.     The Eagles limited or ceased their operations at covered premises because of the imminent "risk" that Coronavirus would cause physical loss or damage to covered property.

119.     Accordingly, the Policy's "Time Element" coverage is triggered, and the Eagles' business interruption losses are covered by the Policy's Time Element coverage.

120.     The Eagles are entitled to recover their covered Time Element losses up to the full $1 billion per occurrence limits provided in the Policy.

121.     As part of the Time Element coverage, the Policy covers as "Extra Expense" the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" and "extra costs of temporarily using property or facilities of the Insured or others," among other expenses, during the Period of Liability.

122.     The Eagles incurred Extra Expenses, as that term is defined by the Policy.

123.     Accordingly, the Policy's "Extra Expense" coverage is triggered.  The Eagles are entitled to recover their Extra Expenses incurred up to the applicable limits provided by the Policy.

### *The Policy's Communicable Disease Coverages Applies*

124.     As an additional coverage, the Policy provides up to $1,000,000 or more for response costs incurred as a result of the "***actual*** not suspected" presence of communicable disease such as Coronavirus or COVID-19

125.     The relevant language of the Policy describing this coverage includes the following:

29

Case ID: 210301454

**COMMUNICABLE DISEASE RESPONSE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

> 1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

> 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

> 1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

> 2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

126.    Furthermore, the Policy provides up to $1,000,000 or more for business interruption as a result of the "***actual*** not suspected" presence of communicable disease such as Coronavirus or COVID-19.  The $1,000,000 limit is an aggregate limit for Communicable Disease Response and Interruption by Communicable Disease combined.

127.    The relevant language of the Policy describing the Interruption by Communicable Disease coverage includes the following:

Case ID: 210301454

**INTERRUPTION BY COMMUNICABLE DISEASE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

> 1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

> 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

128.    The term **"communicable disease"** is defined as:

disease which is:

> A. transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or
> B. Legionellosis.

129.    Coronavirus or COVID-19 qualifies as a "communicable disease" under the Policy.

130.    The actual presence of Coronavirus or COVID-19 has been confirmed at Eagles locations.

131.    These locations have incurred costs for the cleanup, removal and disposal of the actual not suspected presence of Coronavirus or COVID-19 from insured property.

132.    These locations have incurred interruption/time element losses as a result of the actual not suspected presence of Coronavirus or COVID-19 at insured property.

133.    These costs are covered under the Policy, up to the limits of such Communicable Disease coverage.

Case ID: 210301454

134.    Nonetheless, the "Communicable Disease Response" and "Interruption by Communicable Disease" coverage provides coverage for the limited circumstance of where a business must respond to the "actual presence" of a disease causing agents, and the consequent "***costs***" (i.e., not "loss") for the clean-up, remediation, public relations effects, and coverage for lost profits is available only to the extent that the remediation/cleanup requires a brief shutdown. But the nature of the Eagles' losses is not limited to such remediation-type costs, but instead, as set forth more fully above, also includes lost revenues and profits because of an inability to use, or restrictions on the use of, its property.  The Policy therefore provides coverage for such losses up to the full $1 billion per occurrence limits of the Policy.

135.    Moreover, to the extent the Eagles' property and business interruption ***losses*** were not caused by the "actual" presence of a communicable disease, but rather by the "risk" of physical loss or damage from Coronavirus, the Policy provides coverage for such losses up to the full $1 billion per occurrence limits of the Policy.

### ***There is No Enforceable Policy Exclusion Applicable to the Eagles' Loss***

136.    A pandemic, such as Coronavirus, is not excluded by the Policy.

137.    In denying coverage, Factory Mutual contended that the Policy's "contamination" exclusion ("Contamination Exclusion") applied to limit or bar coverage.  Factory Mutual is wrong.

138.    The Contamination Exclusion provides:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
> 1) **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination**

Case ID: 210301454

may be insured. This exclusion D1 does not apply to radioactive
contamination which is excluded elsewhere in this Policy.
2) shrinkage.
3) changes in color, flavor, texture or finish.

139.     The Policy defines "**contaminant**" as "anything that causes "**contamination**" and

defines "**contamination**" as:

> any condition of property due to the actual or suspected presence of any foreign
> substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or
> pathogenic organism, bacteria, virus, disease causing or illness causing agent,
> fungus, mold or mildew.

140.     The Contamination Exclusion does not apply to the Eagles' losses caused by the

risks of the Coronavirus pandemic, for numerous reasons.

141.     Among the reasons, the Contamination Exclusion does not use the defined term

"communicable disease" in the exclusion or in the definition of "contamination."  While Factory

Mutual included within the "contamination" definition the terms "pathogen," "pathogenic

organism," "virus," and "disease causing or illness causing agent," Factory Mutual did not use

those terms in its definition of "communicable disease."  Based upon information and belief, the

Eagles allege that Factory Mutual thus did not intend to include "communicable disease" as an

excluded "contaminant" under the Policy.

142.     The Contamination Exclusion excludes only contamination and associated "direct"

"costs," not "loss" or "damage," or even indirect "costs," such as time element loss and extra

expenses.

143.     Contamination exclusions like the one Factory Mutual drafted here apply to

traditional pollution, not to natural catastrophes such as pandemic.  To the extent Coronavirus is

actually present or suspected of being present at an Eagles property, its presence would be the

result of a natural process, as opposed to an act of pollution or contamination.  The Eagles

Case ID: 210301454

reasonably expected and understood that a Contamination Exclusion would apply to polluting activities, as opposed to natural catastrophes such as the Coronavirus pandemic.

144.    Factory Mutual's inclusion in the definition of "contamination" items such "pathogen" "virus" and "disease causing or illness causing agent," suggests that it hoped to expand, without detection, the scope of what was in reality and apparently intended to be a pollution exclusion well beyond what a reasonable insured would expect.   The presence of items such as mold, mildew, bacteria and virus that lead to disease or health hazards do not fit the definition of pollutants and should not be included in the text of a pollution exclusion or referred to as examples of pollutants.  Had Factory Mutual wished to exclude losses resulting from health hazards or the risks thereof, it should have created a separate, clear exclusion for such losses.

145.    Indeed, the language of the so-called Contamination Exclusion stands in stark contrast to the language of the ISO virus or bacteria exclusion referenced in ¶ 63 *supra*.  Had Factory Mutual wished to exclude pandemic or human-based disease from its Policy, it could have incorporated into the Policy either a specific exclusion (such as a pandemic exclusion), or the ISO virus or bacteria exclusion.

### FACTORY MUTUAL'S DENIAL OF COVERAGE

146.    The Eagles timely reported their losses to Factory Mutual under the Policy.

147.    By letter dated July 27, 2020, Factory Mutual stated that the only coverage that "appears potentially available under our Policy for losses arising from COVID-19 is found in our Communicable Disease coverages, assuming the conditions of those coverages are satisfied." Factory Mutual failed to evaluate and thus denied all other coverage under the Policy.  A true and correct copy of Factory Mutual's July 27, 2020 letter is attached hereto as **Exhibit D** and is incorporated by reference.

34

148.    The Eagles responded to Factory Mutual's July 27, 2020 letter by disputing Factory Mutual's coverage position and providing, in compliance with applicable privacy regulations regarding individual privacy interests, reasonably available information about COVID-19 incidents at the insured premises.

149.    Factory Mutual's denial is contrary to its widely publicized representations that it is an expert in underwriting and studying casualty-related risks and tailoring property coverage to a client's actual exposures.

150.    Factory Mutual was aware prior to issuing the Policy to the Eagles of the risks associated with pandemics, expressly providing limited coverage to the Eagles for such risks when they result from the actual presence of a communicable disease (as defined in the Policy), but failing to incorporate an applicable exclusion or other limitation that would preclude coverage in the event of a pandemic for circumstances such as those at issue here that have caused massive Time Element loss for the Eagles.

151.    Factory Mutual misstated the scope of the Policy by, *inter alia,* stating that coverage is limited to Communicable Disease Response and Interruption by Communicable Disease, and that the Contamination exclusion applies, even though such exclusion is inapplicable, ambiguous and/or unenforceable.

152.    The Eagles have complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or waived by Factory Mutual.

Case ID: 210301454

## COUNT I

## DECLARATORY JUDGMENT

153.    The Eagles reallege and incorporate by reference all preceding allegations as if fully stated herein.

154.    The Eagles seek a declaration by this Court of their rights and the obligations of Factory Mutual under the contractual agreement to provide coverage for the Eagles' losses.

155.    The Eagles contend that Factory Mutual has a duty to pay for the Eagles' losses caused by the risks of the Coronavirus pandemic, pursuant to the terms and conditions under multiple coverages of the Policy.  Factory Mutual disputes the Eagles' contentions.

156.    Factory Mutual contends that coverage under the Policy is limited to Communicable Disease Response and Interruption by Communicable Disease, and its associate policy limit.

157.    The Eagles have complied with all the terms and conditions of the Policy, except to the extent performance has been or is excused or waived by Factory Mutual.

158.    The Eagles contend that the Policy provides full policy limits coverage for their losses and that Factory Mutual's coverage analysis to date is contrary to the Policy, the law, and public policy.

159.    The Eagles contend that the Policy must be interpreted in a reasonable manner to provide the coverage that the parties intended and understood was being provided, and that is in accord with the Eagles' reasonable expectations.  The Eagles are informed and believe, and on that basis allege, that Factory Mutual disputes these contentions.

