# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PHILADELPHIA EAGLES LIMITED PARTNERSHIP | : Case No. 2:21-cv-01776-MMB |
| | : |
| Plaintiff, | : |
| v. | : |
| FACTORY MUTUAL INSURANCE COMPANY | : |
| Defendant. | : |

**[PROPOSED] FIRST AMENDED
COMPLAINT – ACTION FOR DECLARATORY JUDGMENT**

Plaintiff Philadelphia Eagles Limited Partnership (the "Eagles") complains of Defendant Factory Mutual Insurance Company (hereinafter "Factory Mutual") and alleges upon knowledge as to its own acts and upon information and belief as to the acts and omissions of others as follows:

**NATURE OF THIS ACTION**

1.      The Eagles football organization has been a Philadelphia institution since 1933. The team maintains a large, devoted fan base, which *Forbes* magazine ranked in June 2020 as #5 in "America's Most Passionate Sports Fans 2020."[1]

2.      Fans in the stands have been the core of the Eagles' revenue since the team's inception. Football, and specifically Eagles Football, is undoubtedly a Philadelphia and national pastime.

---

[1] *See* https://www.forbes.com/sites/christinasettimi/2020/05/06/americas-most-passionate-sports-fans-2020/?sh=3ce9972b2365 (last visited March 11, 2021).

3.      Year after year, decade after decade, Eagles fans have flocked to the stands to cheer their team, who have appeared in the Super Bowl three times.  After Lincoln Financial Field -- the Eagles' state-of-the art stadium -- opened in 2003, loyal fans continued to purchase season tickets and fill the stadium's approximately 67,000 seats, and "Standing Room Only" sections.

4.      During the 2020-21 football season, however, the Eagles and their fans could not conduct business as usual because of the presence of and the dangers of the presence of the Coronavirus.

5.      Despite their best efforts to navigate the risks presented by the Coronavirus pandemic (the "Pandemic") and to mitigate the damage the pandemic caused to their property and business, the Eagles and its insured subsidiaries have incurred and continue to incur substantial financial loss caused by the dangers of Coronavirus and the resulting interruption of the team's business activities.  Because of the near certain risk of physical harm created by Coronavirus, the Eagles were forced to cancel or significantly restrict in-person attendance at all games at Lincoln Financial Field stadium from August 2020 to January 2021.  Moreover, beginning in March 2020, due to the presence of individuals who had contracted COVID-19 on the premises and the risk that the incidence of infections would grow exponentially if extreme preventative actions were not taken, the Eagles were required to close entirely, or severely restrict access to their covered premises, including the NovaCare Complex (the team's corporate headquarters and training facility in Philadelphia) and team merchandise stores.  The Eagles were prevented from using their facilities not only for team events, but also for multiple other high profile and high-revenue generating events, such as other sporting events, star-studded concerts, and even for weddings and graduations.

2

6.     Fortunately, the Eagles purchased property insurance to protect against this type of catastrophic loss.  By the express terms of the all-risks commercial property policy (the "Policy") that Defendant Factory Mutual sold to the Eagles, Factory Mutual promised to pay for the Eagles' losses resulting from the necessary suspension of business operations, in circumstances such as those at issue, here.

7.     Befitting the top dollar that the Eagles paid for best-in-class insurance coverage, the Policy promises to afford broad protections against the risks of pandemic-related losses. Among other coverages, the Policy provides distinct coverages for (1) property loss, "Time Element" (business interruption) loss, and Extra Expenses resulting from the "risks" associated with the Pandemic; and (2) "Communicable Disease Response" and "Interruption by Communicable Disease" coverages for certain narrow specified amounts incurred in response to an identified incident of communicable disease at Eagles properties.

8.     Factory Mutual has not honored the terms of its Policy in responding to the Eagles' coverage claim.  Specifically, Factory Mutual contends that its coverage is limited only to the "Communicable Disease Response" and "Interruption by Communicable Disease" coverages in the Policy.  More broadly, Factory Mutual has stated that it has no duty to pay for the physical loss or damage to property and business interruption that the Eagles have incurred and continue to incur because of the presence of and risks presented by the Pandemic, even though the Policy expressly provides coverage for such physical loss or damage to the Eagles property and the risks thereof.

9.     In total, the Policy provides coverage of up to $1 billion per-occurrence for precisely the types of losses incurred by the Eagles and at issue in this Action.  But Factory

3

Mutual stated that it intends to strictly limit coverage to the $1 million aggregate sublimit for Communicable Disease coverage.

10.     The insuring agreement in the Policy covers property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." (emphasis original).  Under the Policy's express terms, coverage is provided to the Eagles where, among other circumstances, the Eagles' use of its property is prevented, diminished or restricted to prevent the spread of Coronavirus and resulting loss or damage to the covered premises.  Due to the Pandemic, the Eagles' covered premises were rendered essentially nonfunctional and unusable for the large-event gatherings for which they had at all times been used before the Pandemic's onset, depriving the Eagles of the physical use intended for its premises and causing them to suffer physical loss of the insured premises.  The premises also suffered physical damage or the imminent threat of physical damage due to the impact that the Coronavirus had and imminently would have had to the airspace and other physical components of the premises.

11.     The dangers posed by the Coronavirus have caused the Eagles to incur substantial losses.  These risks rendered covered premises, at least temporarily, unreasonably dangerous, uninhabitable and/or unfit for their intended functions.

12.     The Eagles suffered physical loss or damage to their property due to the presence, or risks of the presence, of Coronavirus and/or COVID-19 at its premises, which did or would have physically and tangibly altered the airspace within its premises and their surfaces from a safe and functional condition to a dangerous and potentially lethal and essentially non-functional condition, or would have caused such physical impact, absent the extreme preventative and costly remedial measures that the Eagles employed.

4

13.     Contrary to its promise to cover such physical loss or damage to property and the risks thereof, Factory Mutual has failed to honor its coverage obligations under the Policy.  The Eagles thus seek the declaratory relief addressed below in this Complaint.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendant Factory Mutual because it transacted and continues to transact the business of selling insurance in this Commonwealth and has purposefully availed itself of this jurisdiction, the subject matter and the parties.  On April 15, 2021, Defendant filed a Notice of Removal in this Court to remove this action, which seeks solely declaratory relief, from the Court of Common Pleas of Philadelphia County, Pennsylvania, Civil Case No. 210301454, and the Eagles timely moved to remand this action to Pennsylvania state court.

15.     The Eagles bring this amended complaint in this Court, while expressly reserving their right to seek remand of this action to the Pennsylvania Court of Common Pleas and request that the Court remand this action to state court on grounds that it should decline to exercise jurisdiction over this lawsuit pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.[2]

16.     Venue is proper in this court because the original action was properly filed in the Pennsylvania Court of Common Pleas in Philadelphia County.

## THE PARTIES

17.     Philadelphia Eagles Limited Partnership is a Pennsylvania limited partnership with its principal place of business and headquarters in Philadelphia, Pennsylvania. At all times

---

[2] *See* Transcript of Motion to Remand Hearing at 30:8 – 30:13 (amended complaint to be filed without prejudice to Plaintiff's motion for remand) (attached hereto as Exhibit 28).

relevant hereto, the Eagles maintained insurance to protect its property and business in the event of various losses.

18.     Factory Mutual Insurance Company is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island, and is licensed to transact, and is regularly transacting, business in the Commonwealth of Pennsylvania.

## THE PHILADELPHIA EAGLES

19.     Established July 8, 1933, the Eagles are one of the oldest continually operating franchises in the National Football League ("NFL").  The Eagles continually rank among the highest valued NFL teams and overall sports teams in the world.  *Forbes* magazine ranked the Eagles in 9th place on its September 2020 list of highest NFL team valuations, with a team value of $3.4 billion and operating income of $120 million.[3]

20.     The City of Philadelphia has always been home to the Eagles.  Eagles fans are vociferous in their support; they purchase Eagles-themed apparel and decor.  And, they attend Eagles games.

21.     The state-of-the-art training facility, NovaCare Complex, opened in the spring of 2001 in Philadelphia.  The complex is intended to be used year-round.

22.     In 2001, the Eagles commenced construction on Lincoln Financial Field to replace their prior stadium.  The purpose of building a new stadium was to enhance fan experience, provide state-of-the art operations, and vitalize the image of the team and the city of Philadelphia.  Eagles then President Joe Banner stated, "Lincoln Financial Field will enhance the image of and economic activity within the Philadelphia region. In terms of what it will mean to

---

[3] See https://www.forbes.com/teams/philadelphia-eagles/?sh=512456442783 (last visited March 11, 2021).

the club in a macro sense, it will enable us to be competitive financially while also helping us further define ourselves as a first-class organization. Ultimately, our investment in Lincoln Financial Field will send a message about how truly driven we are with regard to achieving success and about how committed we are to enhancing the comfort and enjoyment of our fans."[4]

23.     The stadium opened on August 3, 2003 at a construction cost of $512 million. Unlike its previous stadium and many other football stadiums used in the NFL, Lincoln Financial Field was designed to have more seats along the sidelines, resulting in improved sight lines for the fans and more stadium seats for fans to purchase.

24.     In June 2013, the Eagles unveiled plans for a two-year, $131 million revitalizing project at Lincoln Financial Field.  Completed by the 2014 season, the renovation project included the addition of 1,600 seats, new HD video/scoreboards in each end-zone, pedestrian bridges connecting the upper deck concourses, upgrading luxury suites and adding historical imagery throughout the stadium.  With the completion of this expansion, Lincoln Financial Field now has approximate seating capacity of 67,000.

25.     A number of amenities for fans are located at Lincoln Financial Field, including 175 luxury suites, which seat approximately 3500 fans; approximately 8500 club seats; a 100,000 square foot fan-oriented plaza; over 300 concession points of sale; and an Eagles Pro Shop team store.

26.     Like the NovaCare Complex, Lincoln Financial Field is a year-round operation, because it hosts numerous sporting, and other events throughout the year.  Temple University's Division I college football team plays its home games at Lincoln Financial Field. The Philadelphia Union of Major League Soccer has played exhibition games at Lincoln

---

[4] *See* https://www.lincolnfinancialfield.com/stadium-facts/ (last visited March 11, 2021).

Financial Field against high-profile international clubs when their own stadium does not provide adequate seating. The stadium also plays host to multiple other high profile "sell out" events each year, which prior to the Pandemic have included several soccer games, the NCAA lacrosse national championship, the National Hockey League's Stadium Series, the Army-Navy football game, star-studded concerts, Monster Jam, and other events, which did not proceed in 2020 due to the Pandemic and its related dangers.

27.     Thus, because the Pandemic made it impossible for patrons to attend sporting and other events, Lincoln Financial Field could not fulfill its essential purpose and function as a stadium, and the Eagles' business was at least partially suspended, regardless of whether some business activity was conducted at the insured premises.

28.     Due to the Pandemic, its actual or threatened physical impact on the insured premises including the airspace within the premises, the extreme threat of continued infestation as the Pandemic spiked, receded and then spiked again, and its impact on the utility and function of the Eagles' covered premises, the Eagles have suffered multiple millions of dollars in loss with respect to at least the following categories of income generating activities: merchandise sales, ticket sales, premium seating sales, concession sales, stadium parking, in-stadium advertising, naming rights, revenue from the other events described above, and other special events, such as other sports events, weddings, corporate events, conferences and trade shows.

