# EXHIBIT 2

# COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

Fall, 2021

**Reporter**

56 Tort & Ins. L.J. 621

**Length:** 20761 words

**Author:**   Richard P. Lewis,* Lorelie S. Masters,** Scott D. Greenspan*** & Chris Kozak****

  * Partner, ReedSmith LLP, New York.

  ** Partner, Hunton Andrews Kurth LLP, Washington D.C.

  *** Senior Counsel, Pillsbury Winthrop Shaw Pittman LLP, New York.

  **** Associate, Plews Shadley Racher & Braun, LLP, Indianapolis.

# Text

I. INTRODUCTION

  Look at virtually any Covid-19 case favoring an insurer, and you will find a citation to Section 148:46 of *Couch on Insurance*. [1] It is virtually ubiquitous: courts siding with insurers cite *Couch* as restating a "widely held rule" on the meaning of "physical loss or damage"--words typically in the trigger for property-insurance coverage, including business-income coverage. It has been cited, ad nauseam, as evidence of a general consensus that all property-insurance claims require some "distinct, demonstrable, *physical alteration* of the property." [2] Indeed, some pro-insurer decisions substitute a citation to this section for an actual analysis of the specific language before the court.

---

[1] 10A STEVEN PLITT, ET AL., COUCH ON INSURANCE 3D § 148:46. As shown below, some courts quote *Couch* itself, while others cite cases citing *Couch* and merely intone the "distinct, demonstrable, physical alteration" language without citing *Couch* itself. *Couch 1st* and *Couch 2d* were published in hardback books (with pocket parts), in 1929 and 1959 respectively. As explained below ( *infra* n.5), *Couch 3d*, a looseleaf, was first published in 1995.

[2] *Id*. (emphasis added); Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2 F.4th 1141, 1144 (8th Cir. 2021).

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

*Couch* is generally recognized as a significant insurance treatise, and courts have cited it for almost a century.[3] That respect began with the first edition written by George Couch and subsequent editions written by his successors.

This particular section, however, as formulated in the third edition of *Couch*, contains an unfortunate, and serious, error. *Couch*'s apparent conclusion--that "direct physical loss" requires a "distinct, demonstrable, physical alteration"--is wrong. It was wrong when *Couch* first made it in the 1990s, and it is wrong today. As another well-respected treatise puts it, "when an insurance policy refers to *physical loss of or damage* to property, the 'loss of property' requirement can be satisfied by any 'detriment,' and a 'detriment' can be present *without there having been a physical alteration of the object*."[4]

A review of the three editions of *Couch* shows that this statement first appeared in the third edition.[5] As originally published, it supported its assertion by citing to five cases for support and two cases holding to the contrary, presenting the former as the "widely held" majority rule.[6]

But none of these cases used the "distinct, demonstrable, physical alteration" test that *Couch 3d* presents, and it was far from the majority rule. As of March 2020, there were at least *thirty-five* cases adopting a broader rule (including many binding appellate decisions and several rulings by state high courts), and significantly fewer following the *Couch* test. The "physical alteration" test gained traction only because courts relied on *Couch*'s initial mischaracterization--inferred from a single district court opinion that was disapproved three years later by the governing court of appeals, rather than from the thirteen extant cases then holding to the contrary.

We may never know why *Couch* got the law so profoundly backwards on this key issue. But one thing is clear: courts need to stop citing it as the *sine qua non* of what "physical loss or damage" means. It is not. If the courts, and particularly the federal courts,[7] continue down this path without addressing *Couch*'s fallacy, there will be

---

[3] *Girard Fire & Marine Ins. Co. v. Winfrey, 26 S.W.2d 701, 705 (Tex. Ct. App. 1930)* (citing 4 GEORGE J. COUCH, CYCLOPEDIA OF INSURANCE LAW § 915).

[4] 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 11:41 (6th ed. 2013) (emphasis added).

[5] The authors conducted searches in an effort to identify when this phrase first appeared in *Couch*. The authors ran searches on the first edition through HeinOnline and reviewed the hard copy of *Couch 2d* to see if those editions used this language. We found no language in either of the first two editions that was similar to that in section 148:46 of *Couch 3d* ("distinct, demonstrable, physical alteration"). *Couch 3d*, unlike *Couch 1st* and *Couch 2d*, was published in loose-leaf format. Without saving all versions of superseded pages in the updates published over the years, it is not possible at this point in time for us to say with certainty when language first appeared. We were able to verify that the first time that a court cited the "distinct, demonstrable" phrase in *Couch 3d* was in 1999. *Columbiaknit, Inc. v. Affiliated FM Ins. Co., 1999 WL 619100, at *7-8 (D. Or. Aug. 4, 1999)*.

[6] 10A COUCH ON INSURANCE 3D § 148:46. Couch added four cases to supplement this position following the original publication date.

Amy Spencer

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

serious practical consequences. They risk overruling decades of insurance law and drastically narrowing the scope of property insurance that forms the backbone of risk protection for homeowners, businesses, and the banks that lend to them. All of those policies rest on the same terms *Couch* misconstrued. More immediately, courts will deprive American businesses of billions of dollars in coverage they paid for and need to survive the worst public health crisis in a century. Until *Couch* reckons with this error, busy trial and appellate judges cannot, and should not, trust it to give them the straight answer on this foundational question.

II. THE LAW OF "DIRECT PHYSICAL LOSS"

Modern property-insurance policies are triggered by some "direct physical loss or damage" to the property (or some variant of that term). [8] After this standard-form language was adopted, courts were quickly called upon to determine what it meant. Plainly it included injuries by fire, lightning, or tornado. But the breadth of the words--layered on the broad "all risk" [9] template--generated questions about whether a loss of use or function was sufficient to trigger these policies.

From 1950 to 1990, courts uniformly found that such losses qualified. Over the insurance industry's objections at the point of claim, courts asked only whether the property was unsafe or unusable for its intended purpose. If the answer to either question was "yes," then there was "direct physical loss or damage" to the property. The contrary view--requiring "distinct, demonstrable, physical alteration"--emerged in the 1990s but was in the distinct minority. Despite this backdrop, *Couch* wrongly portrayed "physical alteration" as the "widely held" majority rule.

A. *The Original Meaning of "Physical Loss": 1950 to 1995*

---

[7] There is a stark disparity between the way state and federal courts are treating these claims in the Covid-19 context. *Trial Court Rulings on the Merits in Business Interruption Cases*, *Covid Coverage Litigation Tracker*, U. PA. L. SCH., https://cclt.law.upenn.edu/judicial-rulings (last viewed Oct. 9, 2021). As of this writing, state courts have heard fewer than 130 insurer motions to dismiss and have denied 32 of them. Federal courts have heard 484 motions, yet they have denied even fewer (25), with the balance finding, as a matter of law, that there is no claim. *Id.* Since federal courts are constitutionally bound to follow state insurance law under the *Erie* doctrine, this massive disparity simply should not exist. That it does may require corrective action from the U.S. Supreme Court. *See* Brief of *Amicus Curiae* United Policyholders, Mama Jo's, Inc. v. Sparta Ins. Co., No. 20-998 (U.S. Feb. 25, 2021) (raising similar concerns, though in a non-Covid case and without the benefit of current case data), *cert. denied*, 141 S. Ct. 1737 (Mar. 29, 2021).

[8] 5 NEW APPLEMAN ON INSURANCE LAW, LIBR. ED. § 42.02[3].

[9] There are two general types of property insurance. The first is "all risk" insurance. As its name suggests, it is the broadest of all insurance products because it "creates a type of coverage not ordinarily present under other types of insurance, and recovery is allowed for all fortuitous losses unless the loss is excluded by a specific policy provision." 10A COUCH ON INSURANCE 3D § 148:50. The second is "named perils" insurance, which insures only for specified causes of loss.

## COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

Until the 1990s, courts uniformly gave "direct physical loss" and its variants their broad, ordinary meaning. That phrase included cases where property became unsafe or unusable for its intended purpose. Standard-form policies were triggered in such circumstances in the 1950s, [10] the 1960s, [11] the 1970s, [12] the 1980s, [13] and the 1990s. [14]

In 1995, the Third Edition of *Couch on Insurance* added a new section, titled "*Generally; 'Physical' loss or damage*." [15] The first case to cite this section was decided in 1999. [16] The fourth paragraph in that section (as reprinted without relevant change in the June 2021 update) reads:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property

---

[10] *Am. Alliance Ins. Co. v. Keleket X-Ray Corp., 248 F.2d 920, 925 (6th Cir. 1957)* (finding coverage when a release of radon dust and gas made the policyholders' building unsafe to work in and unusable for its purpose, which was calibrating medical instruments); *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co., 98 N.W.2d 280, 295, 300 (Minn. 1959)* (finding that egg powder, which had been exposed to smoke, was physically damaged because it suffered a loss of market value even without actual injury).

[11] *Hughes v. Potomac Ins. Co., 18 Cal. Rptr. 650, 655 (Ct. App. 1962)* (finding "physical loss" because policyholder's home was unsafe for occupancy after a landslide deprived it of support); *W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 54 (Colo. 1968)* (en banc) (finding a "direct physical loss" where gasoline vapors made "use of the building highly dangerous").

[12] *Cyclops Corp. v. Home Ins. Co., 352 F. Supp. 931, 937 (W.D. Pa. 1973)* (finding business-income coverage where vibration of motor, without apparent damage, caused it to be shut down).

[13] *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 787 F.2d 349, 352 (8th Cir. 1986)* (finding Business Income coverage where danger of collapse required abandonment of grocery store); *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 76 (3d Cir. 1989)* (theft of property, depriving policyholder of possession and control, qualified as "direct physical loss"); **Blaine Richards & Co. v. Marine Indem. Ins. Co., 635 F.2d 1051, 1055-56 (2d Cir. 1980)** (finding policyholder could recover lost value of beans exposed to chemical not accepted in the United States but not actually harmed).

[14] In chronological order: Hetrick v. Valley Mut. Ins Co., 1992 WL 524309, at *3 (Pa. Comm. Pl. May 28, 1992) (finding coverage for loss of use of a house if an outside oil spill made the house uninhabitable); *Largent v. State Farm Fire & Cas. Co., 842 P.2d 445, 446 (Or. Ct. App. 1992)* (noting insurance company conceded meth fumes could cause "direct physical loss"); *Farmers Ins. Co. v. Trutanich, 858 P.2d 1332, 1335 (Or. Ct. App. 1993)* (finding costs of meth odor covered as direct physical loss or damage); *Azalea, Ltd. v. Am. States Ins. Co., 656 So. 2d 600, 602 (Fla. Ct. App. 1995)* (chemicals that destroyed a bacteria colony necessary for sewage treatment plant to operate caused "direct damage to the structure").

[15] 10A COUCH ON INSURANCE 2D § 148:46.

[16] *Columbiaknit, Inc. v. Affiliated FM Ins. Co., 1999 WL 619100, at *7-8 (D. Or. Aug. 4, 1999)* (finding that policyholder could bear its burden to demonstrate that clothes contaminated with mold or mildew suffered "direct physical loss or damage" if it established "at trial a class of garments which has increased microbial counts and that will, as a result, develop either an odor or mold or mildew").

insurer when the insured merely suffers a detrimental economic impact unaccompanied by a *distinct, demonstrable, physical alteration of the property*.[17]

The origin of this matter-of-fact statement is puzzling. At the time this section first appeared, only one reported case had adopted this test in the circumstances relevant here-- *Great Northern Ins. Co. v. Benjamin Franklin Federal Savings & Loan Ass'n*, decided by a federal district court in Oregon, in 1990.[18]

*Benjamin Franklin* involved the sudden discovery of non-friable (or intact) asbestos in a building.[19] The property insurer refused to pay for its removal, arguing there was no "direct physical loss."[20] The district court agreed, citing a 1978 Oregon Supreme Court case (*Wyoming Sawmills v. Transportation Ins. Co.*) finding that a lumber manufacturer's third-party liability-insurance policy did not cover a lawsuit seeking labor expenses for removing defective 2 x 4 studs from a building.[21] Despite the many cases actually addressing "direct physical loss" language in this context--and universally coming out the other way--the *Benjamin Franklin* court found this liability-insurance case "most helpful."[22] The court held that property insurance, like liability insurance, does not "include consequential or intangible damages such as depreciation in value, within the terms property damage."[23] Ignoring the distinction between first-party and third-party coverage, the court held that, since the building was "physically intact and undamaged," there was no "*physical* loss, direct or otherwise."[24]

---

[17] 10A COUCH ON INSURANCE 3D § 148:46 (emphasis added).

[18] *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n, 793 F. Supp. 259, 263 (D. Or. 1990)*. There were other cases favoring insurers, but they involved (for example) claims that a title impairment was a "physical loss," which it obviously is not. Those cases are discussed in more detail below. *Benjamin Franklin* was the first to apply this rule in the context of physical effects on property.

[19] *Id. at 261*.

[20] *Id. at 263*.

[21] *Id.* (citing *Wyoming Sawmills v. Transp. Ins. Co., 578 P.2d 1253, 1256 (Or. 1978))*.

[22] *Id.*

[23] *Id.* (quoting *Wyoming Sawmills, 578 P.2d at 1256*).

[24] *Id.* (emphasis in original). Third-party and first-party insurance serve significantly different functions. Third-party insurance is essentially fault-based; it provides compensation for loss suffered by "third parties" that is caused by the policyholder's wrongful acts. First-party insurance, in contrast, provides coverage for loss regardless of fault. This distinction is important in understanding *Wyoming Sawmills*. Most commercial third-party policies have "business risk" exclusions--in *Wyoming Sawmills*, it was an exclusion for liability arising from damage to "your product" or "your work" (i.e., the defective 2 x 4s). The aim of such exclusions is to enforce the general third-party rule that coverage exists only for damage to *someone else*'s property,

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

The "physically intact and undamaged" gloss was brand new in *Benjamin Franklin*. At that time, the major decisions predating it-- *Hughes* and *First Presbyterian*--had rejected that precise logic. *Hughes* was particularly forceful:

> To accept [the insurer's] interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint *remains intact and its walls still adhere to one another*. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, [the insurer] *would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected*. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner. [25]

Similarly, *First Presbyterian* found that a church rendered too dangerous for occupancy because it was permeated with gasoline fumes had suffered a "loss of use" that triggered the policy. [26]

Perhaps because the "intact and undamaged" rule was invented by a single district judge, it did not stick. Three years after *Benjamin Franklin*, the Oregon Court of Appeals refused to follow it in *Farmers Ins. Co. v. Trutanich*, a case involving methamphetamine contamination. [27] *Trutanich* distinguished *Wyoming Sawmills* (the liability-insurance case *Benjamin Franklin* found "most helpful") and instead followed *First Presbyterian*. [28]

When *Couch 3d* cited *Benjamin Franklin* as evincing a "distinct, demonstrable, physical alteration" rule, [29] it ignored that *Trutanich* had rendered the "intact and undamaged" rule a dead letter three years earlier. [30] It also added the modifiers "distinct" and "demonstrable" out of thin air--we have found no pre-*Couch 3d* case where a court frames the test using those adjectives. In spite of this, *Couch 3d* crafted its own rule out of whole cloth, and then then included a paragraph, written in the passive voice, suggesting that there was only some case law to the contrary:

---

and so that liability insurance is not equated with a builder's "performance bond." Thus, *Wyoming Sawmills* is not properly read to require a "physical alteration" rule, even in the third-party context. Loss of use to a third party's property is indisputably "property damage" under standard-form general liability insurance.

