# EXHIBIT 4

**BLANK ROME LLP**
*A Pennsylvania LLP*
STEPHEN M. ORLOFSKY (NJ ID 012431974)
New Jersey Resident Partner
MICHAEL R. DARBEE (NJ ID 119682014)
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Tel.: 609-750-2646
Fax.: 609-897-7286
Stephen.Orlofsky@BlankRome.com
Michael.Darbee@BlankRome.com

**BLANK ROME LLP**
Helen Michael (*pro hac vice*)
1825 Eye Street NW
Washington, DC 20006
Tel.: 202-420-2200
Fax: 202-420-2201
Helen.Michael@BlankRome.com

**BLANK ROME LLP**
Lisa Campisi (NJ ID 045191999)
1271 Avenue of the Americas
New York, New York 10020-1300
Tel.: 212-885-5378
Fax: 212-658-9926
Lisa.Campisi@BlankRome.com

*Attorneys for Plaintiff Tory Burch, LLC*

| | |
|---|---|
| TORY BURCH, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>*Defendant*. | SUPERIOR COURT OF NEW JERSEY<br>UNION COUNTY LAW DIVISION<br>Docket No. UNN-L-000829-21<br><br>**CERTIFICATION OF TY R. SAGALOW IN SUPPORT OF TORY BURCH, LLC'S OPPOSITION TO ZURICH AMERICAN INSURANCE COMPANY'S MOTION TO DISMISS** |

I, **TY R. SAGALOW**, of sound mind and full age, certify as follows:

My name is Ty R. Sagalow. I have been retained by Blank Rome LLP to provide an expert opinion with respect to several issues regarding insurance custom, practice and standards implicated by the coverage dispute between Tory Burch LLC ("Tory Burch") and its property insurer, Zurich American Insurance Company ("Zurich") in this case.

**Background**

1. I have been an insurance executive for 39 years and have held senior positions in underwriting, legal and executive leadership (including COO and CEO) with a number of

companies in the insurance industry during this period.

2. Specifically, from 1983 to 2009, I held various senior positions in American International Group ("AIG"), including Chief Underwriting Officer, General Counsel, Chief Operating Officer and President of AIG Product Development (akin to Chief Innovation Officer).

3. Immediately following my time at AIG until 2011, I was the Chief Innovation Officer at Zurich American Insurance Company (dba Zurich North America). Thereafter, I was retained by the Tower Group, also as Chief Innovation Officer.

4. From August 2015 to July 1, 2017, I was Chief Executive Officer and Chief Insurance Officer for Lemonade Insurance Company and Lemonade, Inc., respectively (collectively, "Lemonade"). Lemonade Insurance Company is a fully regulated and licensed insurance company in several states. Lemonade, Inc. is publicly trade on the New York Stock Exchange under the ticker symbol LMND.

5. In late 2017, I co-founded World Trade Labs, Inc. (dba Assurely), a Managing General Agent (MGA)/Broker specializing in both traditional and innovative commercial property and casualty ("P&C") insurance.

6. Since February 2012, I have served as the Founder & CEO of Innovation Insurance Group, LLC ("IIG"), a consulting firm to the insurance industry with offices in Short Hill, New Jersey. Since its formation, the company has provided various insurance consulting services to insurers, brokers, insureds and entrepreneurs in product creation and policy drafting, insurtech/fintech consulting and expert witness services. As an expert witness, I have been retained over 100 times and testified over 40 times including 6 times at trial, court hearing or arbitration.

7. In the above roles, I have had the opportunity to gain considerable experience in the three main areas relevant to the general topics on which I have asked to opine: (a) Policy

Structure, (b) Policy Drafting, (c) Underwriting Intent and (d) Regulatory Compliance and Relations. I have also worked with the Insurance Services Office ("ISO"), which is now a wholly-owned subsidiary of Verisk Analytics, Inc. ("Verisk").

8. More specifically, as respects Policy Structure and Policy Drafting, throughout the period from 1987 to 2000, in which I served as Deputy General Counsel and then General Counsel at AIG's National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), I was charged with drafting (or approving the drafting done by subordinates under my control) of all insurance policies. I continued to have these responsibilities with respect to the drafting of policy language as Chief Operating Officer at AIG eBusiness Risk Solutions (we did not have a general counsel) from 2000 to 2004, and, for many policies, at Zurich North America as its Chief Innovation Officer in 2009-2011. I have continued to advise on policy drafting issues in connection with the consulting work I have done for various insurers since forming IIG, as well as drafted the MGA policies issued by my current company, Assurely.

9. When I became the Chief Underwriting Officer at National Union in 1991, I became responsible for all major underwriting decisions and strategies. While my title did not necessarily have the word "underwriting" in it, I continued to have such underwriting responsibilities in various subsequent positions, including as the Chief Operating Officer at AIG eBusiness Risk Solutions and Chief Innovation Officer at Zurich, North America (for certain policy forms).

10. As respects Regulatory Compliance and Relations, this was an important part of my job as Chief Underwriting Officer at National Union where I was charged with representing the profit center before all state regulatory agencies in both filings and audits. But perhaps my most significant regulatory role was at Lemonade where I led the effort of this new and very

different insurance company to obtain license, business model, form and rate approval, first from New York Department of Financial Services then soon after from the New Jersey Department of Banking and Insurance as well as most other states around the country. As a consultant, I was also retained from time to time to advise insurers on regulatory compliance issues. And, of course, as a policy drafter, frequently researched and drafted State amendatory endorsements.

11. As respects my involvement with ISO, I have had a working relationship and knowledge of the organization for my entire career and have many friends there, including at a senior level. My day-to-day working relationship with ISO became particularly close while I served as Lemonade's Chief Executive Officer and Chief Insurance Officer. In those capacities, I worked hand-in-hand with ISO in the creation of the Lemonade's rates and forms, almost of all which were either straight ISO forms or based heavily on ISO forms.

12. All of my work in the insurance industry has brought me in frequent contact with insurer claims departments. For example, while I served as Chief Underwriting Officer of National Union, both senior underwriters and senior claims personnel worked hand-in-hand to create new insurance policies. National Union co-located its claims department physically next to the underwriting department and I also participated in major claims meetings. It was also commonplace for me and the head of claims or other members of the claims department to regularly discuss coverage positions on potential claims submitted to the company.

13. I have taught seminars on proper claims-handling processes for the Claims Litigation Management Alliance's "Claims College".

14. I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School.

15. I am a licensed attorney in the State of New York (and licensed to practice before

the U.S. Supreme Court as well). I am also a licensed P&C and surplus lines insurance broker in all 50 states.