160.    An actual and justiciable controversy exists between the Eagles and Factory Mutual concerning the matters alleged herein.

Case ID: 210301454

161.    The Eagles are entitled to a judicial declaration by the Court pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541 confirming: that Factory Mutual's contentions as stated above are wrong, and that the Eagles' contentions as stated above are correct; that Factory Mutual must honor all duties under its Policy, including its duty to pay for the full amount of losses incurred as a result of the risks of the Coronavirus pandemic; and that because of Factory Mutual's conduct, the Eagles are excused from performing or complying with any conditions and duties otherwise imposed on the Eagles by the Policy.

162.    Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## PRAYER FOR RELIEF

WHEREFORE, the Eagles pray for judgment as follows:

      a.      Judgment in favor of the Eagles and against Factory Mutual;

      b.      Declaratory Judgment as set forth in Count I above;

      c.      An award of attorney's fees and costs of suit incurred; and

      d.      Such other and further relief as the Court deems proper.

## JURY DEMAND

The Eagles respectfully demand a trial by jury consisting of 12 members on all claims, issues, and disputed issues of fact so triable.

Case ID: 210301454

Dated:  March 11, 2021                          Respectfully submitted,

**BLANK ROME LLP**

By: /s/ *Charles A. Fitzpatrick IV*
CHARLES A. FITZPATRICK IV (PA Bar
309113)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  215.569.5608
Facsimile:  215.832.5608
Email: fitzpatrick-c@blankrome.com

LINDA KORNFELD (*pro hac vice*
forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434
Email: lkornfeld@blankrome.com

JAMES R. MURRAY (*pro hac vice*
forthcoming)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  202.420.2200
Facsimile:  202.420.2201
Email:  jmurray@blankrome.com

*Attorneys for Plaintiff Philadelphia Eagles
Limited Partnership*

Case ID: 210301454



# EXHIBIT A



Account No. 1-36689
Policy No. 1024422

## MULTI-YEAR POLICY AGREEMENT

This Endorsement is attached to and forms a part of the referenced Policy.

For and in consideration of issuance of this Policy for a multi-year term, premium for the Policy, and other mutual terms and conditions, the Company and the Insured agree as follows:

CANCELLATION/NONRENEWAL/TERMINATION: The Company and the Insured retain their respective rights of cancellation, nonrenewal and termination, as set out in the Cancellation/Nonrenewal/Termination clause of the Policy and applicable amendatory endorsements.

ANNUAL OPTION: The Company may exercise the option of policy termination, in whole or in part, at any Policy annual anniversary date in the event of a broadly applied action taken by the reinsurance industry or by governing or regulatory body(ies) that affects the Company's ability to continue to underwrite the Policy with existing terms and conditions.  To exercise the termination option, the Company must give the Insured at least sixty (60) days' advance notice and deliver the notice to the Insured before the annual anniversary date.  If the Company delivers the notice less than sixty (60) days before that date, coverage will be extended correspondingly beyond the annual anniversary date, at existing terms and conditions, so that the effective date of termination will be sixty (60) days following delivery of the notice.  Return of unearned premium will be calculated on a pro-rata basis.

PRICING AND COVERAGE CHANGES: Premium will be calculated and billed annually, based on rates in effect at the inception of this Policy, and will not be modified, except as follows:

- The premium will increase or decrease based on the corresponding increase or decrease in values provided under the value reporting provisions of this Agreement.

- The costs for **earth movement**, **terrorism** and **flood** (as such coverage may apply under this Policy) will be determined at each annual anniversary date of this Policy.

- The costs for new locations and coverage(s) as applicable will be determined throughout the term of this Policy.

- The Company may increase premium or change coverage upon notice prior to any annual anniversary date of this Policy, corresponding to changes in insured property if physical protection of such property has been reduced from the level of physical protection existing at the Policy inception date.

Case ID: 210301454

**VALUE REPORTING PROVISIONS**

The Company and the Insured agree to the reporting of values at each annual anniversary as follows.  Reports of values will be due within 60 days of the annual anniversary date. Values reported are as of May 22, 2017.

Full Value Reporting at inception and each annual anniversary.

Full Value Reporting: The Insured will report to the Company the 100% value of the following by location:

1) stock and supplies - the average and maximum values based on the previous 12 month period.

2) all other property - the values in accordance with the VALUATION clause in the PROPERTY DAMAGE section of the Policy.

3) Time Element - the Time Element values anticipated for the 12 months following the "Values reported as of date" and the actual Time Element values for the previous 12 month period.

Case ID: 210301454



# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

**DECLARATIONS**

| **Policy No.** | **Previous Policy No.** | **DATE OF ISSUE** |
|---|---|---|
| 1024422 | 1012288 | 23 June 2017 |

| **Account No.** | **Replaces Binder No.** | |
|---|---|---|
| 1-36689 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> The Philadelphia Eagles Limited Partnership
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 29th day of June 2017 to the 29th day of June 2018 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this  23rd day of  June 2017

_Robert F. Lee_

Authorized Signature

_J H Ushirara_

Secretary

_Rawson_

President

Countersigned (if required) this          day of

_____

Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.

Case ID: 210301454

Case ID: 210301454



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

Case ID: 210301454

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

Case ID: 210301454



# TABLE OF CONTENTS
## (Order In Which They Appear)

Page No.

**MULTI-YEAR POLICY AGREEMENT**

**DECLARATIONS PAGE**

**DECLARATIONS**

1.  NAMED INSURED AND MAILING ADDRESS ..................................................................1
2.  POLICY DATES ...............................................................................................................1
3.  INSURANCE PROVIDED .................................................................................................1
4.  PREMIUM ........................................................................................................................1
5.  PREMIUM PAYABLE .......................................................................................................1
6.  LOSS ADJUSTMENT/PAYABLE .....................................................................................2
7.  TERRITORY .....................................................................................................................2
8.  JURISDICTION .................................................................................................................2
9.  CURRENCY ......................................................................................................................2
10. LIMITS OF LIABILITY ......................................................................................................2
11. DEDUCTIBLES .................................................................................................................5

**PROPERTY DAMAGE**

1.  INSURED PROPERTY ......................................................................................................8
2.  EXCLUDED PROPERTY ..................................................................................................8
3.  EXCLUSIONS ...................................................................................................................9
4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ..................................13
5.  VALUATION ...................................................................................................................14
6.  ADDITIONAL COVERAGES ..........................................................................................15
    CYBER ADDITIONAL COVERAGES .............................................................................16
    A.  DATA, PROGRAMS OR SOFTWARE .....................................................................16
    B.  OFF PREMISES DATA SERVICES PROPERTY DAMAGE .....................................17
    OTHER ADDITIONAL COVERAGES ..............................................................................18
    A.  ACCIDENTAL INTERRUPTION OF SERVICES ......................................................18
    B.  ACCOUNTS RECEIVABLE .....................................................................................18
    C.  AUTOMATIC COVERAGE ......................................................................................20
    D.  BRANDS AND LABELS ..........................................................................................20
    E.  CLAIMS PREPARATION COSTS ............................................................................20
    F.  COMMUNICABLE DISEASE RESPONSE ...............................................................21
    G.  CONSEQUENTIAL REDUCTION IN VALUE ...........................................................21
    H.  CONTROL OF DAMAGED PROPERTY ..................................................................21
    I.  DEBRIS REMOVAL .................................................................................................22
    J.  DECONTAMINATION COSTS .................................................................................22
    K.  ERRORS AND OMISSIONS ....................................................................................23
    L.  EXPEDITING COSTS ..............................................................................................23
    M.  FINE ARTS AND VALUABLE PAPERS AND RECORDS .........................................23
    N.  INSTALLMENT OR DEFERRED PAYMENTS ..........................................................24
    O.  LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ......25
    P.  LAW AND ORDINANCE ..........................................................................................25
    Q.  LOSS PAYMENT INCREASED TAX LIABILITY ......................................................27

Case ID: 210301454



# TABLE OF CONTENTS
## (Order In Which They Appear)

Page No.