## THE FACTORY MUTUAL INSURANCE POLICY

29.     As a large international property-only insurer, Factory Mutual, part of the FM Global Group, directs substantial annual resources to studying risks and those that may in the

future cause loss to policyholders and deciding which risks it is willing to cover and those that it intends to avoid.[5]

30.    As addressed in various regulatory filings with state insurance departments, Factory Mutual introduced its standard property policy decades ago.  As shown in such filings, Factory Mutual modified its standard form from time to time.  The Global Advantage® All-Risk Policy sold to the Eagles was issued on standard form "Advantage – TE Select – United States – 2016."

31.    In marketing its Global Advantage® All-Risk Policy, Factory Mutual advertises that, "As an FM Global client, you get an insurance policy based on engineering and research, not just on actuarial formulas. If you need the ability to scale policy options to fit your actual properties and exposures, you'll appreciate our Business Interruption Coverage. It protects against loss of income following a disaster, wherever you operate, or however indirect your connection to the loss."[6]

32.    In addition to Factory Mutual's knowledge of the sports industry business in general, and in connection with providing coverage to the Eagles, Factory Mutual engaged, or had reasonable opportunities to engage in, an extensive underwriting investigation and to

---

[5] *See* https://www.fmglobal.com/about-us/why-fm-global ("You'll discover that our approach to claims is different, too. We work closely with you *before, during* and *after* a loss—no matter where in the world that loss occurs. And we ground our recommendations in world-class scientific research and on-the-ground engineering services") (emphasis original) (last visited March 11, 2021); *see also* https://www.fmglobal.com/products-and-services/our-approach ("Where other insurance companies rely primarily on actuarial tables, we use a hands-on, engineering-based approach. The result? Property insurance coverage based on the realities of your business and your particular property risk management challenges.") (last visited March 11, 2021).

[6] *See* https://www.fmglobal.com/products-and-services/products/the-fm-global-advantage-all-risk-policy (last visited March 11, 2021).

become familiar with and knowledgeable about the nature and scope of the Eagles' business and the nature of the risks against which it was insuring.

33.     In exchange for substantial premiums, Factory Mutual sold the Eagles the Policy, effective from June 29, 2017, to June 29, 2020.  A true and correct copy of the Policy is attached hereto as Exhibit 1 and incorporated by reference.

### *The Broad Coverage the Policy Grants for Property Damage and Time Element Loss*

34.     The applicable coverages granted by the Policy include insurance for property loss and time element (business interruption) loss resulting from all risks of physical loss or damage to covered property.

35.     The Insuring Agreements in the Policy granting these coverage state that the "Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy," and "TIME ELEMENT loss directly resulting from physical loss or damage of the type insured" to covered property.

36.     This coverage extends to losses resulting from the "risks of" direct physical "loss" *or* "damage" to the Eagles' property, and applies even if the Eagles' property did not, in fact, suffer actual damage.

37.     As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "physical damage."

38.     The Policy does not define "physical."

39.     The Policy does not define "loss."

40.     The Policy does not define "physical loss."

41.     The Policy does not define "damage."

10

42.     The Policy does not define the phrase "physical loss or damage."

43.     The Policy does not define the terms "risks" or "risks of."

44.     The Policy does not define the phrase "risks of physical loss or damage."

45.     When undefined, the phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation.

46.     When the undefined phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation, they should be construed against the drafter (which, here, is Factory Mutual).

47.     Dictionary definitions of "loss" include:

   a.   "Deprivation."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss[7]

   b.   "[D]ecrease in amount, magnitude, or degree." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

   c.   "[T]he fact that you no longer have something or have less of something." Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

   d.   "[H]aving less than before."  Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss

   e.   "[T]he state of no longer having something or as much of something." Loss, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

48.     At minimum, the Eagles suffered "deprivation," "decrease," or "having less" of its covered property due to the Pandemic.

---

[7] As of the time of the filing of the Eagles' initial complaint in the Pennsylvania Court of Common Pleas, *Merriam-Webster* included "deprivation" as a definition of "loss."  That definition has since been removed for reasons unknown to the Eagles.

49.    Upon information and belief, Factory Mutual is aware of numerous court decisions previously concluding that insureds have properly alleged or are in fact entitled to coverage for Coronavirus-related business interruption loss or damage.  Upon information and belief, Factory Mutual is aware of these court decisions, many of which are in the Commonwealth of Pennsylvania.  Because numerous courts agree that Coronavirus and/or the Pandemic may cause "direct physical loss or damage" to property, the Eagles' belief that the Policy provides coverage is at least reasonable even if Factory Mutual claims that it believes there is no coverage.

50.    Moreover, over the course of decades, courts have held that the presence of a dangerous (to humans) invisible substance at or on a property, including within the airspace of a covered premises, constitutes "physical loss or damage" to property.  Many courts have also held that the restriction of use of property due to an imminent risk of danger to its inhabitants constitutes "physical loss" to property.[8]

51.    This has been the rule of law in the Third Circuit for years, and Factory Mutual certainly has been aware of it since at least 2002, when its sister company (Affiliated FM) was a party to *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 235 (3d Cir. 2002).  In that case (decided on summary judgment and based upon a fulsome evidentiary record), the Court acknowledged that "physical loss" under a property policy can be established where the imminent release of an invisible substance into the airspace of a covered property presents a significant enough health hazard to people occupying the premises that it impairs the building's function or utility.  *See also Motorists Mut. Ins. Co. v. Hardinger*, 131 F.

---

[8] *See, e.g.,* Richard P. Lewis, Lorelie S. Masters, Scott D. Greenspan & Chris Kozak, *Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences,* 56 Tort & Ins. L. J. 621 (Fall, 2021), attached hereto as Exhibit 2.

App'x 823, 826 (3d Cir. 2005) (issue of fact existed as to whether e-coli in the well water used by a homeowner had sufficient enough impact on the function and use of the home to constitute direct physical loss or damage).

52.     Indeed, despite the industry-wide introduction of the term "direct physical loss or damage" decades ago, Factory Mutual, like other property insurers, has elected not to define that phrase in its commercial property policies, including the Policy it sold to the Eagles for substantial premiums.  *See Cherokee Nation v. Lexington Ins. Co.*, 2021 WL 506271, at *3-6 (Okla. Dist. Ct. Jan. 28, 2021) ("Carriers have utilized the phrase *direct physical loss* for over fifty (50) years and courts have begged carriers to define the phrase to avoid the precise issue before the Court now.") (attached hereto as Exhibit 3).

53.     Upon information and belief, Factory Mutual is also aware that the Pennsylvania Supreme Court has not issued a decision interpreting the undefined phrase "direct physical loss or damage," either before or after the Pandemic.

54.     Insurance industry expert Ty Sagalow has opined that insurers like Factory Mutual carefully and deliberately choose the policy language they wish to employ when drafting an insurance policy.  *See* Certification of Ty R. Sagalow, dated October 1, 2021 ("Sagalow Certification") ¶ 25, publicly filed in the action styled as *Tory Burch LLC v. Zurich Am. Ins. Co.*, Docket No. UNN-L-000829-21 (N.J. Super. Ct., Union Cty.), attached hereto as Exhibit 4. Specifically, "policy drafting typically is a rigorous and time-consuming exercise, frequently involving up to a dozen or more individuals, especially in large organizations…. Every word, and indeed sometimes every punctuation, may be examined and be subject to argument and debate. All prior versions of the policy are typically reviewed and compared.  All major competitor forms are reviewed, compared, and sometimes laid out in detailed spreadsheets.

13

Wording is compared and debated between underwriting, claims, legal/compliance, business development and others.  Differences between the proposed policy language and that contained in prior policy forms, and between other policies available from the particular carrier and its competitors are examined and debated from both a claims perspective and an underwriting perspective, as well as, inevitably, from a sales perspective. The information gleaned from the insurance marketplace as a whole, including positions taken by drafting and rating industry organizations and regulatory bodies, are reviewed, especially with respect to any "hot" or 'emerging' issues." *Id.*

55.    The Court of Common Pleas of Philadelphia County (Judge Glazer presiding) recognized that the issue of whether Coronavirus causes "physical loss or damage" cannot be adjudicated based on preliminary objections, because it is a factual issue to be determined by the trier of fact.  The plaintiff's allegations in a complaint are to be taken as true. *Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*, No. 00375, 2020 WL 6380449, at *1 (Pa. Com. Pl. Oct. 26, 2020).  *See also Ridley Park Fitness, LLC v. Philadelphia Indem. Ins. Co.*, No. 01093, 2020 WL 8613467, at *1, n.1 (Pa. Com. Pl. Aug. 31, 2020) (Insurer preliminary objections overruled, holding that, where defendant insurer asserted there was no "direct physical loss," it would be "premature" to "resolve the factual determinations put forth by defendant to dismiss plaintiff's claims. Taking the factual allegations made in plaintiff's complaint as true, as this court must at this time, plaintiff has successfully pled to survive this stage of the proceedings.") (Glazer, J.); *Brown's Gym, Inc. v. The Cincinnati Ins. Co.*, No. 20 CV 3113, 2021 WL 3036545, at *20 (Pa. Com. Pl. July 13, 2021) (insurer preliminary objections overruled, holding that policyholder had sufficiently alleged "physical loss or damage" to property when it averred that the "continuous presence of the coronavirus" had rendered its property unusable,

14

unsafe, inaccessible, and unfit for its intended use); *SWB Yankees, LLC v. CNA Financial Corp.*, No. 20CV2155, 2021 WL 3468995, at *2 (Pa. Com. Pl. Aug. 04, 2021) (Insurer preliminary objections overruled, holding that policyholder had sufficiently alleged "physical loss or damage" to property when it averred that the "continuous presence of the coronavirus" had "rendered [the property] unsafe and unfit for its intended use."); *see also Ungarean, DMD v. CNA*, No. GD-20-006544, 2021 WL 1164836, at *8 (Pa. Com. Pl. Mar. 25, 2021) (policyholder motion for summary judgment granted, holding that "direct physical loss" must be distinct from "damage," and thus it was "reasonable to interpret the phrase 'direct physical loss of . . . property' to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property."); *MacMiles, LLC v. Erie Ins. Exchange*, No. GD-20-7753, 2021 WL 3079941, at *8 (Pa. Com. Pl. May 25, 2021) (same).

56.     As thoroughly researched and explained by insurance claims expert Charles Miller, the coverage provided by property policies covering business income loss has continually been expanded since inception to cover "loss" exposures beyond actual damage or destruction to property. *See* Expert Report of Charles M. Miller ("Miller Declaration") publicly filed in the matter *Trapped Escape Room LLC d/b/a Trapped Escape Room v. HCC Specialty Insurance Company*, No. 4:20-cv-03782 (S.D. Tex. Aug. 2, 2021), attached hereto as Exhibit 5.

### *Representations Factory Mutual Previously Made to State Insurance Regulators, in Court Filings and Elsewhere Contradict the Reading of the Undefined Trigger of Coverage Terms "Physical Loss or Damage" It Now Advocates*

57.     In its coverage correspondence with the Eagles, and motion papers it has filed with this Court seeking dismissal of the Eagles' complaint, Factory Mutual has asserted that "[t]he presence of COVID-19 at an insured location does not constitute 'physical damage of the type insured.'" *E.g.,* Exhibit 6 (July 27, 2020 letter from Factory Mutual to Eagles, at  4.)  That assertion is contrary to representations made to state insurance regulators by Factory Mutual and

15

its affiliate, Affiliated FM Insurance Company ("Affiliated FM"), for more than a decade after first including communicable disease coverage in property policies issued to healthcare insureds in or about 2011.  Specifically, Factory Mutual and its sister company repeatedly represented to state regulators that the presence and spread of communicable disease at property is considered "direct physical damage" under their policies' coverage grants for communicable disease.