[25] Hughes v. Potomac Ins. Co., 18 Cal. Rptr. 650, 655 (Ct. App. 1962) (emphasis added).

[26] W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 54 (Colo. 1968) (en banc).

[27] Farmers Ins. Co. v. Trutanich, 858 P.2d 1332, 1335 (Or. Ct. App. 1993).

[28] Id. at 1335-36.

[29] 10A COUCH ON INSURANCE 3D § 148:46 (emphasis added).

[30] Trutanich, 858 P.2d at 1335 n.4 (limiting *Benjamin Franklin* to asbestos that was "intact" and nonfriable).

Amy Spencer

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

The opposite result has been reached, allowing coverage based on physical damage despite the lack of physical alteration of the property, on the theory that the uninhabitability of the property was due to the fact that gasoline vapors from adjacent property had infiltrated and saturated the insured building, and the theory that the threatened physical damage to the insured building from a covered peril essentially triggers the insured's obligation to mitigate the impending loss by undertaking some hardship and expense to safeguard the insured premises. [31]

This lukewarm counterpoint cited only *First Presbyterian* and *Hampton Foods*--two of at least *thirteen* cases that had adopted the broader rule when the section was first drafted. [32]

B. *The One-Sided Portrayal Grows: 1995-2019*

Like any treatise updated regularly, *Couch 3d* over the years generally added citations as the law developed. However, a problem appeared on this issue as *Couch 3d* began discussing it--the third edition only added cases favorable to its made-up "majority" position. [33] Every one of these decisions cited *Couch 3d*'s "physical alteration" doctrine. [34] For example, under facts identical to *Benjamin Franklin*, the Third Circuit denied coverage by declaring (citing *Couch* and nothing else) that this was the "widely accepted definition." [35]

Yet this rule was neither "widely accepted" nor correct. *Couch 3d* did not address many of the significant decisions adopting the contrary and earlier generally accepted position. In fact, the only case supporting *Couch*

---

[31] 10A COUCH ON INSURANCE 3D § 148:46.

[32] The others are similar. See *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co., 98 N.W.2d 280, 295, 300 (Minn. 1959)* (unsalable goods); *Hughes v. Potomac Ins. Co., 18 Cal. Rptr. 650, 655 (Ct. App. 1962)* (erosion); *Am. All. Ins. Co. v. Keleket X-Ray Corp., 248 F.2d 920, 925 (6th Cir. 1957)* (radon contamination); *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 76 (3d Cir. 1989)* (theft); **Blaine Richards & Co. v. Marine Indem. Ins. Co., 635 F.2d 1051, 1055-56 (2d Cir. 1980)** (unsalable goods); *Cyclops Corp. v. Home Ins. Co., 352 F. Supp. 931, 937 (W.D. Pa. 1973)* (inoperable motor); Hetrick v. Valley Mut. Ins Co., 1992 WL 524309, *3 (Pa. Comm. Pl. May 28, 1992) (oil spill); *Largent v. State Farm Fire & Cas. Co., 842 P.2d 445, 446 (Or. Ct. App. 1992)* (meth contamination); *Farmers Ins. Co. v. Trutanich, 858 P.2d 1332, 1335 (Or. Ct. App. 1993)* (same); *Azalea, Ltd. v. Am. States Ins. Co., 656 So. 2d 600, 602 (Fla. Ct. App. 1995)* (chemical contamination).

[33] 10A COUCH ON INSURANCE 3D § 148:46 (adding *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002)*; *Universal Image Prods., Inc. v. Fed. Ins. Co., 475 F. App'x 569, 573 (6th Cir. 2012)*; *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co., 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014)*; *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 115 Cal. Rptr. 3d 27, 38 (Ct. App. 2010))*.

[34] *Port Authority, 311 F.3d at 235*; *Universal Image, 475 F. App'x at 573-74*; *Newman Meyers, 17 F. Supp. 3d at 331*; *MRI Healthcare, 115 Cal. Rptr. at 778-79*.

[35] *Port Authority, 311 F.3d at 235*.

Amy Spencer

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

*3d*'s assertion was at the trial level, was not binding, and had been disapproved by the governing state's court of appeals. Beyond that, more and more cases began to recognize that the *Hughes* rule--and not the *Couch 3d* theory--was correct. There were five such cases (including two from state courts of last resort) before the turn of the twenty-first century.[36] *Couch 3d* to date has ignored all of them.

The law continued to snowball in policyholders' favor after that. In 2000,[37] 2001,[38] 2002,[39] 2003,[40] 2005,[41] courts rendered eleven decisions for policyholders on this issue without requiring "physical alteration." *Couch 3d*

---

[36] *Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996)* (finding oil fumes present in house after discovery of oil leak constituted physical damage to the house); *Sentinel Mgmt. Co. v. N.H. Ins. Co., 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)* (asbestos); *Dundee Mut. Ins. Co. v. Marifjeren, 587 N.W.2d 191 (N.D. 1998)* (power outage causing potatoes to freeze); *Murray v. State Farm Fire & Cas. Co., 509 S.E.2d 1, 16-17 (W. Va. 1998)* (concluding that a home rendered dangerously unlivable by the presence of falling rocks had suffered a "direct physical loss to the property"); *Matzner v. Seaco Ins. Co., 9 Mass. L. Rptr. 41, 1998 WL 566658, at *4 (Mass. Super. Ct., Aug. 12, 1998)* (concluding that the phrase "direct physical loss or damage" was ambiguous and could mean either "only tangible damage to the structure of insured property" or "more than tangible damage to the structure of insured property," and that "carbon monoxide contamination constitutes 'direct physical loss of or damage to' property"); *Bd. of Educ. v. Int'l Ins. Co., 720 N.E.2d 622, 625-26 (Ill. Ct. App. 1999)* (citing liability insurance coverage cases finding that incorporation of asbestos into buildings caused "property damage," defined under liability policies to be "physical injury to or destruction of tangible property," and finding that policyholder had established that the asbestos fiber contamination constituted physical damage).

[37] *Sentinel Mgmt. Co. v. Aetna Cas. & Sur. Co., 615 N.W.2d 819, 825-26 (Minn. 2000)* ("A principal function of any living space [is] to provide a safe environment for the occupants," and "[i]f rental property is contaminated by asbestos fibers and presents a health hazard to the tenants, its function is seriously impaired.").

[38] *Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001)* (oats rendered unsalable by FDA regulation suffered "direct physical loss").

[39] *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts, 2002 WL 31495830, at *8-9 (D. Or. June 18, 2002)* (concluding that mold damage to house could constitute "distinct and demonstrable" damage and that inability to inhabit a building may constitute "direct, physical loss"); *Cooper v. Travelers Indem. Co. of Ill., 2002 WL 32775680, at *1 (N.D. Cal. Nov. 4, 2002)* (coliform bacteria and E.coli); *Graff v. Allstate Ins. Co., 54 P.3d 1266, 1269 (Wash. Ct. App. 2002)* (methamphetamine vapors); *Yale Univ. v. CIGNA Ins. Co., 224 F. Supp. 2d 402, 413 (D. Conn. 2002)* (finding while the presence of asbestos and lead in buildings did not constitute "physical loss of or damage to property," contamination by such materials could, citing "the substantial body of case law" "in which a variety of contaminating conditions have been held to constitute 'physical loss or damage to property'").

[40] *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co., 353 F.3d 367, 374-75 (4th Cir. 2003)* (affirming finding that meat exposed to ammonia and thus less valuable even though not actually affected had suffered property damage).