16. In addition, throughout my career I have attended and participated in conferences and panels on issues impacting insurance coverage.

17. I am the author and/or co-author of several works in the field of insurance and new product development. In April of 2019, I authored a book on the creation of Lemonade Insurance Company. In this book, for example, I discuss the importance of alignment between what is told to a carrier's insurance regulators and its policyholders.

**Issues and Questions**

18. I have been asked to address-the following foundational issues and questions-from the point of view of an insurance executive, practitioner, policy-drafter and underwriter familiar with insurance industry custom, practice and standards:

a. The basic structure of an insurance policy, with specific attention to the interplay between the policy's insuring agreement or basic coverage grant (and accompanying definitions) and the policy's exclusions;

b. Under industry custom and practice, the role the evaluation of the history of policy drafting—both of the particular policy at issue and the history of other similar policies in the marketplace—plays in the reading of particular policy provisions;

c. The relevance and importance of guidance provided by industry organizations, and in particular the Insurance Service Organization ("ISO") in such an evaluation;

d. In brief, the regulatory submission and approval process for insurance policy forms issued by admitted carriers, including the need for transparency in the approval process, and the role that ISO has historically played (even for those carriers

filing non-ISO forms) in that process;

e. Under industry custom and practice, the potential for so-called "state amendatory" endorsements to apply to the policy as a whole regardless of the location of the risk or claim; and

f. The relevance of policy drafting, history, the role of ISO and statements and promises made by insurers to their regulators in the examination of the intent and effect of policy language on an submitted claim, including the extent to which a drafter of an insurance policy tries to hide exclusions by incorporating exclusionary language in a manner that is not conspicuous or clear, and the impact if such conduct is supported or permitted.

19. Upon addressing the above, I will then *apply* my conclusions to the particulars of the Zurich EDGE policy as respects the Tory Burch Covid-19 claim as it as I understand it has been alleged, focusing on the following three main areas.

- The Insuring Agreement (and related inclusion of the phrase "all risks of" in the definition of Covered Cause of Loss) in Zurich's "EDGE®" Form (hereinafter the "Zurich EDGE").
- The "Contamination Exclusion" in the Zurich EDGE; and
- Zurich's Regulatory Filings.

## **Foundational Opinions**

### ***A. Policy Structure***

20. All insurance policies contain the same basic structure, with some slight differences in the names given to the parts or sections, and at times the exact order in which such provisions appear in a given policy. The basic structure, expressed in general terminology, is as follows: (i) a Declarations Page; (ii) followed by core policy provisions, including the Insuring Agreement

and Definitions (sometimes called the "guts" of the policy); and then (iii) often followed by one or more endorsements or riders, including various required policyholder notices or "state amendatory" endorsements.

21. **<u>The Declarations Page(s).</u>** The Declarations Page(s) contain(s) the most basic information about the policy including the identity of the policyholder, the policy period, limits of insurance, deductible/retentions, premium and other information including frequently a list of forms or endorsements.

22. **<u>The Base Coverage Grant.</u>** Probably the most important part of the "guts" or core policy is the base coverage grant frequently (but not always) called the "Insuring Clause" or "Insuring Agreement". Some policies have only one such clause, some have multiple ones. This provision is critical because it is always the first place an insured or a practitioner must go in his or her examination as to whether a claim or loss "triggers" the policy, i.e., whether it falls within the purview of the coverage grant afforded by any of the Insuring Agreements.

23. **<u>Definitions</u>**. Another important part of the "guts" of a policy is its Definition section. Indeed, it is a rare Insuring Agreement that does not contain one or more defined terms or phrases. Accordingly, in reviewing the coverage provided under an Insuring Agreement, it is typically necessary to flip back and forth from the Insuring Agreement to the policy's Definition section. A clear policy should be able to be read by substituting the words found in a particular definition for the defined word or phrase in the Insuring Agreement. For example, if an Insuring Agreement says, "We shall pay for all Loss" and "Loss" is a defined term, a policy written consistent with the industry's obligation to write policies in clear and understandable terms should be written in a way that easily allows the reader to "cut and paste" the definition of "Loss" into the phrase "We shall pay for all …" and that phrase should make logical and readable sense. If the

policy is not written in this way, it is susceptible to being subject to multiple reasonable interpretations.

24. **Exclusions.** Exclusions play an important part of the structure of an insurance policy. It is axiomatic that the historical purpose of an exclusion in an insurance policy is to enable the insurance carrier to exclude a coverage for a claim which, but for the exclusion, would have been covered by the policy. In other words, an exclusion is only necessary to bar coverage if a claim would be otherwise covered. For example, Insuring Agreements in directors and officers insurance policies require that a claim be made during the policy period to trigger the policy. As a consequence, there is no exclusion in such policies—and none is required—saying that any claim that is made prior to the policy period is excluded, given that such a claim would not fall within the policy's Insuring Agreement in the first place.

The opposite is equally true. If the drafter does include an exclusion in the policy—especially if the exclusion has many variations in the marketplace, is subject to discussion with regulators, and/or has been subject to ISO filings and circulars—it can be said with nearly absolute certainty (at least from the point of view of industry custom and practice) that the subject matter of the exclusion falls within the Insuring Agreement of the policy.

***B. Policy Drafting***

25. Having sat in, and frequently led, drafting sessions for many insurers over many decades, I can say that policy drafting typically is a rigorous and time-consuming exercise, frequently involving up to a dozen or more individuals, especially in large organizations (like Zurich). "Committee" members frequently include Underwriters, Claims, Business Development Managers (aka Sales), Executive Leadership, Marketing, Legal, Compliance, Actuarial and others. Every word, and indeed sometimes every punctuation, may be examined and be subject to

argument and debate. All prior versions of the policy are typically reviewed and compared. All major competitor forms are reviewed, compared, and sometimes laid out in detailed spreadsheets. Wording is compared and debated between underwriting, claims, legal/compliance, business development and others. Differences between the proposed policy language and that contained in prior policy forms, and between other policies available from the particular carrier and its competitors are examined and debated from both a claims perspective and an underwriting perspective, as well as, inevitably, from a sales perspective. The information gleaned from the insurance marketplace as a whole, including positions taken by drafting and rating industry organizations and regulatory bodies, are reviewed, especially with respect to any "hot" or "emerging" issues.

26. The above drafting process comports with the industry custom and practice that insurers are required to treat their insureds in a fair and evenhanded manner, and give their insureds' interests at least equal consideration as their own. To fulfill that obligation, insurance industry custom and practice dictates that insurers must, among other things, write policies that are clear, understandable and transparent enough to meet the reasonable expectations of the insureds who are purchasing them.