R.    MACHINERY OR EQUIPMENT STARTUP OPTION........................................27
S.    MISCELLANEOUS PROPERTY ..................................................................27
T.    OPERATIONAL TESTING ........................................................................28
U.    PROTECTION AND PRESERVATION OF PROPERTY ..................................28
V.    SERVICE INTERRUPTION PROPERTY DAMAGE .......................................29
W.    TEMPORARY REMOVAL OF PROPERTY ..................................................30
X.    TRANSPORTATION ..............................................................................30

**TIME ELEMENT**

1.    LOSS INSURED ........................................................................................33
2.    TIME ELEMENT COVERAGES ...................................................................34
    A.    INSURED OPTION ..............................................................................34
    B.    GROSS EARNINGS .............................................................................34
    C.    GROSS PROFIT .................................................................................36
    D.    EXTRA EXPENSE ..............................................................................38
    E.    LEASEHOLD INTEREST ......................................................................39
    F.    RENTAL INSURANCE ..........................................................................40
3.    PERIOD OF LIABILITY .............................................................................40
4.    TIME ELEMENT EXCLUSIONS ..................................................................43
5.    TIME ELEMENT COVERAGE EXTENSIONS .................................................43
    CYBER TIME ELEMENT COVERAGE EXTENSIONS ......................................43
    A.    COMPUTER SYSTEMS NON PHYSICAL DAMAGE ...................................44
    B.    OFF PREMISES DATA SERVICES TIME ELEMENT ..................................44
    SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS ..........................45
    A.    CIVIL OR MILITARY AUTHORITY ........................................................45
    B.    CONTINGENT TIME ELEMENT EXTENDED ...........................................46
    C.    INGRESS/EGRESS ............................................................................47
    D.    LOGISTICS EXTRA COST ...................................................................47
    E.    SERVICE INTERRUPTION TIME ELEMENT .............................................49
    ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ..............................49
    A.    ATTRACTION PROPERTY ...................................................................50
    B.    CRISIS MANAGEMENT .......................................................................50
    C.    DELAY IN STARTUP ..........................................................................51
    D.    EXTENDED PERIOD OF LIABILITY .......................................................51
    E.    INTERRUPTION BY COMMUNICABLE DISEASE .....................................51
    F.    ON PREMISES SERVICES ...................................................................52
    G.    PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ...................52
    H.    RELATED REPORTED VALUES .............................................................53
    I.    RESEARCH AND DEVELOPMENT .........................................................53
    J.    SOFT COSTS ....................................................................................53

**LOSS ADJUSTMENT AND SETTLEMENT**

1.    REQUIREMENTS IN CASE OF LOSS ..........................................................54
2.    CURRENCY FOR LOSS PAYMENT.............................................................55
3.    PARTIAL PAYMENT OF LOSS SETTLEMENT ............................................55

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

# TABLE OF CONTENTS
## (Order In Which They Appear)

Page No.

4.   COLLECTION FROM OTHERS ..................................................................................... 55
5.   SUBROGATION .......................................................................................................... 55
6.   COMPANY OPTION .................................................................................................... 55
7.   ABANDONMENT ......................................................................................................... 55
8.   APPRAISAL ................................................................................................................. 56
9.   SUIT AGAINST THE COMPANY .............................................................................. 56
10.  SETTLEMENT OF CLAIMS ....................................................................................... 57

**GENERAL PROVISIONS**

1.   CANCELLATION/NON-RENEWAL ............................................................................ 58
2.   INSPECTIONS ............................................................................................................. 58
3.   PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS ................................ 58
4.   LIBERALIZATION ....................................................................................................... 59
5.   MISREPRESENTATION AND FRAUD ...................................................................... 59
6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ............... 59
7.   OTHER INSURANCE .................................................................................................. 61
8.   POLICY MODIFICATION ............................................................................................ 61
9.   REDUCTION BY LOSS ............................................................................................... 62
10.  SUSPENSION .............................................................................................................. 62
11.  TITLES ......................................................................................................................... 62
12.  ASSIGNMENT ............................................................................................................. 62
13.  DEFINITIONS .............................................................................................................. 62
SCHEDULE OF LOCATIONS ............................................................................ APPENDIX A
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, Form 7308

Case ID: 210301454



**Account No.   1-36689**
**Policy No.   1024422**

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

The Philadelphia Eagles Limited Partnership and any subsidiary, and The Philadelphia Eagles Limited Partnership's interest in any partnership or joint venture in which The Philadelphia Eagles Limited Partnership has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

NovaCare Complex
1 NovaCare Way
Philadelphia, Pennsylvania 19145-5996

## 2.   POLICY DATES

TERM: Three Years

FROM: 29 June 2017 at 12:01 a.m., Standard Time;
TO:      29 June 2020 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

## 4.   PREMIUM

This Policy is issued in consideration of an initial premium.

## 5.   PREMIUM PAYABLE

The Philadelphia Eagles Limited Partnership pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of The Philadelphia Eagles Limited Partnership.

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

6.    **LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to The Philadelphia Eagles Limited Partnership, or as may be directed by The Philadelphia Eagles Limited Partnership.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

7.    **TERRITORY**

Coverage as provided under this Policy applies in the United States of America.

8.    **JURISDICTION**

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to United States of America jurisdiction.

9.    **CURRENCY**

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

10.   **LIMITS OF LIABILITY**

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD1,000,000,000 subject to the following provisions:

A.    Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.    Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1)    when a limit of liability applies in the **aggregate during any policy year**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

Case ID: 210301454



2) when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

C. Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative companies**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ATTRACTION PROPERTY | 30 consecutive days |
| AUTOMATIC COVERAGE | 90 day period but not to exceed a USD100,000,000 limit, per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 consecutive days |
| CLAIMS PREPARATION COSTS | USD100,000 |
| COMMUNICABLE DISEASE RESPONSE | USD1,000,000 in the **aggregate during any policy year**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD1,000,000 in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved. |
| COMPUTER SYSTEMS NON PHYSICAL DAMAGE and DATA, PROGRAMS OR SOFTWARE combined | USD10,000,000 |
| CONTINGENT TIME ELEMENT EXTENDED | USD25,000,000 |
| CRISIS MANAGEMENT | 30 consecutive days |
| **earth movement** | USD250,000,000 in the **aggregate during any policy year** but not to exceed the following limits in the **aggregate during any policy year**:<br><br>a) USD2,500,000 for property located in the **Pacific Northwest Seismic Zone** |

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

| | |
|---|---|
| | combined |
| | b)    USD5,000,000 for property located in the **New Madrid Seismic Zone** Group A combined but not to exceed a USD2,500,000 limit in the **aggregate during any policy year** for CONTINGENT TIME ELEMENT EXTENDED, LOGISTICS EXTRA COST, MISCELLANEOUS PROPERTY, SERVICE INTERRUPTION PROPERTY DAMAGE, SERVICE INTERRUPTION TIME ELEMENT, OFF PREMISES DATA SERVICES PROPERTY DAMAGE and OFF PREMISES DATA SERVICES TIME ELEMENT combined |
| | c)    USD2,500,000 for property located in the **New Madrid Seismic Zone** Group B combined |
| | d)    USD2,500,000 for property located in California, Hawaii, Alaska and Nevada combined |
| ERRORS AND OMISSIONS | USD100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD100,000,000 |
| EXTENDED PERIOD OF LIABILITY | 90 day period |
| **fine arts** | USD100,000,000 but not to exceed a USD10,000 limit per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD100,000 |
| **flood** | USD250,000,000 |
| GROSS PROFIT | 12 month period but not to exceed a USD2,500,000 limit for Ordinary Payroll |
| INGRESS/EGRESS | 30 day period |

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

| INTERRUPTION BY COMMUNICABLE DISEASE | 12 month period but not to exceed a USD1,000,000 limit in the **aggregate during any policy year**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD1,000,000 in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved. |
|---|---|
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD100,000 in the **aggregate during any policy year** |
| LOGISTICS EXTRA COST | 180 day period but not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | As respects property at a **location**:<br><br>a)      USD100,000,000 per **location**<br><br>As respects property not at a **location**:<br><br>a)      USD10,000,000 |
| OFF PREMISES DATA SERVICES PROPERTY DAMAGE and OFF PREMISES DATA SERVICES TIME ELEMENT combined | USD5,000,000 |
| Ordinary Payroll | USD2,500,000 |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD10,000,000 |
| **valuable papers and records** | USD100,000,000 but not to exceed a USD10,000 limit per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply:

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

| earthquake | As respects property located in California, Hawaii, Alaska, Nevada or in the **New Madrid Seismic Zone** Group B:<br><br>    Property Damage:  5%, per **location**<br>    Time Element:  5%, per **location**<br><br>    The above are subject to a minimum deductible of USD250,000 for Property Damage and Time Element combined, per **location**.<br><br>As respects property located in the **New Madrid Seismic Zone** Group A:<br><br>    Property Damage:  1%, per **location**<br>    Time Element:  1%, per **location**<br><br>    The above are subject to a minimum deductible of USD100,000 for Property Damage and Time Element combined, per **location**.<br><br>As respects property located in the **Pacific Northwest Seismic Zone**:<br><br>    Property Damage:  3%, per **location**<br>    Time Element:  3%, per **location**<br><br>    The above are subject to a minimum deductible of USD100,000 for Property Damage and Time Element combined, per **location**. |
| LOGISTICS EXTRA COST | USD100,000 per **occurrence** |
| All Other Loss | USD100,000 combined all coverages, per **occurrence** |

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.    For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.   For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.   The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.   When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.   Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.   When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.   For insured physical loss or damage:

1)   to insured fire protection equipment; or

2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.



## PROPERTY DAMAGE

1. **INSURED PROPERTY**

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.   Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.   Personal Property:

　　1)   owned by the Insured.

　　2)   consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

　　3)   of officers and employees of the Insured.

　　4)   of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

　　5)   of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

2. **EXCLUDED PROPERTY**

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.   currency, money, notes or securities.

B.   precious metal in bullion form.

C.   land and any substance in or on land.  However, this exclusion does not apply to:



    1)   landscape gardening.

    2)   car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)   fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.    water.  However, this exclusion does not apply to:

    1)   water that is contained within any enclosed tank, piping system or any other processing equipment.

E.    animals, standing timber or growing crops.

F.    watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.    vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.    underground mines or mine shafts or any property within such mine or shaft.

I.    dams or dikes.

J.    property in transit, except as otherwise provided by this Policy.

K.    property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.    electronic data, programs or software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured, or as otherwise provided by the DATA, PROGRAMS OR SOFTWARE coverage of this Policy.