58.     In or about 2010, Factory Mutual submitted to state insurance regulators Form FMG7446, an endorsement for "Communicable Disease Cleanup, Removal and Disposal." FMG7446 states that, "[f]or the purpose of this Additional Coverage, the presence of and spread of communicable disease *will be considered direct physical damage* and the expenses listed above *will be considered expenses to repair such damage*." Exhibit 7 (emphasis added).

59.     Affiliated FM told regulators in 2010 that its new coverage for "Interruption by Communicable Disease" was based on the same predicate: "[f]or the purpose of this extension, the presence of and the spread of communicable disease will be considered direct physical damage" and the expenses "will be considered expenses to repair such damage." Exhibit 8 at 21-22.

60.     That statement was repeated several years later in Affiliated FM's 2015 regulatory filings concerning coverages for "Communicable Disease Cleanup, Removal And Disposal" and "Interruption by Communicable Disease" (collectively, the "Communicable Disease Coverages").  Those 2015 regulatory filings stated that "[f]or the purpose of this coverage [or extension], the presence [of] and [the] spread of communicable disease will be considered direct physical damage" and the expenses "will be considered expenses to repair such damage."  Exhibit 9 at 1-2.

61.     The Factory Mutual and Affiliated FM policies were revised in 2016, generally for grammatical and structural reasons. Factory Mutual did not include any new and pertinent coverage limitations but did include "expansions" of coverage, including with respect to the Communicable Disease Coverages.

62.     From publicly available sources, the Eagles have determined that, in an explanatory memorandum filed with state insurance regulators in connection with securing approval of the 2016 version of Factory Mutual's Global Advantage policy form, Factory Mutual stated the following regarding the coverages afforded under its previously promulgated policy form FMG7446:

> This endorsement was previously approved in filing FM-2011-2013 as Communicable Disease, Cleanup. Removal and Disposal Endorsement. The replaced Endorsement was previously available to insureds with healthcare occupancies only. Grammatical and editorial changes have been made to remove the **healthcare facility** terms because this coverage is now offered as optional to all clients. The coverage now allows for an officer of the insured to trigger the coverage. *This is an expansion in coverage.*

Exhibit 10 at 6 (boldface in original; italics added for emphasis).  *See also id.* at 9 ("FMG7450: Interruption by Communicable Endorsement").

63.     Affiliated FM's 2016 filings with respect to its standard policy form substantially repeat the statements made above.  Exhibit 11 at 2, 4-5.

64.     As attested to by expert David L. Stegall in the case *Cinemark Holdings, Inc. et al. v. Factory Mutual Insurance Co.*, No. 4:21-cv-11-ALM (E.D. Tex.), these expansions in coverage, which do not depend on the existence of physical loss or damage, did not change the predicate that communicable disease *can* cause physical damage to property:

> As FM admits in this litigation, these two coverage "expansions" are not triggered by physical loss or damage to the property insured. This is a change from the Communicable Disease coverages that FM previously offered to healthcare clients. Those endorsements explained that "*the presence of and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to*

17

*repair such damage*." In other words, FM understood that in some cases, as [the insured] has presented here, the presence of a Communicable Disease and its causative viral agent can cause loss or damage to property and that the repair and remediation efforts should be considered repair costs. FM represented to regulators that its decision to remove this phrase in 2016 was a "grammatical and editorial change[ ]" to expand coverage. Thus, FM never changed its position that "*the presence of and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to repair such damage*."

Exhibit 12 at 8 (emphasis original).

65.     Factory Mutual itself also previously affirmatively asserted in court filings that a mold infestation in the clean room of a laboratory caused physical loss or damage.  In that context, in direct contravention of its arguments here, Factory Mutual relied upon the impact of a disease-causing agent (i.e., mold) on the function and utility of the covered property as the basis for triggering coverage.  Factory Mutual specifically argued in that case (in conflict with its arguments here), that there was no requirement for structural alteration of the property in order to trigger coverage.  *See Factory Mut. Ins. Co. v. Federal Ins. Co*., Case No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 (attached hereto as Exhibit 13).  In support of its position in that case, Factory Mutual asserted that "numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage," and cited case law as referenced in paragraph 50 above (the very theory and case law that it has rejected as inapplicable in this case).  Exhibit 13, ECF No. 27 at 3.  Factory Mutual affirmatively asserted that another insurer's failure to define "physical loss or damage" made that term "susceptible of more than one reasonable interpretation," rendered the policy "ambiguous," and "must be construed against" that insurer. *Id.*

66.     Also contradicting its current coverage positions, at the outset of the Pandemic, Factory Mutual issued an internal document called "Talking Points on the 2019 Novel Coronavirus (2019-nCov)." Exhibit 14 (the "Talking Points").  Among other things, the Talking

18

Points states that the actual presence of communicable disease at property is a Property Damage "trigger of coverage." *Id.* at 1.  The Talking Points close by noting that the Global Advantage form, on which the Policy is written, "offers some of the broadest property coverage available." *Id.* at 2.[9]

### *The Policy's Coverage Against "Risks of" Pandemic*

67.     The Policy covers not only "physical loss or damage to" property, but also losses resulting from "*all risks of* direct physical loss or damage to property."  The undefined term "risks" in the Policy is defined by many dictionaries to mean "possibility."[10]

68.     By its express terms, the Policy therefore insures against losses caused by "risks," such as*,* threats or the possibility of physical loss or damage to property, as well against losses once such physical loss or damage to property has occurred.

69.     Factory Mutual chose to utilize this broad "all risks" language, instead of more restrictive policy language drafted in 2013 by the Insurance Services Office ("ISO"), the leading insurance industry drafting organization, and utilized by various insurers since that time.

70.     Prior to 2013, ISO's standard "Businessowners Coverage Form" such as ISO form BP 00 03 01 10, defined "Covered Causes of Loss" as "[r]isks of direct physical loss unless

---

[9] In apparent anticipation of the multiple claims expected to be filed as a result of the Pandemic, the Talking Points also contradictorily state  that "Civil or Military Authority" coverage" and "Contingent Time Element Coverage" coverage do not "apply" because "[t]he presence of a communicable disease does not constitute physical damage" because a "virus" is excluded as "contamination."  *Id.* at 2.  Those contradictory statements are false and are belied by Factory Mutual's many prior admissions.

[10] *See*, *e.g.*, *Risk*, Merriam-Webster, www.merriam-webster.com/dictionary/risk ("possibility of loss or injury"); *Risk*, Collins Dictionary, www.collinsdictionary.com/us/dictionary/english/risk (synonymous with "danger, chance, threat, possibility"); *Risk*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/risk ("the possibility of something bad happening"); *Risk*, The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=risk ("The possibility of suffering harm or loss; danger").

the loss is…[e]xcluded…or [l]imited…."  *See* Exhibit 15.  In 2013, ISO issued revised Businessowners coverage forms, such as ISO form BP 00 03 07 13, which redefined "Covered Cause of Loss," by removing the term "risks of."  ISO now defines "Covered Causes of Loss" as "[d]irect physical loss unless the loss is excluded or limited…."  *See* Exhibit 16.

71.     ISO issued a "Notice to Policyholders" that insurers using the form could issue to its insureds to explain the changes in policy wording.  The notice expressly states that "the term 'risk of' is removed from the Covered Cause of Loss provision."  *See* Exhibit 17.

72.     Accordingly, since at least 2013, insurers have had the opportunity to incorporate, and have incorporated, an insuring agreement that deletes any reference to covering losses created by the "risks of" insured perils.   For example, Cincinnati Insurance Company, in revising its standard property policy form number FM 101, issued a "Notice to Policyholders" in 2016 stating, "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101."  *See* Exhibit 18.

73.     Upon information and belief, ISO's rationale for removing the term "risk of" from its standard businessowners property policy turned upon the insurance industry's awareness that courts had repeatedly interpreted the term "risk of" to include the "threat of" loss or damage. Such cases include *401 Fourth St., Inc. v. Inv'rs. Ins. Grp.*, 879 A.2d 166, 169-70 (Pa. 2005) (policy language covering "risks of" direct physical loss involving collapse necessarily contemplates broader coverage than language simply insuring against "collapse."), and *Customized Distrib. Servs. v. Zurich Ins. Co.*, 862 A.2d 560, 564-65 (N.J. Super. Ct. App. Div. 2004) ("the term 'risk' in the provision 'RISK[ ] OF DIRECT, PHYSICAL LOSS" supports the view that the policy does not require that there be any actual physical damage to or alteration of the material composition of the property").  Cincinnati Insurance Company acknowledged in its

Notice to Policyholders that it was deleting the word "Risks" "[a]s ISO has done in reaction to court decisions."  Exhibit 18.

74.     Indeed, in contemporaneous documents prepared by ISO when it revised its language, ISO cited to the Pennsylvania Supreme Court's opinion in *401 Fourth Street* as support for its position that the "risks of" language is being interpreted broadly by the courts.  Exhibit 27.  ISO relied upon that case as a reason to change its current form even though it acknowledged that the language in the policy at issue in *401 Fourth Street* was different than that used in the ISO form, suggesting that the court decision was of concern and created an potential interpretive problem for insurers, regardless.  Factory Mutual here has argued that the Court should likewise not be compelled by the ruling in *401 Fourth Street* because of its claim of different language from its form.  This did not cause ISO to believe that the ruling should be disregarded as creating exposure for the insurance industry and neither should the Court here.  This ISO document certainly supports the fact that before this case is considered on the merits, discovery should be pursued to identify any additional industry documents that conflict with Factory Mutual's arguments in this litigation.

75.     In 2008, before this Pandemic, Donald S. Malecki, an insurance expert, who was an underwriter for a number of insurance companies, authored a number of insurance-industry sponsored treatises and served on a prominent ISO advisory panel, published an article in *Risk Management* magazine stating that a purchaser of insurance may understand the phrase "risks of direct physical loss" to mean a threat of loss, citing *Customized Distribution* and other similar cases.  Exhibit 19.

76.     In the article, Malecki concluded:  "Considering cases like these, where courts hold that 'risks of direct physical loss or damage' or 'risks of physical loss or damage' do not

require that there be any actual physical damage but simply the threat of physical damage, there soon may be impetus for some subtle policy changes.  Instead of referring to 'risks of direct physical loss,' it may be better for insurers to amend their policies to state that the coverage applies to direct physical loss or damage to covered property from a covered cause (or all covered causes), not hereinafter excluded or limited.  (**_Some insurers have already taken similar precautions, with some even going so far as to avoid reference to 'physical loss or damage' because of its potential for ambiguity._**)" (Emphasis added).

77.     Upon information and belief, Factory Mutual has at all relevant times been aware of the recommendation made by Malecki and the case law Malecki cited.

78.     Factory Mutual nonetheless chose not to remove the term "risks of" from the insuring agreement in the Policy that it sold to the Eagles for a very substantial premium.  The Eagles have faced the imminent "risk"/threat of physical loss or damage to its property covered by the Policy because of the Pandemic.  As a result of Factory Mutual's use of the "risks of" language in its Policy (and also due to the fact that the Third Circuit in _Port Authority_ recognized that actual damage is not required to trigger coverage, but a "threat" is enough), it is not necessary in order to trigger coverage under Factory Mutual's policy for the Eagles to prove the actual presence of Coronavirus on its premises; the threat of its presence and a resulting harm to human health is sufficient to trigger Factory Mutual's coverage.  The Eagles will prove this threat through experts and other evidence during the pendency of this litigation.