[41] *Motorists Mut. Ins. Co. v. Hardinger, 131 F. App'x 823, 824, 826-27, 824-26 (3d Cir. 2005)* (E. coli contamination); *De Laurentis v. United Servs. Auto. Ass'n, 162 S.W.3d 714, 722-23 (Tex. Ct. App. 2005)* (finding mold damage constituted "physical loss to property"); *Pepsico, Inc. v. Winterthur Int'l Ins. Co., 24 A.D.3d 743, 744 (N.Y. App. Div., 2d Dep't 2005)* (unmerchantable product); ***Schlamm Stone & Dolan LLP. v. Seneca Ins. Co., 800 N.Y.S.2d 356 (Sup. Ct. 2005)*** (finding that "the presence of

took no notice. In 2007, [42] 2009, [43] and 2010, [44] courts decided eight more. Again, *Couch 3d* ignored them. Five more cases came in 2011, [45] 2013, [46] 2014, [47] 2015, [48] and 2016, [49] including from another state supreme court.

---

noxious particles, both in the air and on surfaces of the plaintiff's premises, would constitute property damage under the terms of the policy").

[42] *Cook v. Allstate Ins. Co., 2007 Ind. Super. LEXIS 32, at *6-10 (Madison Cnty. Nov. 30, 2007)* (finding that infestation of house with brown recluse spiders constituted "direct physical loss" to the house: "Case law demonstrates that a physical condition that renders property unsuitable for its intended use constitutes a 'direct physical loss' even where some utility remains and, in the case of a building, structural integrity remains"); *Stack Metallurgical Servs., Inc. v. Travelers Indem. Co., 2007 WL 464715, at *8 (D. Or. Feb. 7, 2007)* (finding "physical loss or damage" where the policyholder's heat treater for medical implants was contaminated by lead and could no longer be used); Fed. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co., 2007 WL 1007787, at *12 (E.D. Mich. Mar. 31, 2007) (finding that food in cardboard containers exposed to ammonia was physically injured, despite the fact the food was judged fit to eat).

[43] *Essex v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009)* (unpleasant odor in home); *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co., 968 A.2d 724, 734 (N.J. Super. App. Div. 2009)* ("In the context of this case, the electrical grid was 'physically damaged' because, due to a physical incident or series of incidents, the grid and its component generators and transmission lines were physically incapable of performing their essential function of providing electricity."); *Manpower Inc. v. Ins. Co. of the State of Pa., 2009 WL 3738099, at *1 (E.D. Wis. Nov. 3, 2009)* (finding "direct physical loss . . . or damage to" a building adjacent to a building which collapsed despite the fact that the collapse did not cause any noticeable damage to the policyholder's occupied space).

[44] *Travco Ins. Co. v. Ward, 715 F. Supp. 2d 699, 707-08 (E.D. Va. 2010)* (finding that drywall emitting toxic gases, causing the policyholder to move out, caused a direct physical loss, despite the fact that it was "physically intact, functional and ha[d] no visible damage," noting the majority of cases nationwide find that "physical damage to the property is not necessary"); *In re Chinese Mfr'd Drywall Prods. Liab. Litig., 759 F. Supp. 2d 822, 831 (E.D. La. 2010)* (finding that "the presence of Chinese-manufactured drywall in a home constitutes a physical loss" because it "renders the [policyholders'] homes useless and/or uninhabitable").

[45] **Widder v. La. Citizens Prop. Ins. Corp., 82 So.3d 294 (La. Ct. App. 2011)** (lead).

[46] *Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co., 939 F. Supp. 2d 1059, 1068 (D. Haw. 2013)* (finding that intrusion of arsenic into roof caused "direct physical loss or damage" to the roof).

[47] *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co., 2014 WL 6675934, at *5-6 (D.N.J. Nov. 25, 2014)* (concluding that "property can sustain physical loss or damage without experiencing structural alteration," that "the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated," and therefore that the ammonia discharge caused direct physical loss).

[48] *Mellin v. N. Sec. Ins. Co., 115 A.3d 799, 806 (N.H. 2015)* (rejecting "tangible alteration" rule and holding that pervasive odor of cat urine was "physical loss" to condominium).

Amy Spencer

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

None of these decisions were featured in *Couch 3d*, and even its June 2021 update failed to grapple with (or even cite) any of them.

*Couch 3d* may not have recognized these cases, but insurers did--when it served their purposes. In late 2019, Factory Mutual Insurance Company ("FM"), one of the largest and most sophisticated property insurers in the world, sued another insurer seeking to shift some of its liability for mold and mold spore contamination at a biopharmaceuticals lab.[50] In the case, it brought a motion *in limine* contending that "physical loss or damage" to property exists when a physical substance renders property unfit for its intended use, despite that there was *no* physical alteration.[51] Citing cases like *First Presbyterian, Gregory Packaging*, and *Trutanich*, FM argued to the Court:

> Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage. *See, e.g.*, Western Fire Insurance Co. v. First Presbyterian Church, 437 P.2d 52 (Colo. 1968) (church building sustained physical loss or damage when it was rendered uninhabitable and dangerous due to gasoline under the building); *Gregory Packaging, Inc. v. Travelers Property and Casualty Company of America*, Civ. No. 2:12-cv-04418, 2014 U.S. Dist. LEXIS 165232, 2014 WL 6675934 (D. N.J. 2014) (unsafe levels of ammonia in the air inflicted "direct physical loss of or damage to" the juice packing facility "because the ammonia physically rendered the facility unusable for a period of time."); Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002) (asbestos fibers); Essex v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) (unpleasant odor in home); TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) ("toxic gases" released by defective drywall).[52]

Moreover, FM argued that, *at worst*, it had put forward a reasonable interpretation of the undefined phrase "physical loss or damage"--and even if Federal could propose a reasonable reading, this merely rendered the subject policy ambiguous and required the court to construe it in favor of coverage.[53]

---

[49] Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co., 2016 WL 3267247, at *5-6 (D. Or. June 7, 2016), *vacated by joint stipulation*, 2017 WL 1034203 (Mar. 6, 2017) (smoke from wildfires, making operations hazardous to human health, caused a "direct physical loss").

[50] Factory Mut. Ins. Co. v. Fed. Ins. Co., 1:17-cv-00760-GJF-LF, 2019 U.S. Dist. LEXIS 191769 (D.N.M. Nov. 5, 2019).

[51] Motion *in Limine* No. 5 re Physical Loss or Damage at 3, *Factory Mut. Ins. Co.*, filed Nov. 19, 2019, ECF#127, https://3inbm04c0p4j2h1w132uyb5e-wpengine.netdna-ssl.com/wp-content/uploads/2021/02/fm_v._federal.pdf.

[52] Id. at 3-4 (emphasis added).

[53] *See* id. at 3 n.1.

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

The oddity and error in *Couch 3d*'s statement is further shown by other major insurance-coverage treatises. Allan Windt's *Insurance Claims & Disputes* (6th ed. 2013) is most explicit: "[W]hen an insurance policy refers to physical loss of or damage to property, the 'loss of property' requirement can be satisfied by *any* 'detriment,' and a 'detriment' can be present *without there having been a physical alteration of the object*." [54] Windt then proceeds to discuss the major cases that *Couch 3d* ignores, including *Murray, Sentinel*, and *Hardinger*. [55]

Appleman's *Insurance Law and Practice*, often cited side-by-side with *Couch*, contains a similar statement of the standard in its section on "all risk" insurance. [56] After discussing *First Presbyterian*, it concluded that "[t]he courts have construed the scope of what constitutes 'physical loss or damage' liberally," while still recognizing that some losses (such as a withdrawn warranty) were not "physical." [57] At the time it was discontinued, in favor of the *New Appleman* series, the "Old" *Appleman* recognized all, or nearly all, of the seminal decisions on "physical loss" that *Couch* omitted. Those cases include dispossession of property (*Intermetal Mexicana*), "unusable or uninhabitable" property (*Murray*), and contamination (*Board of Education*). [58]

---

[54] 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 11:41 (6th ed. 2013) (emphasis added).