27. Insurance industry standards also prescribe that, once a particular phraseology comes to have a recognized meaning in the insurance marketplace (whether as a result of court decisions or industry pronouncements), that meaning creates a reasonable expectation as to the coverage afforded by such terms for insureds and the brokers securing insurance for them. It follows that, if a carrier wishes to provide different, more restrictive coverage, as is its general right in most circumstances, that carrier must adopt new or modified drafting language to express the underwriting intent to restrict coverage.

28. Regrettably, and all too often, despite the above rules, when tension arises between the Sales department's desire to sell the insurance policies in the easiest way possible, and a good underwriter's concern (supported by reasoned claims professionals) about coverage being unduly expanded, Sales will "win," with the legal department being pushed on the one hand to "do something" to satisfy the Sales department's needs to "sell" the product, but on the other still limit the insurer's potential loss exposure. In this regrettably common circumstance, the policy drafter is incentivized to draft a policy which "looks good for Sales" but still contains language "somewhere" that can be used to deny coverage for the insured risk when a claim is asserted.[1]. This is a violation of industry custom and practices.

29. In conclusion, knowing the *history* of where language in a policy came from, what *other* language is used in the marketplace, and what language was discussed and filed by industry organizations such as ISO (discussed below) plays a critical role in the actual decisions made by both the drafters of insurance policies and the teams that surround them (including underwriters and claims representatives).

30. As discussed below, ISO plays a prominent role in such drafting history, including by the drafting and seeking regulatory approval of policy forms.

### ***C. <u>The Important Role of ISO</u>***

31. ISO is a well-known organization of insurance professionals that provides a vital service to the insurance industry in the creation and filing of recommended policy forms and endorsements together with associated "loss costs" where applicable. I heavily used ISO at Lemonade. ISO is funded by membership fees (and all their members are insurance companies).

[1] As a 40+ year insurance veteran, I want to say that I am not condemning all carriers by this statement. I am only commenting on an unfortunate and not uncommon practice I have observed many times over the years.

32. To my knowledge, the vast majority of U.S. insurance companies are ISO members, including Zurich. Evidencing that Zurich is a member and subscriber of ISO is that as of December 31, 2019, the effective date of the first Zurich EDGE policy at issue in this case, one of the endorsements in the December 2019 policy specifically reflected in a standard ISO referenced footer that the endorsement "includes copyrighted material of ISO Properties, Inc. with its permission." In addition, I am also in possession of other policies issued by Zurich as early as 2009 (obtained after I left Zurich) bearing a similar ISO footnote.

33. Further evidencing Zurich's membership in and use of ISO is that in as early as March 2007, Zurich American Insurance Company, which is the insurance carrier and defendant in this very case, along with ten other Zurich insurance carriers, advised the Missouri Department of Insurance that they were postponing the adoption of the ISO Filing Designation Number CF-2006-OVBEF and CF-OVBER effective March 1, 2007, which filings were entitled "ISO's Forms and Rules to Address Exclusion to Loss Due to Virus or Bacteria."[2] This last communication not only shows that Zurich was a member of ISO, but also shows that, despite their representation to an insurance regulator that they planned to adopt ISO's approach of using a standalone Virus Exclusion, Zurich instead (at least in the Zurich EDGE product) affirmatively chose to not use such an exclusion, but to instead insert the word "virus" in a pollution exclusion that no insured is likely to read when purchasing the policy. As discussed more fully below with respect to Zurich's "Contamination Exclusion," this tactic subverts the reasonable expectation of an insured and is a violation of industry custom, practice and standards.

---

[2] See Certification of Stephen M. Orlofsky dated October 1, 2021 ("Orlofsky Cert.") at Exhibit 5 (March 19, 2007 Letter from Paula S. Bartell (Zurich) to Missouri Department of Insurance Re: "Delay Adoption of ISO's Forms and Rules to Address Exclusion of Loss Due To Virus or Bacteria").

34. Because ISO has a staff of policy drafters, actuaries and other experienced insurance professionals, ISO is recognized as a thought leader in the insurance industry, and as such, plays a pivotal role in establishing industry custom, practice and standards for insurance carriers and others in the industry. Indeed, its name says it all: THE INSURANCE *SERVICES* ORGANIZATION.

35. ISO has been performing these functions for over 50 years; since 1971, when it was a not-for-profit "advisory and rating organization serving U.S. insurers."[3] Today, its parent organization, Verisk, whose name, according to the ISO/Verisk website, is derived from the Latin term for truth and risk, is a publicly held global company serving customers in insurance, energy and specialized markets, and financial services from 34 countries.[4]

36. According to the current ISO/Verisk website, "[s]ince 1971, ISO has been the leading source of information about property/casualty insurance risk . . . [and can] provide statistical, actuarial, underwriting and claims information, Policy Language, Information about specific locations, Fraud-identification tools, Technical Services."[5]

37. Today, ISO has filed at least 2,000 form and loss costs filings with state insurance departments. Member companies, including Zurich, have access to "ISO Forms, Rules, ISO Education, ISO Emerging Issues Portal," among other services designed by ISO to, among other things, "anticipate emerging risks," "identify exposures to underwrite and price coverages," "minimize claim and defense expenses" and "streamline insurance product development."[6]

38. While the above descriptions are taken from ISO's current website, ISO has

---

[3] https://www.verisk.com/about/

[4] *Id.* In 2008, Verisk Analytics, Inc. was established to serve as the parent holding company of ISO. In 2009, Verisk completed its IPO and became a publicly-traded company. (https://en.wikipedia.org/wiki/Verisk_Analytics).

[5] https://www.verisk.com/insurance/brands/iso/

[6] https://www.verisk.com/insurance/capabilities/insurance-policy-programs/

provided the same services for all the decades I have been familiar with the organization, and ISO certainly has done so during the period from 2006-2017, which encompasses the period in which ISO adopted various coverage restrictions in its commercial property forms that Zurich chose not to utilize in the Zurich EDGE property forms covering Tory Burch. Indeed, I made personal use of these services in the years 2015-2017 when I served as Lemonade's Chief Insurance Officer and CEO of Lemonade Insurance Company, whose policy risk was 95% property exposure, albeit personal lines. During that time, I worked with ISO on a daily and weekly basis in developing the terms of and rates for our insurance forms and state filings.