M.    property located at Lincoln Financial Field, 1020 Pattison Avenue, Philadelphia, Pennsylvania 19148 as described on the Schedule of Locations, Appendix A that is owned by NRG Energy Center Eagles LLC.

N.    property located at NovaCare Complex, 1 NovaCare Way, Philadelphia, Pennsylvania 19145 as described on the Schedule of Locations, Appendix A that is owned by The Rothman Institute.

## 3.   EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

Case ID: 210301454



A.   This Policy excludes:

1)   indirect or remote loss or damage.

2)   interruption of business, except to the extent provided by this Policy.

3)   loss of market or loss of use.

4)   loss or damage or deterioration arising from any delay.

5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)   loss from enforcement of any law or ordinance:

   a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b)   requiring the demolition of any property, including the cost in removing its debris;

   except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)   loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   nuclear reaction or nuclear radiation or radioactive contamination.  However:

   a)   if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b)   this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

   This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)   a)   hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

Case ID: 210301454



(i)   government or sovereign power (de jure or de facto);

(ii)  military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)   discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)   insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)   seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)   risks of contraband, or illegal transportation or trade.

f)   **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)   direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii)  any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.

Case ID: 210301454



If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

   This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of the following services:

   a) incoming electricity, fuel, water, gas, steam or refrigerant;

   b) outgoing sewerage;

   c) incoming or outgoing voice, data or video,

   all when caused by an event off the insured **location**, except as provided in the SERVICE INTERRUPTION and OFF PREMISES DATA SERVICES coverages of this Policy. But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

C. This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4) settling, cracking, shrinking, bulging, or expansion of:

Case ID: 210301454



    a)  foundations (including any pedestal, pad, platform or other property supporting machinery).

    b)  floors.

    c)  pavements.

    d)  walls.

    e)  ceilings.

    f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

    b)  changes in relative humidity damage,

    all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.    This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.    This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does

Case ID: 210301454



not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.   Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

5.   **VALUATION**

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.   On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.   On raw materials, supplies or other merchandise not manufactured by the Insured:

1)   if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)   if not repaired or replaced, the **actual cash value**.

D.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.

E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to if stated the limit of liability for SUPPLEMENTAL UNITED STATES

Case ID: 210301454



CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

a)   useless to the Insured; or

b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.

## 6.   ADDITIONAL COVERAGES

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)      are subject to the applicable limit of liability;

Case ID: 210301454



2) will not increase the Policy limit of liability; and

3) are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## CYBER ADDITIONAL COVERAGES

### A. DATA, PROGRAMS OR SOFTWARE

This Policy covers insured **physical loss or damage to electronic data, programs or software**, including physical loss or damage caused by the malicious introduction of a machine code or instruction.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

With respect to destruction, distortion or corruption caused by the malicious introduction of machine code or instruction, this Additional Coverage will apply when the Period of Liability is in excess of 24 hours.

This Additional Coverage also covers:

1) the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a) actions to temporarily protect and preserve insured electronic data, programs or software.

   b) actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c) actions taken to expedite the permanent repair or replacement of such damaged property.

2) the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**. In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

Case ID: 210301454



This Additional Coverage excludes loss or damage to data, programs or software when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured.

DATA, PROGRAMS OR SOFTWARE Exclusions: As respects DATA, PROGRAMS OR SOFTWARE, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a and B4.

2) the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a) errors or omissions in processing or copying.

b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c) deterioration, inherent vice, vermin or wear and tear.

DATA, PROGRAMS OR SOFTWARE Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

## B.   OFF PREMISES DATA SERVICES PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

Case ID: 210301454



This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

OFF PREMISES DATA SERVICES PROPERTY DAMAGE Exclusions: As respects OFF PREMISES DATA SERVICES PROPERTY DAMAGE, the following applies:

1) Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.

## OTHER ADDITIONAL COVERAGES

### A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

### B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:



1) any shortage in the collection of accounts receivable.

2) the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3) the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4) any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1) use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) reduce loss by use of any suitable property or service:

    a) owned or controlled by the Insured; or

    b) obtainable from other sources.

3) reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1) bookkeeping, accounting or billing errors or omissions; or

2) a) alteration, falsification, manipulation; or

    b) concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

Case ID: 210301454

### C.   AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1)   from the date of purchase, lease or rental,

2)   until the first of the following:

    a)   the **location** is bound by the Company.

    b)   agreement is reached that the **location** will not be insured under this Policy.

    c)   the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

### D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)   stamp "salvage" on the property or its containers; or

2)   remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

### E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)   of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)   the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

Case ID: 210301454

**FM Global**

Account No.   1-36689
Policy No.   1024422

1)  attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)  loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

## F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)  an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)  a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1)  cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2)  actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

## G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

## H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by or for the Insured as follows:

Case ID: 210301454



1)   the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2)   the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3)   property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4)   any salvage proceeds received will go to the:

    a)   Company at the time of loss settlement; or

    b)   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

**I.    DEBRIS REMOVAL**

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1)   contaminated uninsured property; or

2)   the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

**J.    DECONTAMINATION COSTS**

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

Case ID: 210301454



## K.    ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)    in the description of where insured property is physically located;

2)    to include any **location**:

    a)   owned, leased or rented by the Insured on the effective date of this Policy; or

    b)   purchased, leased or rented by the Insured during the term of this Policy; or

3)    that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.    EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)    for the temporary repair of insured physical damage to insured property;

2)    for the temporary replacement of insured equipment suffering insured physical damage; and

3)    to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

## M.    FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1)    the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2)    the following additional exclusions apply:

This Policy excludes:

Case ID: 210301454



a)   currency, money, securities.

b)   errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c)   deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d)   fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

e)   loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   the cost to repair or restore such property to the physical condition that existed on the date of loss.

2)   the cost to replace.

3)   the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

## N.   INSTALLMENT OR DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

Case ID: 210301454



3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.

## O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.

2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

Case ID: 210301454



The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced**, the** loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)   any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.



**Q. LOSS PAYMENT INCREASED TAX LIABILITY**

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1) the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2) the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

**R. MACHINERY OR EQUIPMENT STARTUP OPTION**

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1) to the first startup event after the original repair or replacement; and

2) when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1) the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2) the commencement of fuel or energy supply to machinery or equipment.

**S. MISCELLANEOUS PROPERTY**

This Policy covers insured physical loss or damage to:

1) insured property;

Case ID: 210301454



2)   property of the type insured that is under contract to be used in a construction project at an insured **location**:

    a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

    b)   while such property is located at a storage site; and

    c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1)   This Policy excludes:

    a)   **transmission and distribution systems** not at a **location**.

    b)   property insured under import or export ocean marine insurance.

    c)   property shipped between continents.

    d)   airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

    e)   property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

Case ID: 210301454

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

b) costs incurred of restoring and recharging fire protection systems following an insured loss.

c) costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

a) A1, A2, A3, A6, B1, B2, and

Case ID: 210301454

b)  B4 with respect to incoming or outgoing voice, data or video, and

c)  D1 except with respect to fungus, mold or mildew.

## W.   TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1)  while at the premises to which such property has been moved; and

2)  for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)  insured, in whole or in part, elsewhere in this Policy.

2)  insured, in whole or in part, by any other insurance policy.

3)  removed for normal storage, processing or preparation for sale or delivery.

## X.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1)  owned by the Insured.

2)  shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3)  of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4)  of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

a)  when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

b)  when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

Case ID: 210301454



1)   This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2)   However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1)   covers general average and salvage charges on shipments covered while waterborne.

2)   insures physical loss or damage caused by or resulting from:

 a)   unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

 b)   improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1)   This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2)   The Insured has permission, without prejudicing this insurance, to accept:

 a)   ordinary bills of lading used by carriers;

 b)   released bills of lading;

 c)   undervalued bills of lading; and

 d)   shipping or messenger receipts.

3)   The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B4, C1, C3, C5, C6, D1 through D3.

2)   the following additional exclusions apply:

This Policy excludes:

 a)   samples in the custody of salespeople or selling agents.

Case ID: 210301454



   b)  property insured under import or export ocean marine insurance.

   c)  waterborne shipments, unless:

      (i)  by inland water; or

      (ii) by coastal shipments.

   d)  waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e)  airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   f)  property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

   g)  any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2)  Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3)  Property not under invoice will be valued:

   a)  for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

   b)  for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

Case ID: 210301454



**Account No.   1-36689**
**Policy No.   1024422**

**TIME ELEMENT**

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.   is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.   will not increase the Policy limit of liability; and

C.   is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

**1.   LOSS INSURED**

A.   This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

    1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

    2)   used by the Insured, or for which the Insured has contracted use;

    3)   while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

    4)   while in transit as provided by this Policy, and

    5)   during the Periods of Liability described in this section,

    provided such loss or damage is not at a **contingent time element location**.