### _The Policy's "Additional Coverages" for "Communicable Disease"_

79.     The Policy provides various coverages, including coverage extensions/ additional coverages, that are not mutually exclusive, except where the Policy explicitly so states.  In the instances where Factory Mutual intended a coverage extension to be the sole available coverage

for a particular type of loss, Factory Mutual included policy language expressly stating this limitation.

80.     For example, the Policy covers as an "Additional Coverage" "Data, Programs or Software" coverage.  In that coverage grant, Factory Mutual expressly states that the "Costs recoverable under this Additional Coverage are *excluded from coverage elsewhere in this Policy*."  Exhibit 1, Property Damage form at p. 16 (emphasis added).

81.     With respect to its Additional Coverages for Communicable Disease, Factory Mutual did not include any such language that stated that these coverages were the only coverages under the Policy that applied to Communicable Disease (as that phrase is defined by Factory Mutual in its Policy), or that broader Communicable Disease coverage was otherwise excluded by the Policy.

82.     The Policy's "Communicable Disease Coverages," grant "Additional Coverage" for "Communicable Disease Response" and "Interruption by Communicable Disease," and limit these coverages to $1,000,000.  These are narrow coverages that apply when Communicable Disease (again, as defined in the Policy) is actually present at a property and does not involve circumstances where the Policy's full $1 billion policy limits ordinarily would be triggered— where Communicable disease involves or creates "direct physical loss or damage," including a threat of such physical loss or damage.  In other words, regardless of whether Communicable Disease is actually present, if it is suspected or threatened to be present and that threatened presence could create a significant health hazard to people occupying the premises impairing the property' function or utility, actual or threatened "physical loss or damage" would be involved and the Policy's full limit applies.  The Communicable Disease Coverages thus provide

"Additional Coverage" in the circumstance where the Policy's traditional coverage trigger is not met.

83.     With respect to "Communicable Disease Response," the Policy grants "Additional Coverage" for up to $1,000,000 in insurance for clean-up, removal, disposal and reputation management public relations costs where the "actual" presence of communicable disease is involved at a covered location and access is "limited, restricted or prohibited" by an order of an authorized governmental regulatory agency or a decision of an Officer of the Eagles.  Exhibit 1, Property Damage form at p. 21.

84.     For "Interruption by Communicable Disease," the Policy grants corresponding coverage for the short-term business-interruption loss under the same specified circumstances as the "Communicable Disease Response" coverage section.  As one of the "Additional Time Element Coverage Extensions, "the "Interruption by Communicable Disease" section provides coverage of up to $1,000,000 for the Eagles' "Actual Loss Sustained and EXTRA EXPENSE," where the "actual" presence of communicable disease is involved at a covered location and access is "limited, restricted or prohibited" by an order of an authorized governmental regulatory agency or a decision by an Officer of the Eagles.  Exhibit 1, Time Element form at p. 51.  In direct contrast to the "Data, Programs or Software" additional coverage section, which, as noted above, expressly states that amounts recoverable under that additional coverage "are excluded from coverage elsewhere in [the] Policy," the "Interruption by Communicable Disease" section states that the insurance provided is "part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section," thereby confirming that such coverage is available *concurrently* with *any other* Time Element coverage that may apply.  Exhibit 1, Time Element form at p. 52 (emphasis added).

24

85.     As set forth above, the coverage provided by the Policy's Communicable Disease

Coverages is triggered when (1) "communicable disease" is actually present at an insured

location, and (2) access to that facility is "limited, restricted or prohibited" by the "decision of an

Officer" of the Eagles "as a result of such presence of communicable disease."  If these two

predicates are satisfied, then the Policy covers (1) the "[c]leanup, removal and disposal of such

presence of communicable disease" from the Eagles' facilities together with the costs or fees for

reputation management, and (2) the business interruption coverage loss, up to the applicable

sublimit.  On their face, the Policy's Communicable Disease Additional Coverages do not

require "physical loss or damage" to apply.  However, (as admitted by Factory Mutual in at least

its coverage correspondence with the Eagles), if communicable disease also involves actual or

threatened "physical loss or damage," then other Factory Mutual coverages (and policy limits)

can be triggered.

86.     In fact, Factory Mutual stated as much to the Eagles in its April 21, 2021,

coverage letter.  *See* April 21, 2021, letter attached hereto as Exhibit 26 and incorporated by

reference.  In that letter, after Factory Mutual described its Communicable Disease Additional

Coverages, it stated "in reference to other coverages provided by the Policy," and then explained

that "except as provided by the Policy extensions that specifically extend coverage for ***non-***

***physical*** damage, you must sustain actual physical loss or damage of the type insured to property

for the Policy's coverage to respond."  As a result, Factory Mutual expressly acknowledged that

its Communicable Disease Additional Coverages are not the only coverages (and policy limits)

that could apply to loss associated with communicable disease.  According to Factory Mutual, if

a communicable disease event does not result in physical damage, coverage is still triggered

under the sub-limited Additional Coverage (this is the "additional" coverage).  However, if the

event presents a significant health hazard to people occupying the premises impairing the property' function or utility, then the Policy's traditional and much broader coverage also could be triggered. Under Third Circuit law, a communicable disease event can create physical loss or damage if, by way of example, there exists a risk that it could be released into the airspace of a covered property in sufficient amount to impact the property's function or utility. *See* paragraph 51 above.

87.     Thus, where the insured suffers loss as a result of the presence of communicable disease causing physical loss or damage, both the "Interruption by Communicable Disease" coverage (which does not require physical damage to property as a predicate to coverage) and the broad "Time Element" coverage involving actual or threatened physical loss or damage are triggered. In such instances, the full $1 billion policy limit per-occurrence applies.

### *Factory Mutual's Contamination Exclusion*

88.     In denying coverage, Factory Mutual contended that the Policy's "contamination" exclusion precludes coverage for the Eagles' claim, and has argued that the exclusion applies to communicable disease that involves actual or threatened physical loss or damage, but not the sub-limited Communicable Disease Additional Coverages. According to Factory Mutual, those coverages are "exempted" from the exclusion. Factory Mutual is wrong. On the face of the Policy and in light of Factory Mutual's representations to state insurance regulators when it added the term "virus" to its policy definition of "contamination," its contamination exclusion applies narrowly to virus in the pollution context (such as medical waste dumped in a landfill) and not broadly to human spread infectious disease. In other words, whatever the Contamination exclusion means, and more precisely, whatever the term "virus" means as used in the exclusion, it cannot mean the etiological cause of Communicable Disease, a covered cause of loss. This is

26

so because if it did, then under Factory Mutual's interpretation, the exclusion would apply not just to the Policy's traditional coverages, but also to its Communicable Disease Additional Coverages, rendering those coverages meaningless as a result of being excluded by the Policy.

89.　　The Contamination Exclusion provides:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> 1)　**contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

90.　　A "**contaminant**" is defined as "anything that causes "**contamination**" and "**contamination**" is defined as:

> any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

91.　　Factory Mutual fixates on the word "virus" and says that since COVID-19, a Communicable Disease, is caused by SARS-CoV-2, a virus, the physical loss and damage it causes must be excluded.  This is not correct.

92.　　The Policy contains an express definition for "communicable disease" which is:

> disease which is:
> A.　transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or
> B.　Legionellosis.

Exhibit 1 at General Provisions 13 (Definitions).

93.     That defined term is not included in the Policy's definition of "contamination." And, while Factory Mutual included within the "contamination" definition the terms "pathogen," "pathogenic organism," "virus," and "disease causing or illness causing agent," Factory Mutual did not use those terms in its definition of "communicable disease."  Based upon information and belief, the Eagles allege that Factory Mutual thus did not intend to include "communicable disease" as an excluded "contaminant" under the Policy.

94.     In fact, were "communicable disease" interpreted to be included within "contamination," then the sub-limited Communicable Disease Additional Coverage would have no value because the coverage would be expressly excluded. As a result, Contamination (as used in the Policy) cannot mean Communicable Disease (as defined in the Policy) and the exclusion therefore cannot reasonably be interpreted to exclude the Eagles' loss (which is the direct result of a Communicable Disease).

95.     Understanding the policy interpretation problem created by Factory Mutual's effort to expand its Contamination exclusion to include pandemic-related loss, Factory Mutual has stated in this litigation that its Communicable Disease Additional Coverages are "exceptions" to its Contamination exclusion. In other words, according to Factory Mutual, the Contamination exclusion excludes loss and damage from Communicable Disease, with an exception for the Communicable Disease Additional Coverages. While Factory Mutual may argue that now to overcome an insurmountable hurdle to applying its Contamination exclusion, nowhere in its Policy (which is what governs) does Factory Mutual state that these coverages are so excepted.

28

96.     First, both Communicable Disease Additional Coverages are expressly "subject to the Policy provisions, including applicable exclusions . . . ." Exhibit 1, Property Damage form at p. 16.

97.     Second, the Contamination exclusion does contain an express exception, ***but only*** for radioactive contamination, not for the Communicable Disease Additional Coverages. Exhibit 1, Property Damage form at p. 13, Exclusion D.1 ("This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.")

98.     Third, in other exclusions, Factory Mutual also includes express exceptions. *See, e.g.,* Exclusion A.6. (exception for DECONTAMINATION COSTS and LAW AND ORDINANCE coverages); B.4. (exception for SERVICE INTERRUPTION and OFF PREMISES DATA SERVICES coverages), but again does not do so with respect to its Communicable Disease Additional Coverages. In other words, when it wanted to, Factory Mutual provided for exceptions to its exclusions right in the exclusions themselves. It did not do so with respect to the Communicable Disease Additional Coverages in the Contamination exclusion (or anywhere else in the Policy).

99.     As a result, the only interpretation of "virus" and related terms used by Factory Mutual in its Contamination exclusion that gives meaning to all coverages, including the Communicable Disease coverages (particularly because Factory Mutual did not include the defined phrase "communicable disease" in its Contamination exclusion) is to treat "virus" as used in the Contamination exclusions as involving traditional environmental pollution, not diseases that are transmitted between humans.

100.    Factory Mutual's statements to state regulators in 2006 confirm the reasonableness of such an interpretation.  Prior to 2006, the "contamination" exclusion in

Factory Mutual's standard property policy was expressly limited to traditional pollution. Specifically, the standard policy excluded "contamination including but not limited to the presence of pollution or hazardous material." *See* Exhibit 20, Explanatory Memorandum accompanying Filing FMIC-2006-5, at p. 21 of 35.

101.    On information and belief in or around August, 2006, Factory Mutual sought approval from state insurance regulators in a "nationwide submission done simultaneously," to sell a revised property policy form that includes the language contained in the Contamination exclusion that Factory Mutual used in the Eagles' Policy.  Factory Mutual advised the state regulators approving the form that there was "no change in coverage" from the previous pollution-only exclusion.  In its Explanatory Memorandum accompanying Filing FMIC-2006-5, Factory Mutual explained that the contamination exclusion was:

> editorially revised to accentuate what is meant by contamination. ***No coverage change***. Note that the introductory wording (page 20 in Comparison) to the exclusion has not been amended, and contamination which directly results from other physical damage not excluded by this policy is still covered.  No coverage change.

Exhibit 20, Explanatory Memorandum at p. 2 of 3 (emphasis added).

102.    On information and belief, Factory Mutual submitted Filing FMIC-2006-5 in all states where it proposed to sell its revised form, including in Pennsylvania.