[55] *Id.*

[56] 5 JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW & PRACTICE 2D § 3092 (1970 & 2012 Supp.), *reprinted in* 5f-142f APPLEMAN ON INSURANCE LAW & PRACTICE ARCHIVE § 3092 (LEXIS 2011). *Appleman*, like *Couch*, is a venerable treatise, used for decades by coverage practitioners including authors of this article. The "Original" *Appleman*, first published in 1929, was updated for years after the death in 1936 of the original author, John Alan Appleman. The hard copy volume of the "original" *Appleman* containing § 3092 was last copyrighted in 1970 and thereafter was updated through pocket parts. From the authors' knowledge and research on provenance of this section, the last "cumulative supplement" for this volume (volume 5) of "Old" *Appleman* was copyrighted in 2012. The "original" *Appleman* was joined by a successor, *New Appleman*, in the last two decades, which overlapped with original *Appleman* and was called first *Holmes Appleman on Insurance* and later *Appleman on Insurance 2d*. The publisher also published *New Appleman on Insurance Law, Law Library Edition* (Jeffrey E. Thomas & Francis J. Mootz, III, eds., Lexis-Nexis 2009 & Dec. 2020 Supp.); and most recently, *New Appleman Insurance Law Practice Guide* (Leo P. Martinez, Marc S. Mayerson & Douglas R. Richmond eds., Lexis-Nexis 2020). *Appleman on Insurance 2d*, for example, while focusing on many issues of import in insurance law, includes little analysis of the relevant policy language in consideration in this article.

[57] *Id.*

[58] *Id.* The *New Appleman* successor to this work, rather than carrying forward the existing research, borrowed heavily from *Couch 3d*'s misstatement of the rule--down to the cases *Couch 3d* cited and some of the descriptive words *Couch 3d* used. 5 NEW APPLEMAN ON INSURANCE LAW, LIBR. ED., § 46.03[2] (offering the "generally prevailing" rule as one that "preclude[s] coverage for losses that are solely intangible or incorporeal; for example, an economic loss unaccompanied by a distinct physical alteration to property"). To the *New Appleman* authors' credit, their statements are more restrained, and (unlike *Couch 3d*) they do follow this introduction with treatments of important cases like *Trutanich, Sentinel*, *Hardinger*, *Pepsico, General Mills*, and *Wakefern*, discussed throughout this article. *Id.* § 46.03[3] ("Contamination by Vapor, Bacteria, or other Foreign Substance," "Intact Property Rendered Unfit for Intended Purpose," "Destruction or Corruption of Electronic Data," and

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

The 1999 update to another treatise by Peter J. Kalis reaches the same conclusion. [59] Explaining that "direct" and "physical" loss or damage is the coverage trigger for property insurance, the authors correctly summarized the law at the time by saying that disputes over these words "generally have been resolved in favor of coverage." [60] It then proceeds to discuss *Hampton Foods, First Presbyterian*, *Hughes*, and *Intermetal Mexicana*, among other cases, as representing the majority rule. [61] It acknowledged *Benjamin Franklin* but noted that it was an outlier. [62] It concluded that while insurers may argue for a more stringent version of "physical loss," "[t]hese arguments have generally been unsuccessful if the loss arises out of some external event or condition changing and devaluing the property." [63] In 2013, the principal author of *Couch 3d*, Steven Plitt, published an article in an insurance industry magazine entitled "Direct Physical Loss in All-Risk Policies: The Modern Trend Does Not Require Specific Physical Damage, Alteration." [64] He discussed recent case law and concluded that the "modern trend" is that "courts are not looking for physical alteration, but for loss of use." It is unclear why the current 2021 update of *Couch 3d* does not match its principal author's stated understanding of the law.

For whatever reason, this robust body of scholarship--all contrary to *Couch 3d*--has not caught the courts' attention. That is unfortunate. Windt, Appelman, and Kalis present a far superior resource for courts interested in understanding the full scope of the law, rather than *Couch 3d*'s truncated, one-sided version.

C. Couch 3d *'s 2021 Update Has Not Remedied This Significant Error*

In 2021, *Couch 3d* updated this section. The current edition repeats the error of the previous ones.

For the proposition that its "physical alteration" rule is "widely held," *Couch 3d* currently cites seven cases--none of which were decided in 1995, when it appears that *Couch 3d* first made this statement. Moreover, nearly all of these cases *themselves cite Couch 3d* (or cases citing *Couch 3d*) for this proposition. [65] This is a remarkable

---

"Deprivation of Access by Government Authorities"). Although *New Appleman*'s decision to borrow its summary from *Couch 3d* was ill-advised, the balance of the section--and the nuance it explains--illustrates the severity of *Couch 3d*'s error.

[59] I PETER J. KALIS, THOMAS M. REITER & JAMES R. SEGERDAHL, POLICYHOLDER'S GUIDE TO THE LAW OF INSURANCE COVERAGE § 13.04 (ASPEN L. & BUS., Supp. 1999). As the name of this treatise suggests, its authors generally represented policyholders. But unlike this section of *Couch*, the discussion is balanced and accurately represents the case law.

[60] *Id.*

[61] *Id. at 13-15* to 13-18.

[62] *Id. at 13-18* to 13-19.

[63] *Id. at 13-19*.

[64] Steven Plitt, *Direct Physical Loss in All-Risk Policies: The Modern Trend Does Not Require Specific Physical Damage, Alteration*, Claims J. (Apr. 15, 2013) (*https://amp.claimsjournal.com/magazines/idea-exchange/2013/04/15/226666.htm*) (discussing *Murray* and *Trutanich*, among other cases).

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

feat: state *ipse dixit* you wish was true, convince courts to cite it, and then cite *those* cases as establishing that the rule is "widely held."

For its claim that there must be a "distinct, demonstrable, physical alteration of the property," *Couch 3d* now cites five cases extant in 1995 (*Benjamin Franklin* and four others).[66] None of these pre-1995 cases cure *Couch 3d*'s original error. Nor do they offer support for the way courts are citing this section in Covid-19 cases.

For example, in the oldest case (*Cleland Simpson*) the Pennsylvania Supreme Court summarily affirmed the lower court's decision.[67] That case, however, involved a *named perils* policy for "all direct loss by fire [and] lightning."[68] The court held that an order of civil authority was not covered in the absence of fire or lightning damage.[69] In the context of a named-perils property-insurance policy, that made perfect sense: without a loss caused by an insured peril, there is no coverage. But the use of "physical loss" in an *all* risk policy is entirely different, because *all* (nonexcluded) perils are insured. *Cleland Simpson* fails to support *Couch*'s proposition at all.

In the next two cases (*Sponholz* and *HRG*) the courts held that a defect in the title to property was not a "physical loss."[70] That too, makes sense, but fails to support a "physical alteration" requirement. Title defects are *legal* injuries, not physical ones, and these cases are perfectly reconcilable with the loss-of-safe-use rule from *Hughes* and *First Presbyterian*, neither of which required "physical alteration."

---

[65] Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002); Universal Image Prods., Inc. v. Fed. Ins. Co., 475 F. App'x 569, 573 (6th Cir. 2012); Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co., 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014); In re Chinese Mfd. Drywall Prods. Liab. Litig., 759 F. Supp. 2d 822, 831 (E.D. La. 2010); MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 115 Cal. Rptr. 3d 27, 38 (Ct. App. 2010); Welton Enters., Inc. v. Cincinnati Ins. Co., 131 F. Supp. 3d 827 (W.D. Wis. 2015); Shirley v. Allstate Ins. Co., 392 F. Supp. 3d 1185 (S.D. Cal. 2019).