39. With respect to traditional property and casualty policies, ISO forms typically are regarded as THE policy forms, and insurance companies frequently either copy ISO forms outright or utilize ISO policy terms substantially in their own forms. It is not uncommon for state insurance regulators responsible for approving the policy forms that may be utilized by insurers admitted to do insurance business in any given state to decree that only ISO-standard terms, for example, an ISO-standard exclusion (e.g., a pollution exclusion) will be approved for use in policies sold in that state. Accordingly, drafters of traditional property and casualty insurance policies commonly look to ISO forms and circulars when drafting policy language.

40. Simply put, when insurance industry professionals like me draft or supervise the drafting and use of traditional property and casualty policies, they look at what ISO has done and consider what ISO says.

41. ISO, of course, knows the central role it plays in the insurance industry and often takes care in evaluating issues, especially new and emerging issues, with a mind toward not only its insurance members but also the reasonable expectations of insureds and recent court decisions. Insurance brokers (as well as many sophisticated insureds) also know this role of ISO and so look

toward it and its guidance in understanding the intent of the insurance policies it recommends or sells to its customers.

42. In conclusion, ISO's circulars, filings and thought leadership plays a critical role in understanding the meaning and intent of P&C insurance policies, including for its members. This is true not only for policies which actually use, in part or in whole, ISO language in their forms but also for so-called carrier proprietary policies which purport not to use any ISO taken language, including if the carrier in question is a ISO member and therefore knows what that ISO language is.

43. Once a policy is drafted, and assuming that the carrier wishes, or is legally compelled, to offer it as an admitted product[7], the next step is to file the form (and rate) with the insurance department in the state or states the carrier wishes to sell the insurance product.

***D. The Insurance Regulatory Process***

44. According to the National Association of Insurance Commissioners ("NAIC"),[8] the current state insurance regulatory framework has its roots in the 19th century with New Hampshire appointing the first insurance commissioner in 1851. In 1945, Congress adopted the McCarran-Ferguson Act to formally declare that states should regulate the business of insurance and to affirm that the continued regulation of the insurance industry by the states was in the public's best interest. State legislatures set broad policy for the regulation of insurance. They establish and oversee state insurance departments, regularly review and revise state insurance laws, and approve regulatory

[7] *See* https://www.insurancethoughtleadership.com/admitted-v-non-admitted-whats-the-difference/ ("To qualify as an admitted carrier, an insurance company must file an application with each state's insurance commissioner and be approved. Approval requires compliance with a state's insurance requirements, including the filing and approval of that company's forms and rates.")

[8] NAIC serves as a vehicle for individual state regulators to coordinate their activities and share resources. Established in 1871, the NAIC functions as an advisory body and service provider for state insurance departments. *See* https://www.naic.org/documents/consumer_state_reg_brief.pdf

budgets. State insurance departments employ 12,500 regulatory personnel. The fundamental reason for government regulation of insurance is to protect American consumers. State regulators protect consumers by ensuring that insurance policy provisions comply with state law, are reasonable and fair, and do not contain major gaps in coverage that might be misunderstood by consumers and leave them unprotected.[9]

45. Insurance regulators therefore require that admitted carriers submit insurance product forms and rates for their regulatory approval, and that carriers when doing so are truthful and clear as to their intent in making the filing. This is especially important when a carrier files an amendment to an existing form, including making changes to exclusions or adding additional exclusions. For example, insurers must indicate whether such changes "expand" or "restrict" coverage, and whether they have an impact (positive or negative) on premium rate. If, for example, a carrier adds a new exclusion, this would normally have a positive impact on, i.e. decrease the premium rate, absent other factors.

46. However, the most important part of the filing experience is honesty and transparency. Having gone through many filings, audits, meetings and conversations with insurance regulators from the often not appreciated junior staffer to the insurance commissioner himself/herself, I can state with firm authority that transparency and truthfulness is an absolute requirement and lynchpin of that relationship, the absence of which can cause harm to those for whom the insurance regulators are most designed to protect—policyholders and the public.

47. For example, I am advised that New Jersey law recognizes a doctrine referred to as Regulatory Estoppel. My understanding of this doctrine, in brief, is that if an insurance carrier misrepresents to an insurance regulator the effect of an insurance provision, particularly as to

---

[9] *See* https://www.naic.org/documents/consumer_state_reg_brief.pdf

whether the provision expands or restricts coverage warranting an impact on premium rates, that insurer will be estopped from enforcing that provision against a policyholder to deny coverage. *Morton International, Inc. v General Accident Insurance Company of America*, 134 N.J. 1, 38 (1993) ("As a matter of equity and fairness, the insurance industry should be bound by the representations to the [Insurance Rating Bureau], its designated agent, in presenting the pollution-exclusion clause to state regulators.").

48. Based on my experience as an underwriter and insurance executive, this tie-in between the insurer's relationship to its regulator and the regulator's role to the insured communication is a natural and expected one, as the same court commented: "A basic role of the Commissioner of Insurance is 'to protect the interests of policyholders' and to assure that 'insurance companies provide reasonable, equitable and fair treatment to the insuring public." *Morton International,* 134 N.J. at 38.

49. As can be seen from my above comments, this doctrine has a strong foundation in industry custom and standards. As a representative for insurance carriers for four decades, I can say without hesitation that it is absolutely critical for an insurance carrier not to lie, mislead or misrepresent to insurance regulators. Thus, when filing a revised exclusion that *reduces coverage* phrases such as "the above exclusion clarifies this situation so as to avoid any question of intent" is, from my experience and as stated in the *Morton International* case, "simply indefensible." Similarly, saying that an endorsement is designed to "provide clarity to insureds about this coverage" really doesn't say anything.

50. Moreover, what is most important is that once a regulator tells an insurer that it cannot include in its policy a particular exclusion because, for example, the regulator believes that including the exclusion would not be in the best interests of the policyholders, the insurer has no

choice but to remove the exclusion. It would be a violation of industry custom and practice for that insurer to later seek to exclude coverage for a claim that was the subject of the unallowed exclusion on a theory that the exclusion wasn't needed in the first place because it was simply a "clarification" of intent, or similar line of argument. This is doubly true when the regulator provided an alternative exclusion for the carrier to consider and the carrier decided not to use that or any exclusion for the subject issue.

### *E. State Amendatory Endorsements*

51. Frequently as part of the filing process a state regulator will require the creation and issuance of an endorsement to the policy. These endorsements are called "state amendatory endorsements" or, more simply, "state amendatories."