B.   This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

    1)   the use of any property or service owned or controlled by the Insured;

    2)   the use of any property or service obtainable from other sources;

    3)   working extra time or overtime; or

    4)   the use of inventory,

    all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

Case ID: 210301454



C.   This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   INSURED OPTION

The Insured has the option to make claim based on either

a)   GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b)   GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)   Gross Earnings;

b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)   less ordinary payroll.

d)   Ordinary Payroll, including taxes and charges dependent on the payment of wages:

Case ID: 210301454



(i)   immediately following the interruption of production or suspension of business operations or services, and

(ii)   only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

2)   For the purposes of the Measurement of Loss, Gross Earnings is:

the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured consisting of ticket revenue, suite license fees net of ticket revenue, club suite premium, stadium naming rights, concession and merchandise income and in-stadium advertising.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3)   In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4)   If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a)   for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

b)   for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5)   There is recovery hereunder to the extent that the Insured is:

a)   wholly or partially prevented from producing goods or continuing business operations or services;

b)   unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

c)   unable to continue such operations or services during the PERIOD OF LIABILITY; and

d)   able to demonstrate a loss of sales for the operations, services or production prevented.

6)   GROSS EARNINGS Exclusion:  As respects GROSS EARNINGS, the following applies:

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

This Policy does not insure salaries or other compensation of contracted players and coaches.

## C.   GROSS PROFIT

Measurement of Loss:

1) The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing Business.  The amount payable as indemnity hereunder will be:

   a) with respect to Reduction in Sales: The sum produced by applying the Rate of Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY will fall short of the Standard Sales.  In determining the Reduction in Sales, any amount recovered under property damage coverage at selling price will be credited against lost sales.

   b) Ordinary Payroll, including taxes and charges dependent on the payment of wages, during the PERIOD OF LIABILITY only to the extent such payroll would have been earned had such loss not happened.

      Ordinary Payroll does not cover any portion of salaries or wages included in Net Profit or fixed charges.

   c) with respect to Increase in Cost of Doing Business:

      (i) the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in sales and a loss of Ordinary Payroll which, but for that expenditure, would have taken place during the PERIOD OF LIABILITY; but

      (ii) not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided,

   all less any sum saved during the PERIOD OF LIABILITY with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

2) For the purposes of the Measurement of Loss:

   Gross Profit is:

   The amount produced by adding to the Net Profit the amount of the Insured Fixed Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that proportion of any loss from business operations as the amount of the Insured Fixed Charges bears to all fixed charges.

Case ID: 210301454



Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at the insured **locations** after due provision has been made for all fixed charges and other expenses including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein.  Ordinary Payroll is not an Insured Fixed Charge.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services rendered in the conduct of the business at an insured **location** consisting of ticket revenue, suite license fees net of ticket revenue, club suite premium, stadium naming rights, concession and merchandise income and in-stadium advertising.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months immediately before the date of the physical loss or damage to the described property.

Standard Sales is:

The sales during that period in the twelve months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF LIABILITY.

3)   In determining the indemnity payable as the Actual Loss Sustained:

a)   if any fixed charges of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase in Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges excluding Ordinary Payroll.

b)   if during the PERIOD OF LIABILITY goods will be sold or services will be rendered elsewhere than at the insured **locations** for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services will be included in arriving at the amount of sales during the PERIOD OF LIABILITY.

4)   The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.



GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

The following additional exclusion applies:

This Policy does not insure salaries or other compensation of contracted players and coaches.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

**D.   EXTRA EXPENSE**

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)   extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)   extra costs of temporarily using property or facilities of the Insured or others; and

3)   costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)   TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)   The following additional exclusions apply:

This Policy does not insure:

a)   any loss of income.

Case ID: 210301454



b)   costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)   costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)   any expense recoverable elsewhere in this Policy.

## E.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)   If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2)   If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)   As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1)   This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2)   TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

Case ID: 210301454



F.    **RENTAL INSURANCE**

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1)   the fair rental value of any portion of the property occupied by the Insured;

2)   the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3)   the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

3.    **PERIOD OF LIABILITY**

A.    The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

1)   For building and equipment, the period:

a)   starting from the time of physical loss or damage of the type insured; and

b)   ending when with due diligence and dispatch the building and equipment could be:

(i)   repaired or replaced; and

(ii)  made ready for operations,

under the same or equivalent physical and operating conditions that existed prior to the damage.

c)   not to be limited by the expiration of this Policy.

2)   For building and equipment under construction:

Case ID: 210301454



a) the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

b) due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

3) For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

a) to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

b) to replace physically damaged mercantile stock.

This item does not apply to RENTAL INSURANCE.

4) For raw materials and supplies, the period of time:

a) of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

b) stored behind dams or in reservoirs; and

c) on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

Case ID: 210301454



This item does not apply to RENTAL INSURANCE.

7) For physically damaged or destroyed property covered under DATA, PROGRAMS OR SOFTWARE, the time to recreate or restore including the time for researching or engineering lost information.

This item does not apply to RENTAL INSURANCE.

B. The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1) The period:

a) starting from the time of physical loss or damage of the type insured; and

b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

c) not to be limited by the expiration of this Policy.

2) For property under construction, the period:

a) starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

c) not to be limited by the expiration of this Policy.

The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C. The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1) making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

2) restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is

Case ID: 210301454



completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.

## 4.    TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.    Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

    1)    physical loss or damage not insured by this Policy on or off of the insured **location**.

    2)    planned or rescheduled shutdown.

    3)    strikes or other work stoppage.

    4)    any other reason other than physical loss or damage insured under this Policy.

B.    Any increase in loss due to:

    1)    suspension, cancellation or lapse of any lease, contract, license or orders.

    2)    damages for breach of contract or for late or noncompletion of orders.

    3)    fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

    4)    any other consequential or remote loss.

C.    Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.    Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

## 5.    TIME ELEMENT COVERAGE EXTENSIONS

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.

### CYBER TIME ELEMENT COVERAGE EXTENSIONS

Case ID: 210301454



### A.   COMPUTER SYSTEMS NON PHYSICAL DAMAGE

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1) the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a malicious act directed at the NAMED INSURED; or

2) the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending malicious act directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 24 hours.

As used above, the period of interruption:

1) is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2) does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

### B.   OFF PREMISES DATA SERVICES TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

Case ID: 210301454



This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1)   The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by COMPUTER SYSTEMS NON PHYSICAL DAMAGE coverage as provided in this section of the Policy.

OFF PREMISES DATA SERVICES TIME ELEMENT Exclusions: As respects OFF PREMISES DATA SERVICES TIME ELEMENT, the following applies:

1)   Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

a)   incoming electricity, fuel, water, gas, steam or refrigerant; and

b)   outgoing sewerage.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1)   is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.   CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits,

Case ID: 210301454



restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting at the time of such physical damage; but

2)   not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

**B.   CONTINGENT TIME ELEMENT EXTENDED**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)   Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

  CIVIL OR MILITARY AUTHORITY
  CONTINGENT TIME ELEMENT EXTENDED
  DELAY IN STARTUP
  EXTENDED PERIOD OF LIABILITY
  INGRESS/EGRESS
  OFF PREMISES DATA SERVICES TIME ELEMENT
  ON PREMISES SERVICES
  SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

Case ID: 210301454



This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

## C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)   picketing or other action by strikers except for physical damage not excluded by this Policy.

This Policy does not provide coverage under this Extension for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)   directly between insured **locations**; or

2)   directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)   extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1) any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2) any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3) any loss of income.

4) costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5) costs of permanent repair or replacement of property that has been damaged or destroyed.

6) any expense recoverable elsewhere in this Policy.

7) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

Case ID: 210301454



### E.    SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1)   The Insured will immediately notify the suppliers of services of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1)   The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

a)   A1, A2, A3, A6, B1, B2, and

b)   B4 with respect to incoming or outgoing voice, data or video, and

c)   D1 except with respect to fungus, mold or mildew.

As used above, the period of service interruption:

1)   is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

### ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

Case ID: 210301454



## A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting at the time of such physical damage; but

2)   not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## B.   CRISIS MANAGEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)   a violent crime, suicide, attempted suicide, or armed robbery; or

2)   a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting with the time the civil or military authority prohibits access; but

2)   not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

Case ID: 210301454



### C.   DELAY IN STARTUP

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

### D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)   the interruption of business as covered by GROSS EARNINGS;

2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

Case ID: 210301454



this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

2) not to exceed the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## F.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1) Electrical equipment and equipment used for the transmission of voice, data or video.

2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

## G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

Case ID: 210301454



This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## H.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

## I.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but not exceed the period of time shown for GROSS PROFIT in the LIMITS OF LIABILITY clause of the DECLARATIONS section. Such period of time shall not be limited by the date of expiration of this Policy.   Ordinary Payroll is subject to the limit of liability stated in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## J.   SOFT COSTS

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

Case ID: 210301454



## LOSS ADJUSTMENT AND SETTLEMENT

**1.    REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)    give immediate written notice to the Company of any loss.

2)    protect the property from further loss or damage.

3)    promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)    give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

    a)    the time and origin of the loss.

    b)    the Insured's interest and that of all others in the property.

    c)    the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

    d)    any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

    e)    by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)    include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)    further, the Insured, will as often as may be reasonably required:

    a)    exhibit to any person designated by the Company all that remains of any property;

    b)    submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

    c)    produce for examination at the request of the Company:

        (i)    all books of accounts, business records, bills, invoices and other vouchers; or

        (ii)    certified copies if originals are lost,

Case ID: 210301454



at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)   any applicable deductible; and/or

2)   any provable uninsured loss,

bears to the entire provable loss amount.

## 6.   COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

## 7.   ABANDONMENT

There may be no abandonment of any property to the Company.