103.    Factory Mutual thus expressly advised insurance regulators including in Pennsylvania that its Contamination exclusion did not reduce coverage to consumers as compared to its 2006 form containing a pollution-only exclusion. Despite its statements to regulators, Factory Mutual now alleges that its exclusion applies much more broadly than to "pollution and hazardous material" and that it is also a pandemic exclusion. The Eagles have not yet had the opportunity to conduct discovery of Factory Mutual to ascertain what additional information it may possess in its files and through its witnesses regarding the meaning and

expanse of its Contamination exclusion, particularly in light of the sub-limited Communicable Disease Additional Coverages and that Factory Mutual chose not to except from its Contamination exclusion the Communicable Disease Additional Coverages.

104.    The Eagles thus allege that the only interpretation of the Contamination exclusion that gives meaning to all policy terms, and is consistent with Factory Mutual's representations to state insurance regulators is that "virus" and other related terms contained in Factory Mutual's Contamination exclusion applies to pollution and hazardous material-related virus, and not virus that is transmitted between humans, such as the Coronavirus.

105.    To the extent Coronavirus was/is actually present or at risk of being present at an Eagles property, its presence would be the result of a natural process, as opposed to conduct causing pollution or contamination. The Eagles reasonably expected and understood that a Contamination exclusion would apply to polluting activities, as opposed to natural catastrophes such as the Coronavirus Pandemic.

106.    Moreover, had Factory Mutual wished to exclude losses resulting from a pandemic, it should and could have created a separate, clear exclusion for such losses.

107.    Indeed, the language of the so-called Contamination Exclusion stands in stark contrast to the language of the Insurance Services Office's ("ISO") "virus or bacteria" exclusion referenced *supra*, which ISO confirmed in contemporaneous documents was intended to address pandemic. Had Factory Mutual wished to exclude coverage for losses resulting from a pandemic or other human-transmitted disease from its Policy, it could have incorporated into the Policy a specific exclusion (such as a pandemic exclusion). At the very least, discovery is necessary to determine why Factory Mutual did not, so that all parties and the Court can evaluate Factory Mutual's coverage based upon a fulsome record.

31

108.    The Eagles also allege that the Contamination Exclusion does not apply because, among other reasons, it excludes only contamination and associated "direct" "costs," not "loss" or "damage," or even indirect "costs," such as time element loss and extra expenses.

## THE INSURANCE INDUSTRY AND FACTORY MUTUAL
## SPECIFICALLY KNEW OF THE RISKS AND DANGERS OF THE PANDEMIC

109.    Insurers, such as Factory Mutual, were repeatedly warned, and have been aware for years, of the potential impact of pandemics. In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do in response to those risks – in the months and years before the Pandemic.  For example:

    a.  One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[11]

    b.  The Insurance Library Association of Boston (founded 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early 2007 through 2018.[12]  The Association states on its website: "The past 20 years has seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well."  The webpage then lists various articles and reports discussing the risks and impacts of pandemics on the insurance industry.  For example, an article stated in 2014 that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, business interruption, travel and event cancellation and disability insurance."[13]

---

[11] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited March 11, 2021).

[12] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited March 11, 2021).

[13] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014).

110.    In 2005, in response to the 2003 outbreak of SARS, the Insurance Services Office (ISO) decided against modifying a "contamination" exclusion to exclude virus from the standard property policy but rather decided to proceed with a standalone "Exclusion of Loss Due to Virus or Bacteria."

111.    Loretta Newman, who participated in leading ISO in its 2006 approach to biological contamination wrote in an internal email on April 18, 2006 that ISO would not use a contamination exclusion to exclude coverage for viruses: "Please do not use this [contamination exclusion] draft.  We are not going forward with it for Commercial Property. Instead we're working on a virus/bacteria exclusion for accelerated filing action."[14]

112.    In 2006, ISO considered the need to draft an exclusion that would bar coverage for losses caused by a virus, and in July 2006 ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to human disease-causing viruses and bacteria.  In that circular, ISO cited "rotavirus, SARS, [and] influenza" and observed that "[t]he universe of disease-causing organisms is always in evolution."  Exhibit 22.

113.    ISO's circular further recognized that "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property."

114.    ISO also expressly warned of a need for its exclusion because "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent."

---

[14] Exhibit 4, Sagalow Certification at ¶ 78.

33

115.     With its circular, ISO thus acknowledged that (i) the presence of a human disease causing virus could give rise to physical loss or damage to property; (ii) such damage could trigger coverage under property policies for property losses, including business interruption losses; and (iii) absent addition of ISO's exclusion, the existing language in property policies, like that issued by Factory Mutual here, did not clearly and unambiguously bar coverage for such losses.

116.     ISO therefore introduced with its circular a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  As noted in the circular, the purpose of this standard form language was to allow those insurers that chose to use it in their insurance policies, to attempt to protect themselves from coverage for loss or damage resulting from infectious material and pandemic.

117.     Accordingly, since 2006 insurers have had the opportunity to incorporate, and have incorporated, this standard virus exclusion in certain of their policies in an effort to avoid covering loss due to a disease such as COVID-19.

118.     Factory Mutual nonetheless chose to not include the ISO or other more express pandemic or similar exclusion(s) in the Policy.

119.     If the Policy does not expressly exclude a particular cause of a risk of physical loss or damage to property, then the non-excluded peril triggers coverage.  Factory Mutual's Policy does not expressly exclude "communicable disease." To the contrary, Factory Mutual did not include its defined term "communicable disease" anywhere within its Contamination exclusion.

## THE PANDEMIC

34

120.    In December 2019, the first instance of a respiratory illness caused by a novel coronavirus was identified in Wuhan, China.  In a matter of weeks, the virus quickly spread across Asia, the United States and most of the world.

121.    In January 2020, the first reported case of Coronavirus occurred in the United States.

122.    On February 11, 2020, the International Committee on Taxonomy of Viruses named this novel coronavirus "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" (the "Coronavirus").  The same day, the World Health Organization ("WHO") named the disease caused by the Coronavirus, "COVID-19."

123.    On March 11, 2020, the WHO declared the Coronavirus outbreak a worldwide pandemic[15] and noted its deep concern "by the alarming levels of spread and severity [of the Coronavirus]." According to numerous public health authorities, *everyone* is at risk of exposure to Coronavirus and falling ill with COVID-19.  Due to its highly contagious and easily transmitted nature, a single instance of Coronavirus in a community can (and as time has progressed, does) quickly and exponentially grow into a massive, uncontainable outbreak.

124.    Coronavirus rapidly spread and continues to spread throughout the United States and the world.  It is present in fluid particles in the air, as well as on surfaces (*e.g.*, walls, furniture, doors, fixtures, countertops and touch screens).  It is highly contagious and easily transmitted from person to person, from airspace to person, or from surface to person.

---

[15] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited March 11, 2021).

125.     Coronavirus has several modes of transmission.  According to the WHO and the Centers for Disease Control and Prevention ("CDC"), Coronavirus can spread from person to person through physical droplets from the nose or mouth that are spread when an infected person sneezes, coughs or exhales.  The physical droplets then remain in and contaminate the air, and also land on and contaminate nearby objects and surfaces, where Coronavirus remains active and dangerous (even while in the air and on inert objects and surfaces) for long periods of time. People "catch" Coronavirus by being in the vicinity of a person who has Coronavirus and breathing in shed droplets, or by touching objects or surfaces on which droplets landed and then touching their own eyes, nose or mouth. Those people then further spread Coronavirus throughout their environments and communities in the same manner.

126.     Coronavirus spread widely in this manner, in Pennsylvania, New Jersey, and nationwide, including through interactions with physical property inside premises, and encounters with airborne particles within premises.

127.     Importantly, even asymptomatic infected persons (*i.e.*, those who have no sign of illness) can and do spread Coronavirus.[16]  In fact, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[17]

128.     According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one

---

[16] *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited March 11, 2021).

[17] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM)*,* https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last visited March 11, 2021).

infectious cough."[18]  And, one human sneeze can expel droplets that can travel up to 27 feet at

nearly a hundred miles an hour.[19]  Thus, the WHO has reported that airborne transmission of

Coronavirus may be possible in certain circumstances, and "is different from droplet

transmission as it refers to the presence of microbes within droplet nuclei, which…[can] be

transmitted to others over distances greater than 1 m."[20]

129.    Respiratory droplets expelled from infected individuals remain in the air, and land

on, attach, and adhere to surfaces and objects.  In doing so, they physically change the airspace

of the relevant premises and the property and its surface by becoming a part of that surface.  As a

result of this physical alteration, contact with that previously safe, airspace, as well as inert

surfaces (e.g., walls, tables, countertops) has been made unsafe.

130.    At the time Factory Mutual evaluated the Eagles' claim for coverage, numerous

scientific studies had documented that Coronavirus can physically remain in and alter a

premises' airspace and property for extended periods of time.  For example:

    a.    A study documented in the *New England Journal of Medicine* found that
        Coronavirus is detectable in aerosols (*i.e.*, fine solid particles in air) for up
        to three hours, on copper for up to four hours, on cardboard up to 24 hours

---

[18] *See* Yuliya Pashina-Kottas, *et al.*, *This 3-D Simulation Shows Why Social Distancing Is So Important*, *The New York Times* (April 14, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited March 11, 2021).

[19] *See* Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited March 11, 2021).

[20] *See* World Health Organization, *Modes of Transmission of Virus Causing COVID-19: Implications for IPC* (Mar. 29, 2020, updated on July 9, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (last visited March 11, 2021).

and on plastic or stainless steel for ***up to two to three days***.[21]

b.     Another study found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for ***up to nine days***.[22]

c.     A peer-reviewed article published in *Virology Journal* on October 7, 2020 found that Coronavirus can survive on surfaces for ***up to 28 days*** at ambient temperature and humidity (20 °C [68 °F] and 50% RH).[23]   The article concludes that Coronavirus "can remain infectious for significantly longer time periods than generally considered possible."

131.    The recent consensus among researchers, the CDC and WHO is that a predominant mode of transmission of Coronavirus and/or COVID-19 is through the air.[24] Scientists have recently confirmed that infections can be prevented through improved ventilation and better indoor air quality guidelines to cover airborne pathogens.[25]   For example, a study in the journal *Science* issued on May 14, 2021 "suggest[s]that the rapid growth in our understanding of the mechanisms behind respiratory infection transmission should drive a

---

[21] *See* News Release, *New Coronavirus Stable for Hours on Surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), *available at* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited March 11, 2021).

[22] *See* G. Kampf *et al., Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation with Biocidal Agents*, J. HOSPITAL INFECTION (Feb. 6, 2020), *available at* https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (last visited March 11, 2021).

[23] *See* S. Riddell, *et al., The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited March 11, 2021).

[24] Jason Gale, *Covid-19 Is Airborne, Scientists Say. Now Authorities Think So, Too,* Bloomberg (May 16, 2021), https://www.bloomberg.com/news/articles/2021-05-16/covid-is-airborne-scientists-say-now-authorities-think-so-too (last visited December 14, 2021).