[66] Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n, 793 F. Supp. 259, 263 (D. Or. 1990) (asbestos), *disapproved by* Farmers Ins. Co. v. Trutanich, 858 P.2d 1332 (Or. Ct. App. 1993); **Comm. Union Ins. Co. v. Sponholz, 866 F.2d 1162, 1162 (9th Cir. 1989)** (title defect); HRG Dev. Co. v. Graphic Arts Mut. Ins. Co., 527 N.E.2d 1179, 1181 (Mass. Ct. App. 1988) (title defect); Cleland Simpson Co. v. Fireman's Ins. Co. of Newark, 140 A.2d 41, 44 (Pa. 1958) (named-perils coverage); Glens Falls Ins. Co. v. Covert, 526 S.W.2d 222, 223 (Tex. Ct. App. 1975) (products lacking manufacturer's warranty).

[67] Cleland Simpson, 140 A.2d at 44.

[68] Cleland Simpson Co. v. Fireman's Ins. Co., 1957 Pa. Dist. & Cnty. LEXIS 202, at *5 (Lackawanna Cnty. Jan. 11, 1957).

[69] Id. at *8.

[70] **Sponholz, 866 F.2d at 1162**; HRG, 527 N.E.2d at 1181.

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

The final case from this group of pre-1995 cases (*Covert*) involved products that were discarded because the manufacturer had rescinded its warranty.[71] The policyholder would not sell them without the warranty. This case comes the closest to supporting *Couch 3d*'s argument, but it still fails. As in the title-defect cases, the defect was legal or contractual (i.e., the manufacturer would not indemnify the seller from potential product defects). However, that can still be squared with the prevailing loss-of-safe-use and loss-of-function rules.[72] These cases did not support the rule *Couch 3d* derived from them.

In sum, *Couch 3d* seized on a single trial-level case with no support in the appellate law, asserted in the first instance that such a rule was "widely held," did not confess error when that case was disapproved, convinced courts to cite it as authoritative, and then cited *those* cases as showing that its scantly supported test was correct. That circular process does not create sound jurisprudence, it is not persuasive, and it should not be followed any further.

D. *The Current Majority of Covid-19 Cases Adopt and Perpetuate* Couch 3d *'s Error*

To any objective observer, *Couch 3d*'s treatment of this issue is incorrect and unnerving. Despite this, a large number of courts are relying upon it to dismiss claims that the presence of SARS-CoV-2, the Covid-19 pandemic, and/or the associated orders of Civil Authority cause "physical loss or damage" to property. The result of these decisions is that many businesses--entitled to business-income coverage under the *actual* majority rule--are not receiving it.

At least twenty-eight of the early pandemic decisions ruling for insurers expressly rely on this section.[73] Another fifteen cases applied *Couch 3d*'s "distinct, demonstrable, physical alteration" rule without citing it directly.[74] And the first three published appellate decisions on this issue cite the section as authoritative.[75]

---

[71] *Covert, 526 S.W.2d at 223*.

[72] *See supra* notes 10-13 and accompanying text.

[73] E.g., *Brunswick Panini's LLC v. Zurich Am. Ins. Co., 2021 WL 663675, at *8 (N.D. Ohio Feb. 19, 2021)* (Ohio law); *Kahn v. Pa. Nat'l Mut. Cas. Ins. Co., 2021 WL 422607, at *5 (M.D. Pa. Feb. 8, 2021)* (Pennsylvania law); *Wellness Eatery La Jolla LLC v. Hanover Ins. Grp., 2021 WL 389215, at *5 (S.D. Cal. Feb. 3, 2021)* (California law); *Frank Van's Auto. Tag, LLC v. Selective Ins. Co., 2021 WL 289547, at *5 (E.D. Pa. Jan. 28, 2021)* (Pennsylvania law); *Graspa Consulting, Inc. v. United Nat'l Ins. Co., 2021 WL 199980, at *5 (S.D. Fla. Jan. 20, 2021)* (Florida law); *1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., 2021 WL 147139, at *6 (W.D. Pa. Jan. 15, 2021)* (Pennsylvania law); *Zagafen Bala, LLC v. Twin City Fire Ins. Co., 2021 WL 131657, at *4 (E.D. Pa. Jan. 14, 2021)* (Pennsylvania law); *TAQ Willow Grove, LLC v. Twin City Fire Ins., 2021 WL 131555, at *4 (E.D. Pa. Jan. 14, 2021)* (Pennsylvania law); *Ultimate Hearing Sols. II, LLC v. Twin City Fire Ins. Co., 2021 WL 131556, at *5 (E.D. Pa. Jan. 14, 2021)* (Pennsylvania law); *Moody v. Hartford Fin. Grp., Inc., 2021 WL 135897, at *4 (E.D. Pa. Jan. 14, 2021)* (Pennsylvania law); ATCM Optical, Inc. v. Twin City Ins. Co., 2021 WL 131282, at *4 (E.D. Pa. Jan. 14, 2021) (Pennsylvania law); *Indep. Rest. Grp. v. Certain Underwriters at Lloyd's, London, 2021 WL 131339, at *5 (E.D. Pa. Jan. 14, 2021)* (Pennsylvania law); *Santo's Italian Café LLC v. Acuity Ins. Co., 508 F. Supp. 3d 186, 197-98 (N.D. Ohio 2020)* (Ohio law); *Newchops Rest. Comcast LLC v. Admiral*

III. THINKING CRITICALLY ABOUT *COUCH* AND PROPERTY INSURANCE LAW

    Whatever the ultimate outcome of the Covid-19 business-income-coverage litigation, the courts' treatment of this section in *Couch 3d* will have profound impacts on property-insurance coverage. The error originating from that section is poised to reshape insurance law without the rigorous intellectual analysis of a state appellate court charged with determining the law in its jurisdiction. If courts continue to blindly follow *Couch 3d* on this point, they will effectively overrule decades of property-insurance law without grappling with *stare decisis* or the usual stabilizing principles attached to precedent. Courts must dismantle *Couch 3d*'s fallacy, and the cases it has spawned, before it is too late--and, above all, stop citing *Couch 3d* on this point until the authors address the problem. We offer three general reasons for this position.

---

*Indem. Co., 507 F. Supp. 3d 616, 623-24 (E.D. Pa. 2020)* (Pennsylvania law); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co., 2020 WL 7351246, at \*5 (W.D. Tex. Dec. 14, 2020)* (Texas law); *Richard Kirsch, DDS v. Aspen Am. Ins. Co., 507 F. Supp. 3d 835, 839 (E.D. Mich. 2020)* (Michigan law); *SA Palm Beach LLC v. Certain Underwriters at Lloyd's, London, 506 F. Supp. 3d 1248, 1253 (S.D. Fla. 2020)* (Florida law); *El Novillo Rest. v. Certain Underwriters at Lloyd's, London, 505 F. Supp. 3d 1343, 1349 (S.D. Fla. 2020)* (Florida law); *Hajer v. Ohio Sec. Ins. Co., 505 F. Supp. 3d 646, 650 (E.D. Tex. 2020)* (Texas law); *Promotional Headwear Int'l v. Cincinnati Ins. Co., 504 F. Supp. 3d 1191, 1198 n.38 (D. Kan. 2020)*; *S. Fla. Ent. Assocs., Inc. v. Hartford Fire Ins. Co., 2020 WL 6864560, at \*6 (S.D. Fla. Nov. 13, 2020)* (Florida law); Dab Dental PLLC v. Main St. Am. Prot. Ins. Co., 2020 WL 7137138, at *5 (Fla. Cir. Ct. Hillsborough Cnty. Nov. 10, 2020); *Hillcrest Optical, Inc. v. Cont'l Cas. Co., 497 F. Supp. 3d 1203, 1211 & n.4 (S.D. Ala. 2020)* (Alabama law); *Plan Check Downtown III, LLC v. AmGuard Ins. Co., 485 F. Supp. 3d 1225, 1229 (C.D. Cal. 2020)* (California law); *Malaube, LLC v. Greenwich Ins. Co., 2020 WL 5051581, at \*5 (S.D. Fla. Aug. 26, 2020)* (Florida law); *Diesel Barbershop, LLC v. State Farm Lloyds, 479 F. Supp. 3d 353, 360 (W.D. Tex. 2020)* (Texas law); *Visconti Bus. Serv., LLC v. Utica Nat'l Ins. Grp., 71 Misc. 3d 516, 528 (N.Y. Super. Ct. 2021)*.