52. State amendatory endorsements are extremely common. They vary in their language and import, and under industry custom and practice, they are designed for various purposes. I have written hundreds over the decades. One such purpose is to have the state amendatory endorsement drafted to comport with specific state insurance regulations, such as that state's regulations governing policy cancellation, renewal, and suit limitations. Such regulatory-specific endorsements include language restricting their effect to the particular state identified in the state amendatory endorsement. Another purpose of state amendatories is to incorporate changes to certain of the policy terms as requested by the state insurance regulators that are not tied to the specific state's regulatory scheme, but instead to clarify and/or revise certain policy terms overall, such as for example, the definition of "pollutants," or "loss." These endorsements frequently reflect important public policy positions of the state. Such endorsements often do not include the restrictive language limiting the effect of the endorsement to risks in a particular state. Accordingly, absent a violation of the rules surrounding misrepresentations to regulators discussed

above, a fair reading of state amendatory endorsements is that only those state amendatory endorsements that specifically say that their effect is limited to the state in question, or their content obviously applies to specific state-based regulations, will be so applied. This is especially true in a policy where some state amendatories do expressly restrict their application to a given state while others do not.

***F. The Relevance of Policy Drafting History***

53. As noted above, insurance custom and practice dictates that an insurer must treat their insureds in a fair and evenhanded manner treating their insureds' interests equal with their own. It is commonsensical that a necessary derivative of this obligation is that insurers may not mislead their insureds or "hide the ball" as far as coverage is concerned. Industry custom and practice also says that policies must be clear, understandable and transparent enough to meet the reasonable expectations of the insureds who are purchasing them and that exclusions must be clear and not vague, ambiguous or subject to multiple reasonable interpretations.

54. To adhere to these rules, drafters of insurance policies cannot, for example, hide exclusions in places where the drafter knows most insureds will not look. Favored (and improper) methods of achieving this end include: (1) insertion of new exclusionary language into another pre-existing very standard exclusion which no one reads (because it is so standard), (2) insertion of an exclusion using as few words as possible *in the middle* of another exclusion which relates to other than the apparent subject matter of the exclusion (cognitive dissonance prevents people from reading/understanding the new exclusion in the middle or else they simply read over it), (3) insertion of an exclusion in a definition or condition, i.e. not in the exclusion section of the policy.

55. Given the unique nature of insurance policy drafting as described above, including that such drafting is often not a product of arms-length negotiations with the insurers' counter-

parties (i.e., policyholders), and the sad truth that the placement and choice of words an insurer uses can be manipulated to fool the unwitting purchaser into thinking he has purchased coverage he has not, it is critical to view the language of an insurance policy by considering the context of history and industry environment. Doing so ensures that the policy is a means of fair and honest communication, as opposed to a document that takes advantage of the lack of knowledge of the counterparty, and even go back on promises, expressed and implied, made to regulators.

56. With the above foundation, what follows are the application of the above principles to the specific questions relating to this case.

**Zurich EDGE Policy Specific Opinions**

***Zurich's Coverage Grant Provisions***

57. As mentioned earlier, as a matter of policy structure, the primary purpose of an exclusion is to bar coverage or exclude something that would otherwise have been covered by the policy's Insuring Agreement. Moreover, as described more fully below with respect to the "Contamination Exclusion" in the Zurich EDGE, as well as ISO's efforts beginning in 2006 with respect to the virus exclusion, it was because the industry recognized that viruses did trigger coverage and fell within the modern property policy coverage grant of "direct physical loss of or damage," that Zurich, ISO and its members and other insurers undertook the effort to draft language barring coverage for viruses.

58. I reviewed the Expert Report of Charles M. Miller publicly filed in the matter *Trapped Escape Room LLC d/b/a Trapped Escape Room v. HCC Specialty Insurance Company*, No. 4:20-cv-03782 (S.D. Tex. Aug. 2, 2021) (the "Miller Declaration")[10] which discusses in extensive detail the history of business income coverage forms promulgated by the insurance

[10] Orlofsky Cert. Exhibit 4.

industry from the turn of the 19th century to present. Based on my review of Mr. Miller's comprehensive, well-researched, and erudite historical summary,[11] I agree that the coverage provided by business income loss policies has continually been expanded since its inception to cover "loss" exposures beyond actual damage or destruction to property.

59. This view is consistent with the industry custom and standards for general underwriting intent and use of the disjunctive word "or". At minimum, a fair view of the phrase "loss of or damage to" means that the phrase can be triggered by *either* the "loss of" OR the "damage to" and that "loss of" must mean something different than "damage to". This is especially true in the case of the Zurich EDGE where the word "loss" is not defined and can reasonably be said to carry its common sense meaning of the "act of losing possession: DEPRIVATION".[12]

60. Accordingly, the argument that direct physical loss requires a physical alteration to the property or a tangible damage or actual structure damage is simply not supported by the history

[11] *See* Miller Declaration at ¶¶ 59-65 (early "Use and Occupancy" insurance forms introduced at the turn of the 19th century reimbursed the insured on a "Per Diem" basis "for the loss of net profit and necessary continuing business expense during the time the Insured's business is totally or partially prevented from operating because of damage to or destruction of business property by fire other perils insured against."); ¶¶ 66-80 (twin concepts that property policies would only cover "damage to or destruction of" property and then only if such damage or destruction was a result of named perils such as fire continued in large part into the 1970s); ¶¶ 81–89 (the original ISO Business Interruption forms were similar in many important ways to the Use and Occupancy forms, continuing the main themes of the past requiring actual damage or destruction to property arising from a named peril); *id.* (the word "loss" only appeared in these early ISO policies as a description of damages or the amount the insurer would have to pay; even when ISO added Civil Authority coverage in the 1977 form it required the business interruption to be "a direct result of damage to or destruction of property adjacent to the premises described herein as described by the peril(s) insured against…", again staying with the themes of "damage to or destruction of" property and named perils); ¶¶ 104-123 (the foregoing pattern started to change in the mid 1980s; the 1985 ISO "Business Standard Property Coverage Form" was one of the first policy forms to delete the phrase "damage to or destruction of" property and replace it with "direct physical loss of or damage to Covered Property…resulting from any Covered Cause of Loss."); ¶¶ 124-131 (what these mid 1980 policies, and those that followed them, demonstrated from a point of view of insurance draftsmanship and intent (as well as reasonable expectations of an insured) is that in order to be consistent with the use of the word "loss" in property policies uses that term in the Insuring Agreement, the Insuring Agreement must be construed as providing coverage for loss of the property or loss of its use or function as long as that loss is not excluded by the policy. This view is consistent with the industry custom and standards for general underwriting intent and use of the disjunctive word "or"); ¶¶ 136 (in 1986, there was a "major overhaul" of the Business Income policy by ISO; although revised since then, the insuring agreements have not been changed. All ISO Business Income forms, from 1986 to date, still provide coverage for "loss of or damage to" covered property).