Case ID: 210301454



8.   **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)   the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)   the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)   pay its chosen appraiser; and

2)   bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

9.   **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)   the Insured has fully complied with all the provisions of this Policy; and

2)   legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

Case ID: 210301454



**Account No.   1-36689**
**Policy No.   1024422**

## 10.   SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.    proof of loss as described in this Policy is received by the Company; and

B.    when a resolution of the amount of loss is made either by:

    1)    written agreement between the Insured and the Company; or

    2)    the filing with the Company of an award as provided in the APPRAISAL clause of this section.

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

## GENERAL PROVISIONS

**1. CANCELLATION/NON-RENEWAL**

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

   1)   60 days' written notice of cancellation; or

   2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 60 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

**2. INSPECTIONS**

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

**3. PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

A.   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy

Case ID: 210301454



will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

C.   As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.

Notwithstanding anything contained in this Policy to the contrary, this Policy provides coverage for direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of this Policy, caused by or resulting from a Certified Act of Terrorism in accordance with the terms and conditions of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy.  Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

## 4.   LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## 5.   MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.   willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.   made any attempt to defraud the Company.

C.   made any false swearing.

## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:



1)  any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

2)  foreclosure, notice of sale, or similar proceedings with respect to the property.

3)  change in the title or ownership of the property.

4)  change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1)  sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2)  this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgage the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned

Case ID: 210301454



Account No.  1-36689
Policy No.  1024422

and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.  If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.  Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.   OTHER INSURANCE

A.  If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.  In no event will this Policy apply as contributing insurance.

C.  The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.  The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.  If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.  create a waiver, or change any part of this Policy; or

B.  prevent the Company from asserting any rights under the provisions of this Policy.

Case ID: 210301454



9.   **REDUCTION BY LOSS**

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **aggregate during any policy year** limit.

10.   **SUSPENSION**

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

11.   **TITLES**

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

12.   **ASSIGNMENT**

Assignment of this Policy will not be valid except with the written consent of the Company.

13.   **DEFINITIONS**

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**aggregate during any policy year**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.     transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.     Legionellosis.

**contaminant**:
anything that causes **contamination**.

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

Case ID: 210301454



Account No.   1-36689
Policy No.   1024422

**contingent time element location**:
A.    any **location**:

   1)   of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

   2)   of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

Case ID: 210301454



**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:
A.  as specified in the Schedule of Locations, or

B.  if not so specified in the Schedule of Locations:

　　1)  a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

　　　　a)  bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
Group A listing:
Arkansas, United States of America, counties of:
Arkansas, Fulton, Independence, Izard, Lonoke, Phillips, Prairie, Sharp, White

Illinois, United States of America, counties of:
Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Gallatin, Hardin, Jasper, Lawrence, Madison, Marion, Monroe, Richland, St. Clair, Wabash, Wayne, White

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Caldwell, Christian, Crittenden, Daviess, Henderson, Hopkins, Lyon, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, Lafayette, Marshall, Panola, Quitman, Tippah

Missouri, United States of America, counties of:
Iron, Jefferson, Oregon, Reynolds, Shannon, St. Francois, St. Louis, St. Louis City, Ste. Genevieve, Washington

Tennessee, United States of America, counties of:
Decatur, Hardin, Houston, Humphreys, McNairy, Montgomery, Perry, Stewart

Group B listing:
Arkansas, United States of America, counties of:
Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Lee, Mississippi, Monroe, Poinsett, Randolph, St. Francis, Woodruff

Illinois, United States of America, counties of:
Alexander, Franklin, Hamilton, Jackson, Jefferson, Johnson, Massac, Perry, Pope, Pulaski, Randolph, Saline, Union, Washington, Williamson

Case ID: 210301454



Kentucky, United States of America, counties of:
Ballard, Calloway, Carlisle, Fulton, Graves, Hickman, Livingston, Marshall, McCracken

Mississippi, United States of America, counties of:
De Soto, Tate, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Madison, Mississippi, New Madrid, Pemiscot, Perry, Ripley, Scott, Stoddard, Wayne

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Dyer, Fayette, Gibson, Hardeman, Haywood, Henderson, Henry, Lake, Lauderdale, Madison, Obion, Shelby, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.   **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.   **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

Washington, United States of America, counties of:
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

Case ID: 210301454

British Columbia (includes Vancouver Island), Canada:
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.   introduction, into a system, of feedstock or other materials for processing or handling;

B.   commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.   the expiration date or cancellation date of this Policy.

B.   if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company or FM Insurance Company Limited; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.   construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.   commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.   additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.   property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

Case ID: 210301454



when the effect or apparent purpose is:

A.    to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.    to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.

Case ID: 210301454

Account No. 1-36689
Policy No. 1024422

Case ID: 210301454
Page 1 of 1



## SCHEDULE OF LOCATIONS, APPENDIX A

| Loc. No. | Index No. | Name | Local Name | Street Address | City | County | State/Prov | Postal Co | Country |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 000567.47 | Lincoln Financial Field | | 1020 Pattison Ave | Philadelphia | Philadelphia | Pennsylvania | 19148-5307 | United States of America |
| 2 | 000567.48 | NovaCare Complex | | 1 NovaCare Way | Philadelphia | Philadelphia | Pennsylvania | 19145-5900 | United States of America |
| 3 | | Eagles End Zone Outlet Store | Rockvale Square Outlets | 35 South Willowdale Drive, Suite 105 | Lancaster | Lancaster | Pennsylvania | 17602-1473 | United States of America |
| 4 | | Eagles End Zone Outlet Store | Market Place at Garden State Park, Bldg. E | 2000 Route 70 West, Suite E | Cherry Hill | Camden | New Jersey | 08002 | United States of America |

Account No. 1-36689
Policy No. 1024422

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of USD**66,240**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD100,000,000,000.  If the aggregate insured losses for all insurers exceed USD100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and

Case ID: 210301454

extended in 2005, 2007, and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

    a.   The act resulted in aggregate losses in excess of USD5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Case ID: 210301454

**FILING EXEMPTION NOTICE**

Various states have enacted laws which suspend the requirement for the filing of rates and forms used for commercial and large commercial risks. This notice is being sent to you in accordance with the following states' requirement for the insurance company to notify clients affected by this law. If you have any questions or concerns, please contact your Account Manager.

<u>Applicable States:</u>
Kentucky
Michigan
Pennsylvania
South Dakota

Form FMG7547                                    Page 1 of 1                                    December 2016
Factory Mutual Insurance Company

Case ID: 210301454



# EXHIBIT B

Filed and Attested by the
Office of Judicial Records
11 MAR 2021 04:25 pm
S. RICE

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

DOCKETED

OCT 2 6 2020

R. POSTELL
COMMERCE PROGRAM

| | | |
|---|---|---|
| **TAPS & BOURBON ON TERRACE, LLC** | : | **JULY TERM, 2020** |
| *Plaintiff* | : | |
| | : | **NO. 00375** |
| **v.** | : | |
| | : | **COMMERCE PROGRAM** |
| **UNDERWRITERS AT LLOYDS LONDON** | : | |
| **and MAIN LINE INSURANCE OFFICES,** | : | **CONTROL NO. 20093025** |
| **INC.** | : | |
| *Defendants* | : | |
| | : | |

### ORDER

AND NOW, this 2ℓ day of October, 2020, upon consideration of defendant Certain

Underwriters at Lloyd's, London's, improperly identified as "Those Certain Underwriters at

Lloyd's London" preliminary objections to plaintiff's complaint, and any response thereto, it is

hereby

### ORDERED

that the preliminary objections are **OVERRULED.**[1]

Taps & Bourbon On Terra-ORDER



20070037500035

---

[1] Pursuant to Pa. R.C.P. 1028(a)(4), a party may raise a preliminary objection due to legal insufficiency of a pleading (demurrer). When considering preliminary objections, all material facts and reasonable inferences set forth must be admitted as true. Haun v. Cmty. Health Sys. Inc., 14 A.3d 120, 123 (Pa. Super. 2011) (citation omitted). A court may not consider facts that are not contained within the challenged pleading. See Detweiler v. School Dist. Of Borough of Hatfield, et al., 104 A.2d 110, 113 (Pa. 1954).

This litigation arises from the denial of insurance coverage for business losses as a result of the COVID-19 pandemic and the resulting state and local orders mandating that all non-essential businesses be temporarily closed. In the instant preliminary objections, defendant alleges that plaintiff's claim is not covered under the policy because, *inter alia*, there is no "direct physical loss" or "damage to" the property, the civil authority coverage provision does not apply, and the virus exclusion provision precludes coverage. Additionally, defendant alleges that since the claim is not covered, a bad faith claim cannot survive.

At this very early stage, it would be premature for this court resolve the factual determinations put forth by defendant to dismiss plaintiff's claims. Taking the factual allegations made the plaintiff's complaint as true, as this court must at this time, plaintiff has successfully

BY THE COURT:

GLAZER, J.

---

pled to survive this stage of the proceedings. Moreover, the law and facts are rapidly evolving in the area of COVID-19 related business losses. Accordingly, the preliminary objections are overruled.