[25] *Id.*

paradigm shift in how we view and address the transmission of respiratory infections to protect

against unnecessary suffering and economic losses."[26]

132.    The CDC updated its guidance as of May 7, 2021 to reflect that exposure occurs

through "inhalation of very fine respiratory droplets and aerosol particles" in addition to

"deposition of respiratory droplets and particles on exposed mucous membranes in the mouth,

nose, or eye by direct splashes and sprays, and "touching mucous membranes with hands that

have been soiled either directly by virus-containing respiratory fluids or indirectly by touching

surfaces with virus on them."[27]

133.    The WHO updated its guidance as of April 30, 2021, stating, *inter alia,* that "The

virus can also spread in poorly ventilated and/or crowded indoor settings, where people tend to

spend longer periods of time. This is because aerosols remain suspended in the air or travel

farther than 1 metre (long-range)."[28]

134.    State and local governments and public health officials acknowledged that

Coronavirus causes physical loss and damage to property.  For example:

a.    The City of Philadelphia issued an Emergency Order that states "COVID-19 may
remain viable for hours to days on surfaces made from a variety of materials
located in businesses and other places, thus contaminating certain ***property*** and
places." (emphasis added).

---

[26] Lidia Morwaska, et al., *A paradigm shift to combat indoor respiratory infection, Science* (May 14, 2021), https://science.sciencemag.org/content/372/6543/689 (last visited December 14, 2021).

[27] *Scientific Brief: SARS-CoV-2 Transmission,* CDC (updates as of May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html#:~:text=References-,SARS%2DCoV%2D2%20is%20transmitted%20by%20exposure%20to%20infectious%20respiratory,respiratory%20fluids%20carrying%20infectious%20virus (last visited December 14, 2021).

[28] *Coronavirus Disease (COVID-19): How is it transmitted?,* WHO (updated April 30, 2021), https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted (last visited December 14, 2021).

    b.   The Secretary of the Pennsylvania Department of Health issued an Order Directing Building Safety Measures in part because "exposure is possible by touching a **surface or object** that has the virus on it and then touching one's nose, mouth or eyes." (emphasis added).

    c.   The State of New Jersey issued an Order requiring closures of certain "brick-and-mortar facilities" and businesses in order to minimize "contact with common surfaces."

135.    The physical effects of the Coronavirus and/or Pandemic are not something that one can determine by glancing at the air, a door handle or a light switch and deciding that they look undamaged. Instead, those physical effects are established through factual and expert investigation, studies, and evidence, including through testimony by experts in the field of, for example, epidemiology and virology.

136.    As Factory Mutual is aware, experts have already opined in other similar matters as to the precise mechanism by which such damage occurs.  In litigation pending in the Nevada federal court against Factory Mutual's sister company, Affiliated FM Insurance Company, styled *Treasure Island LLC v. Affiliated FM Ins. Co*., No. 2:30- cv-00965-JC-EJY (D. Nev.), the insured's virology expert, Dr. Angela Rasmussen, opined as follows in her November 6, 2020 initial report (*see* Exhibit 23 attached hereto, as attached to the complaint in the action styled *Cinemark Holdings, Inc. v. Factory Mutual Ins. Co*, No. 4:21-cv-00011 (E.D. Tex.)):

    a.   "COVID-19 is a communicable disease that impacts and physically damages Treasure Island's property in the following way: persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces at Treasure Island. This results in tangible, demonstrable, and detectable physical alternation and transformation to the air and surfaces rendering them dangerous transmission vehicles for the potentially deadly disease."

    b.   "The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Because COVID-19 is an infectious viral disease that can be transmitted to susceptible people, it causes additive, sustained property damage. A substantial amount of transmission is prior to onset of clinical symptoms, which makes it difficult to detect. Due to the size of the property at Treasure Island, cleaning and disinfection alone are insufficient to remediate the damage."

40

137.     In the same case, the insured's epidemiology expert, Dr. Alex LeBeau, opined in his November 6, 2020 initial report (see Exhibit 24 attached hereto, as attached to the complaint in the action styled *Cinemark Holdings, Inc. v. Factory Mutual Ins. Co*, No. 4:21-cv-00011 (E.D. Tex.)) as follows: "Individuals with COVID-19 at Treasure Island altered the physical characteristics of surfaces and the air of occupied spaces at the location and at facilities in the vicinity with respiratory secretions and aerosols. As a result, the surfaces and air of occupied spaces at Treasure Island became vehicles for COVID-19 transmission."

138.     The damage to property caused by persons with COVID-19 is not limited to the duration that infection from a single source remains present.  A recurrent cycle of infection via the  air, infectious surfaces, and contact between an infected person and others will further damage property, thus resulting in sustained property damage.

139.     Mere cleaning and disinfecting of the property and the air does not repair or remediate the actual physical and tangible alteration to property caused by Coronavirus and/or COVID-19, nor does it transform the property from its unsafe, hazardous and potentially deadly condition.

140.     A number of studies have demonstrated that Coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[29]   The measures that must be taken to remove Coronavirus from property are significant and go far beyond ordinary or routine cleaning.  A study by the Northwell Health System concluded that even the decontamination

---

[29] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://doi.org/10.1002/jmv.26170 (last visited November 30, 2021).

procedures recommended by the WHO for intensive-care units were not effective at removing SARS-CoV-2, and in particular were ineffective against aerosolized particles.[30]

141.    Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[31]  Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[32]

142.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents.  The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[33]

143.    Critically, cleaning surfaces will not remove the aerosolized Coronavirus particles from the air that can be inhaled and cause people to develop COVID-19[34]—no more than cleaning friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases.  Nor will routine cleaning prevent an infected person from entering the property and

---

[30] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612/ (last visited December 14, 2021).

[31] *Id.*

[32] Joon Young Song et al., *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 254-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited November 30, 2021).

[33] *Id.*

[34] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612/ (last visited December 14, 2021).

exhaling Coronavirus particles and virions into the air and surrounding environment.  What was

and is necessary to repair airspace and surfaces within a premises to address the dangers of

spread of Coronavirus requires factual and expert input and analysis.

144.     In *Treasure Island, LLC v. Affiliate FM Insurance Co.*, epidemiology expert

Joseph Lewnard, Ph.D. explained that to entirely clean the insured property would take

> a minimum of 24 or 48 hours, during which time functions would need to be
> suspended to allow cleaning to take place. Assuming a 48-hour cleaning, we see
> that even at the lowest background prevalence considered (0.1%), re-introduction
> would be expected before cleaning could be completed in over one half of
> instances; with a 24-hour cleaning, re-introduction would be expected before
> cleaning could be completed in roughly one in three instances. . . . [The insured]
> would, in effect, need to remain continuously closed in order to address
> introductions of COVID-19 at the rate they would be expected to occur.

Exhibit 25 ("Lewnard Report") ECF No. 205-3 at 131.

145.     Accordingly, because an individual with no symptoms can spread Coronavirus

simply by breathing or talking (and certainly by yelling and screaming for their team at an Eagles

football game),, and because droplets containing Coronavirus can remain in the air and land and

remain infectious on surfaces for substantial time, ***the risks*** posed by Coronavirus are not

temporary.  Even if the air and surfaces at a covered premises can be thoroughly and effectively

cleaned, each time an infected person enters that space the cycle renews such that infectious

Coronavirus is likely (if not certain) to be present wherever people are located or congregate,

particularly if they are congregated as would be intended for the Eagles' premises to be used for

their intended function.  The world has seen communities shut down and reopen, only to be shut

down again following another outbreak.  Until recently, with the advent and administration of

COVID-19 vaccines to people across the country and world, the risk of spread of Coronavirus in

an environment such as the Eagles' premises when used for their intended function was a near

certainty, particularly when the people are gathered in packed and raucous screaming crowds at a

football stadium to cheer on their football team. The virtually guaranteed risk of significant harm and damage to persons and property (including its airspace), and in particular in a location such as the Eagles stadium, prior to the widespread administration of the vaccine, is why it became necessary to close or strictly limit the use of the Eagles' premises; and it is why in some instances those closures and restrictions continued to remain necessary for a wholly unforeseen and extended period. This chain of events created great risk to the Eagles of physical loss or damage to covered property, in addition to actual physical loss or damage to property.

146.    Owing to the Coronavirus' contagiousness and pervasiveness once the Pandemic began, it was statistically certain that many individuals in or around commercial properties where people congregate had been exposed to the Coronavirus and were carrying the virus. Statistical modeling confirms to a high degree of certainty that the Coronavirus has been imminently present or actually present in or around such commercial properties, including insured premises.[35] After the Pandemic began, it also was statistically certain that the Coronavirus was being dispersed continuously into the air and on property in or around such premises.

---

[35] *See, e.g.*, Exhibit 25, Lewnard Report, ECF No. 205-3 at 126-128; *COVID-19 Event Risk Assessment Planning Tool*, Georgia Institute of Technology https://covid19risk.biosci.gatech.edu; *Covid-19 Projections*, IHME https://covid19.healthdata.org/united-states-of-america?view=total-deaths&tab=trend; *Covid-19 Risk Mapping*, Columbia University, https://columbia.maps.arcgis.com/apps/webappviewer/index.html?id=ade6ba85450c4325a12a5b 9c09ba796c; *Covid-19 Modeling*, NORTHEASTERN UNIVERSITY, https://covid19.gleamproject.org; *LANL Covid-19 Cases and Deaths Forecasts,* LOS ALAMOS NATIONAL LABORATORY, https://covid-19.bsvgateway.org

147.    Once the Pandemic began in the United States, COVID-19 positivity rates revealed by the commercially available testing initially available demonstrated the pervasiveness of the Coronavirus in or around such premises.[36]

148.    Epidemiologists have explained that "the percent positive is a critical measure because it gives us in indication of how widespread infection is in the area where the testing is occurring[.]"[37]  It is a crucial indicator of whether a business can safely remain open.  As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[38]

149.    Once the Pandemic began in the United States, the Commonwealth of Pennsylvania and City of Philadelphia began experiencing exceptionally high positivity rates far exceeding this CDC-standard.  As of May 15, 2020, the positivity rate in Philadelphia was approximately 13%.[39]

150.    In addition, owing to the absence of commercially-available tests for surface and aerosol presence of the Coronavirus and the shortage of testing kits for humans at the time the Pandemic began in the United States, positive test results did not and could not provide sufficient means for ascertaining the full presence of the Coronavirus in or around commercial properties, including insured premises.

---

[36] *See, e.g.*, Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NATURE HUM. BEHAV. 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9

[37] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html

[38] *Id.*

[39] *Philly COVID positive rate worse than other big U.S. cities, cases surge past spring peak,* available at https://billypenn.com/2020/11/15/philly-covid-restrictions-surge-worse-other-cities-spring-peak/

151.    The high number of COVID-19 deaths indicates a significantly higher number of cases than those that have been confirmed by COVID-19 tests.[40]  The Infection Fatality Ratio (IFR) for COVID-19 is defined as the number of individuals who die of the disease per 1,000,000 infections.[41]  Application of the IFR to the United States death toll of 738,000 since the beginning of the Pandemic,[42] results in a larger number of statistically positive cases than those confirmed by tests.

152.    The CDC estimated that the number of people in the United States who have been infected with COVID-19 was ten times higher than the number of reported cases in June 2020.[43]

153.    The actual and/or threatened presence of Coronavirus particles at the Eagles' premises rendered physical property within the premises damaged, unusable, uninhabitable, unfit for intended function, dangerous, and unsafe.  It impaired and diminished the value, utility and normal function of the premises (including the airspace and physical property contained within).  Similarly, the presence at the Eagles' premises of individuals infected with Coronavirus, or carrying Coronavirus particles on their body (including their clothing and any other objects on their body), rendered and/or created the risk of the premises, including the airspace within those premises unusable for their intended function, damaged and unsafe.  These circumstances caused and/or created the risk of physical loss and damage to the covered premises and property. And,

---

[40] Andrew T. Levin et al., *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, 35 EUR. J. EPIDEMIOLOGY 12, 1123-38 (Dec. 2020), https://pubmed.ncbi.nlm.nih.gov/33289900

[41] CDC, *COVID-19 Planning Pandemic Scenarios*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

[42] *See Coronavirus in the U.S.: Latest Map and Case Count*, NEW YORK TIMES, https://www.nytimes.com/interactive/2021/us/covid-cases.html

[43] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, WASH. POST (June 25, 2020, 10:41 PM), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger

as to premises where Coronavirus was not in fact specifically identified, given the nature of the disease, the risk of such consequences was near certain, if not certain.