74 *Café La Troya LLC v. Aspen Spec. Ins. Co., 2021 WL 602585, at \*7 (S.D. Fla. Feb. 16, 2021)* (Florida law); *Vandalay Hosp. Grp. LP v. Cincinnati Ins. Co., 2021 WL 462105, at \*1 (N.D. Tex. Feb. 9, 2021)* (Texas law); *Protégé Rest. Partners LLC v. Sentinel Ins. Co., 2021 WL 428653, at \*4 (N.D. Cal. Feb. 8, 2021)* (California law); Colgan v. Sentinel Ins. Co., 2021 WL 472961, at *3 (N.D. Cal. Jan. 26, 2021) (California law); *Ba Lax, LLC v. Hartford Fire Ins. Co., 2021 WL 144248, at \*3 (C.D. Cal. Jan. 12, 2021)* (California law); *O'Brien Sales & Mktg, Inc. v. Transp. Ins. Co., 2021 WL 105772, at \*3-4 (N.D. Cal. Jan. 12, 2021)* (California law); *Humans & Resources, LLC v. Firstline Nat'l Ins. Co., 2021 WL 75775, at \*5 (E.D. Pa. Jan. 8, 2021)* (Pennsylvania law); *Karen Trinh, DDS, Inc. v. State Farm Gen. Ins. Co., 2020 WL 7696080, at \*4 (N.D. Cal. Dec. 28, 2020)* (California law); *Mortar & Pestle Corp. v. Atain Spec. Ins. Co., 2020 WL 7495180, at \*3 (N.D. Cal. Dec. 21, 2020)* (California law); *Kessler Dental Assocs., P.C. v. Dentists Ins. Co., 505 F. Supp. 3d 474, 480 (E.D. Pa. 2020)* (Pennsylvania law); *Long Affair Carpet & Rug, Inc. v. Liberty Mut. Ins. Co., 500 F. Supp. 3d 1075, 1078 (C.D. Cal. 2020)* (California law); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co., 499 F. Supp. 3d 95, 99 (E.D. Pa. 2020)* (Pennsylvania law); *Uncork & Create LLC v. Cincinnati Ins. Co., 498 F. Supp. 3d 878, 883 (S.D. W. Va. 2020)* (West Virginia law); *Mudpie, Inc. v. Travelers Cas. Ins. Co., 487 F. Supp. 3d 834, 839 (N.D. Cal. 2020)* (California law); *Pappy's Barber Shops, Inc. v. Farmers Group, Inc., 487 F. Supp. 3d 937, 944 (S.D. Cal. 2020)* (California law); 10e, *LLC v. Travelers Indem. Co., 483 F. Supp. 3d 828, 836 (C.D. Cal. 2020)* (California law).

75 *Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2 F.4th 1141 (8th Cir. 2021)*; Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am., __ F.4th __, 2021 WL 4486509 (9th Cir. Oct. 1, 2021); Santo's Italian Cafe, LLC v. Acuity Ins. Co., __ F.4th __, 2021 WL 4304607 (6th Cir. Sept. 22, 2021).

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

*First*, this section of *Couch 3d* never provides a precedent-driven or intellectual justification for its test (for it is, in reality, a test *Couch 3d* invented). Generally, when staking a position that rests at the core of a body of law, a treatise will either (a) rely on the reasoned decisions of then-extant judicial decisions to justify the rule, or (b) develop its own, independent reason that the rule is correct. *Couch 3d* does neither. This oversight is having devastating consequences for businesses struggling to survive the Covid-19 pandemic, and it will have even greater consequences for the homeowners and lenders who purchase property insurance on a daily basis.

The *Couch 3d* test is largely circular. It does not flow from any substantial body of insurance law that existed (or that currently exists) outside of *Couch 3d*'s own sphere of influence. Nor is it compelling on its own. Property policies generally cover "direct physical loss or damage," which does not unmistakably communicate *Couch 3d*'s rule to an ordinary person. Perhaps insurers view "physical" as a term of art that means a "distinct, demonstrable, physical alteration." But they have not *communicated* that intent in the policy by actually defining "physical loss or damage," as courts have "begged" them to do for decades. [76]

Basic textual analysis shows why the opposite rule is correct. When property is stolen, unusable, unsafe, or nonfunctional, the policyholder has suffered a "physical loss." This comports with the distinction between "loss" [77] and "damage," [78] two words with different meanings in the English language. If "physical" required some "distinct, demonstrable, physical alteration," then "physical loss" would be rendered meaningless.

The word "physical" simply restricts coverage to losses that are "of or relating to natural or material things, as opposed to things mental, moral, spiritual, or imaginary." [79] This draws the same line as pre-1995 decisions

---

[76] Cherokee Nation v. Lexington Ins. Co., 2021 WL 506271, at *3-6 (Okla. Dist., Cherokee Cnty. Jan. 28, 2021).

[77] "[T]he act or fact of losing: failure to keep possession: deprivation." *Loss*, WEBSTER'S THIRD NEW INT'L DICTIONARY 1338 (Unabridged ed. 1966) [hereinafter WEBSTER'S]; *Loss*, I THE COMPACT EDITION OF THE OXFORD ENGLISH DICTIONARY 1666 (2d ed. 1986) [hereinafter Oxford's] (" **2.a**. The being deprived of, or the failure to keep (a possession, appurtenance, right . . . or the like). . . . **5**. Diminution of one's possessions or advantages; detriment or disadvantage involved in being deprived of something."); *Loss*, MERRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/loss (last visited Sept. 1, 2021) ("2.a(2) the partial or complete deterioration or absence of a physical capability or function"); *Loss*, Dictionary.com, www.dictionary.com/browse/loss (last visited Sept. 1, 2021) ("1. detriment, disadvantage, or deprivation from failure to keep, have, or get").

[78] "[L]OSS due to injury: injury or harm to person, property, or reputation: hurt, harm." *Damage*, Webster's, *supra* note 77, at 571; *Damage*, I OXFORD'S, *supra* note 77, at 641 (" **2**. Injury, harm; *esp*. physical injury to a thing."); *Damage*, MERRIAM-WEBSTER ONLINE DICTIONARY, *supra* note 77 ("[L]oss or harm resulting from injury to person, property, or reputation."); *Damage*, DICTIONARY.COM, *supra* note 77 ("injury or harm that reduces value or usefulness").

[79] *Physical*, Webster's, *supra* note 77, at 1706; *see Physical*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1331 (5th ed. 2011) (same); II OXFORD'S, *supra* note 77, at 2161 ("Of or pertaining to material nature . . . as opposed to *psychical, mental, spiritual*"); *Physical*, MERRIAM-WEBSTER ONLINE DICTIONARY, *supra* note 77 ("of or relating to material things"); *Physical*, DICTIONARY.COM, *supra* note 77 ("of or relating to that which is material").