[12] Loss, Merriam-Webster, www.merriam-webster.com/dictionary/loss (as of August 1, 2021).

and development of business interruption coverage, nor is it supported by insurance industry standards for the interpretation and application of insurance policies, such as the Zurich EGDE.[13]

61. It is therefore my opinion that by choosing to keep the language in its Insuring Agreement for coverage of "direct physical loss", Zurich is supporting an insured's reasonable expectation that coverage under the form is not restricted to claims alleging actual physical damage to or destruction of the insured's property. Or, put another way, for Zurich to proffer a converse interpretation would be a violation of industry custom, practice and standards.

62. Notably, in a 2012 Advisory, ISO stated that it was removing the phrase "risks of" from the definition of "Covered Cause of Loss" in its Business Owners' Coverage Form, ISO's standard commercial property insurance form. Other insurance companies, such as Cincinnati Insurance Company ("Cincinnati"),[14] followed ISO's lead, indicating that such removal was done "in reaction to court decisions."

63. However, Zurich in its EDGE form did not follow ISO's lead. Instead, the Insuring Agreement in the Zurich EDGE provides that the policy "[i]nsures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location. . . ."[15]

---

[13] I do note, however, that as correctly analyzed by ISO, viruses, including the virus that causes Covid-19, do alter property, at least until they are successfully removed. Similarly, multiple state and local governments have stated their emergency orders were needed, in part, to protect property, not just people. (See e.g. Nevada Governor's Declaration of March 12, 2020, City of Los Angeles Public Order of March 19, 2020 (revised May 27, 2020), San Francisco Mayor's Office Order of February 25, 2020, NYC Emergency Executive Order of March 15, 2020 and Broward County [FL] Administrative Emergency Order of March 22, 2020, among others, all mentioning the protection of property as a reason for the Covid-19 orders. (See Miller Declaration ¶¶ 174-175). However, even if this was not the case, property policies have for decades if not centuries covered air releases substances which require cleaning but do not alter the structure of the property, the most obvious of one being smoke. See Miller Declaration ¶¶ 165-168.

[14] *See* Orlofsky Cert. Exhibit 2, excerpt from 2016 Notice to Policyholders from Cincinnati Insurance Co., as filed as an exhibit to the Complaint in *Milan v. The Cincinnati Ins. Co.*, No. 2:20-cv-12222-PDB-RSW (E.D. Mich. Aug. 18, 2020). "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101. Item 3.a. is changed from 'Risks of Direct Physical Loss' to 'Covered Causes of Loss' (Clarification)".

[15] First Amended Complaint and Demand for Jury Trial in *Tory Burch, LLC v. Zurich American Ins. Co.* ("Compl."), Exhibit A, 2020-21 Master Policy at § 1.01.

The Zurich EDGE defines the term "Covered Cause of Loss" as "[a]ll risks of direct physical loss of or damage from any cause unless excluded"[16] – i.e., exactly the opposite of ISO's recommendation.

64. Indeed, as discussed in an article written by a renowned insurance expert in 2008 (i.e, the year that the Zurich EDGE form was first introduced), as well as a trade publication published by the Insurance Risk Management Institute (IRMI), it was already apparent in the industry that the term "risks of" used in the definition of "covered cause of loss" was being interpreted by many courts to mean not just actual physical loss or physical damage, but the threat of physical loss or physical damage.[17] Despite this awareness, Zurich continued to use the term "risks of" in its definition of "Covered Cause of Loss."

65. Given its affirmative choice to retain "risks of" in its Covered Cause of Loss definition in its EDGE form, any effort by Zurich to argue that its policy does not cover a claim alleging a "risk of" or "threat of" "physical loss" even without direct "damage" to property would be in violation of custom and practice.

66. Additionally, Zurich would be aware that by continuing to use the phrase "physical loss of *or* damage to", the policyholder would reasonably expect that it would be covered (subject to the policy's exclusions) for EITHER physical loss OR damage to property, and that it would not be required to show "damage or destruction to" property or a physical alteration to the property or a tangible damage or actual structure damage to obtain coverage.

***<u>The History of the ISO Virus Exclusion and</u>***
***<u>Its Relevance to the Zurich Contamination Exclusion</u>***

[16] *Id.* at § 7.11.

[17] *See* Orlofsky Cert. Exhibit 7, Donald S. Malecki, *Troubled Terminology, "Risks of direct physical loss" wording is currently read broadly by courts* (*Risk Management,* June 2008); Exhibit 8, Steven A. Coombs and Donald S. Malecki, *The Builders Risk Book* (2d ed. 2019) (Chapter 9, the "All Risks Coverage Approach") (published by IRMI).

67. In 2005, in response to the 2003 outbreak of SARS, by way of a 2005 ISO state filing document, ISO explained that it was proposing a "new exclusion specific to naturally occurring or manmade contamination … Some examples of contamination of property include: … Contamination of office equipment and/or products by anthrax or by a virus such as Severe Acute Respiratory (SARS) or Avian Influenza."[18] The document explained that a unmodified pollution exclusion would be insufficient to communicate to the public that coverage for viruses was excluded given the "trend to treat various subjects ('hot' topics, emerging exposures or frequently encountered types of loss) with more focused exclusions .... The 'laser' treatment may enhance an insured's understanding of the policy and avert claim disputes and litigation."[19]

68. From my industry experience, the above statements by ISO can be fairly translated to say "[o]ur policy language has been broadened to such a degree over the years that it now covers viruses, and unless we exclude viruses (and no reasonable insured will interpret our standard pollution/contamination exclusion as excluding viruses), so if we want to exclude SARS and the like, we need to add another specific exclusion."

69. The above is, of course, correct. Given the history of the property policy's Insuring Agreement there should be little doubt that a property policy expressly using the term "all risks of" covers business interruption loss due to the "risk of" (i.e. potential reasonable threat and/or alleged or actual presence) of the SARS virus.[20]

---

[18] Miller Declaration at p. 86 citing that the ISO documents discussed were produced in the matter of *Hartford Fire Ins. Co. v. Moda LLC, et al.*, Conn. Sup. Ct., Jud. Dist. of Hartford At Hartford, Docket No.: HHD-CV-20-6127638-S ("Hartford Action"). These documents are not subject to protective orders.

[19] Orlofsky Cert. Exhibit 3, Hartford Action, Dkt. No. 202 at Exhibit A, ISO_00004700-4705.