Case ID: 210301454



*Filed and Attested by the*
*Office of Judicial Records*
*11 MAR 2021 04:25 pm*
*S. RICE*

# EXHIBIT C

Case ID: 210301454

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY (as Assignee of ALBANY MOLECULAR RESEARCH, INC. and OSO BIOPHARMACEUTICALS MANUFACTURING, LLC) | ) ) ) ) ) ) | |
| Plaintiff, | ) | **CASE NO.: 1:17-cv-00760-GJF-LF** |
| vs. | ) ) | |
| FEDERAL INSURANCE COMPANY and DOES 1-10, | ) ) ) | |
| Defendants. | ) | |

---

## PLAINTIFF FACTORY MUTUAL INSURANCE COMPANY'S MOTION *IN LIMINE* NO. 5 RE PHYSICAL LOSS OR DAMAGE

---

## I.  INTRODUCTION

Plaintiff Factory Mutual Insurance Company ("FM Global") hereby moves this court for an order excluding any and all evidence, references to evidence, testimony and argument that the mold infestation, as well as the costs incurred to remediate and return the facility to its pre-loss condition, is not physical loss under the Federal Insurance Company policy.  Plaintiff further moves the court to instruct defendant and defendant's counsel to advise all witnesses accordingly.

Evidence and argument that mold is not physical damage have no tendency to prove or disprove disputed facts relevant to the determination of this action and are contrary to the law in this regard.  Accordingly, such assertions cannot lead to proper evidentiary inferences, i.e., a deduction of *fact* logically and reasonable drawn from another established *fact*.  It will consume unnecessary

---

1

Case ID: 210301454

time and create an extreme danger of confusing and misleading the jury about what is physical loss or damage for purposes of establishing coverage under the Federal policy.

## II.    ARGUMENT

### A.    Legal Standard.

The Court has the inherent authority to control trial proceedings, including ruling on motions *in limine*. See, e.g., *Luce v. United States,* 469 U.S. 38, 40, n.2 and 4 (1984). In addition, a motion *in limine*:

> affords an opportunity to the court to rule on the admissibility of evidence in advance, and prevents encumbering the record with immaterial or prejudicial matter, as well as providing a means of ensuring that privileged material as to which discovery has been allowed by the court will not be used at trial if it is found to be inadmissible.

75 Am.Jur.2d, *Trial* § 94 (1991) (footnotes omitted).

Federal Rule of Evidence Rule 401 states that evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. *Sprint/United Mgmt. Co. v. Medelsohn*, 552 U.S. 379, 388 (2008). Rule 402 specifically prohibits irrelevant evidence. The Advisory Committee has stated that "relevance is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." *Fed. R. Evid*. 401. In addition, the Court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *Fed. R. Evid*. 403. Further, evidence may be excluded when there is a significant danger that the jury might base its decision on emotion, or when non-party events would distract reasonable jurors from the real issues in the case. *Tennison v. Circus Circus Enterprises, Inc*., 244 F.3d 684, 690 (9th Cir. 2001). With this in mind, "motion[s] in limine allow[] the parties to resolve evidentiary disputes before trial and avoid[] potentially prejudicial evidence being presented in front of the jury, thereby relieving the trial judge from the formidable

Case ID: 210301454

task of neutralizing the taint of prejudicial evidence." *Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003).

## B. The Mold Infestation Is Physical Loss or Damage Under the Federal Policy.

FM Global anticipates that Federal will argue and attempt to introduce evidence that the mold infestation is not "physical loss or damage" under its policy and thus, not covered. In addition, Federal has indicated it will assert that the costs to remediate and return the facility to its pre-loss condition are not "physical loss or damage." These arguments are contrary to the facts of this loss and the case law which broadly interprets the term "physical loss or damage" in property insurance policies.[1]

It is undisputed that the mold infestation destroyed the aseptic environment and rendered Room 152 unfit for its intended use – manufacturing injectable pharmaceutical products. Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage. *See, e.g., Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (church building sustained physical loss or damage when it was rendered uninhabitable and dangerous due to gasoline under the building); *Gregory Packaging, Inc. v. Travelers Property and Casualty Company of America*, Civ. No. 2:12-cv-04418 2014 U.S. Dist. LEXIS 165232, **2014 WL 6675934** (D. N.J. 2014) (unsafe levels of ammonia in the air inflicted "direct physical loss of or damage to" the juice packing facility "because the ammonia physically rendered the facility unusable for a period of time."); *Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (asbestos fibers); *Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (unpleasant odor in home); *TRAVCO Ins. Co. v. Ward*, 715

---

[1] At best for Federal, 'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous and must be construed against Federal. See Memorandum and Order, docket 118, p. 9, citing *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 & 649 (N.M. 2012); *Battishill v. Farmers All. Ins. Co.*, 127 P.3d 1111, 1115 (N.M. 2006).

3

Case ID: 210301454

F.Supp.2d 699, 709 (E.D.Va. 2010), aff'd, 504 F. App'x. 251 (4th Cir. 2013) ("toxic gases" released by defective drywall).

Loss of functionality and/or reliability is especially significant where, as here, the property covered involves a product to be consumed by humans. Courts have concluded that the product is damaged where its "function and value have been seriously impaired, such that the product cannot be sold." *Pepsico, Inc. v. Winterthur International America Insurance Co.*, 806 N.Y.S.2d 709, 744 (App. Div. 2005), citing *General Mills, Inc. v. Gold Medal Insurance Co.*, 622 N.W.2d 147 (Minn. Ct.App. 2001); *Pillsbury Co. v. Underwriters at Lloyd's, London*, 705 F Supp 1396 (D. Minn. 1989); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Terra Indus.*, 216 F Supp 2d 899 (N.D. Iowa 2002), aff'd 346 F3d 1160 (8th Cir. 2003), cert denied 541 US 939 (2004); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 93 Cal Rptr. 2d 364 (Cal.App. 2000); *Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, 2002 WL 1433728, 2002 US Dist LEXIS 26829 (M.D. Fla. 2002). These courts' rationale regarding food products applies equally, if not more so, to the injectable pharmaceuticals OSO manufactured which were exposed to mold and no longer met industry safety standard. *See*, *General Mills v. Gold Medal Insurance*, 622 N.W.2d at 152 (food product which no longer met FDA safety standard sustained property damage.); *Motorists Mutual Ins. Co. v. Hardinger*, 131 F.Appx. 823 (3d Cir. 2005) (E coli in water well was physical loss or damage to insured's home.)[2]

The period of time as well as costs required to bring OSO's facility to the level of cleanliness following the mold infestation required by OSO's customers is also physical loss or damage covered by the Federal policy. The facility was damaged by stringent requirements of OSO's customers regarding production to the same extent it was damaged from the mold infestation itself as the facility was unusable as the result of a covered loss. See, e.g., *Western Fire v. First Presbyterian*,

---

[2] The Court appears to agree that the mold infestation at the OSO facility was "physical loss or damage" as that term is used in property insurance policies such as the one issued by Federal. See Memorandum and Order, docket 118, p. 9.

Case ID: 210301454

437 P.2d at 55 (insured was awarded costs to remediate infiltration and contamination when gasoline rendered church unusable); *Farmers Insurance Co. v. Trutanich,* 858 P.2d 1332, 1335 (Ore.App. 1993) (costs of rectifying methamphetamine odor covered as direct physical loss or damage.)

The case of *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co*., 256 Minn. 404, 98 N.W.2d 280 (1959 Minn.) is instructive. There, the insured manufactured food products for the army pursuant to a contract that required the manufacturing plant be smoke free. When smoke from a fire on a neighbor's property permeated the insured's plant for some period of time, the army refused to accept any of the products, rendering them worthless. The Minnesota Supreme Court rejected the insurer's argument that there was no physical loss or damage. According to the court, the food was damaged because of army regulations that set forth stringent requirements for the manufacturing environment. The court also noted that the impairment of value, not the physical damage, was the measure of damages. *Id.* 98 N.W. 2d at 293.

Here, Federal was familiar with OSO's manufacturing process and the contracts which required OSO to maintain an aseptic manufacturing standards at its facilities. Federal was also aware that a mold infestation could cause significant damage not only to the products exposed to the mold, but also because of the time and cost to clean the mold to the standards required by the manufacturing contracts. Without the customers' approval of the restored aseptic conditions following the mold infestation, OSO's facility remained unusable. Indeed, had OSO manufactured products without the customers' approval of the facility, the customers could have properly refused to accept the products and they would have been as worthless as the food products at issue in *Marshall Produce v. St. Paul.* See also, *General Mills, Inc. v. Gold Medal Insurance Co*., 622 N.W.2d 147 (Minn. Ct.App. 2001) (The function and value of food products was impaired where the

5

Case ID: 210301454

FDA prevented the insured from selling them.); *Pepsico, Inc. v. Winterthur International America Insurance Co.*, 806 N.Y.S.2d 709, 744 (App. Div. 2005) (Insured sustained property damage where its beverages had become "unmerchantable," i.e., the product's function and value were seriously impaired, such that the product could not be sold.)

Accordingly, evidence or argument that the mold infestation or the time and costs to remediate the infestation are not physical loss or damage does not create a reasonable inference as to the probability or lack of probability of a fact. *Fed. R. Evid*. 401; *A.I. Credit Corp v. Legion Insurance Co.*, 265 F.3d 630, 638 (7th Cir. 2001). There being no legal basis to require FM Global to prove demonstrable structural damage or alteration to property or products, evidence or argument in this regard does not involve or establish a controverted fact and should be barred from trial. Allowing Federal to argue or elicit testimony that the loss did not create structural damage or alteration to property or products, so is not covered is inconsistent the law, prejudicial to FM Global and will only confuse the jury. See *Fed. R. Evid*. 403.