154.    The Policy expressly insures against the "risks" of Coronavirus and the Coronavirus rendered the Eagles' properties, among other things, unusable, damaged, unsafe or not able to be used for their full and intended functions.

## THE EAGLES AND GOVERNMENTAL PUBLIC HEALTH RESPONSES TO THE PANDEMIC

155.    On March 16, 2020, the CDC and the national Coronavirus Task Force issued guidance titled "30 Days to Slow the Spread" of Coronavirus.  The guidance called for extreme social distancing measures, such as working from home and avoiding gatherings of more than 10 people.

156.    On March 16, 2020, Pennsylvania Governor Tom Wolf issued guidance encouraging non-essential businesses, expressly including sporting event venues, to close.

157.    On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses to close.

158.    On March 23, 2020, Governor Wolf issued an order requiring individuals residing in certain Pennsylvania counties, including Philadelphia County, to stay at home.

159.    Governor Wolf's orders related to Coronavirus were extended and modified from time to time, including during the Eagles' 2020-21 playing season.

160.    On March 17, 2020, the City of Philadelphia issued an Emergency Order prohibiting the operation of non-essential businesses.

161.    The City of Philadelphia further prohibited the operation of non-essential businesses by order dated March 22, 2020.

47

162.     The City of Philadelphia's orders related to Coronavirus were extended and modified from time to time, including during the Eagles' 2020-21 playing season.

163.     Commencing in March 2020, as a result of the risks associated with the Pandemic, including physical loss or damage to covered property, and in compliance with government guidance and orders, the Eagles limited, reduced or suspended operations at its covered premises.

164.     On March 12, 2020, the Eagles announced the closure of the NovaCare Complex and Lincoln Financial Field.

165.     The Eagles were required to close their Eagles Pro Shop retail stores located at Lincoln Financial Field, in Lancaster, Pennsylvania and in Cherry Hill, New Jersey.

166.     Over the next months, the Eagles incurred substantial costs to implement and comply with social distancing mandates and governmental guidelines at the NovaCare Complex and Lincoln Financial Field in order to ready the building for the team's training camp.  The measures included: building additional weight rooms to accommodate players; knocking down walls between meeting rooms to make them larger; removing seating in the cafeteria; putting up outdoor tents for eating and meetings; spacing out lockers in the locker room; converting windows into doors leading to outdoor tents; providing each player his own toiletries rather than shared toiletries; installing touchless dispensers; and putting up signage indicating where staff and players should walk within the building.  The Eagles incurred additional substantial expense in connection with, among other things, (1) conducting virtual off-season programs that required necessary supplies to be delivered to the players at their virtual locations, (2) performing a virtual draft, (3) addressing virtual technology issues, and (4) purchasing protective face masks, PPE, temperature check machines, and technology for COVID-19-related questionnaires.

167.    Beginning with the Eagles' training camp in August 2020, staff and players were tested daily for Coronavirus.  The Eagles installed new tents at the NovaCare Complex for tests and temperature screenings.  Each player was provided his own water bottle and single use towels.  The complex was cleaned throughout the day and after each day's football work was done.

168.    In July 2020, the NFL formally announced that due to the Pandemic, all pre-season games, typically held in August and September of each football season, were cancelled. As a result, the Eagles could not sell tickets or derive revenue from any pre-season games in August and September 2020.

169.    During the summer of 2020, the Eagles worked with state and local government agencies, public health experts, and NFL officials to develop health and safety protocols for the 2020 regular football season.

170.    Ultimately, although the Eagles were permitted to conduct in-person games at the start of the regular season, due to the extreme risk of spread of Coronavirus, attendance was limited to team personnel, league officials, and certain media personnel.  At the start of the season, again due to the extreme risk of spread, no public fans were permitted to attend games at Lincoln Financial Field.  The Eagles played their games to mostly empty stadiums, and fans who otherwise would have purchased tickets were famously replaced in the stands by cardboard "cut-outs."

171.    In October 2020, the Eagles, the City of Philadelphia, and the Commonwealth of Pennsylvania developed a plan that allowed limited attendance at home games, capping attendance at Lincoln Financial Field to 7,500 individuals, including team personnel and the

media, reducing by over 90% the seats that the Eagles would have been able to sell for games at the stadium.

172.    On November 16, 2020, in response to a surge in Coronavirus cases and the dangers that would be presented were the Eagles to continue to allow even limited fans to attend games, the Eagles announced that fans would no longer be permitted to attend in-person games at Lincoln Financial Field.

173.    Despite the substantial costs incurred to guard against the risks of Coronavirus, including use limitations and closures of their properties, actual incidents of COVID-19 were detected at covered locations, including the NovaCare Complex, Lincoln Financial Field, and the Eagles ProShop in Lancaster, Pennsylvania.  Following these incidents, the Eagles incurred costs to clean the premises and perform contact tracing, among other costs.

## **THE IMPACT OF THE PANDEMIC**

174.    The impact of the Pandemic has been massive and devastating to people, property, businesses, and local governments.

175.    As of March 11, 2021, when the Eagles' initial complaint was filed, Coronavirus was detected in nearly every country.  Total reported cases topped 118 million people, and more than 2.62 million people had died.  In the United States alone, more than 29.2 million people had tested positive for COVID-19, and more than 529,000 people had died as a result of it.

176.    The states', cities' and counties' attempt at phased reopenings in the summer and fall of 2020 did not help matters.  As some visitors cautiously returned to patronize businesses, so did Coronavirus – leading many localities to reimpose restrictions on businesses, to combat later surges.

177.    For these reasons, it was virtually certain during the heights of the Pandemic that Coronavirus presented an ongoing risk of physical loss or damage to the Eagles' covered premises.  Each time any person entered a place of business, so did the risks associated with Coronavirus.

178.    Indeed, if the Eagles had conducted business as usual, the disease and virus spread would have been inevitable, as well as its resulting impact on persons and property. Under these circumstances, the Eagles' property could not be used according to its intended function.

## THE FACTORY MUTUAL INSURANCE POLICY
## APPLIES TO THE EAGLES' CORONAVIRUS LOSSES

179.    The risk of and actual spread of Coronavirus causes physical loss or damage to property, and the Policy includes no enforceable exclusion that would preclude coverage for such risks of loss or damage to covered property.

180.    The Eagles have complied with all terms and conditions contained in the Policy, except to the extent its performance has been or is excused or waived by Factory Mutual, and the Eagles accordingly are entitled to the full coverage provided by the Policy, up to its maximum per-occurrence limits, for the losses the Eagles have suffered as a result of the Coronavirus and/or the Pandemic.

### *The Policy's Property Coverage Applies*

181.    The Policy provides coverage of up to $1 billion per occurrence for "all risks of physical loss or damage" to Real Property and/or Personal Property (as defined in the Policy), unless such property is excluded or results from an excluded cause of loss.

182.    The Eagles have faced the imminent "risk" of, and actual, physical loss or damage to their property because of the Pandemic.

183.    Accordingly, the Policy has been triggered, and the Eagles' loss or damage to their property is covered by the Policy.

184.    The Eagles are entitled to recover their covered losses with respect to physical loss or damage to their property up to the full $1 billion per occurrence limits provided in the Policy.

### *The Policy's Time Element and Extra Expense Coverages Apply*

185.    The Policy provides coverage for up to $1 billion per occurrence for "TIME ELEMENT loss" "directly resulting from physical loss or damage of the type insured" to covered Property during the "Periods of Liability" described.

186.    The term "physical loss or damage of the type insured" means "all risks of physical loss or damage" to covered property.  The Policy therefore provides business interruption coverage when the insured suffers an interruption of its business activities due to the "risks" of the Pandemic causing physical loss or damage to covered property, in addition to any actual loss or damage.

187.    The Policy does not require a total cessation of business for an insured incur covered Time Element losses.

188.    The Eagles limited or ceased their operations at covered premises because of the presence of Coronavirus and/or the imminent "risk" that Coronavirus would cause physical loss or damage to covered property.

189.    The "Period of Liability" provision establishes the time period during which Factory Mutual will be obligated to provide coverage for Time Element losses.  For Time Element losses measured other than by Gross Profit, this provision prescribes that the Period of Liability begins when the policyholder suffers "physical loss or damage of the type insured" and

ends "when with due diligence and dispatch" the covered property could be "(i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."  For Time Element Coverage for losses measured by Gross Profit, this provision establishes that the Period of Liability begins when the policyholder suffers "physical loss or damage of the type insured" and ends not later than the period of time shown in the Declarations, which is 12 months (i.e., without requiring repair or replacement of property).  These provisions govern the duration of coverage; they do not govern whether coverage is triggered, nor do they impose any prerequisite to coverage.  Moreover, as mentioned above in paragraph 58, even Factory Mutual has agreed that amounts spent in response to a communicable disease event can constitute "repair" as that term is used in Factory Mutual's claimed "Period of Liability."  The Eagles will provide evidence regarding the duration of the "Period of Liability" during the course and scope of this litigation.

190.    The Eagles are entitled to recover their covered Time Element losses up to the full $1 billion per occurrence limits provided in the Policy.

191.    As part of the Time Element coverage, the Policy covers as "Extra Expense" the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" and "extra costs of temporarily using property or facilities of the Insured or others," among other expenses, during the Period of Liability.

192.    The Eagles incurred Extra Expenses, as that term is defined by the Policy.

193.    For these and other reasons, the Policy's "Time Element" and "Extra Expense" coverages are triggered.  The Eagles are entitled to recover their Time Element loss and Extra Expenses incurred up to the applicable limits provided by the Policy.

### ***The Policy's Communicable Disease Additional Coverages Apply***

194.    As set forth above, the Policy provides up to $1,000,000 or more for response costs incurred as a result of the "*actual* not suspected" presence of communicable disease such as Coronavirus or COVID-19

195.    The relevant language of the Policy describing this coverage includes the following:

**COMMUNICABLE DISEASE RESPONSE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

> 1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

> 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

> 1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

> 2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

196.    As also set forth above, the Policy provides up to $1,000,000 or more for business interruption as a result of the "*actual* not suspected" presence of communicable disease such as Coronavirus or COVID-19.  The $1,000,000 limit is an aggregate limit for Communicable Disease Response and Interruption by Communicable Disease combined.

197.    The relevant language of the Policy describing the Interruption by Communicable

Disease coverage includes the following:

### INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual
not suspected presence of **communicable disease** and access to
such **location** is limited, restricted or prohibited by:

> 1) an order of an authorized governmental agency
> regulating the actual not suspected presence of
> **communicable disease**; or

> 2) a decision of an Officer of the Insured as a result of the
> actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA
EXPENSE incurred by the Insured during the PERIOD OF
LIABILITY at such **location** with the actual not suspected
presence of **communicable disease**.

198.    The term **"communicable disease"** is defined as:

disease which is:

> A. transmissible from human to human by direct or indirect
> contact with an affected individual or the individual's
> discharges, or

> B. Legionellosis.

199.    Coronavirus or COVID-19 qualifies as a "communicable disease" under the

Policy.