COUCH'S "PHYSICAL ALTERATION" FALLACY: ITS ORIGINS AND CONSEQUENCES

favoring policyholders (involving physically unsafe, physically unusable, or physically contaminated property) and pre-1995 cases favoring insurers (involving title insurance and voided warranties). An impaired title or an invalid warranty is a *legal* loss. It injures a legal right appurtenant to the property, and does not impair the property itself. Thus, *Couch 3d* is correct in observing that the term "physical loss" excludes losses "that are intangible or incorporeal," such as a defect in title. [80] But that statement, true as it is, does not support *Couch 3d*'s blanket "physical alteration" test. It simply illustrates one kind of "loss" that property insurance does not cover.

As the title-insurance litigation shows, the word "physical" exists in the policy for a good reason. English speakers often use the word "loss" in the mental, moral, spiritual, or imaginary sense. We speak of a "loss of reputation," a "loss of affection," or even (as John Milton wrote) a world in a state of "utter loss" and in need of divine intervention. [81] Or, in another direction, the unwitting purchaser of a house "widely reputed to be possessed by poltergeists" might have made a claim on his property insurer for a "loss," had the New York Appellate Division not excused him from the purchase by holding the seller "is estopped to deny their existence and, as a matter of law, the house is haunted." [82] In contrast to property overrun by chemicals [83] or spiders, [84] a house possessed by ghosts would seem to be the prototypical example of an "incorporeal," and thus a "nonphysical," loss.

However, this discussion of ghosts, titles, and damnation simply shows that the traditional analysis--supported by the decades of case law predating this section of *Couch 3d*--is not outlandish at all. A property perched on a cliff, inundated with gasoline, unusable due to odors or bacteria, or in danger of a rockfall is at risk due to the laws of the physical realm, not of perils legal or paranormal. *Couch 3d*'s rule erases this important distinction.

*Second*, the pre-*Couch* rule has a firm basis in the risk-based nature of insurance, in basic principles of insurance law, and in insurance-industry intent. Actuaries can predict the likelihood of physical phenomena that might affect property, even if those perils do not alter or structurally injure property, and even if the peril strikes the entire risk pool at the same time. [85] They can set appropriate premiums. But more difficult (or impossible) to predict,

---

[80] 10A COUCH ON INSURANCE 3d § 148:46.

[81] *Loss*, I OXFORD'S, *supra* note 77, at 1666.

[82] Stambovsky v. Ackley, 169 A.D.2d 254, 255-56 (N.Y. App. Div., 1st Dep't 1991).

[83] Gregory Packaging, Inc. v. Travelers Prop. Cas. Co., 2014 WL 6675934, at *5-6 (D.N.J. Nov. 25, 2014).

[84] Cook v. Allstate Ins. Co., 2007 Ind. Super. LEXIS 32, at *6-10 (Madison Cnty. Nov. 30, 2007).

[85] Erik S. Knutsen & Jeffrey W. Stempel, *Infected Judgment: Problematic Rush to Conventional Wisdom and Insurance Coverage Denial in a Pandemic*, 27 CONN. INS. L.J. 185, 194-95 (2020) (explaining that pandemic losses are "insurable in theory because the timing of the pandemic itself is a fortuitous event," because "not all industries will be affected at the same time and to the same degree," and because some portions of the risk pool "may profit from the pandemic in their specific industries and may have no loss at all").

Amy Spencer

in advance, is the risk that décor will go out of style, that a house will be deemed haunted as a matter of law, or that a market meltdown will impair property values.

Thus, the traditional distinction between physical and nonphysical losses matches up neatly with risks that insurers can price, predict, and guard against. *Couch 3d*'s test draws the line much further upstream, leaving homeowners, businesses, and lenders exposed to large swaths of perfectly insurable risks. That fact provides ample reason to doubt *Couch 3d*'s argument that insurers drew the line there.

The more likely explanation is that "physical loss" is what the *Restatement (Second) of Contracts* calls a "deliberately obscure" term.[86] It is broad enough to let insurers charge "all risk" premiums, but ambiguous enough so the insurer can "decide at a later date what meaning to assert,"[87] i.e., a narrower, "physical alteration" rule.[88] This is illustrated by the industry's acts of playing both sides of the "physical loss" question--restrictive when it faces the policyholder, and expansive when it faces another insurer to whom it might shift liability.[89] As the *Restatement of the Law, Liability Insurance* points out, this is the definition of ambiguity: when "there is more than one meaning to which the language of the term is reasonably susceptible when applied to the facts of the claim."[90] If the insurance industry interprets the language both ways, surely both readings must be reasonable. But it is in these situations that both *Restatements* and every jurisdiction in the country calls for words to be construed against the drafter.[91]

*Third*, property insurance is one of the least negotiable types of insurance. Millions of homeowners are required, by their lenders, to maintain insurance on mortgaged property. Homeowners lack the kind of leverage that a multinational company would have to negotiate manuscript commercial-property coverage. They must have it, and due to insurers' antitrust immunity, they have no power to negotiate the terms of the policy. Yet they (and the banks

---

[86] RESTATEMENT (SECOND) OF CONTRACTS § 206, cmt. a (AM. L. INST. 1981).

[87] *Id.*

[88] This is far from speculation. One writer recounts the story of an "experienced policy underwriter justifying an ambiguous draft policy as follows: 'We draft them this way so we can say later that the policy means whatever we want it to mean.'" George M. Plews & Donna C. Marron, *Survey: Environmental Law Developments: Hope and Ambiguity in Achieving the Optimum Environment*, 37 IND. L. REV. 1055, 1058-59 (2004).

[89] *See supra* notes 50-53 and accompanying text.

[90] RESTATEMENT OF THE LAW, LIABILITY INSURANCE § 4(1) (AM. L. INST. 2019).

[91] RESTATEMENT (SECOND) OF CONTRACTS, *supra* note 86, § 206, cmt. a. The *Restatement of the Law, Liability Insurance* provides for the same outcome, for the same reasons. RESTATEMENT OF THE LAW, LIABILITY INSURANCE, *supra* note 90, § 4(2), *see id.* §§ 3(3), (4), cmt. d ("The *contra proferentem* rule gives the supplier of the terms the incentive to take all reasonable steps to eliminate ambiguity in the drafting of terms.").

that hold their mortgages) would be among the ones who suffer the most if *Couch 3d*'s rule actually becomes "widely held."

Homeowners' policies, like commercial property policies, are written on "physical loss" forms. If property insurance is construed as *Couch 3d* (incorrectly) suggests, the courts will unwittingly shift an enormous body of risks back on consumers and financial institutions. Homes condemned due to contamination, health hazards, or nearby natural perils could suddenly lack coverage. And if there are outstanding mortgages on those homes, the loss would be borne by the homeowner (saddled with five-or-six-figure debt or an additional mortgage payment) or the lender (unable to sell foreclosed property for anywhere near its mortgaged value). Given the long-term nature of these arrangements, blindly following *Couch* threatens to upend the law mid-stream and throw these reliance interests into disarray.

IV. CONCLUSION

The current Covid-19 coverage litigation is important in its own right. However, it is also a test of the courts' ability to be curious, thorough, and prudent in the way they resolve disputes. There is no substitute for a court's thorough review and analysis of the actual language before it and the actual law governing that language. Consulting a treatise is helpful. But they are only aids in legal analysis and can, as we have shown, be grievously wrong.

This particular section of *Couch 3d* does not aid courts whatsoever in their efforts to faithfully apply the law. Not only does it get the law wrong, but it invites courts to set dangerous precedent that could unravel decades of settled property-insurance law, on which ordinary businesses, banks, and families rely. If courts accept *Couch 3d*'s "physical alteration" fallacy, the results could be catastrophic. The ensuing legal regime could well deny policyholders the benefit of the all-risk coverage they purchased and, under the pressure of the greatest health and economic dislocation in a century, send droves of policyholders into bankruptcy. That is both bad law and bad policy.

Tort Trial & Insurance Practice Law Journal
Copyright © 2021 American Bar Association

End of Document