[20] *See also* Miller Declaration at p. 89, citing "CPP-2005-008 Biological Contamination and Errors in Production" (Meeting of September 28, 2005, ISO Commercial Property Panel). ISO's Commercial Property Panel again recognized that viruses could contaminate physical property. According to a November 10, 2004 ISO document entitled "To the Members of the Commercial Property Panel", the panel all consisted of employees from insurance companies.

70. As discussed below, ISO decided against modifying the "contamination" exclusion but rather in 2006 proceeded with a standalone "Exclusion of Loss Due to Virus or Bacteria" (hereinafter, the "Virus Exclusion"). ISO submitted the Virus Exclusion to many state insurance departments for approval.[21]

71. In explaining the Virus Exclusion, ISO told the state departments:

a. Some other examples of viral and bacterial contaminants are rotavirus, SARS, influenza (such as avian flu) legionella and anthrax. The universe of disease-causing organisms is always in evolution.

b. Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior buildings surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[22]

72. Accordingly, ISO's statements teach that viruses can cause the "physical loss of or damage to" property resulting in either the need to "replace" (in the case of bacteria infected milk) or decontaminate (i.e. clean) surfaces in case of viruses like SARS-CoV.

73. Further, as supported by ISO's email discussed later, ISO teaches that if a carrier wishes to exclude such loss, it must do so by way of an effective standalone virus exclusion and not modify the policy's pollution (or contamination) exclusion to add the word "virus" in the middle of what would otherwise by a fairly standard, decades old, pollution exclusion.

---

[21] *See* Orlofsky Cert. Exhibit 6, ISO Circular LI-CF-2006-175 (July 6, 2006).

[22] *Id.*

*Zurich's Contamination Exclusion*

74. Despite ISO's efforts and statements, Zurich, an ISO member, who regardless can be reasonably assumed to well aware of this history, chose ***not*** to use an exclusion in its EDGE form such as ISO's standalone Virus Exclusion, but instead attempted to obfuscate the presence of such an exclusion by inserting the word "virus" into a "Contamination Exclusion," i.e., it did the exact opposite of what ISO recommended.

75. For this reason, Zurich cannot reasonably contend that even if the policyholder's claim triggers the policy's Insuring Agreement, the claim is nevertheless excluded by the policy's Contamination Exclusion.

76. The "contamination" exclusion, also known as the pollution exclusion, has been around for many decades, largely unchanged and, as noted in the ISO filings referred to above in connection with the ISO Virus Exclusion, the exclusion is generally understood by insurance professionals and regulators to bar coverage for traditional environmental pollution.

77. A 2011 Explanatory Memorandum from the Louisiana Department of Insurance in response to Zurich's request for regulatory approval of its Contamination Exclusion is consistent with the point that the contamination/pollution exclusion is viewed by insurance practitioners and regulators to extend only to traditional environmental contamination. The department stated as follows:

> This Department views pollutants as substances that damage the natural environment when accidentally spilled, leaked or discharged. Hence, the presence of products such as …. poison, toxins, pathogens, organism, fungus, mold, mildew, bacteria and virus that lead to disease or health hazards do not fit our definition of pollutants and should not be included in the text of a pollution exclusion or referred to as examples of pollutant. *Damages relating to these types of products and health hazards MAY be excluded from coverage, but they should not be included within a pollution exclusion*. It is recommended to create separate exclusions and definitions for contaminants such as fungus, mold, asbestos, spores, bacteria, virus, biological substances, medical waste and products that

may lead to disease.[23]

78. Similarly, Loretta Newman, who participated in leading ISO in its 2006 approach to Biological Contamination wrote in an internal email on April 18, 2006 that ISO would not use a contamination exclusion to exclude coverage for viruses: "Please do not use this [contamination exclusion] draft. We are not going forward with it for Commercial Property. Instead we're working on a virus/bacteria exclusion for accelerated filing action."[24] This comment reveals that Ms. Newman was aware, as fellow ISO employee Tom Gibboney had remarked earlier in a 2005 staff meeting, that "I think an insured would have a reasonable expectation of coverage [under the standard property form] if ordered to cease business by a government authority" due to a virus.[25]

79. The lesson in both the above actions is clear. The standard property policy gave the insured community the reasonable expectation of coverage for loss of business due to the presence or reasonable/statistical probability of the presence of a virus on the covered premises. Accordingly, as the Louisiana Department of Insurance instructed, and ISO actually did, to the extent an insurer wanted to exclude coverage for losses caused by viruses, it was free to do so, provided that it used a *separate*, and *clearly worded* virus exclusion.

80. For this reason, it is my view that inserting the word "virus" and few other words *in the middle* of a decades old, classic ISO-like pollution exclusion is a poster child example of the draftsman's "hiding the exclusion" game I discussed earlier. Simply put, everyone knows or, at least, thinks they know what "contamination" or "pollution" is, and so why read the exclusion? Accordingly, to the extent the drafter wanted to obfuscate the import and presence of such an

---

[23] Compl., Exhibit C, 2011 Explanatory Memorandum (emphasis added).

[24] Orlofsky Cert. Exhibit 3, April 18, 2006 email from Loretta Newman to John Pineda (Hartford Action, Dkt. No. 202 at Exhibit A, ISO_00004699).

[25] Orlofsky Cert. Exhibit 3, Hartford Action, Dkt. No. 202 at Exhibit A, ISO_00004722.

exclusion, placing it in a decades old ISO-like pollution exclusion would achieve that goal, because there is an excellent chance most policyholders (and even possibly regulators) would reasonably expect that it barred coverage for environmental pollution, not a pandemic, and hence would never even think to read it.[26]

81. It is therefore my opinion that regardless of whether the Contamination Exclusion in the base Zurich EDGE form is modified to remove "virus" as provided by amendatory endorsement, the attempt to hide a virus exclusion within what would otherwise be a standard pollution exclusion is contrary to acceptable industry custom and practice, in that it violates the insurer's obligation to express its intention in a transparent and conspicuous manner consistent with the reasonable expectations of the insured.

82. Further demonstrating that Zurich's drafting choices are contrary to the reasonable expectations of a reasonably intelligent insured are Zurich's definitions of the terms "Contamination" and "Contaminants" in the base EDGE policy form. First, the definition of "Contaminants" Zurich chose to include in the main policy form does not even include any reference to "virus":

> Contaminant(s) - Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, Fungus or Spores.[27]

[26] Similar to an earlier footnote, my observation here is simply to connect a fact to a behavioral pattern I have seen in the past which would represent, in my view, a violation of industry custom and practice. I mean no disparagement of intent on behalf of Zurich here and obviously testimonial from Zurich's drafters. However, regardless of a particular drafter's subjective intent, it is my view that a reasonable insured would not look for a pandemic exclusion in an insurance policy's pollution exclusion, however named, i.e. that from a point of view of insurance industry custom, practices and standards the Louisiana Department of Insurance was right in its analysis, and the legitimacy of that analysis is not limited to Louisiana risks.