## III.    CONCLUSION

Based on the foregoing, FM Global respectfully requests that the Court grant this motion *in limine* to preclude questions, testimony or argument that the mold infestation and costs to remediate the infestation are not physical loss or damage under the Federal policy.

Respectfully submitted,

/s/*Maureen A. Sanders*
MAUREEN A. SANDERS
Email: mas@sanwestlaw.com
SANDERS & WESTBROOK, PC
102 Granite Ave. NW
Albuquerque, NM 87102
Tel.: (505) 243-2243

6

Case ID: 210301454

Joyce C. Wang (California Bar No. 121139)
Email:  jwang@ccplaw.com
Colin C. Munro (California Bar No. 195520)
Email:  cmunro@ccplaw.com
CARLSON CALLADINE & PETERSON LLP
353 Sacramento Street, 16th Floor
San Francisco, CA 94111
Tel:  (415) 391-3911
Fax:  (415) 391-3898

Attorneys for Plaintiff
FACTORY MUTUAL INSURANCE COMPANY
(individually, and as Assignee of ALBANY
MOLECULAR RESEARCH, INC. and OSO
BIOPHARMACEUTICALS MANUFACTURING,
LLC)


## CERTIFICATE OF SERVICE

This is to certify that on November 19, 2019, a true and correct copy of the foregoing was

delivered to all counsel of record in accordance with the Federal Rules of Civil Procedure and the

Local Rules of this Court.

/s/ *Maureen A. Sanders*
Maureen A. Sanders
Email:  mas@sanwestlaw.com
SANDERS & WESTBROOK, PC

Case ID: 210301454



# EXHIBIT D

Case ID: 210301454



Ms. Aileen Dagrosa
Senior Vice President
General Counsel
Philadelphia Eagles

July 27, 2020

Reference:   Insured:        The Philadelphia Eagles Limited Partnership
             Location:       NovaCare Complex
                             1 NovaCare Way
                             Philadelphia, PA 19145
             Policy No:      1024422
             Date of Loss:   March 13, 2020
             Description:    Impact associated with COVID-19
             Claim ID:       505589

Dear Ms. Dagrosa:

This will acknowledge your notice of the above referenced loss as received on 28-June-2020 via electronic mail and will confirm our discussion of 23-July-2020 regarding the same.

Briefly recapping, you have reported the shutdown or partial shutdown of The Philadelphia Eagles Limited Partnership business operations due to the coronavirus (COVID-19). You mentioned Lincoln Financial Field, the NovaCare Complex and two outlet stores were affected.

According to the loss notice, the initial closure of these locations took effect on Wednesday, March 13, 2020 upon the direction of officers of the Company and based on the order of governmental authorities. Per our discussion on July 23, 2020, The Philadelphia Eagles Limited Partnership is aware of people at its locations who were infected with the virus.

Please note that Factory Mutual Insurance Company Policy No. 1024422 contains Additional Coverages for COMMUNICABLE DISEASE RESPONSE and INTERRUPTION BY COMMUNICABLE DISEASE, subject to all policy terms and conditions. COVID-19 meets the definition of a "communicable disease" under the Policy.  Other key conditions of the Communicable Disease coverage are the actual not suspected presence of a communicable disease at a location owned, leased or rented by the insured, access to which has been limited, restricted or prohibited for more than 48 hours by an order of an authorized governmental agency or a decision of an officer of the Insured.

The Policy's Property Damage section includes coverage for "OTHER ADDITIONAL COVERAGES" Page 21 states, in relevant part:

**F.    COMMUNICABLE DISEASE RESPONSE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

Case ID: 210301454

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1) cleanup, removal and disposal of the actual not suspected presence of **communicable disease** from insured property; and

2) actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable disease** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

The Policy's Time Element section also includes coverage for "ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS" Page 51 states, in relevant part:

### E.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such described **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)  a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease.**

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

The Policy defines "communicable disease" on page 62 as follows:

**communicable disease**:
disease which is:

Case ID: 210301454

A.  transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges…

The Policy also includes the following limit on coverage for Communicable Disease on pages 3 and 5:

COMMUNICABLE DISEASE RESPONSE

USD 1,000,000 **annual aggregate**

The Company's maximum limit of liability INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD1,000,000 **annual aggregate**.

\* \* \*

INTERRUPTION BY COMMUNICABLE DISEASE

12 month period but not to exceed USD 1,000,000 limit in the **aggregate during any policy year**

The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD1,000,000 in the **aggregate during any policy year** regardless of the number of locations, coverages or **occurrences** involved.

Responding to your reference to Policy provisions other than the Communicable Disease coverages, we note that the Policy excludes coverage for contamination. The presence of a virus, pathogen, or disease causing or illness causing agent such as COVID-19 is a form of contamination as defined in our Policy, which is excluded. The relevant provisions, in part, are set forth below:

D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

The Policy defines contamination under 13. DEFINITIONS within the GENERAL PROVISIONS of the Policy on Page 62:

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

Other Policy coverages, such as Civil or Military Authority, do not apply absent physical loss or damage of the type insured. For example, the Policy states, in relevant part, as follows:

Case ID: 210301454

**A.    CIVIL OR MILITARY AUTHORITY**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

The presence of COVID-19 at an insured location does not constitute "physical damage of the type insured" as required under this provision. Accordingly, the Policy's Civil or Military Authority provision (and other Policy provisions requiring physical loss or damage of the type insured) do not respond based on the information presented.

Consequently, based on the limited information provided at this time, the coverage that appears potentially available under our Policy for losses arising from COVID-19 is found in our Communicable Disease coverages, assuming the conditions of those coverages are satisfied.

Since you have indicated that The Philadelphia Eagles Limited Partnership owned locations where people were infected with the virus, we request the following information which will allow us to proceed with our investigation:

1. Please identify each location owned, leased or rented by The Philadelphia Eagles Limited Partnership which had the actual not suspected presence of COVID-19.

2. How did you determine that the location(s) identified above had the actual presence of COVID-19?

3. Have the identified location(s) been tested for COVID-19? If yes, please provide copies of the test reports.

4. Have the location(s) been cleaned due to the presence of COVID-19? If yes, please provide copies of contractor invoices and service report(s), cleanup, removal or disposal costs incurred and any documents confirming that the location was cleaned.

5. Have any employees (guests, patrons, outside workers, sub-contractors, etc.) and others who were in the location(s) been tested for COVID-19? Please answer only "yes" or "no."

6. Have any of these individuals tested positive for COVID-19? Please answer only "yes" or "no."

7. Please request and provide the employee's or other person's test results (with all personal identifying information redacted).

8. For each employee who tested positive, please provide the date of the employee's positive test result.

9. For each employee who tested positive, please provide support to establish when the employee was present at the location(s). This may include, but is not limited to, information such as payroll records and building entry data. Please redact identifying personal information of the employee(s) if required.

Case ID: 210301454

10. For each employee (guest, patron, outside worker, sub-contractor, etc.) who tested positive, please provide information as to when the employee first exhibited symptoms of COVID-19. Symptoms may include, but are not limited to: fever of 100.4 F or higher; a new persistent cough; chest pain; and/or shortness of breath; loss of taste or smell.

11. Have you contacted or been contacted by any local, state, or federal agency (e.g. local/state Department of Health, CDC, etc.) regarding COVID-19 test results of your employees? If yes, please provide those communications.  If the communications contain any personal private information of employees, please forward a redacted copy of the communications.

12. Has access to the location(s) been limited, restricted or prohibited by an order of an authorized governmental agency or an Officer of The Philadelphia Eagles Limited Partnership. Please provide a copy of all such order(s).

Please provide this information and any other information you believe may be relevant to the loss as soon as you are able. This list is not intended to be all inclusive and additional requests for information may be necessary to assist in our investigation of this claim.

Once we have had an opportunity to complete our investigation and review of your policy information, we will confirm any applicable coverages, loss payables, and deductibles in effect.

Neither this letter nor our investigation is an admission or denial of liability and does not waive any right or duties of either party under the Factory Mutual Insurance Company Policy.  Anything done or to be done by Factory Mutual Insurance Company, or on its behalf, in connection with the above described matter, including but not limited to, any investigation into the cause or amount of loss or other matter relative thereto, shall not waive, invalidate, forfeit or modify any of its rights under the policies issued by it.

We would like to thank you for your cooperation in this matter.  In the interim, should you have any questions or comments, please feel free to contact us.

Sincerely,

Senior Adjuster
Philadelphia Branch Claims Office

For your protection, The State of Pennsylvania requires the following statement:
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH VIOLATION.

Case ID: 210301454

## VERIFICATION

I, Frank Gumienny, hereby verify that, as Senior Vice President, Chief _____

of Philadelphia Eagles Limited Partnership, I am authorized to make this verification on behalf of

Philadelphia Eagles Limited Partnership, and that the facts set forth in the foregoing Complaint

are true and correct to the best of my knowledge, information, and belief.  I understand that the

statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn

falsification to authorities.

Date: ___3/11/21___                          _____

Filed and Attested by the
Office of Judicial Records
11 MAR 2021 04:25 pm
S. RICE