200.    The actual presence of Coronavirus or COVID-19 has been confirmed at the

Eagles' locations.

201.    These locations have incurred costs for the cleanup, removal and disposal of the

actual not suspected presence of Coronavirus or COVID-19 from insured property.

202.    These locations have incurred interruption/time element losses as a result of the

actual not suspected presence of Coronavirus or COVID-19 at insured property.

203.     As addressed above, these costs are covered under the Policy under the Communicable Disease Additional Coverages.

204.     As set forth above, the Eagles also have suffered covered Time Element loss because of, e.g., the imminent "risk" that the Coronavirus and/or the Pandemic would cause physical loss or damage to covered property had the Eagles continued to use their property for its intended functions.  As also set forth above, the full $1 billion limit the Policy grants for this Time Element coverage accordingly applies with respect to the Eagles' losses.

### *There is No Enforceable Policy Exclusion Applicable to the Eagles' Loss*

205.     A pandemic, such as the Coronavirus Pandemic, is not excluded by the Policy.

206.     In denying coverage, Factory Mutual contended that the Policy's "contamination" exclusion applies to limit or bar coverage. For the reasons discussed above in Paragraphs 88 – 108, the Contamination Exclusion does not apply to the Eagles' loss.

### *Representations Factory Mutual Previously Made to State Insurance Regulators Contradict the Reading of the Contamination Exclusion" It Now Advocates*

207.     Factory Mutual's current position that the Contamination exclusion applies to the Pandemic is also contrary to representations that Factory Mutual made to state insurance regulators at the time it sought regulatory approval to sell its insurance policy to Pennsylvania consumers, as discussed above in Paragraphs 100 – 104.  For this additional reason, and due to the Doctrine of Regulatory Estoppel, Factory Mutual may not rely upon its Contamination exclusion to deny coverage for the Eagles' claim.

### FACTORY MUTUAL'S DENIAL OF COVERAGE

208.     The Eagles timely reported their losses to Factory Mutual under the Policy.

209.     By letter dated July 27, 2020, Factory Mutual stated that the only coverage that "appears potentially available under our Policy for losses arising from COVID-19 is found in our

Communicable Disease coverages, assuming the conditions of those coverages are satisfied." Factory Mutual failed to evaluate and thus denied all other coverage under the Policy.  A true and correct copy of Factory Mutual's July 27, 2020 letter is attached hereto as Exhibit 6 and is incorporated by reference.

210.    The Eagles responded to Factory Mutual's July 27, 2020 letter by disputing Factory Mutual's coverage position and providing, in compliance with applicable privacy regulations regarding individual privacy interests, reasonably available information about COVID-19 incidents at the insured premises.

211.    On April 21, 2021, Factory Mutual issued another letter stating that "there is a potentially recoverable claim related to the additional policy coverages related to Communicable Diseases."  A true and correct copy of Factory Mutual's April 21, 2021 letter is attached hereto as Exhibit 26 and is incorporated by reference.  In that letter, Factory Mutual admitted that if the Eagles could show "all risks of direct physical loss or damage" resulting from the Pandemic, other coverages within Factory Mutual's Policy also would apply, including its Time Element coverages. Exhibit 26 at p. 4.

212.    Factory Mutual's July 27, 2020 and April 21, 2021 letters and later correspondence with the Eagles demonstrate Factory Mutual's awareness that the Communicable Disease Additional Coverages are separate and additional coverages apart from the Time Element coverage.

213.    Factory Mutual's denial of coverage is contrary to its widely publicized representations that it is an expert in underwriting and studying casualty-related risks and tailoring property coverage to a client's actual exposures.

214.    Factory Mutual's denial is contrary to its prior admissions and statements made to state regulators that communicable disease causes physical damage to property.

215.    Factory Mutual's denial is contrary to its prior admissions and statements made to state regulators that the Contamination Exclusion is limited to traditional pollution.

216.    In its Policy, Factory Mutual covered the risks associated with Communicable Disease (as defined by the Policy) by providing broad coverage when Communicable Disease involves "all risks of direct physical loss of or damage," and narrow sublimited coverage when Communicable Disease is actually present and does not involve direct physical damage to property.  Factory Mutual provided both broad and narrow coverages, without including an applicable exclusion or other limitation that would preclude coverage in the event of a pandemic for circumstances such as those at issue here that have caused significant Time Element loss for the Eagles.

217.    Factory Mutual misstated the scope of the Policy by, *inter alia,* stating that coverage is limited to Communicable Disease Response and Interruption by Communicable Disease, and that the Contamination exclusion applies, even though such exclusion is inapplicable, ambiguous and/or unenforceable.

218.    The Eagles have complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or waived by Factory Mutual.

## COUNT I

## DECLARATORY JUDGMENT – POLICY COVERAGE

219.    The Eagles reallege and incorporate by reference all preceding allegations as if fully stated herein.

220.    The Eagles seek a declaration by this Court of their rights and the obligations of Factory Mutual under the contractual agreement to provide coverage for the Eagles' losses.

221.    The Eagles contend that Factory Mutual has a duty to pay for the Eagles' losses caused by the risks of the Pandemic, pursuant to the terms and conditions under multiple coverages of the Policy.  Factory Mutual disputes the Eagles' contentions.

222.    Factory Mutual contends that coverage under the Policy is limited to Communicable Disease Response and Interruption by Communicable Disease, and its associated policy limit.

223.    The Eagles have complied with all the terms and conditions of the Policy, except to the extent performance has been or is excused or waived by Factory Mutual.

224.    The Eagles contend that the Policy provides full policy limits coverage for their losses and that Factory Mutual's coverage analysis to date is contrary to the Policy, the law, and public policy.

225.    The Eagles contend that the Policy must be interpreted in a reasonable manner to provide the coverage that the parties intended and understood was being provided, and that is in accord with the Eagles' reasonable expectations.  The Eagles are informed and believe, and on that basis allege, that Factory Mutual disputes these contentions.

226.    An actual and justiciable controversy exists between the Eagles and Factory Mutual concerning the matters alleged herein.

227.    In the event that this Court declines to grant the Eagles' request for remand, the Eagles are entitled to a judicial declaration by the Court pursuant 28 U.S.C. § 2201, which is being sought without prejudice to their right to seek remand to the Court of Common Pleas, confirming: that Factory Mutual's contentions as stated above are wrong, and that the Eagles'

contentions as stated above are correct; that Factory Mutual must honor all duties under its

Policy, including its duty to pay for the full amount of losses incurred as a result of the risks of

the Pandemic; and that because of Factory Mutual's conduct, the Eagles are excused from

performing or complying with any conditions and duties otherwise imposed on the Eagles by the

Policy.

228.    Declaratory relief by this Court will terminate some or all of the existing

controversy between the parties.

**COUNT II**

**DECLARATORY JUDGMENT – REGULATORY ESTOPPEL**

229.    The Eagles reallege and incorporate by reference all preceding allegations as if

fully stated herein.

230.    In the course of seeking regulatory approval to sell its standard property form to

consumers, including the "Advantage – TE Select – United States – 2016" that was sold to the

Eagles, Factory Mutual made numerous representations and admissions to state insurance

regulators about the scope of coverage provided by this form and Contamination exclusion

contained in this form, which contradict the assertions that Factory is now making its quest to

avoid coverage for the Eagles' claims.  Under the regulatory estoppel doctrine, Factory Mutual is

now estopped from asserting that the Policy does not afford coverage for the Eagles' losses.  *See

Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 566 Pa. 494, 781 A.2d 1189 (2001).

231.    As is also set forth above, at the time it sought approval of the same version of the

Contamination exclusion, as sold to the Eagles, the Eagles are informed and believe that Factory

Mutual expressly represented to state insurance regulators including in Pennsylvania that the

exclusion did not reduce coverage to consumers from the previous version of the exclusion that

60

was strictly limited to traditional environmental pollution. Factory Mutual is therefore estopped under the doctrine of regulatory estoppel from representing to the Court and the Eagles that "virus" or pandemic is encompassed by the Contamination exclusion, or enforcing the Contamination exclusion against the Eagles to bar coverage for the Eagles' Pandemic-related losses.

232.    As set forth above, Factory Mutual's admissions and representations in securing regulatory approval of its Communicable Disease Additional Coverages that initially were offered only to healthcare insureds contradict it current categorical contentions that a virus cannot cause physical loss or damage to property triggering coverage.  As alleged above, Factory Mutual stated in securing approval to sell the Communicable Disease Additional Coverages to healthcare insureds that the presence of and spread of communicable disease qualified as involving direct physical damage for which coverage was provided.  As further alleged above, the Eagles are informed and believe that at the time it sought regulatory approval in 2016 for the form of the Communicable Disease Additional Coverages contained in the Policy sold to the Eagles, Factory Mutual represented to state insurance regulators including in Pennsylvania that the Communicable Disease Additional Coverages were "expansions" in coverage – not restrictions of the additional communicable disease coverage offered to healthcare insureds for which Factory Mutual had previously secured approval.

233.    Factory Mutual is therefore estopped under the doctrine of regulatory estoppel from representing to the Court and to the Eagles that communicable disease does not trigger coverages under the Policy that require physical loss or damage to property, including the Time Element coverage.

234.    If regulatory estoppel is established, this doctrine prevents Factory Mutual from enforcing misrepresented policy language, even if the Court otherwise would find that it clearly and unambiguously prevents coverage (here, in any event, the challenged policy language does not clearly and unambiguously apply in Factory Mutual's favor).  *Sunbeam,* supra.

235.    In the event that this Court declines to grant the Eagles' request for remand, the Eagles are entitled to a judicial declaration by the Court pursuant 28 U.S.C. § 2201, which is being sought without prejudice to their right to seek remand to the Court of Common Pleas, confirming that the regulatory estoppel doctrine precludes Factory Mutual from denying coverage to the Eagles under the Policy.

**PRAYER FOR RELIEF**

WHEREFORE, the Eagles pray for judgment as follows:

      a.    Judgment in favor of the Eagles and against Factory Mutual;

      b.    Declaratory Judgment as set forth in Count I above;

      c.    Declaratory Judgment as set forth in Count II above;

      d.    An award of attorney's fees and costs of suit incurred; and

      e.    Such other and further relief as the Court deems proper.

**JURY DEMAND**

The Eagles respectfully demand a trial by jury consisting of 12 members on all claims, issues, and disputed issues of fact so triable.

Dated:  December 15, 2021                    Respectfully submitted,

**BLANK ROME LLP**
By: /s/ Charles A. Fitzpatrick IV
CHARLES A. FITZPATRICK IV (PA Bar 309113)
JAMES T. GILES (Pa Bar 4425
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  215.569.5608
Facsimile:  215.832.5608
Email: fitzpatrick-c@blankrome.com
Email: jgiles@blankrome.com
LINDA KORNFELD (pro hac vice)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434
Email: lkornfeld@blankrome.com

JAMES R. MURRAY (pro hac vice)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  202.420.2200
Facsimile:  202.420.2201
Email:  jmurray@blankrome.com

LISA M. CAMPISI (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020-1300
Telephone: (212) 885-5378
Facsimile: (212) 685-9926
Email: lcampisi@blankrome.com

Attorneys for Plaintiff Philadelphia Eagles Limited Partnership

## <u>CERTIFICATE OF SERVICE</u>

I, Charles A. Fitzpatrick IV, Esq. hereby certify that on this 15th day of December, 2021 I caused a true and accurate copy of the foregoing to be served via the Court's ECF system upon all counsel of record.

<u>/s/ Charles A. Fitzpatrick IV</u>