[27] *E.g.*, Compl. Exhibit A, 2020-21 Master Policy at § 7.10.

Moreover, despite defining the term "Contaminant" without including the term "virus," Zurich then inconsistently included a definition of "Contamination" that **did** refer to "virus."[28] In other words, rather than simply defining "Contamination" as "any condition of property due to the actual presence of any Contaminant(s)" (i.e., precisely what the regulator required in the amendatory endorsement), Zurich instead affirmatively chose to confusingly and incongruously slip into the Contamination Exclusion the term "virus."

83. A reasonably intelligent insured would not expect the defined term "Contaminants" to have a meaning that differs substantially from the defined term "Contamination," as is the case in the Zurich EDGE base form. As someone with decades of drafting experience, I would expect if there was a reason to draft a policy with both terms, "Contaminants" would be defined in the classic pollution sense (i.e ISO) and Contamination would in turn be defined as "any condition of property due to the actual presence of Contaminant(s)," or the like. What would not be expected, and is contrary to custom and practice, is to have, as the Zurich base form does, a definition of Contamination that does not include and is inconsistent with the definition of "Contaminants," which is directly contrary to what an insured would reasonably expect. Indeed, Zurich's insertion of "pathogenic organism" and "virus" in a "Contamination Exclusion" is tantamount to a "livestock exclusion" that defines "livestock" as "cattle, sheep, swine, goats, horses, mules, donkeys, and *houseplants*." Such draftsmanship defeats these reasonable expectations and results, in my opinion, in confusion and ambiguity.

84. Accordingly, it is my view that, given the history of the ISO Virus Exclusion and the role that ISO plays in the industry, together with the industry custom, practice and standards of policy clarity and transparency, for Zurich to argue that its Contamination Exclusion is a basis

---

[28] *E.g.*, Compl. Exhibit A, 2020-21 Master Policy § 7.09.

to deny coverage for COVID-19 business interruption losses because of the presence of the word "virus" in that exclusion would be a violation of industry custom and practice. In addition, a proper and reasonable interpretation of Zurich's "Contamination Exclusion" is that, by virtue of the amendatory endorsement deleting the word "virus" from the definition of "Contaminants," the Contamination Exclusion in any event does not apply to losses caused by a virus.

85. Finally, as discussed below, because of Zurich's representations to regulators in Louisiana, and the manner in which Zurich handled its state amendatory endorsements, it is consistent with industry custom and practice for the Louisiana amendatory endorsement to have the effect of revising the Contamination Exclusion in the base form of the policy as to all insured locations. To construe the endorsement otherwise is inconsistent with standards of industry custom and practice.

**Zurich's Regulatory Filings**

86. As discussed above, insurance industry custom, practice and standards include fundamental principles of fairness, equity and a requirement that an insurer act in good faith and with fair dealings with its insured. For an insurer to represent to a state regulator that it would delete an exclusion, as Zurich did vis à vis the Louisiana regulator, and then seek to exclude a claim submitted based solely on the fact that it arises out a virus, while simultaneously arguing that the claim does not trigger the policy's Insuring Agreement, violates these standards.

87. The above behavior violates industry custom and practice in at least two other ways. First, as mentioned earlier, generally speaking, exclusions are inserted in policies to bar coverage for a claim that triggers the policy's Insuring Agreement and is otherwise covered. Put another way, if the claim did not fall within the Insuring Agreement of the policy, no exclusion would be needed. Accordingly, Zurich's effort to obtain regulatory approval for its Contamination Exclusion to bar coverage for losses caused by a virus further shows that Zurich effectively

represented to regulators its belief that such claims would be covered were it not for the exclusion. It cannot now say that the claim in fact did not come within the Insuring Agreement such that the exclusion was not necessary.

88. Secondly, Zurich was specifically directed by the Louisiana regulator to delete "virus" from its Contamination Exclusion, and Zurich would not be entitled to exclude coverage for virus claims unless Zurich drafted and attached a separate and approved virus exclusion. In response, Zurich drafted an endorsement deleting the term "virus" from its Contamination Exclusion (the "Virus Deletion Endorsement") but chose not to also create a separate, standalone "virus" exclusion. Zurich's failure to create such an exclusion, even though its regulator advised Zurich that doing so was the only way Zurich would be entitled to deny virus claims in the future, and to then to try to deny coverage for the very type of claim that the insurance regulator told Zurich it was not entitled to exclude, constitutes a severe violation of industry custom and practice.

89. In response to all the above, Zurich is likely to say that the Virus Deletion Endorsement added to the policy in response to the Louisiana regulator only applies to property in Louisiana, such that Zurich is entitled to rely on the presence of the word "virus" in the original unmodified version of its Contamination Exclusion to deny coverage for COVID-19 business interruption claims in other states. However, this position is inconsistent with industry custom and practice.

90. The Virus Deletion Endorsement does not state that it applies solely to Louisiana risks, [29] and there is nothing in the endorsement that is rooted in Louisiana-specific state laws or

[29] This is in contrast, for example, to their Connecticut endorsement which states "APPLIES TO THOSE RISKS IN CONNECTICUT." *See, e.g.*, Compl. Exhibit A, 2020-21 Master Policy at "Amendatory Endorsement – Connecticut"); *see also id.*, at "Amendatory Endorsement – New York") ("THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK").

regulations. That the changes reflected in the endorsement appear to arise out of that Insurance Department's "public policy" view of what pollution is only underscores this point.

91. Zurich might also argue that the name of the endorsement itself states that it, in effect, only applies to property within the state of Louisiana but that argument should be of no avail. The Zurich EDGE policy has a specific provision which speaks of titles of endorsements and states explicitly that "The titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."[30]

92. Zurich might further argue that the various amendatory endorsements contain terms that contradict each other, and it would be nonsensical to apply all of these endorsements to all claims. However, again, this argument fails. First, the policy Zurich issued to Tory Burch in 2020 contains 31 state amendatories and to the best of my knowledge, in addition to Louisiana, numerous of the other states reflected are states where there is no insured location, and yet without explanation as to why, Zurich included these endorsements in Tory Burch's policy. In any case, and more importantly, in the event of any contradictory language, custom and practice dictates that the language most favorable to coverage would automatically apply.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: October 1, 2021

TY R. SAGALOW

[30] *E.g.*, Compl. Exhibit A, 2020-21 Master Policy § 6.21.