# EXHIBIT 5

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

TRAPPED ESCAPE ROOM LLC D/B/A
TRAPPED ESCAPED ROOM, et al.,

         Plaintiffs,

    vs.

HCC SPECIALTY INSURANCE
COMPANY, an Oklahoma Corporation,
and HCC COMPANY, a Texas
Corporation,

        Defendants.

Civil Action: 4:20-cv-03782

EXPERT REPORT OF CHARLES M.
MILLER

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 5

II. SUMMARY OF OPINIONS .............................................. 5

III. BASIS FOR OPINIONS .................................................. 8

    A. Background and Experience.................................... 8

    B. Documents Reviewed .......................................... 12

    C. Insurance Industry Standards and Practices ............... 12

        1. Insurance Industry Claims Personnel Are Trained in the Standards for Claims Handling ................................. 12

        2. Insurance Industry Claims Personnel Are Trained in the Duty of Good Faith to Assure That the Purposes of Insurance Are Fulfilled ....................................... 13

        3. Insurance Industry Claims Handling Standards Exist to Assure That the Purposes of Insurance Are Fulfilled ........... 13

        4. Insurance Claims Handlers Are Also Guided in Their Claims Handling by the Standards for the Interpretation and Application of Insurance Policies ..................................... 16

    D. HCC's Policy Issued to Trapped Escape Room ............ 18

IV. OPINIONS................................................................... 20

    A. HCC Failed to Comply With Insurance Industry Standards Which Require a Timely and Thorough Investigation of Claims Such as Trapped Escape Room's..................................... 20

        1. Insurance Industry Standards for the Timely and Thorough Investigation of First-Party Insurance Claims........................ 20

        2. HCC Did Not Comply With Insurance Industry Standards for the Investigation of Trapped Escape Room's Claim......... 21

            a. Trapped Escape Room's Notice of Claim and HCC's Insufficient Investigation ..................................... 21

            b. HCC Issues Reservation of Rights Letter to Trapped Escape Room ..................................... 24

            c. HCC Adopts Procedures for Handling COVID-19 Claims Which Are Contrary to the Policy Coverage and Which Were Not Followed With Regard to the Trapped Escape Room Claim ..................................... 26

        3. HCC's Claim File Contains No Documentation of the Required Investigation of Trapped Escape Room's Claim .... 28

B. HCC Improperly Denied Coverage for Trapped Escape
Room's Losses Due to the COVID-19 Pandemic.......................... 31

   1. Insurance Industry Standards for the Denial of
Insurance Claims....................................................................... 31

   2. HCC's Denial Was Contrary to Insurance
Industry Standards ................................................................... 32

C. The History and Development of Business Loss of Income
Policies Supports Coverage For COVID-19 Business Income
Loss Claims.................................................................................... 36

   1. Introduction and Summary of the History of Business
Income Coverage........................................................................ 36

   2. The Pre-ISO Use and Occupancy Policy Forms and the
Origin of Loss of Earnings Coverage in the United States .... 42

      a. The Early Per Diem and Gross Earnings Forms
Provided Coverage for "Damage to or Destruction of"
Covered Property .............................................................. 42

      b. The Standardized Use and Occupancy Policies
Continued the Practice of Insuring Only When There
Was "Damage to or Destruction of" Covered Property .... 45

      c. The Use & Occupancy Forms Are Changed but
Continue to Provide Coverage Only Where There Is
"Damage or Destruction" of Covered Property ................. 50

   3. ISO Issues Standardized Business Interruption and
Business Income Loss Policy Forms ....................................... 52

      a. The Formation of ISO ......................................................... 52

      b. The Early ISO Business Interruption Forms
Continued to Provide Coverage for Only "Damage
to or Destruction of" Covered Property ............................. 53

      c. Non-ISO Forms Continued the Requirement That
There Be Physical Damage to Covered Property ............. 58

   4. The Development of Commercial Property Policies
and the Introduction of Coverage For "Loss of or
Damage to" Covered Property.................................................... 61

      a. Early Commercial Property Policies.................................... 61

      b. ISO Develops the Businessowners Policy, Including
Business Income Coverage and Expanding Coverage
to Include Loss of or Damage to Covered Property.......... 66

      c. The Inclusion of Coverage for Loss of or Damage to
Covered Property in The ISO Business Income Policy

Form Expanded Coverage to Include Loss of Use or Function .......................................................... 76

    d.  ISO Continues Coverage for Loss of or Damage to Covered Property in the 1999 Business Income Policy Form .............................................................. 79

    e.  The 1986 ISO Revisions to the Business Income Form .... 81

    f.  ISO's 2012 Business Income Policy Forms Continued Coverage for Loss of or Damage to Physical Property .... 82

C.  ISO Has Acknowledged That Property Policies Provide Coverage for Losses From a Virus ................................................ 83

D.  Coverage for Business Income Losses Arising From the Coronavirus Pandemic Is Demonstrated Where an Insurer Has Failed, as Here, to Expressly Exclude Loss or Damage Arising From Viruses and Pandemics ...................................................... 90

E.  The Policy's "Repair or Replace" Language in the Business Income Coverage Does Not Limit Coverage to Only Structural Damage ................................................................. 92

F.  Business Income Loss Coverage Is Provided for Both Temporary and Permanent Loss of Use or Function .................. 94

G.  Civil Authority Coverage Applies to the Coronavirus Claims ..... 97

H.  Pursuant to Industry Coverage Standards, the Policy's Extra Expense Coverage Applies to Trapped Escape Room's Claim .. 103

I.  HCC's Reliance on the Acts or Decisions Exclusions Was Contrary to Insurance Industry Standards ................................... 106

J.  Coverage for Business Income Losses Arising From the COVID-19 Pandemic Accords With Trapped Escape Room's Reasonable Expectations .............................................................. 109

K.  HCC Failed to Timely Pay Trapped Escape Room's Claim ......... 112

V.  CONCLUSION ......................................................................... 114

## I.     INTRODUCTION

1.      I have been retained by Trapped Escape Room LLC, d/b/a Trapped Escape Room, a California limited liability company, and Trapped! LLC, a Nevada limited liability company (hereinafter, collectively referred to as "Trapped Escape Room") in this matter brought against HCC Company and HCC Specialty Insurance Company (hereinafter, collectively referred to as "HCC") to provide my expert opinion on HCC's handling of the claim submitted by Trapped Escape Room, which is the subject of this action, including the scope of coverage, based on insurance industry standards, customs, and practices, including the history and development of business income loss coverage, provided by the HCC insurance policy issued to Trapped Escape Room for business income losses.  The opinions herein are offered to a reasonable degree of professional certainty.

2.      A copy of my CV is attached hereto as Exhibit A.  My hourly rate is $525.00, except for deposition and trial, where it is $575.00.

## II.     SUMMARY OF OPINIONS

3.      It is evident that HCC failed to comply with insurance industry standards for the handling of claims in its handling of Trapped Escape Room's claim.  HCC only conducted, at best, a cursory investigation of the claim, failing to look for facts which would support coverage.  Following this insufficient investigation, HCC then denied the claim.  The denial was clearly contrary to insurance industry standards first because it was based on an insufficient investigation, but also because HCC relied upon an interpretation of the Policy

EXPERT REPORT OF CHARLES M. MILLER
Page 5

which was contrary to insurance industry standards. Indeed, based on insurance industry standards, there was no reasonable basis for HCC's denial. HCC also failed to investigate and evaluate Trapped Escape Room's damages as it should have done. HCC developed a claim handling protocol which was aimed at supporting denial of COVID-19 related business income claims. In other words, HCC sought only to serve its own interests to the detriment of the interests of its insured, Trapped Escape Room.

4.    The opinions herein regarding the history and development of business income coverage result from extensive research and analysis of the historic and present-day literature in the insurance industry, including numerous policy forms, regarding business income coverage. This literature, which is publicly available, is cited throughout this report.[1] The purpose of this research is to determine if the history and development of business income coverage would provide guidance on the present-day application of business income coverage to claims arising out of the coronavirus pandemic. Based on the research, my conclusions are:

- The history and development of business income coverage supports the present claims for business income loss arising from the coronavirus pandemic.

- Business income loss policies, dating from their initial development as use and occupancy policies, up to the late 1970s and early 1980s, only provided coverage where there was "damage or destruction" to covered property, and not for loss of property that was not damaged, such as theft. As a result, these business income policies only applied to physical damage to physical property.

---

[1] A list of the sources relied upon for this report is attached hereto as Exhibit P.

EXPERT REPORT OF CHARLES M. MILLER
Page 6

- In the early business income loss policies, the word "loss" was used to describe the amount the insurer may have to pay, and did not refer to the event which resulted in that amount.

- Coverage for business income losses changed significantly when the Insurance Services Office ("ISO"), in the early 1980s, offered for the first time a Businessowner's policy, which included business income coverage, and for the first time provided coverage for "loss of or damage to" covered property.

- ISO's new Businessowner's policy represented a significant departure from the historic coverage because, with the advent of the new ISO form, coverage was now extended to loss of use or function of real or personal property, and not only to its damage or destruction.

- This conclusion is supported by the insurance industry standards for the interpretation of policies, such as the modern ISO Businessowners and business income forms.

- Pursuant to industry standards, damage in the business income policies refers to physical damage, whereas the word "loss" clearly does not and cannot. "Loss" broadly refers to the loss of use of a property and does not require any physical damage to be present. Accordingly, and consistent with the history of business income policies, coverage is provided for the loss of use or function of the property.

- The new ISO forms are issued on either a named peril or an all risk basis, with the all risk form being the most common. The all risk nature of the HCC all risk policy informs all decisions regarding the scope of the policy coverage, including the Business Income coverage. Indeed, the HCC policy provides coverage even where there is no actual physical damage to an insured's property.

- Accordingly, the modern ISO business income forms provide coverage for an insured's loss of business income due to the loss of use or function of the insured's business property.

- The business income policy's "Repair or Replace" provision does not limit coverage to only structural damage.

- ISO acknowledged that property policies provide coverage for losses from a virus.

- Coverage for business income losses arising from the coronavirus pandemic is demonstrated where an insurer has

EXPERT REPORT OF CHARLES M. MILLER
Page 7

failed to expressly exclude loss or damage arising from viruses and pandemics.

- The business income coverage extends to temporary as well as permanent losses.

- Civil Authority coverage applies to COVID-19 related business income claims even if total access to an insured's property has not been prohibited.

- Civil Authority coverage applies to COVID-19 related business income claims even where the civil authority closure order does not expressly set forth that its purpose, in part, is to protect property.

- The Government Acts or Decisions Exclusion in the Policy does not apply to Trapped Escape Room's business income claim.

- Based on insurance industry standards, it is within Trapped Escape Room's reasonable expectations that coverage would be provided under the HCC policy for COVID-19 business income losses.

## II.    BASIS FOR OPINIONS

### A.    Background and Experience.

5.      I have been retained as an expert on insurance claims handling practices and standards, including, but not limited to, insurance industry standards for the interpretation and application of insurance policies, in more than 200 cases, in both federal and state courts, including those in Texas, Arizona, California, Idaho, Nevada, New Mexico, South Carolina, Colorado, Wyoming, Pennsylvania, Florida, the U.S. Virgin Islands, Washington, Oregon, Utah, Arkansas, Missouri, Massachusetts, Mississippi, Louisiana, West Virginia, and Toronto, Ontario, Canada.  I have been qualified as an expert on insurance industry claims handling standards and practices in Texas, Arizona, Nevada, Arkansas, Colorado, Ohio, West Virginia, Washington, New Mexico, Louisiana,

South Carolina, Idaho, Hawaii, Florida, Kansas, and California. Attached hereto as Exhibit B is a list of cases in which I have been deposed or testified at trial for the past five years.

6. My opinions are based on my experience and training as an insurance claims adjuster and manager at Fireman's Fund Insurance Company from 1972 to 1990, my experience and training as a lawyer practicing insurance law, and my experience in reviewing and analyzing the claims handling of other insurance companies. My opinions are also based upon, among other sources, my review and knowledge of insurance industry texts and articles concerning the handling of insurance claims, and of the statutory and regulatory standards for the handling of insurance claims, such as the National Association of Insurance Commissioners' (hereinafter, the "NAIC") Model Unfair Claims Settlement Practices Act, adopted in Texas at the Texas Insurance Code, §542.001, et seq. (hereinafter, the "Texas Act"), and the Texas Administrative Code, §§21.202 and 21.203 (hereinafter, the "Texas Regulations"). The Act has also been adopted in California (Ins. Code §790.03(h); hereinafter, the "California Act"), and the NAIC Model Unfair Claims Settlement Practices Regulations has been adopted in California as well (§2695.1, et seq.; hereinafter, the "California Regulations"). In Nevada, the NAIC Model Unfair

Claims Settlement Practices Act has been adopted at NRS 686A.310 (hereinafter, the "Nevada Act").[2]

7.      The Act and the Regulations together form one of the most recognized sources for the minimum insurance industry standards for the proper handling of claims.  Indeed, the Act and Regulations are often an articulation of the general insurance industry standards for claims handling.[3]  As one well-known author on insurance claims handling has pointed out, "insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a nationally recommended standard of care.  It was developed [by the NAIC] as a guide for insurance regulators in every state to establish reasonable claim practices" (Markham, James J. [Ed.], et al., The Claims Environment [Insurance Institute of America, 1st ed., 1993], p. 297; hereinafter, "Markham").  Because the Act and the Regulations constitute accepted insurance industry minimum practices and standards for claims

---

[2] The Act and Regulations in Texas, Nevada, and California are referred to herein, as R&C Entertainment has insured locations in both Nevada and California, and this matter is filed in Texas.

[3] The Act and Regulations are based on the NAIC's Model Unfair Claims Settlement Practices Act and Regulations.  More than 45 states have adopted the Model Unfair Claims Settlement Practices Act, either in its original form or in a modified form. The Model Unfair Claims Settlement Practices Act is used by insurance commissioners nationwide to perform market conduct examinations of insurance claims operations.  Such examinations involve the review of hundreds of claims files to determine if the insurer is complying with the standards set forth in the Model Unfair Claims Settlement Practices Act. Further, many insurers have included the Model Unfair Claims Settlement Practices Act and Regulations in their claims manuals, and have required their claims personnel to comply with them.

EXPERT REPORT OF CHARLES M. MILLER
Page 10

handling, where appropriate, sections of the Act and Regulations are referred to herein.

8.     During my employment at Fireman's Fund, I was responsible for the handling of thousands of claims, either as an adjuster or supervisor, including first-party personal and commercial lines property claims and business income loss claims.  In handling these claims, it was necessary, upon notice of an accident or occurrence, for me to thoroughly investigate the claim, determine the scope and extent of damages, and then determine what coverages applied to the loss.  During my employment in the insurance industry, I not only had the opportunity to learn about proper claims handling standards from my own employer, but I was also able to observe the claims handling procedures and standards of many other insurers.  In addition, I attended numerous classes, workshops, seminars, and similar programs regarding the handling of insurance claims.  I have received the Associate in Claims certification from the Insurance Institute of America.

9.     My experience with insurance industry claims handling standards continued with my legal practice, which began in 1990.  My legal practice, particularly since 1992, has been substantially devoted to insurance matters. As a result, I have been able to review claims files and manuals of many insurers, as well as to observe their claims handling procedures and methods.  I have also testified as an expert in insurance claims handling since 1997.  As a result, I again have had the opportunity to review numerous claims files, claims manuals, and other documents regarding the claims handling procedures of many insurance companies.

EXPERT REPORT OF CHARLES M. MILLER
Page 11

10.     My continuing work in insurance industry-related programs includes presentations on ethics and claims handling at the Property Loss Research Bureau's regional conventions.  In addition, I am currently the author of the personal lines claims handling section for the International Risk Management Institute.

**B.     Documents Reviewed.**

11.     In preparing my opinions, I was provided with and reviewed the documents listed in Exhibit C hereto.  These documents are the type of documents that are reasonably and customarily relied upon by experts in formulating opinions regarding insurance claim handling standards and practices and an insurer's handling of a claim.

**C.     Insurance Industry Standards and Practices.**

**1.     Insurance Industry Claims Personnel Are Trained in the Standards for Claims Handling.**

12.     Insurance company claims representatives are routinely trained in the standards of insurance claims handling.  Claims personnel are expected to know these standards and apply them in their work on a daily basis.  This requirement is underscored in a text on insurance claims, which has been used nationwide to train insurance claims personnel.  In the book, The Claims Environment by Markham et al., the authors, all of whom are or were employed in the insurance industry, point out that "claims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages" (Markham, p. 12).

EXPERT REPORT OF CHARLES M. MILLER
Page 12

13.    Any insurance company, as well as claims professionals in Texas, California, and Nevada, or those who handle claims in Texas, California, and Nevada, should be trained and knowledgeable in the standards of insurance claims handling.

**2.    Insurance Industry Claims Personnel Are Trained in the Duty of Good Faith to Assure That the Purposes of Insurance Are Fulfilled.**

14.    Insurance claims personnel are directed in their claims handling by the insurance industry standards for claims handling, including their training on the duty of good faith and fair dealing.  Indeed, insurance claims professionals are commonly taught about the importance of avoiding bad faith conduct.  As Markham has pointed out, "[c]laim representatives must know what the law of bad faith is, how it evolved, and how it affects everyone in the claims business.  More important, they must know how to investigate, evaluate, and settle claims in a way that protects the interests of both the insured and the insurer and avoids the problems that lead to bad faith claims" (Markham, p. 234).  Conduct which, in the insurance industry, is understood may lead to bad faith includes failing to conduct diligent investigations (Rokes, Willis Park, Aggressive Good Faith and Successful Claims Handling [IIA, 1st ed., 1987], pp. 31–37; hereinafter, "Rokes").

**3.    Insurance Industry Claims Handling Standards Exist to Assure That the Purposes of Insurance Are Fulfilled.**

15.    Insurance is defined as the "pooling of fortuitous losses by transfer of such risk to the insurer, who agrees to indemnify insureds for such losses, to provide other pecuniary benefits on their occurrence, or to render services

connected with the risk" (Rejda, George E., <u>Principles of Risk Management and Insurance</u> [Addison Wesley, 8th ed., 2003], p. 18, quoting from the Commission on Insurance Terminology of the American Risk and Insurance Association). As the definition reflects, a key, if not critical component of insurance is the transfer of risk from the insured to the insurer. If this transfer is interfered with so that the insured does not receive the full benefits owed under the insurance policy, then the purpose of insurance is defeated. In order to prevent this outcome, the insurance industry has adopted various standards and practices for the handling of insurance claims. The aim of these standards and practices is to assure that the purpose of insurance and the insurance contract are fulfilled when the insured submits a claim.[4] Among the standards for claims handling are the following:

_____

[4] Insurance industry claims handling standards are derived from a number of sources. One important group of these sources is the insurance industry texts which have been or are used to train insurance claims handlers on how to handle insurance claims. These include the following texts: Markham, James J. (Ed.), et al., <u>The Claims Environment</u> (IIA, 1st ed., 1993); Rokes, Willis Park, <u>Aggressive Good Faith and Successful Claims Handling</u> (IIA, 1st ed., 1987); Vaughn, Emmet J., & Vaughn, Therese, <u>Fundamentals of Risk and Insurance</u> (John Wiley & Sons, Inc., 9th ed., 2003); Jones, James R., <u>Liability Claim Practices</u> (IIA, 1st ed., 2001); Soule, Charles E., <u>Disability Income Insurance: The Unique Risk</u> (The Am. College, 4th ed., 1994); Petitta, Joseph P., <u>Insurance Practice for the Millennium</u> (2000); Mehr, Ann E., & Markham, James J., <u>Insurance Operations, Regulation and Statutory Accounting</u> (IIS, 2nd ed., 2004); White, George A. (Ed.), et al., <u>Organizational Behavior in Insurance, Vol. 1</u> (IIA, 1st ed., 1992); Popow, Donna J., <u>Property Loss Adjusting</u> (Am. Inst. of CPCU, 3rd ed., 2004); Thomas, Paul & Reed, Prentiss, <u>Adjustment of Property Losses</u>, (McGraw Hill, 4th ed., 1977); Lightcap, Jane S., <u>Managing Claim Department Operations</u> (Int'l. Claim Assoc., 1997); Hirsch, Donald J., <u>Casualty Claim Practice</u> (Irwin/McGraw Hill, 6th ed., 1996); Mehr, Robert I., & Cammack, Emerson, <u>Principles of Insurance</u> (R. D. Irwin Inc., 5th ed., 1972); and Murdock, Michael T., <u>Claims Operations: A Practical Guide</u> (IRMI, 1st ed., 2010). Other important sources of insurance industry claims handling standards include

a. The insurance company must treat its policyholder's interests with equal regard to its own;

b. The insurance company should assist the policyholder with the presentation of the claim;

c. The insurance company should not mischaracterize the evidence to the benefit of the insurer;

d. The insurance company should not select or use biased consultants or experts;

e. The insurance company should be open and honest in all of its dealings with its insured;

f. The insurance company must disclose to its insured all benefits, coverages, and time limits that may apply to the claim;

g. The insurance company should not consider factors in its evaluation of a claim for which there is no evidence;

h. The insurance company must conduct a full, fair, and prompt investigation of the claim at its own expense;

i. The insurance company should objectively evaluate all claims based on all available evidence, and not just evidence which the insurance company believes supports its position;

j. The insurance company should examine and question reports from its consultants to assure that they contain all opinions necessary to properly evaluate the claim and are based on all relevant and available evidence;

k. The insurance company must fully, fairly, and promptly evaluate and adjust the claim;

l. The insurance company must pay timely all amounts not in dispute;

m. If there is a full or partial claim denial, the insurance company must give a written explanation, pointing to the facts and policy provisions supporting the denial;

n. The insurance company must not misrepresent facts or policy provisions;

---

Claims magazine, the Fire Casualty & Surety ("FC&S") Bulletins, and the International Risk Management Institute ("IRMI") publications. In addition, the claims handling manuals and standards of the insurers themselves, which I have reviewed, set forth how insurance claims should be handled. Finally, claims handling standards are derived from the deposition testimony of insurance claims handlers from many insurance companies, which I have also reviewed.

o.  The insurance company must timely advise its insured of all policy limitations or exclusions which may apply to a claim;

p.  The insurance company must not assert coverage positions which it knows are without merit; and

q.  The insurance company must look for coverage and not just ways to deny a claim.

**4.      Insurance Claims Handlers Are Also Guided in Their Claims Handling by the Standards for the Interpretation and Application of Insurance Policies.**

16.      Insurance claims professionals are also routinely trained in the interpretation and application of insurance policies sold by their respective companies. These same insurance claims professionals are called upon daily to interpret and apply those policies in the course of handling insurance claims.  In interpreting and applying insurance policy provisions, insurance claims professionals will apply the accepted insurance industry standards and practices for insurance policy interpretation.  Pursuant to these standards and practices, an insurance company must interpret its policies reasonably, pursuant to the well-recognized insurance industry rules for insurance policy construction, which include the following:

- exclusions are to be interpreted narrowly;[5]
- insuring agreements are to be interpreted broadly;[6]

---

[5] Wollner, Kenneth S., How to Draft and Interpret Insurance Policies (Cas. Risk Pub., LLC, 1999; hereinafter, "Wollner"), p. 19, "Exclusions and other limitations are strictly construed against the party seeking to impose the limitation."  All the insurance texts referenced in this report are either used in training insurance claims professionals or as reference materials for claims professionals.

[6] Wiening, Eric A., & Malecki, Donald S., Insurance Contract Analysis (Am. Inst. of CPCU, 1st ed., 1992; hereinafter, "Wiening & Malecki"), p. 76, "[I]nsurance agreement provides a broad statement of coverage."

- the insurance company must resolve doubts concerning coverage in favor of the policyholder;[7]

- policy language should be given its plain, ordinary, and popular meaning;[8]

- ambiguous policy provisions should be interpreted against the insurer and in favor of coverage;[9] and

- The insurance company has the burden of proving the application of an excluded peril. The Fire Casualty & Surety (FC&S) Bulletin notes two important principles: "[T]he burden is on the insurer to establish the fact that the exclusions apply. The insurer simply stating that coverage is excluded is not enough to settle the issue; the insurer must prove its case," and "if there is any reasonable doubt as the applicability of an exclusion, the insured is entitled to the benefit of the doubt. Exclusions are to be construed strictly against the insurer" ("That Particular Part," FC&S, June 2004).[10]

---

[7] Popow, Donna J., Property Loss Adjusting (Am. Inst. of CPCU, 3rd ed., 2004; hereinafter, "Popow"), §5.34.

[8] Thomas, Paul & Reed, Prentiss, Adjustment of Property Losses (McGraw Hill, 4th ed., 1977; hereinafter, "Thomas & Reed"), p. 48.

[9] Id., p. 50.

[10] The FC&S Bulletins have been published by the National Underwriter for more than 50 years to assist insurance companies in the interpretation and application of a wide variety of insurance policy provisions. The FC&S Bulletins are used frequently by insurance industry claims professionals to interpret and apply insurance policy provisions. As one Court has noted: "The FC & S bulletin, which is published by the National Underwriters Association, is used by insurance agents and brokers to interpret standard insurance policy provisions [citation omitted]. . . . [R]eliance on [an] FC & S bulletin is appropriate under Civil Code section 1645 which provides: 'Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense [citations omitted].' . . . [I]nsurance industry publications are particularly persuasive as interpretive aids where they support coverage on behalf of the insured. Ultimately, the test is whether coverage is 'consistent with the insured's objectively reasonable

17.     In arriving at my opinions in this case, I have applied the standards for insurance claims handling.

**D.      HCC's Policy Issued to Trapped Escape Room.**

18.     HCC Specialty Insurance Company ("HCC") issued a Commercial Package Property Policy, Master Policy Number S18/7007423, to Trapped Escape Room for the period from December 30, 2019, to December 30, 2020 (hereinafter, the "Policy").  The Policy covers risks of direct physical loss unless it is otherwise excluded or limited.  This is commonly referred to as an "all risk" policy.  This term derives from earlier forms of commercial property policies which provided coverage for "risks of direct physical loss," such as the Policy here.  This language has not been used in an ISO commercial property policy since 2012 (See "All Risks Coverage Approach," IRMI).

19.     HCC's use of the pre-2012 language is significant here, because "when applied to property loss exposures, the phrase 'risks of direct physical loss' could be interpreted to mean the *chance or possibility* of direct physical loss or damage, whether any property damage ever occurs or not" (Id.; emphasis in original).  Indeed, IRMI has noted that some courts have read the language exactly in that way.  One court concluded that "the policy did not require that there be any actual physical damage or alteration of the material composition of the property" (Id., p. 2).

---

expectations' [citation omitted]" (*Golden Eagle Insurance Co. v. Ins. Co. of the West*, 99 Cal.App.4th 837, 838 [Cal. App. 2002]).

20.     As a result of these decisions, ISO 'revised the causes of loss provision [in its commercial property program] in the October 2012 edition of its all risk commercial property form—the Causes of Loss Special Form (CP 10 30)—to eliminate the words "risk of" (Id., p. 3).  HCC could have easily done the same for the Policy, but it did not.  Rather, HCC continued to use the pre-2012 language, which meant that the Policy can be viewed as providing coverage even where there has not yet been actual physical damage or alteration of the insured's property.  This is clearly contrary to the position taken by HCC here, which is that actual tangible property damage must be present before business income coverage can be provided.  It would appear that HCC has never considered this scope of coverage, as it should have done.

21.     The Policy also contains Business Income coverage, pursuant to the Business Income (And Extra Expense) Coverage Form, form no. HC-CP-002 (04/11) (hereinafter, "Business Income Form"), which provides (in pertinent part):

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be **caused by direct physical loss of or damage to** property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.
> (Business Income Form, p. 1; emphasis added)

22.     The Business Income Form also includes coverage for Extra Expense as follows (in pertinent part):

EXPERT REPORT OF CHARLES M. MILLER
Page 19

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulted from a Covered Cause of Loss.

(Id.)

23.     The Business Income Form also includes coverage for losses arising from acts by civil authorities, which provides in pertinent part:

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

This coverage will apply for a period of up to three consecutive weeks after coverage begins.

(Id., p. 2)

## IV.     OPINIONS

### A.     HCC Failed to Comply With Insurance Industry Standards Which Require a Timely and Thorough Investigation of Claims Such as Trapped Escape Room's.

#### 1.     Insurance Industry Standards for the Timely and Thorough Investigation of First-Party Insurance Claims.

24.     "An investigation must often be undertaken to develop fully the facts needed to determine coverage.  Good faith claim practices require that this investigation be objective, thorough, and timely" (Markham, p. 29; see also Jones, James R., Liability Claim Practices [IIA, 1st ed., 2001; hereinafter, "Jones"], §1.14, that insurers have a good faith duty to perform investigations promptly and thoroughly; and Rokes, p. 114, that insurers have a duty to conduct prompt investigations).  Similarly, Barry Zalma, in his recent text on insurance claims handling, writes: "There is no excuse, regardless of the size of

the loss, for failing to complete a thorough investigation" (Insurance Claims: A Comprehensive Guide [Nat'l. Underwriter, 2015], p. 420).  Similarly, the California Regulations provide that "[u]pon receiving notice of claim, every insurer shall immediately, but in no event more than (15) calendar days later, do the following unless the notice of claimed received is a notice of legal action: (3) being any necessary investigation of the claim" (California Regulations, §2695.5(e)(3)).[11]  Likewise, the Texas Regulations provide that it is an unfair claims settlement practice to "refuse[ ] to pay claims without a reasonable investigation based upon all available information" (§21.203(15)).  It is critically important that an insurer conduct such an investigation in order to fulfill its obligation to look for coverage for the insured.

> **2.    HCC Did Not Comply With Insurance Industry Standards for the Investigation of Trapped Escape Room's Claim.**
>
> > **a.    Trapped Escape Room's Notice of Claim and HCC's Insufficient Investigation.**

25.    On March 27, 2020, American Claims Management ("ACM"), a third-party administrator for HCC, received notice of Trapped Escape Room's claim (Bates No. HCC_683).  It appears that on March 31, 2020, a claims handler at ACM entered into the claim Trapped Escape Room's responses to a list of eight questions regarding the claim (Bates No. HCC_682).  It cannot be

---

[11] The California Regulations broadly define investigation as meaning "all activities of an insurer or its claims agent related to the determination of coverage, liabilities, or nature and extent of loss or damage for which benefits are afforded by an insurance policy, obligations or duties under a bond, and other obligations or duties arising from an insurance policy or bond" (California Regulations, §2695.2(k)).

determined if these questions were posed and answered by Trapped Escape

Room during a telephone call or simply by email response to written questions.

Four of the eight questions, and answers thereto, are set forth here.

> 1.  I would like to confirm you are making a business interruption claim due to Coronavirus also known as COVID-19. YES
>
> 2.  Has your business property sustained any physical damage to your knowledge?  (If yes, get description and escalate claim to Tim A or Steve J) NO
>
> 3.  Do you have any employees or patients that have tested positive to COVID-19 or otherwise indicated they intend to test due to symptoms? (do NOT request private medical details nor should you document same if they volunteer it)  Not to Knowledge
>
> 4.  Have you been asked or compelled by a government agency to close?  If yes, who [request copy of notice if applicable] Governor of Nevada.
>
> 5.  Has any other group asked or compelled you to close your business?  No Add'l.
>
> (Id.; emphasis in original)

26.    It is evident that ACM's brief investigation did not comply with

insurance industry standards.  ACM made no further effort to inspect the various

insured properties to determine, among other things, whether employees or

customers at the various locations had been diagnosed with COVID-19.  This

was particularly important given that Trapped Escape Room apparently did not

have any knowledge regarding the conditions at the various locations.  Despite

the instruction in ACM's own questions, there is no evidence that ACM

requested and reviewed any of the applicable government closure orders.  ACM

also did not conduct any investigation into whether businesses close to Trapped

Escape Room's location were also closed, partially or completely, because of

the government orders, which is necessary information to determine the application of the Civil Authority Coverage. Further, there is no evidence that ACM and HCC sought to apply the business income coverage to Trapped Escape Room's claim in accordance with insurance industry standards.

27.     Further, ACM misquoted the scope of insurance coverage when it limited its second question to "physical damage," when there was coverage for "loss of or damage to" covered property. This is significant because an insured, in answering the ACM question, may view it as asking if there was any structural or similar damage, when actually the coverage was much broader. This amounts to a misrepresentation of the Policy coverage. (See California Act, §790.03(h)(1), that it is an unfair claims settlement practice to "[m]isrepresent[ ] to claimants pertinent facts or insurance policy provisions relating to any coverages at issue"; and see Nevada Act, NRS 686A.310(I)(a), and Texas Regulations, §21.203(1)).

28.     ACM also did not investigate Trapped Escape Room's damages, as its claims handlers would later be instructed to do. Since the loss location on the claim note entry was only "4760 Polaris Ave., Las Vegas, NV 89103," it would appear that ACM only inquired about one of the three insured locations. As a result, there was no investigation recorded in the claim file documents produced to date of the other two locations.

29.     All of this investigation, at the minimum, was required if ACM and HCC were to fulfill HCC's obligation to Trapped Escape Room to look for

coverage.[12]  Indeed, such an investigation was required in order for ACM and

HCC to properly evaluate coverage for Trapped Escape Room.  It is apparent

from ACM's and HCC's "investigation" that it did not comply with insurance

industry standards for the investigation of Trapped Escape Room's claim.

### b. HCC Issues Reservation of Rights Letter to Trapped Escape Room.

30.     On or about April 21, 2020, ACM issued one of its reservation of

rights letters to Richard Wilsons at Trapped Escape Room (Bates No.

HCC_714).[13]  Richard Saucier, ACM Sr. Property Adjuster, wrote the following

in the letter:

> This will confirm the telephone conversation from
> March 31, 2020. You indicated that you closed your
> business on March 18, 2020 due to an order from
> the State of Nevada.[14]  You stated that your
> employees are not being paid during the closure
> period and you wished to make a claim for loss of
> Business Income.  Also, at that time, you indicated

---

[12] An insurer must look for coverage and not just ways to deny coverage (See Markham, p. 13, "[T]he claims representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims"; and p. 9, "[C]laim representatives must investigate the facts of each claim because policyholders do not know exactly what is covered, under exactly what circumstances it is covered, or exactly what amount should be paid").

[13] There are actually two such letters in the claim file documents produced to date.  The second letter is dated April 23, 2020, and is virtually identical to the April 21, 2020, letter, except that the April 23, 2020, letter appears to be slightly differently formatted (Bates No. HCC_623).  Significantly, it appears that the April 23, 2020 letter was returned to ACM as "not deliverable as addressed" on or about May 5, 2020.  Both the April 21, 2020, and April 23, 2020, letters had the same mailing address for Trapped Escape Room; however, it is unclear whether the April 23, 2020 also was not delivered to Trapped Escape Room.

[14] This may indicate that the information obtained from Wilsons on May 31, 2020, was obtained over the telephone.

> that to your knowledge, no employees or guests had
> tested positive for COVID-19. There was no
> reported physical damage to the business premise
> and the sole reason cited for closure was due to the
> order placed by the Governor of Nevada.
>
> (Id).

31.     It is evident that Saucier misrepresented Wilsons' answer. Wilsons did not respond to the questions that the sole reason for closure was because of the governor's orders. He only responded that no other group had ordered or compelled closure of his business. ACM and Saucier did not inquire as to whether the closure was due to any other reasons Wilsons had to close his business. Further, Saucier continued the misrepresentation regarding the scope of coverage by again referring to only "physical damage."

32.     Further, Saucier, took the position in the reservation of rights letter that, "[t]hus far, You have not identified any direct physical loss of or damage to property. To the extent that Your suspension of operations has no causal relationship to direct physical loss or damage to property, You will not be entitled to business interruption coverage" (Bates No. HCC_633). Although Saucier did correctly cite to the Policy here, it is apparent that Saucier and HCC was applying the Policy to only structural or similar damage and not considering that coverage also extended to loss of use or function of the property. Given the paucity of information that ACM and HCC actually had about the condition of the insured property at this point, this position would virtually dictate a denial of coverage by HCC.

33.     Saucier also wrote, with regard to the Civil Authority coverage, that "coverage would apply only if the [government] order was issued in

response to direct physical loss of or damage to property that resulted from a covered cause of loss. There would be no coverage if the civil authority orders were issued solely to prevent the spread of COVID-19 or from an excluded cause of loss" (Id.). Again, this demonstrated that HCC was applying a narrow and improper understanding of the scope of the business income coverage.

### c. HCC Adopts Procedures for Handling COVID-19 Claims Which Are Contrary to the Policy Coverage and Which Were Not Followed With Regard to the Trapped Escape Room Claim.

34. On April 24, 2020, Adam Cook, HCC's Vice President – Corporate Claims, in an email to Lorna Gillespie, also apparently of HCC, set forth the procedure for the handling of COVID-19 claims (Bates No. HCC_737). This included sending an acknowledgement letter in response to each claim, contacting the insured regarding the claim, and that "[t]he adjuster is to identify the type of damages involved" (Id.). The acknowledgement letter attached to the email clearly only dealt with third-party injury claims and not first-party property claims, such as Trapped Escape Room's (Bates No. HCC_738).[15]

35. On April 27, 2020, Gillespie, in an email to Adam Cook, also apparently with HCC, provided a more extensive list of procedures for the handling of such claims. This list included the following instructions for conducting an investigation:

_____

[15] The documents produced also include another acknowledgement letter that could be used upon receipt of a first-party property claim (See Bates No. HCC_744). Nonetheless, there is no record that Trapped Escape Room received any of these acknowledgement letters.

Adjuster will contact insured for investigation: counsel has provided a guide of suggested questions/topics to cover.  Where possible we are getting recorded statements to memorialize all details up front.  Statements will cover: alleged damages, date of facility closure, reason for closure, etc.  if a specific COVID 19 Exposure by Employee or customer: we will ask for specific details: date of notification of exposure, documentation of same, any correspondence with local officials re exposure and the need to close the facility, proof specific exposure was proximate cause of closure and not general social distancing recommendations or closures by government.  Did/does insured have access to premises during the shutdown?  Was access ever prevented?  If so, causes.[16]

. . .

Coverage will be reviewed by counsel and Loran Gillespie.  Any disclaimer or unusual circumstance will be sent to Houston for review.

(Bates No. HCC_739)

36.     It is evident that the directed investigation was to look solely for reasons to deny coverage.  There is nothing in the instructions regarding the handling of the claim beyond "[a]ny disclaimer or unusual circumstance."  The claims handlers are provided no direction on conducting a thorough investigation of the business income in order to determine the amount of the loss and then to make payments.  Further, many of the questions are directed solely at obtaining information that in HCC's view would support denial.  For example, this included questions regarding prevention of access to the

---

[16]  There is also a somewhat different list of questions in a June 3, 2020, email from Charles Coen, a Senior Claims Specialist with PGCS Claim Services, that is addressed to Wilsons (Bates No. HCC_680).  It is presently unclear why this different list of questions was sent to Wilsons.  There is also no evidence that it was answered and returned.

EXPERT REPORT OF CHARLES M. MILLER
Page 27

premises, which fails to advise the insured that both complete and partial access are covered.

37.    Trapped Escape Room's owners were not contacted and interviewed pursuant to the April 24, 2020, and April 27, 2020, protocols.  There is no evidence of any attempt by ACM to go back to Wilsons, following ACM's initial contact, and complete the purported investigation in accordance with the protocols.  Needless to say, no statement was ever taken from Wilsons or anyone else at Trapped Escape Room.[17]

### 3.    HCC's Claim File Contains No Documentation of the Required Investigation of Trapped Escape Room's Claim.

38.    Because there is nothing in the claim file indicating that HCC conducted the required investigation, it must be concluded that this was not done.  The standard in the insurance industry is that, where there is nothing in the claim file to document an activity or action, it must be assumed that the activity or action did not take place.

---

[17] The importance of taking statements in such an investigation cannot be ignored.  "Statements are written or recorded accounts of the facts and circumstances involved in a claim; they are the principal investigative tool of the claim representative.  The basic purpose of a statement is to gather information in a logical and orderly fashion so that claim representatives can make decisions necessary for the disposition of the claims" (Markham, p. 46).  Similarly, Popow points out: "In larger or more complicated losses, especially those involving a coverage question or suspected insurance fraud, the insured's statement is an essential part of the investigation.  The statement's purposes are to establish the property's ownership, the cause of loss and facts that surround the loss, the extent of loss, and also determine for subrogation purposes if any third party is responsible for the loss" (Popow, Donna A. [Ed.], Property Claim Practices [The Institutes, 1st ed., 2011], §§3.16–3.17).

The standard for [claim file] documentation is that the file should speak for itself. The basis for all decisions should be clear, all communications to and from the claim representative should be recorded, and it should be possible at any stage in the file's life to transfer it from one claim representative to another. Upon transfer of a file, what has been done and what remains to be done should be clear.

(Markham, p. 340)

Good claim handling alone is not enough to avoid bad faith claims. Supporting evidence must be in the file to establish that the good work was indeed done. **If the documentation is not in the file, then it can only be assumed that nothing happened.** The absence of good log notes, correspondence, and investigative and evaluative material is another indicator that the claim representatives were not doing their job properly.

(Markham, p. 249, emphasis added; and See California Regulations, §2695.3(a), "These [claim] files shall contain all documents, notes and work papers (including copies of all correspondence) which reasonably pertain to each claim in such detail that pertinent events and the dates of the event can be reconstructed and the licensee's actions pertaining to the claim can be determined")

39.     Complete documentation of the claim file is critical for several reasons. First, if there is a change in the handling adjusters, the new adjuster must be able to determine what has occurred in the handling of the claim, what decisions were made, and the basis for those decisions. Without that information, the new adjuster will be unable to effectively proceed with handling the claim, thereby causing unnecessary delays, or even mistakes in the claim handling. Further, supervisors periodically review the claim files to evaluate the claim handling, so they must also be able to determine how the claim is being handled and whether it is being handled in accordance with accepted claims

handling standards.  Without complete documentation of the claim file, the supervisor will be unable to fulfill this important role.  Finally, claim files are often audited, either in the office where they are handled or by a property office audit team.  When the files are audited by an audit team, the team will use a prepared audit form which sets forth the standards that are to be used to evaluate the claim handling.  If the claim file is not properly documented, the audit team will be unable to evaluate the claim file in accordance with the company's audit standards.

40.     At no time should adjusters be able to supplement their file documentation by verbally representing to supervisors, managers, or auditors that an activity that is not documented in the claim file actually took place.  Verbal representations of activities often come well after the activity should have been performed, and as such, they are subject to inaccurate memories as to what actually occurred.  Further, verbal representations may be viewed as unreliable where the adjuster may be attempting to explain his or her failure to perform a certain activity.  Accordingly, only contemporaneous entries in the claim file should be relied upon to determine what was done in the handling of the claim file.  Finally, at no time should it be assumed that an activity took place where it is not documented in the claim file.  Assumptions as to claim handling conduct would only undermine the purpose of file documentation—that the claim file is accurately documented as to all events that occurred in the handling of the claim.  Assumptions also would mean that claim file evaluation would be based on mere conjecture or speculation, which would clearly be improper.

41.     Based on the foregoing standard, it must be concluded that HCC failed to conduct an investigation of Trapped Escape Room's claim in accordance with insurance industry standards.

**B.     HCC Improperly Denied Coverage for Trapped Escape Room's Losses Due to the COVID-19 Pandemic.**

**1.     Insurance Industry Standards for the Denial of Insurance Claims.**

42.     "The decision [to deny a claim] should also be carefully reviewed by supervisors, consultants, attorneys, and upper-level management" (Markham, p. 245).

43.     It is also critically important that claims handlers who are given authority to deny claims have a clear understanding of the policy provisions that they are asked to interpret and apply to a claim.  Soule points out that "the experienced claim examiner must also develop a detailed background in contractual language and its interpretation.  The examiner is the first line of such interpretation and therefore must become somewhat of a lay attorney.  His or her contractual knowledge must encompass all contracts that the company has in force on which there may be disability claims" (Soule, Charles E., Disability Income Insurance: The Unique Risk [The Am. College, 4th ed., 1994], p. 307). Likewise, it has been noted that "the claims examiner will be required to interpret the policy language and apply it to the claimant's particular situation" (Disability Income Insurance: A Primer, p. 165).

44.     In making a decision to deny a claim, the claims handler must keep in mind that "the courts tend to construe contractual language against the

insurer and in favor of the insured.  The reason for this is that insurance contracts are classified as **contracts of adhesion.**  A contract of adhesion is one in which one party determines the contractual language" (Id., p. 166, emphasis in original; and see "That Particular Part," FC&S, 2004, "If there is any reasonable doubt as the applicability of exclusion, the insured is entitled to the benefit of the doubt").

45.     Further, in making the coverage determination, the policy language should be interpreted based on its ordinary and common understanding, and not upon technical definitions that policyholders are unlikely to be aware of.

46.     The Nevada Act provides that it is unfair practice to fail "to provide promptly to an insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claims and the applicable law, for the denial of the claim or for an offer to settle or compromise the claim" (§NRS 686A.310(1)(n); and see Texas Regulations, §21.203(9); and the California Act, §790.03(h)(13), and California Regulations, §2695.7(b)(2)).

### 2.     HCC's Denial Was Contrary to Insurance Industry Standards.

47.     On June 4, 2020, Gillespie, in an email to Stefano Minale, HCC's Vice President and Chief Claims Officer, requested authorization to issue a denial letter to Trapped Escape Room (Bates No. HCC_637).  In her email, Gillespie wrote: "We have confirmed no PD [Property Damage] away from the insured premises and no specific COVID19 Exposure at insured facilities."  To the extent this statement indicated that HCC had conducted some investigation

about property damage "away from the insured premises," that was incorrect. There is no record of such an investigation. Further, with regard to property damage at the insured's premises, HCC's investigation was clearly deficient and did not comply with insurance industry standards. There is also is no record that HCC contacted Trapped Escape Room, after their initial contact on March 31, 2020, to determine if there had been further "specific COVID 19 Exposure." This was particularly important because slightly over two months had transpired since that initial contact, during which additional information could have been obtained regarding such exposure. Despite the obvious deficiencies in HCC's investigation and analysis of the Trapped Escape Room claim, Milani, on the same date, approved the coverage denial (Id.).[18]

48.     On June 4, 2020, Richard Saucier, Sr. Property Adjuster for American Claims Management, on behalf of HCC, issued a denial of coverage to Trapped Escape Room.[19]  Saucier wrote that "Specialty has determined that You are not entitled to coverage for the Claim."[20]

49.     In denying the claim, Saucier reportedly summarized information he had received from Richard Wilsons of Trapped Escape Room.

---

[18] Also, on June 4, 2020, Drew Fichtel, ACM's Commercial Claims Supervisor, approved the denial letter (Bates No. HCC_639).

[19] It appears that this denial letter also was returned as undeliverable (See Bates No. HCC_623).

[20] As with the reservation of rights letters, there are two denial letters, both dated June 4, 2020, but with slightly different formatting, that have the same addressee and address.

During telephone communications with ACM on March 31, 2020 and June 2, 2020[21] you explained that Trapped sustained business interruption damages due to COVID-19.  You described that on March 18, 2020, Trapped was forced to close to comply with the Governor of Nevada's COVID-19 orders which were designed to contain the spread of COVID-19.  You also confirmed you were unaware of any physical damage to your location.  You are similarly unaware of whether any of Trapped's employees or customers tested positive for COVID-19 and acknowledged that your location was not contaminated with COVID-19.

50.     Based on this and some other information, Saucier concluded:

The Policy affords coverage for business income and extra expense arising out of the suspension of "operations" caused by "direct physical loss of or damage to property."  Trapped has not identified any direct physical loss of or damage to property.[22]  As there is no causal relationship between Your suspension of operations and any direct physical loss or damage to property, You are not entitled to business interruption coverage.

. . .

To the extent You were forced to shut down operations by an order of civil authority, coverage would apply only if the order was issued in response to direct physical loss of or damage to property that resulted from a covered cause of loss.  As the civil authority orders were issued solely to prevent the spread of COVID-19 and there is no indication that Trapped has been prevented from accessing its location, Trapped is not entitled to civil authority coverage.

---

[21] There does not appear to be any record of a June 2, 2020, telephone conversation in the claim file documents produced to date.

[22] HCC apparently seeks to impose this obligation on Trapped Escape Room. This, however, is incorrect, as it is HCC's obligation to conduct a thorough investigation while looking for facts which support coverage, which it did not do.

51.     The denial clearly does not comply with insurance industry standards.  The denial is based on insufficient investigation, which does not support the denial.  Further, HCC applies a far too narrow definition of "loss of or damage to property," which, when properly applied, applies not only to physical damage to property but also to the loss or function of property.  Likewise, HCC is incorrect that Civil Authority orders here were issued "solely to prevent the spread of COVID-19," as they were also issued to protect property.  Finally, and for the other reasons discussed further herein, pursuant to insurance industry standards, Trapped Escaped Room's is a covered loss.

52.     On July 10, 2020, Wilsons, in an email to Saucier, wrote that "it has been over three months since we filed this claim. . . . We need to know whether our claim will be covered by our insurance or denied ASAP as we will need to apply for loans or other sources of funding to keep the company afloat if this is denied" (Bates No. HCC_677).  In response, on the same day, Saucier "attached a copy of the coverage declination which was mailed on June 4, 2020" (Id.).  This exchange indicates that the denial letter (and possibly the reservation of rights letter too), one of which was returned, was never received by Wilsons.  Further, and contrary to insurance industry standards, it suggests that after receiving notice that one of the denial letters was not deliverable, HCC did nothing to locate another address and resend the denial, as it should have done.  Accordingly, it would appear that Trapped Escape Room did not receive the denial until four months after the claim was first reported (See California Regulations, §2695.7(b), "upon receiving proof of claim, every insurer, except as specified in subsection 2695.7(b)(4) below, shall immediately, but in no event

more than forty (40) calendar days later, accept or deny the claim, in whole or in part").

## C. The History and Development of Business Loss of Income Policies Supports Coverage For COVID-19 Business Income Loss Claims.[23]

### 1. Introduction and Summary of the History of Business Income Coverage.

53.　　Throughout its denial and filings in this matter, HCC has repeatedly claimed that business income losses arising out of COVID-19 are not covered unless there is "some sort of tangible, physical alteration to property" (Defendant Houston Casualty Company's Reply In Support of Motion to Dismiss [hereinafter, "HCC's Reply"], p. 2; and see Defendant Houston Casualty Company's Rule 12(B)(6) Motion to Dismiss and Memorandum of Support ["HCC's Motion to Dismiss"], p. 6, arguing that direct physical loss requires a physical alteration of the property or tangible damage or structural damage).[24] This conclusion is not supported by the history and development of business interruption and then business income coverage, nor is it supported by

_____

[23] This report focuses on, with some exceptions, standardized insurance property and business income policy forms, such as the forms issued by the Insurance Services Office.  It is important to note that the Policy forms are substantially identical to forms issued by the Insurance Services Office.  Indeed, the following is commonly noted on the Policy forms: "Includes copyright material of Insurance Services Office, Inc., with its permission."

[24] Nonetheless, Trapped Escape Room has alleged that "COVID-19 was physically present at their premises, and Plaintiffs' properties sustained physical loss or damage due to the presence of COVID-19." (Plaintiff's Response in Opposition to Defendant's Motion to Dismiss Complaint and Memorandum in Support, p. 9, fn. 1).

insurance industry standards for the interpretation and application of insurance policies, such as the Policy.

54.     As noted in one insurance industry publication, throughout its history, the "purpose of business income insurance is to do for the insured during a period of business interruption what the business would have done had no loss occurred" ("Business Income Information Introductory History and Development," FC&S, September 24, 2019, p. 1; hereinafter, "FC&S History").[25] If there is one clear theme since the inception of insurance policies covering loss of business income in the United States, it is that the coverage provided by business income loss policies has been continually expanded to cover additional loss exposures.

55.     Prior to the formation of Insurance Services Office (hereinafter, "ISO") in 1971,[26] policies were issued by and rates determined by a wide range of rating bureaus.  Indeed, "[i]nsurers were required by law in most states to belong to the bureau and use its rates and forms" ("The Role of Advisory

---

[25] Likewise, it has been noted that "Use and Occupancy insurance comes to his [the insured's] rescue and undertakes to indemnify the owner for these interrupted earnings during the time necessary to restore the plant to operating condition" (Foster, W. S., Removing the Mystery From U & O Insurance [Nat'l. Underwriter Co., 1927], p. 8; hereinafter, "Foster").

[26] According to the testimony of Michael L. Averill, the manager of the Commercial Casualty Division of ISO in New York, in his December 18, 1985, testimony before the New Jersey Department of Insurance, "ISO is a not-for-profit corporation which provides a variety of rating and advisory and statistical services to the PC [Property Casualty] industry.  We are a voluntary organization made up of companies who choose to associate with us to receive any or all of our services.  One of the services we do provide is the development of policy forms and endorsements that are made available to our companies" (Transcript of testimony, pp. 8–9).

Organizations in Commercial Property Insurance: Insurance Services Office," IRMI, p. 2; and see Klein, Henry C. & Clapp, Wallace L., Jr., Business Interruption Insurance and Extra Expense Insurance as Written By Fire Insurance Companies in the United States and Canada [The Rough Notes Co., 1st ed., 1964; hereinafter, "Klein"], ch. 12, p. 190; and see Rodda, William H., Property and Liability Insurance [Prentice-Hall, Inc., 1966; hereinafter, "Rodda"]).[27] "Rating bureaus also develop and prescribe the policies and forms that are to be used by their companies" (Rodda, p. 70). Although rating bureaus date back several decades, in as late as the 1970s one author noted that, "[f]or the majority of companies, fire rates are set by rating bureaus which are operated by the insurance companies and which act on their behalf in determining the rates as well as filing them with the various state regulatory authorities" (Siver, Edward W., CPCU, CLU, The Handbook of Commercial Property and Casualty Insurance [Insurers Press, Inc., 1972; hereinafter, "Siver"], p. 173; and see Magee, John H. & Serbein, Oscar N., Property and Liability Insurance [Richard D. Irwin, Inc., 4th ed., 1967), pp. 708–714; and Wagner, Tim, "Insurance Rating Bureaus," Journal of Insurance Regulations, 19(2), Winter 2000 [hereinafter, "Wagner"], p. 189, "Stock fire insurers, acting in concert, formed rating bureaus to establish and maintain adequate rates, to

---

[27] As one author has noted with regard to these developments in Ohio, "[i]n 1917, three years after completion of the Ohio legislative committee's study [footnote omitted], a bill was enacted that initiated Ohio's affirmative regulation of fire insurance rates [footnote omitted]. This legislation required all fire insurers to be members of ratings bureaus, whose uniform rates were to be filed with the Superintendent of Insurance, if he so requested [footnote omitted]" (Rose, Michael D., "Regulation of Property and Casualty Insurance Rates in Ohio," Ohio State Law Journal, 32(3), 1971, p. 487; hereinafter, "Rose").

control excessive commissions and to standardize policy forms").

56.    Rodda has also noted that "Fire insurance rating bureaus operate locally, but they need country wide coordination of rates, policy forms, and statistics.  The regional and country wide coordination is provided by advisory organizations. . . . The function of an advisory organization is to provide technical information, statistical service, and advice concerning forms and coverages used by the rating bureaus in promulgating rates and forms. . . . They suggest to the fire insurance rating bureaus the adoption of new coverages, changes in rate levels, and other improvements in insurance based upon studies made by the organizations' technical staffs" (Id., p. 82; and see Rose, p. 494, that rating bureau functions "also include establishing underwritings rules [and] preparing and promulgating policy forms").  Thus, the pre-1980 policy forms discussed herein were written largely by rating bureaus.

57.    This history of business income policies is briefly summarized in the FC&S History:

> Insurance protection for loss of business earnings due to physical damage has undergone a gradual but steady evolution.  Along with many changes in the provisions of coverage, it has also gone through several changes in name since the first time element coverage was written over a century ago.  Known as "use and occupancy" insurance in its early days (a term that survived in boiler and machinery insurance until the late 1970s). The name, for fire insurance, was changed to "business interruption" insurance in the 1940s. [28]  The name, in turn, was replaced,

---

[28] Nonetheless, business interruption continued to be referred "in short as "U & O," up to 1980 and later, as ISO did not withdraw the older forms (Glendening, Frank S., CPA, Business Interruption Insurance: What Is Covered (Nat'l.

under the Insurance Services Office (ISO) simplified commercial property program, by the term "business income" insurance.

. . .

Until the introduction of the current ISO business income coverage form, the predominant business interruption form in use was the gross earnings form.[29]  There were separate editions for mercantile and nonmanufacturing risks and for manufacturing risks (and even adaptations of these for use in the old special multiperil policy program).  The difference between the two editions was in the basis for computing the gross earnings.  For the mercantile and nonmanufacturing form, gross earnings were net sales less cost of goods and consumable supplies for a twelve month period.  For the manufacturing form, gross earnings were net sales value of production less cost of raw materials and consumable supplies for the same period.

. . .

For insureds who wanted a less complicated form, there was earnings insurance (and it, too, was available in special multiperil version).  The earnings form was introduced in the mid-1950s in the hope that a simplified form would encourage small to medium businesses that had not been purchasing business interruption insurance to do so.

. . .

This form was widely available to mercantile and nonmanufacturing risks and was subsequently made available to manufacturing risks as well.

---

Underwriter Co., 1st ed., 1980; hereinafter, "Glendening"), p. 6; and Mangan, Joseph F., "The Right Way to Measure Business Income Losses," <u>Insurance Advocate</u>, March 4, 2000, p. 12).

[29] "The two most common 'actual loss sustained' types of business interruption policies in general use cover (1) gross earnings, less all noncontinuing expenses and (2) net profits, plus continuing expense (with separate but important reference to ordinary payroll).  The intent of both contracts is to arrive at the same result, namely to place the business somewhere near where it would have been had there no interruption" (Glendening, p. 2).

EXPERT REPORT OF CHARLES M. MILLER

Page 40

(FC&S History, pp. 1–2)

58.　The history of loss of earnings or business income coverage over nearly the last 100 years has included the use of several different policy forms. The purpose of this section of the report is to discuss in detail those forms as they relate to claims of business income losses arising from the COVID-19 pandemic.[30]　Based on my research and analysis, it is concluded that the history demonstrates that commercial business income loss policies issued today do provide coverage for claims arising from the COVID-19 pandemic.[31]

---

[30]　This discussion will not address the various methods to determine the amount of a business income loss; rather, the focus is on the scope of coverage provided in the policy forms discussed.

[31] The following business income forms are attached hereto as exhibits: Exhibit D, "USE AND OCCUPANCY FORM NO. 1 (For Use on Either Fire or Tornado Policies) (Manufacturing)"; Exhibit E, "USE AND OCCUPANCY FORM NO. 3 (For Use on Either Fire or Tornado Policies) (Manufacturing Plants) ("Seasonable" or "Fluctuating" Earnings)"; Exhibit F, "USE AND OCCUPANCY FORM NO. 2 (For Use on Either Fire or Tornado Policies) (Mercantile or Non-Contributing)"; Exhibit G, "USE AND OCCUPANY FORM NO. 4 (For Use in Either Fire or Tornado Policies) (Mercantile or Non-Manufacturing) ("Seasonable" or ""Fluctuating")"; Exhibit H, ISO 1977 Business Interruption (Gross Earnings Form for Mercantile or Non-Manufacturing Risks), Form CF 15 03 (Ed. 05.77); Exhibit I, the 1985 ISO "Businessowners Standard Property Coverage Form," Form BP 00 01 06 89; Exhibit J, the 2012 ISO Causes of Loss – Broad Form (form CP 10 20 10 12); Exhibit K, the 2017 ISO Cause of Loss – Special Form (form CP 10 30 09 17); Exhibit L, the 1999 ISO Businessowners Special Property Coverage Form (form number BP0002 (12/99)); and Exhibit M,

## 2. The Pre-ISO Use and Occupancy Policy Forms and the Origin of Loss of Earnings Coverage in the United States.

### a. The Early Per Diem and Gross Earnings Forms Provided Coverage for "Damage to or Destruction of" Covered Property.

59.    As one insurance industry author has noted: "Use and occupancy insurance forms valued per idem, per week, or per month were among the first forms under which use and occupancy insurance was written in the United States" (Christiansen, R.S., "Business Interruption and Extra Expense Insurance," published in <u>Insurance Costs and Controls: A Reappraisal</u> [Ins. Div., Am. Mgt. Assoc., Inc., 1958], p. 91; hereinafter, "Christiansen").[32]  According to one insurance industry author, "it appears that the words 'Use and Occupancy,' as applied to insurance, were first used between 1879 . . . and 1882" (Klein, p. 11).  The purpose of Use and Occupancy insurance was "to indemnify the owner for these interrupted earnings during the time necessary to restore the [manufacturing] plant to operating condition" (Foster, p. 3).[33]

60.    The Per Diem Use & Occupancy form, which "was the first Use & occupancy written in the United States," provided the following coverage.

> The Per Diem Policy form indemnifies the Insured at the rate of a specified sum per day for the loss of net profit and necessarily continuing business expense

---

the 2012 ISO form CP 00 30 10 12, Business Income (And Extra Expense) Coverage Form (all emphases in originals).

[32] Christiansen was the Vice President of American Reciprocal Insurers (Id., p. 86).

[33] The Use and Occupancy forms provided for both partial and total suspension of the business (Id., p. 29).

during the time the Insured's business is totally or partially prevented from operating because of **damage to or destruction of** business property by fire or other perils insured against.

(Klein, p. 24. emphasis added)[34]

61.     Accordingly, from the outset of Use and Occupancy coverage, and then for many more years, there was only limited coverage where there was "damage to or destruction of business property."  With only a few anomalous exceptions, the word "loss" was not used as a term defining the trigger or cause of a claim; rather, it was limited to refer to only the amount of damages that may be owed under a policy.

62.     The earliest Use & Occupancy Per Diem forms contained "no provision . . . for the measurement of the amount of loss resulting from less than a total prevention of production" (Id.).  Accordingly, "[i]n later forms, this omission was corrected by providing that in the event of a partial suspension of production, settlement was to be for that proportion of the Per Diem amount of insurance which the product prevented from being manufactured bore to the average daily yield previous to the fire." (Id., pp. 25–26, 31–32; and See Foster,

---

[34] Loss of earnings forms had appeared prior to the advent of the Use & Occupancy standardized forms.  For example, the 1879 "Newton Mills" form provided coverage "from damage or destruction of their buildings, or machinery, by fire" (Glendening, p. 16).  Similarly, "[i]n 1880 the first 'per diem' form of business interruption in the United States" was issued (Id.; and see Klein, pp. 8–10).

p. 29).  Following this change, Use & Occupancy forms continued to provide for both total and partial suspension of business for several decades.[35]

63.     As Klein has reported, "in 1929 the capital stock companies agreed upon a form of contract which became standard in all states including New York" (Id., p. 47).  One such was the "Gross Earnings Policy form [that] has been know as Form 'G' when applied to non-manufacturing and mercantile properties, and Form 'C' (West) or ('H') (elsewhere) when applied to manufacturing properties" (Id., p. 63).  These two forms were later designated as forms "No. 3" and "No. 4," and are discussed below.

64.     The Gross Earnings Form was adopted for mercantile business in 1938–1939, and for manufacturing plants in 1945.[36]  It was approved for non-manufacturing businesses (other than mercantile) in 1940, but was withdrawn from them in a few territories in 1948 (Id.).[37]

65.     In addition, there was an "Earnings Insurance" form.  This was a "simplified version of Gross Earnings Business Interruption *having the special*

---

[35] This would become an important historical fact when, in 2020, some insurers contended that Civil Authority coverage was limited to only complete (and not partial) denial of access to an insured's property.

[36] Klein points out that, although the Gross Earnings Form was adopted in 1929, "[i]t required the experience of the following nine years under the Two Item, Weekly and Per Diem Forms, culminating in the conviction that a simpler form of contract was possible" (Klein, p. 64).

[37] The Gross Earnings form was initially "designed to be used only on businesses selling merchandise. . . . Following the extension of the use of this form, in 1940, to all non-manufacturing businesses (selling merchandise and/or service) without revision in phraseology" (Klein, p. 82).  In other words, although the scope of the Gross Earnings Form was expanded, it continued to provide coverage only where there was damage to or destruction of property.

*advantage of eliminating the need for a detailed review of the insured's business records*" ("Business Interruption Form 4," <u>Rough Notes</u> MONTHLY POLICY, FORM & MANUAL ANALYSIS, No. 132.10; emphasis in original). This form also provided coverage only where the interruption of business "was caused by **damage to or destruction of real or personal property** by an insured peril" (Id.; emphasis added).

> **b. The Standardized Use and Occupancy Policies Continued the Practice of Insuring Only When There Was "Damage to or Destruction of" Covered Property.**

66. Following the initial development of Use and Occupancy coverage, and as previously noted, four standardized Use and Occupancy Policies came into use, which is discussed below.[38] As one insurance industry author has noted:

> There are a number of "standard" business interruption forms in use by board companies, the FIA, FM, the reciprocals, and others. With very few exceptions, these contracts are on an actual-loss-sustained basis. For both mercantile and manufacturing operations, the single-item gross earnings form and two-item contribution forms are available. The two-item form gives separate consideration to ordinary payroll coverage, where single-item gross earnings forms provide ordinary payroll coverage which is necessary to continue without separate treatment in the form itself.

---

[38] These forms are set forth in Falls, L.E., <u>AGENTS MANUAL – Use and Occupancy Insurance of Business Interruption Indemnity Including Rents, Profits and Leasehold Insurance</u> (Am. Ins. Co., 1929), pp. 8–28; and see Klein, pp. 28–29.

(Christiansen, p. 89)[39]

67.     These forms, some of which continued in use into the 1970s, provided coverage only where there was "damage to or destruction of covered property."  There are two forms, numbers one and three, which apply to manufacturing, and two forms, numbers two and four, which apply to mercantile or non-manufacturing risks.

68.     First is the "USE AND OCCUPANCY FORM NO. 1 (For Use on Either Fire or Tornado Policies) (Manufacturing)," attached hereto as Exhibit D, which provided in pertinent part:

> The conditions of this contract are that if the building [Insert]_____ described above, and/or machinery and/or equipment _____ (insert "and/or stock" if covering liability for suspension of business **due to damage to, or destruction** of stock, otherwise policy shall not cover) contained therein, be **destroyed or damaged by fire** occurring during the term of this policy so as to necessitate a **total or partial suspension of business**,[40] this company shall be liable under this policy for the

_____

[39] The Two Item form has been described as follows: "Under Item I, insurance was provided against loss of 'net profit which is prevented from being earned and such charges and expense, including payroll expense of group I employees but excluding payroll expenses of group II employees, as must necessarily continue during the interruption of business.' . . . If reimbursement for payroll expenditure for 'ordinary' labor was desired, it could be covered under Item II for 90 days or for longer in 30-day increments" (Bardwell, E.C., New Profits – Business Interruption insurance [Rough Notes Co., 1970], p. 33).

[40] This policy also contains a "*Total Suspension Clause,*" and a "*Partial Suspension Clause*" (Id., p. 9).  The insertion of "total or partial" suspension corrected the prior failure to include both total and partial suspension of business income.  Indeed, the provision for "partial" suspension would continue into the 1980s, when the words "total or partial" were left off the early ISO Business Income policies.  The insurance industry's intent remained, however, to provide coverage for both partial and total suspension, and was again corrected.

<u>actual loss</u> sustained consisting of net profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a **total or partial suspension** of business and such expenses as are necessarily incurred for the purpose of reducing <u>the loss</u> under this policy for not exceeding such length of time (commencing with the date of the fire and not limited by the date of the expiration of this policy) as shall be required with the exercise of due diligence and dispatch **to rebuild, repair or replace** such of said building [Insert]_____ and machinery and equipment _____ (insert "and stock" if covering liability for suspension of business due to **damage to or destruction** of stock) as may be **destroyed or damaged**, subject to the following conditions and limits.

(Id., pp. 8-9; emphasis added)[41]

69.    The second form is "USE AND OCCUPANCY FORM NO. 3 (For Use on Either Fire or Tornado Policies) (Manufacturing Plants) ("Seasonable" or "Fluctuating" Earnings)," attached hereto as Exhibit E.  This form contained virtually the same insuring agreement as found in Form No. 1 (See "Business Interruption Form 3," <u>Rough Notes</u> MONTHLY POLICY, FORM & MANUAL ANALYSIS, No. 132.10, 1985).  For example, coverage is provided if the insured building is "**destroyed or damaged by fire** occurring during the term of this policy so as to necessitate a **total or partial suspension** of business" (Id., p. 10; emphasis added). Further coverage is only provided for the "actual **loss** sustained," including "expenses incurred for the purpose of **reducing the loss** . . . for not exceeding the length of time . . . as shall be required with the

---

[41] For a further presentation of and discussion regarding Forms 1, 2, 3, and 4, as well as related forms, see Withers, K. W., <u>Business Interruption Insurance Coverage and Adjustment</u> (The Howell-North Press, 1973), pp. 24–57.

exercise of due diligence and dispatch to **rebuild, repair or replace**, as soon as possible after the fire" (Id.; emphasis added).

70. The third form is "USE AND OCCUPANCY FORM NO. 2 (For Use on Either Fire or Tornado Policies) (Mercantile or Non-Contributing)," attached hereto as Exhibit F (see Id., p. 13). The insuring agreement for Form 2 is virtually the same as forms 1 and 3.

71. The fourth form is "USE AND OCCUPANY FORM NO. 4 (For Use in Either Fire or Tornado Policies) (Mercantile or Non-Manufacturing) ("Seasonable" or ""Fluctuating")," attached hereto as Exhibit G (see Id., p. 15; and see Klein, pp. 64–65; and see "Business Interruption Form 4," Rough Notes MONTHLY POLICY, FORM & MANUAL ANALYSIS, No. 132.10). This form is paid on an agreed per-diem amount.

72. Form No. 4 went through at least two revisions (See Glendening, p. 100). One modification took place before 1953, but still provided that coverage would only apply where the property was "damaged or destroyed" (Id.). The second modification took place after 1953, and likewise still required that the property be "damaged or destroyed" (Id.).

73. In addition to the above four forms, there was also a "Contributing Use and Occupancy Form (To be Used to Insure Against Use and Occupancy

Loss in One Property Because of a Fire in Other Premises)" (Id., p. 17). The insuring agreement is substantially the same as Forms 1, 2, 3, and 4.[42]

74.    A Form 6 was also developed for Manufacturing Businesses. (Bardwell, Edward C., "Guide for Computation of Business Interruption Insurance Under Actual Loss Policy, Form 6," 1964). This form provided business interruption coverage as a "direct consequence of damage to or destruction, by perils insured against, of the physical properties pertaining to the business" (Id.). This form also provides extra expense coverage.[43]

75.    Based on the foregoing, several important observations can be made. First, the policies were written on a named peril basis, rather than an all risk basis. All risk property policies would not appear until around the time the ISO Businessowners policies appeared.

_____

[42] In addition to the five standard Use and Occupancy forms, there was also a Sales Expense form; an Abandonment form; a Depletion form; a Depreciation form; a Profits Tax form; a Profits Insurance form; Profits and/or Commissions forms 1, 2, and 3; Rents and Rental Values forms 1, 2 and 3; and a Leasehold Interest Form (Id., pp. 17–27; and see Foster, pp. 17–30). Many of these forms, while not discussed in detail herein, also had similar if not virtually identical insuring agreements to forms 1, 2, 3, and 4.

[43] The Extra Expense coverage provided: "In event of interruption, it may be desirable to continue some degree of business by adoption of temporary measures. Also, the period of interruption may be reduced by extraordinary procedures in restoration and replacement of the damage or destroyed properties. Application of such measures and procedures will reduce the loss of earnings, but may cost more than the amount of the loss reduction. All such extraordinary expenses are covered under their insurance **if the amount of insurance is sufficient** to also cover loss of net profit and continuing expenses" (Id.; bold emphasis in original; underline emphasis added).

76.     Second, and foremost, is that all the policies provided coverage where the property was "damaged or destroyed."  The word "loss" is only used to refer to the amount that shall be paid in the event of damage or destruction, and not in reference to the event itself (See Siver, p. 193, "This term ['Time Element' Loss] refers to a type of money loss caused by the damage or destruction of income-producing property").[44]  This was consistent throughout the history of business loss insurance, up to the issuance of Business Income Insurance by ISO.

77.     Third, the basic policies all provided coverage for partial and total losses.  It was, therefore, expected under these forms that, if an insured's operation was only partially shut down due to a covered cause of loss, the insurer's liability would still attach under the policy.  This would become important later in the development of Civil Authority Coverage.

78.     Fourth, coverage was provided for the necessary time taken to "rebuild, repair or restore" the damaged property.  This language was consistent with the coverage for only "damaged or destroyed" property by named perils such as fire or tornados.  Taken together, it is evident that coverage was contemplated for only actual physical damage or destruction to physical property, and not for any other type of loss of use.[45]  Indeed, such non-damage

---

[44] Similarly, it has been noted that "Business Interruption insurance concerns itself with a shutdown of operations as a result of the **damaged property** being unavailable for use during the time required to restore or replace such property" (Siver, p. 193; emphasis added).

[45] "The [Gross Earnings] form states that it will pay actual loss sustained not exceeding loss of revenue less cost of merchandise sold and other

EXPERT REPORT OF CHARLES M. MILLER

Page 50

losses, such as theft, were not covered—and in many cases, they were expressly excluded.

###### c. The Use & Occupancy Forms Are Changed but Continue to Provide Coverage Only Where There Is "Damage or Destruction" of Covered Property.

79.     In the late 1950s, the standardized business interruption loss forms were changed.[46]  This change was described by Roy McCormick, the editor of Policy Form and Manual Analysis Service of the Rough Notes Company, in his presentation before the Proceedings of the Transportation Insurance Rating Bureau Sessions Mutual Technical Conference, held on November 9–12, 1959, in Chicago, Illinois:

> In recognition of a general feeling in the field that the business interruption forms in use were unduly complex, but that the language employed in the gross earnings form is more easily understood and explained than that employed in the two-item contribution forms, a nation-wide study was conducted over a period of almost three years to convert all standard business interruption coverage to that approach.
>
> The study resulted in a country-wide recommendation to substitute such a program. Gross earnings forms 3 and 4[47] continue in use in

---

noncontinuing expenses for that period of time that it would take with due diligence and dispatch **to replace or repair the physical properties destroyed or damage**" (Bradford, E. N., CPCU, The ABC's of Handling Business Interruption Claims [Interstate Printers and Publishers, Inc., 1978]; emphasis added).

[46] It appears that the phrase "Business Interruption Indemnity," may have first been used as early as 1918 (Klein, p. 12).  By 1963, "Business Interruption Insurance" had been "accorded virtually universal acceptance and official recognition in Manuals of Rules and Standard Forms" (Id., p. 13).

[47] For a further discussion of business forms 3 and 4, see "Fire Policy Business Interruption Form (Annotated)," Mut. Ins. Institute, Educational Division of

revised form and serve as the basis for business interruption coverage, together with two new option endorsements.[48]  The two optional endorsements included one which "excludes all ordinary payroll expense coverage and the other limits such coverage to 90, 120, 150 or 180 days."  These endorsements permit elimination of two-item contribution business income forms 1 and 2.

. . .

The number of basic forms is reduced from four to two.  The two-contribution forms are withdrawn.  The two gross earnings forms are retained for use in amended form.

. . .

Although minor editorial changes have been made for the purpose of clarification in those two forms, **the essential features remain unchanged**.

(Published by the Transportation Insurance Rating Bureau, 1959, pp. 19-20; and see Shifrin, Robert L., CPCU, "Risk Management," Agent & Broker, May 1980, p. 12).[49]

---

Kemper Ins., MII 2002, Ser. 631 (hereinafter, "Kemper"); and see Phelan, John D., Business Interruption Primer (Rough Notes Co., 8th ed., 1976), pp. 79–93; and Bardwell, E.C., New Profits – Business Interruption insurance (Rough Notes Co., 1970), ch. 11).

[48] Some insurers would designate these forms as Forms A, E, and M (See "Business Interruption Including Extra Expense," Industrial Risk Insurers, 1971). The re-designation did not change the scope of coverage, which continued to be limited to "interruption caused by damage to or destruction of real or personal property" (Id.).

[49] Similarly, it has been noted that the "Earnings form (no coinsurance) for mercantile and nonmanufacturing (service) risks . . . was introduced in 1954 to overcome some of the complexities of the gross earnings form particularly the coinsurance clause" (Glendening, p. 6; and see "Business Interruption Insurance," Crum & Forster Group, "in 1959 and 1960 there have been approved in most rating jurisdictions two forms.  They are gross earnings Form #3 for mercantile or non-manufacturing risks, and the gross earnings Form #4 for manufacturing plants").

80.  Of significance for this discussion is the final comment above that the "essential features remain unchanged" (See Kemper, pp. 4, 10).  The two surviving gross earnings forms contained virtually the same insurance agreement as its predecessors.  In other words, coverage was only provided where there was "damage to or destruction of covered property."

### 3.  ISO Issues Standardized Business Interruption and Business Income Loss Policy Forms.

### a.  The Formation of ISO.

81.  In 1971, "the Insurance Rating Board, the Multi-Line Insurance Rating Bureau, and the Inland Marine Insurance Bureaus became the Insurance Services Office (ISO).  Nine fire bureaus (now referred to as property bureaus) also merged into ISO that year" (Wagner, p. 199; and see Talley, Douglas, "Stock and Mutual Insurer Contract Wordings," IRMI, June 2011, p. 4).  Since 1971, ISO has issued a large number of standardized insurance policy forms that are widely used in the insurance industry.  Indeed,

> A very important part of ISO's service to its customers is the development of standardized coverage forms and endorsements.  These forms and endorsements are copyrighted by ISO and are licensed for use by its insurer customers.  ISO's standardized forms and endorsements serve as benchmarks.  Without them, it would be very difficult for consumers and government to make meaningful price and coverage comparisons among insurers.  Standardized forms provide a base from which insures can depart, tailoring endorsements to insure unique risks or target markets.
>
> . . .
>
> ISO's staff drafts language to express the intent of the new or revised coverage concept in a way that addresses such matters as new laws, court interpretations of forms, or changed market

EXPERT REPORT OF CHARLES M. MILLER

Page 53

conditions. Once the new forms are developed it is reviewed by the appropriate working committee. Once approved by the committee, ISO files the proposed forms, where necessary, with state insurance regulatory for their approval.

(Id., p. 4)[50]

**b.** **The Early ISO Business Interruption Forms Continued to Provide Coverage for Only "Damage to or Destruction of" Covered Property.**

82. The original ISO Business Interruption forms were similar in many important ways to the Use and Occupancy forms. For example, the ISO 1977 Business Interruption (Gross Earnings Form for Mercantile or Non-Manufacturing Risks), Form CF 15 03 (Ed. 05.77), attached hereto as Exhibit H, provided in pertinent part:

1. This policy insures against loss resulting directly from necessary interruption of business caused by <u>damage to or destruction of real or personal property</u> by the peril(s) insured against during the term of the policy, on premises occupied by the Insured and situated as herein described.

2. In the event of such <u>damage or destruction</u> this Company shall be liable for the ACTUAL <u>LOSS</u> SUSTAINED by the insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expense which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of diligence and dispatch to <u>rebuild, repair or replace</u> such part of the property herein described as has

---

[50] Similarly, in the Government of the District of Columbia, August 28, 2013, Market Conduct Examination of ISO (hereinafter, the "DC Market Conduct Exam"), it was reported that ISO "was formed on April 1, 1971 as a national voluntary, non-profit unincorporated association of insurers through the consolidation of various state, regional and national rating bureaus for various lines of property/casualty insurance" (Id., p. 3).

been <u>damaged or destroyed</u> and not limited by the date of expiration of this policy.

3. **Resumption of Operations**.  It is a condition of this insurance that if the insured could reduce <u>the loss</u> resulting from the interruption of business.

    a.  by complete or partial resumption of operations of the property herein described, whether damaged or not, or

    b.  by making use of merchandise or other property at the location(s) described herein or elsewhere

such reduction shall be taken into account at arriving at the amount of loss hereunder.

(Glendening, Appendix A; bold and all-caps emphasis in original; underline emphasis added)

83.    The 1977 ISO Form, now referred to as a "Business Interruption" form, replaced Use & Occupancy Forms, which also covered mercantile businesses.[51]  The form also was written on a named peril basis,[52] and is

---

[51] "Gross Earnings Form #3 [and] Gross Earnings Form #4," continued in use into the late 1970s (Mueller, Werner A., CPCU, "Insurance Quiz of the Month," <u>American Agent & Broker</u>, February 1978, p. 44; and see "Policy Kit for Students of Insurance," Alliance Insurers, pp. 30–34; and see Exhibits N and O).  Indeed, some insurers, during the same period, issued the business income loss coverage under a policy endorsement entitled "Use and Occupancy (Actual Loss Sustained – No Specified Daily Indemnity)" Form no. RK 352-s, 7-79 ("Study Kit for Students of Insurance – Sample Insurance Policies, Endorsements and Forms," American Mutual Insurance Alliance, 1977).  This endorsement provided coverage for "that amount of expense which is reasonably incurred by the Insured or the Company to reduce or avert prevention of Business . . . caused solely by an Accident" (Id.).

[52]  The named perils were "fire, lightning, the extended coverage perils, vandalism or malicious mischief, and sprinkler leakage" (Turner, Richard D., et al., <u>Multiple-Lines Insurance Production</u> [Ins. Institute of Am., 1st ed., 1981], p. 553; hereinafter, "Turner").

sometimes referred to as the "standard policy"[53] (Turner, p. 550).[54] The ISO named peril form continued to provide coverage for only property that was "damaged or destroyed,"[55] and only for the period that the insured, acting with "diligence and dispatch," was able to "rebuild, repair or replace the property." Unlike later ISO forms, the policy did not use (let alone define) the word "suspension." The coverage for both partial and complete suspension of business, however, was not as expressly set forth in the ISO 1977 form as it had been in the prior Use and Occupancy forms.[56] The ISO form implicitly provides coverage for both partial and complete interruption by requiring the insured to restore the business to even partial operation in order to "reduce the loss." In other words, the "loss" remains even after partial restoration of business, which can only by definition, leave remaining a partial loss. As with the Use and Occupancy policies, the word "loss" is used to describe the amount the insurer may have to pay, and does not refer to the event which resulted in

---

[53] The Policy could be endorsed with an "Extended Coverage Endorsement," which provided additional coverage for windstorm, hail, smoke, explosion, riot, riot attending strike, civil commotion, aircraft, and vehicles (ISO Form CF 15 23 (Ed. 05.77)). Again, loss due to theft was not covered.

[54] ISO also issued at the same time an all risk policy, sometimes referred to as the "Special policy" (Turner, p. 550).

[55] It appears that one version of the ISO BOP provided coverage "when the building or the personal property is damaged as a direct result of an insured peril" (Turner, p. 555).

[56] The 1979 version of this policy form provided coverage for both "complete or partial" interruption of business (Glendening, p. 67; and see Jorgensen, James R., Business Income Insurance: How It Works [BJ Publications, 2nd ed., 1989], p. 1, "Business Income Insurance pays when fire, wind, hail (or any other peril you insured against), causes partial or total suspension of your business operations").

EXPERT REPORT OF CHARLES M. MILLER
Page 56

1   that amount.

2       84.    The 1977 named peril form also included coverage for "Expenses

3  to Reduce Loss," which provided:

> This policy also covers such expenses as are
> necessarily incurred for the purpose of reducing **loss**
> under this policy[57] (except expense incurred to
> extinguish a fire), but in no event shall the aggregate
> of such expense exceeding the amount by which the
> **loss** otherwise payable under this policy is thereby
> reduced.  Such expenses shall not be subject to the
> application of the Coinsurance Clause.
>
> (Id.)

85.    Consistent with the insuring agreement, the word "loss," as in prior

Use and Occupancy policies, is used solely in reference to the amount to be

paid under the policy.

86.    Finally, the 1977 form provided coverage for "Interruption by Civil

Authority," which provided:

> This policy is extended to include the actual **loss**
> **sustained** by the insured, resulting directly from an
> interruption of business as covered hereunder,
> during the length of time, not exceeding 2
> consecutive weeks, when, as a direct result of
> **damage to or destruction** of property **adjacent**[58]
> to the premises herein as described by the peril(s)
> insured against access to such described premises
> is **specifically prohibited** by order of civil

---

[57] The phrase "under this policy" would mean that coverage for extra expense is limited to the type of loss covered—that is, to damage or destruction of property.

[58]  The language "damage to or destruction of property adjacent to the premises herein described" was added to the policy in 1966 (Bardwell, E.C., <u>New Profits – Business Interruption Insurance</u> [Rough Notes Co., 1970], p. 41).

authority.[59]

(Id.)

87.     The Civil Authority coverage continued to require "damage to or destruction of property" for coverage to apply.  Again, the word "loss" is used to refer to the amount to be paid, and not to the cause of that amount.  Finally, the coverage is limited only to damage or destruction to "adjacent" property to which access has been "specifically prohibited."  This early form of the Civil Authority coverage was, therefore, more limited than later forms.

88.     In addition to the foregoing form, ISO also issued in 1977 a Gross Earnings Endorsement, Form MP-140 (Ed. 7-77), which similarly provided coverage for "interruption of business caused by the peril insured against **damaging or destroying** during the policy period real or personal property (Glendening, Exhibit A; emphasis added).  This form also covered complete or partial business interruption and provided identical coverage to the Business Interruption form for Extra Expense and Civil Authority coverages (Id.).

89.     Other ISO business interruption forms issued in 1977 included the Gross Earnings Endorsement, Form MP-140 (Ed. 7-77); the Loss of Earnings Endorsement, Form MP-143 (Ed. 7-77); Earnings Insurance Forms CF 15 01 (Ed. 05.77) and CF 15 02 (Ed. 05.77); the Business Interruption Gross Earnings Form for Manufacturing or Mining Risks, Form CF 15 04 (Ed. 05.77), which replaced the Use and Occupancy Forms 1 and 3; the Extended Coverage

---

[59] This was modified by some insurers "where access to his premises is prohibited by order of civil authority—Issued as a direct result of the perils insured against in the vicinity of such premises" (Klein, Henry C., Business Interruption Insurance [Rough Notes Co., 1964], p. 265).

Endorsement, form CF 15 04 (Ed. 05.77); the Earnings Insurance Form CF 15 02; the Combined Business Interruption and Extra Expense Insurance Form, CF 15 05; the Contingent Business Interruption Gross Earnings Form for Contributing Properties, Form CF 15 08 (Ed. 05.77); and the Contingent Business Interruption Gross Earnings Form for Recipient Properties, Form CF 15 09 (Ed. 05 07) (Id., Appendices A–CC). All of these forms provided coverage only where there was damage or destruction to covered property, along with other provisions that were similar if not identical to Form CF 15 03 (Ed. 05.77).

### c. Non-ISO Forms Continued the Requirement That There Be Physical Damage to Covered Property.

90. In addition to the ISO forms, during the same period there were non-standard forms issued by some insurance companies. For example, the Factory Mutual System (hereinafter, "FMS") issued a business interruption policy, Form SP-1(2/77) effective February 1, 1977 (Glendening, Appendix DD).[60] The FMS policy provided named peril coverage:

> **This Policy covers loss as herein defined which is the result of physical damage to the property described herein caused by:**
> . . .
>
> **This Policy covers loss as herein defined:**
> Computed from the time of the damage caused by a peril insured against to the time when with due diligence the property could be repaired or replaced and made ready for normal operations, not to be limited by the expiration of this Policy.

---

[60] Also see Glendening, pp. 11–13.

(Id., bold emphasis in original, underline emphasis added)

91.    Likewise, FMS Business Interruption Insurance, Form T-1 (3/76), provided that,

> This Policy covers only the actual loss sustained by the Insured due to necessary interruption of business **as a result of physical damage** caused directly by the perils insured hereinunder to the property utilized by the insured situate as described elsewhere in the Policy.

(Id., Appendix DD; emphasis added)

92.    FMS Form T-1 also provided coverage for partial and complete loss of production (Id.).

93.    Although the insuring agreement in these forms is slightly different from the ISO business interruption forms of the same period, they, like the ISO forms, provided coverage only for "damage."  The word "loss," also like the ISO forms, is used describe the amount to paid under the policy.

94.    An anomalous exception to the long trend of limiting coverage when there is only damage to or destruction of covered property is found in "one unusual business interruption coverage," applicable to otherwise uninsurable losses, such as flood or earthquake (Glendening, p. 12).  That form provided coverage for "loss resulting from interruption of or interference with the insured's business in consequent of all risks of physical loss or damage as defined which shall prevent or hinder the use of the insured's premises or property or access thereto, irrespective of whether the premises or property of the insured shall have been damaged, and shall be deemed to be loss resulting from damage to premises or property of the insured" (Id.).  This anomalous form appears to be

EXPERT REPORT OF CHARLES M. MILLER

Page 60

one of the first to use the phrase "loss or damage," which would not appear in ISO standardized forms until the 1980s.

95.     Similarly, a group of policy forms entitled "Business Interruption Specific Time Forms," which were only used "on the Pacific coast," provided coverage for "business interruption because of fire, [and] the extended coverage hazards or vandalism and malicious mischief for actual loss sustained over a specified number of days" ("Business Interruption Form 4," Rough Notes MONTHLY POLICY, FORM & MANUAL ANALYSIS, No. 132.13).  The "period of recovery under all items on which insurance is provided begins with the date of the **physical loss to building**, plant or other property and is not limited by the expiration date of the policy.  It does not exceed such length of time as would be required with due diligence and dispatch to rebuild, repair or replace property **destroyed or damaged**" (Id.; emphasis added).  This form was also anomalous, as it used the word "loss" in reference to the type of damage and not the monetary amount of the damage.  It may have been one of the first such business income loss policies to use the word "loss" in this manner.  Nonetheless, the form also uses the phrase "destroyed or damaged," as with other contemporary business interruption forms, indicating that the word loss would only refer to damage or destruction, and not to any other kind of loss.  This would be consistent with the type of coverage afforded, which was for only named perils, such as fire, that caused actual damage or destruction to physical property.

    **4.**    **The Development of Commercial Property Policies and the Introduction of Coverage For "Loss of or Damage to" Covered Property.**

### a. Early Commercial Property Policies.

96.    It is necessary to review the development of commercial property or businessowners' policies in order to understand the significant changes that ISO would make to the business income coverage.

97.    One of the early property policy forms to use both the terms "loss" and "damage" was the 1886 "New York Standard Fire Policy," which provided coverage "against all direct loss or damage by fire" (Wood, Joseph G., The Standard Fire Policy [Rough Notes Co., 2nd ed., 1930], p. 6).  The policy expressly did not provide coverage for theft or "interruption of business" (Id.).

98.    In 1918, The New York Standard Fire Policy was revised to provide coverage "against all DIRECT LOSS AND DAMAGE BY FIRE" (Id., emphasis in original).  As with the earlier form, coverage was not provided for theft.  Given that both forms provided coverage only for fire, the use of the word "loss," unlike later ISO policy forms, clearly only referred to physical loss.  Indeed, business interruption losses were expressly excluded in these forms.  This limitation in the use of the word "loss" would later change with the introduction of the ISO Businessowners and Business Income Loss forms.

99.    As with the ISO Business Income Forms developed in the 1970s, One of the earliest commercial property forms also came into use around the same time, and was entitled the "General Property Form, Form FGP-1 (Ed. 6-75)" ("Study Kit For Students of Insurance," Prepared for the American Mutual Insurance Alliance by the James S. Kemper Institute for Insurance Training,

1977).[61]  This form provided that "[t]his policy insures against all direct loss caused by…" (Id.).  The coverage was provided for only named perils, and did not include theft (Id.).  Like subsequent Businessowners policies, coverage was extended to "Buildings," "Personal Property of the Insured," "Personal Property of Others," and "Debris Removal" (Id.).  The Policy did not provide coverage for business income loss, which would have had to be added by endorsement.[62]  This early property form addressed only "loss" and made no reference to "damage" or "destruction" of property.  In contrast, the terms "damage" or "destruction" appeared in the Business Interruption policies of the same period.  This appears to be because the "General Property Form" was only written on a named peril basis, and the named perils all involved some form of actual physical damage to property (e.g., fire), making reference to damage or destruction possibly unnecessary.  This would not, however, be the case when the all risk Businessowners policy came into use, which provided coverage for losses that did not involve damage or destruction of physical property.

100.   A "Standard Businessowner's Policy" Form BU 00 01 (Ed. 08 76)

---

[61] In the late 1970s, Allstate also unsuccessfully introduced a commercial property form (See Greene, Richard, "Buying a Comeback," Forbes, October 1, 1979; and Mueller, Werner A., "Insurance Quiz of the Month," Agent & Broker, August 1975, p. 46).  "BOP was created to package various insurance coverages into a single policy specifically geared to meet the needs of various small business owners.  Before the creation by Allstate in 1974, business policies were stand-alone or monocline" (Trawick, David, "The Business's Policy," North American Risk Services).

[62] This coverage corresponded to the New York Standard Fire Insurance Policy, which provided that "[t]his Company shall not be liable for loss by fire," and then set forth a list of excluded causes of loss, including theft (See Coombs, Steven A. & Malecki, Donald S., The Builders Risk Book [IRMI, 2nd ed., 2019], Appendix B).

was also offered in the 1976 (See "1987 Policy Kit for Students of Insurance," Alliance Insurers (25th ed.), p. 148; hereinafter, "Alliance").[63]  This policy included business income coverage, and provided in pertinent part:

> This policy covers the actual business loss sustained by the insured and the expense necessarily incurred to resume normal business operations resulting from the interruption of business or the untenantability of the premises when the building or the personal property is damaged as a direct result of an insured peril.
>
> . . .
>
> Loss of income shall be payable for only such length of time as would be required to resume normal business operations but not exceeding such length of time as would be required to rebuild, repair or replace such part of the building or personal property as has been **damaged or destroyed** as a direct result of an insured peril.
>
> (p. 2 of 23; emphasis added)

101.    As is evident, this policy form only extended coverage, on a named perils basis, where the property is "damaged or destroyed."  The policy expressly excluded coverage for "theft, burglary or larceny" (Id., p. 4 of 23).

102.    There was also an all risk version of this policy (See Form BU 00 02 (Ed. 05 76), Alliance, p. 171).  Unlike the named peril version, the all risk version provided that the "policy insures against all risks of direct physical loss, subject to all provisions contained herein" (Id., p. 3).  This insuring agreement

---

[63] One author has noted that "The Businessowners' Policy (BOP)," was "[f]irst introduced in 1976, [and] was the first time commercial risks were offered property and liability coverage in the same form without the need to piecemeal the parts together in a package" (Boggs, Chris, "One Person's View: 7 Wonders of P/C Insurance History, Insurance Journal, February 21, 2010, p. 2).

allowed the insurer to add within the policy coverages for losses that did not require physical damage, such as loss of money and securities, and as an optional coverage, employee dishonesty.  For example, "[t]he special policy is an 'all-risks' contract with theft coverage, which also includes automatically money and securities coverage without an additional charge" (Turner, p. 550). At the same time, the "Loss of Income" coverage was limited to "when the building or the personal property is damaged as a direct result of an insured peril" (Id., p. 2).  Further, coverage was only provided for the "length of time as would be required to rebuild, repair or replace such part of the building or personal property as has been **damaged or destroyed** as a direct result of an insured peril" (Id.; emphasis added).  Accordingly, the property coverage was extended to include coverages for losses that did not require physical damage, whereas the loss of income coverage was limited to property that has been "damaged or destroyed."  This distinction would not be followed in later ISO policies, which would provide both damage and loss coverage for the property coverage, as well as the business income coverage.

103.    The foregoing is important because it demonstrates that the property and business income coverages can be provided on a different basis. That is, this businessowners' non-business income coverage applies to loss, thereby allowing the insurer to provide coverage for purely loss of use claims, such as theft, while at the same time limiting the business income coverage to claims arising out of damaged or destroyed property, thereby emphasizing the requirement for physical alteration of covered property in order to have coverage for a business income loss claim.  Rather than take this path, ISO

would later decide to provide businessowners' property and business income coverages on the same basis.[64] That is, both coverages would apply to "loss of or damage to" property. Pursuant to insurance industry standards for the drafting, interpretation, and application of insurance policy provisions, where an insurer does not use policy language that limits coverage, where that language is known and used in the insurance industry, it is understood that the insurer did not intend to so limit the coverage (See Wollner, p. 20, "If a contract provision lists particular items, it is presumed that what it is left out was purposefully omitted"). Accordingly, when ISO would choose to use the word "loss" in the scope of the business income policy coverage, rather than destruction, as had been used for decades prior, it must be concluded that ISO did not intend to limit the business income coverage to only physical damage.

        **b.    ISO Develops the Businessowners Policy, Including Business Income Coverage and Expanding Coverage to Include Loss of or Damage to Covered Property.**

104.    The Businessowners policy was first introduced in the early 1980s (See Gordis, Philip & Chilanda, Edward A., <u>Property and Casualty Insurance</u> [Rough Notes, 27th ed., 1982], p. 709). Two versions of the policy were introduced: An all risk form and a named peril form. The policy "[l]oss of income

---

[64] In the 1970s, frequently the Businessowner's policy was written to "apply all-risk coverage to building and contents and then leave the business interruption coverage on a fire, lighting, extended coverage and vandalism basis" (Mueller, Werner A., CPCU, "Insurance Quiz of the Month," <u>American Agent & Broker</u>, February 1978, p. 43).

[coverage] on actual loss sustained basis, with the period of recovery limited to 12 months" (Id.). The all risk form automatically included coverage for burglary and robbery, without the need for endorsement (Id., p. 710). This was the first commercial businessowners form that combined both property and business income loss coverages.

105. The 1985 version of the ISO "Businessowners Standard Property Coverage Form," was one of the first policy forms to provide coverage for "direct physical loss of or damage to Covered Property" (Form BP 00 01 06 89, p. 1 of 17; attached hereto as Exhibit I).[65] The Policy provided:

> We will pay for the actual loss of Business Income
> you sustain due to the necessary suspension of your
> "operations" during the "period of restoration."[66]
> The suspension[67] must be caused by direct physical

---

[65] "In 1976, the ISO filed a BOP program" (Businessowners Policy [Ins. Inst. of Am., 1981], p. 549).

[66] Period of Restoration was defined as the period that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

(Id., p. 16)

Some have contended that the language "repaired, rebuilt or replaced" demonstrates that business income coverage only applies to physical damage to physical property, and not to the loss of use of the property. This is clearly incorrect.

[67] Suspension was not defined in the policy. The failure to define the word, as had occurred previously, would lead to a misinterpretation of the business income coverage, which was corrected by the appropriate definition (See ISO Business Income (And Extra Expense) Coverage Form, CP 00 30 06 07, p. 9,

loss of or damage to property at the described premises.

(Id., p. 4)

106.    The importance of this development cannot be overstated.  One author has noted that the ISO form was "a radical departure from the standard loss-of-income approach that historically has been written to cover the perils of fire, extended coverage and vandalism only" (Mueller, Werner A., "Insurance Quiz of the Month," Agent & Broker, August 1975, p. 48).  This form was one of the first (if not the first) to use the language "physical loss of or damage to." Unlike preceding business income and commercial property forms, which insured for "damage or destruction" to property, the 1985 ISO policy deleted the word "destruction," and replaced it with the word "loss."  The use of loss, in this context, was not to reference the amount that the insurer owed; rather, it referred to the cause of that amount.  A close examination of this Businessowners Form reveals why this change had to be made.

107.    The 1984 Businessowners named peril form contains a number of coverages that cover only the loss of property and not its damage or destruction.  For example, the named peril version provided coverage for "[l]ooting occurring at the time and place of a riot or civil commotion" (Id., p. 2). Loot or looting is defined as "to seize and carry away" (www.merriam-webster.com/dictionary/loot).  Accordingly, looting can occur without damage to property, as it can result just from the removal of property.  Similarly, coverage

defining suspension as "a. the slowdown or cessation of your business activities").

was provided for "loss or damage" resulting from "Burglary and Robbery" (Id., p. 13).[68]  Significantly, the 1984 Policy defined Burglary as:

> (1)  Burglary, meaning the taking of property from inside the described premises by a person unlawfully entering or leaving the premises as evidenced by marks of forcible entry or exit; or

> (2)  Robbery, meaning the taking of property from the care and custody of a person by one who has:

>> (a) Caused or threatened to cause that person bodily harm; or

>> (b) Committed an obviously unlawful act witnessed by the person from whom the property was taken.

> (Id., p. 13).

108.    Again, there is no requirement that property be "damaged."  The only requirement is that the property be taken—in other words, that the insured has lost the use of the property.

109.    Likewise, the 1984 Policy provided coverage for "employee Dishonesty,"[69] which provided in pertinent part:

> a.   We will pay for direct loss of or damage to Business Personal property, including money and securities, resulting from a dishonest act committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

>> (1) Cause you to sustain loss or damage, and also

>> (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other

---

[68] This was an optional coverage that could be added to the policy.

[69] This was another optional coverage that could be added to the policy.

EXPERT REPORT OF CHARLES M. MILLER
Page 69

employee benefits earned in the normal
course of employment.

(Id., p. 14)

110.    Similarly, the 2012 ISO Causes of Loss – Broad Form (form CP 10 20 10 12; attached hereto as Exhibit J) provides coverage for "Riot or Civil Commotion, including . . . looting occurring at the time and place of a riot or civil commotion" (Id., p. 1).[70]  Again, physical damage is not required; rather, coverage is provided for loss of property due to looting.

111.    The Cause of Loss – Special Form (form CP 10 30 09 17; attached hereto as Exhibit K) also provides:

**Exclusions**

1.  We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . .

2.

h.  Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

---

[70]  Either the Cause of Loss – Broad Form or the Cause of Loss – Special Form are attached to, among other commercial first-party property policies, the Building and Personal Property Coverage Form, as well as the Business Income (and Extra Expense) Coverage form in order to set forth the scope of coverage (i.e., named peril or all risk), as well as set forth the exclusions.

(Id., p. 4; emphasis in original)[71]

112.    The foregoing actually sets forth the extent of coverage for dishonest or criminal acts, including theft, by setting forth the category of persons whose dishonest or criminal acts, including theft, are not covered.  This means that there is coverage for the dishonest or criminal acts (including theft) of those persons who commit such acts that are outside this category.  As IRMI has pointed out:

> It is impossible to pinpoint all of the loss scenarios that would not be covered under a typical named perils policy but would be covered under a typical all risks policy.  However, one significant advantage of all risks policies is that they generally cover most types of theft.  (The major exception is theft by employees, which is insurable under a commercial crime policy form).  Named perils policies typically provide almost no theft coverage.  Another advantage of the all risks approach is that it is more difficult for insurers to deny coverage under an all risks form.  With an all risks form, the burden is on the insurer to show that coverage does not apply to a particular loss, whereas with a named perils form, the insured must show that loss was caused by a peril specifically insured against in the policy.
>
> (Property Insurance, "Practical Risk Management/Property Risks and Insurance—Topic F-1)
>
> [72]

_____

[71] The Policy contains an exclusion virtually identical to this exclusion (See HC-CP-001 (09/11), p. 38).

[72] Also see ISO Capital Assets Program Coverage Form (Output Policy)," form no. CP 00 01 0702, which provides coverage for employee theft, forgery or alteration and loss by theft, disappearance or destruction" of money and securities (Id., p. 12).

113. Indeed, exclusions, such as the foregoing, set forth the scope of coverage by excluding only certain acts but not all acts.

> The primary function of exclusions is to *clarify* the coverage granted by the insurer, not to *take away* coverage from the insured. Specifying what aspects of something an insurer does *not* intend to cover is a proven way of clarifying what aspects the insurer *does* intend to cover.
>
> (Wiening & Malecki, p. 65; emphasis in original)

114. Accordingly, coverage is provided for certain criminal and dishonest acts, including theft, which again do not require that any property be damaged, but, rather, only lost.

115. Likewise, the Policy provides coverage for "Theft Damage to Unknown Building Property" (Form HC-CP-00-001 (09/11), p. 5). Coverage is provided for theft of business personal property, without any requirement that the property be damaged for coverage to be afforded (Id.).

116. Likewise, the Policy may provide coverage for loss of "Money and Securities" (Id., p. 42). Coverage is provided for such loss "(a) [a]t the described premises of a bank or savings institution; or (b) [a]t any other location . . . resulting directly from theft (meaning any act of stealing), disappearance or destruction" (Id.). Again, no actual destruction or damage is required for coverage to apply.[73]

---

[73] Significantly, the Policy also provides that HCC "will determine the value of lost or damage property, or the cost of its repair or replacement" (Id., p. 48). In other words, the Policy contemplates that HCC will pay for property that is only lost, and not destroyed or damaged.

EXPERT REPORT OF CHARLES M. MILLER
Page 72

117.    This feature of ISO property policies is carried over to ISO

Business Income policies, which provide the following coverage:

>    d.  Interruption of Computer Operations

>>    (3) With respect to the coverage provided under
>>    this Additional Coverage, the Covered
>>    Causes of Loss are subject to the following:

>>    (b) If the Causes of Loss – Broad Form
>>    applies, coverage under the Additional
>>    Coverage – Interruption of Computer
>>    Operations includes Collapse as set forth
>>    in that form.

>    . . .

>>    (c) The Covered Causes of Loss include a
>>    virus, harmful code or similar instruction
>>    introduced into or enacted on a computer
>>    system (including electronic data) or a
>>    network to which it is connected, designed
>>    to **damage or destroy any part of the
>>    system or disrupt its normal operation**.

>    (Id., p. 3; emphasis added)[74]

118.    As is evident, the foregoing coverage applies, in addition to

damage or destruction, to disruption of the computer's normal operation which

may not involve actual damage or destruction, but rather the loss of use of the

normal operation.[75]  Indeed, the title of coverage is simply "Interruption of

_____

[74]  The Policy provides possible coverage for "Restoration of Electronic Data,"
which provides coverage to "replace or restore lost or damaged 'electronic data'
for which duplicates do not exist" (HC-CP-00-001 (09/11), p. 40).  Similarly,
under the business income coverage, the Policy provides coverage for
"restoration of Electronic Data," in which coverage is provided for "the
replacement or restoration of the "Electronic Data" (HC-CP-00-002 (04/11), p.
58).

[75] See Kuntsen, Erik S & Stempel, Jeffrey W., "Infected Judgment: Problematic
Rush to Conventional Wisdom and Insurance Coverage Denial in a Pandemic,"
185 Conn. Ins. Law Journal 27 (hereinafter, Kuntsen & Stempel") p. 244, "The
more reasonable and now widely accepted approach has been to find that

Computer Operations," and not damage or destruction to computer operations.[76]

119.    Further, the "Loss Payment" section of the policy provided that, "[i]n the event of loss or damage covered by this policy: a. At our option, we will either: (1) Pay the value of lost or damaged property" (Id., p. 9).[77]  In other words, the policy contemplated that coverage would extend to property not damaged, but simply lost.[78]  This coverage (further expanded in the all risk form) would require that the insuring agreement be changed to cover both "loss" and "damage."  As explained in one insurance industry text,

> Physical loss is not synonymous with damage or physical damage.  Too often, when reference is made to this insuring agreement, physical loss is not mentioned as if it does not exist.  It does exist, and it is different from physical damages.
>
> (Malecki, Donald, S., <u>Commercial Property Coverage Guide</u> [Nat'l. Underwriter Co., 5th ed., 2013], p. 8)

---

electronic data losses are capable of being covered as a "direct physical loss" under a property policy when the data is corrupted, lost or damaged.  Many courts have found that, although data cannot be seen or touched, it nevertheless exists in some fashion electronically and microscopically as property and can suffered direct physical loss. (footnote omitted)"

[76] Also see ISO "Electronic Commerce (E-Commerce)" form, form numbers OP 04 08 07 02 and CP 04 30 04 02, which provides business income loss coverage for "[i]nterruption in normal computer network service or **function**" (Id., p. 2; emphasis added).

[77] Likewise, the 1984 form provided coverage "for loss of or damage to personal property of others" (Id., p. 11).

[78] These same coverages continue in the BOP to the present day (See e.g., ISO Form CP 00 10 02).

EXPERT REPORT OF CHARLES M. MILLER
Page 74

120. After noting the foregoing, Malecki proceeds to discuss the court decision in *Manpower Inc. v. Insurance Co. of the State of Pennsylvania*, 2009 WL 3738099 (E.D. Wisc. November 3, 2009):

> The court rejected the insurer's argument that a peril must physically damage property in order to cause a covered loss. If the policy covered physical losses in addition to physical damage, explained the court, then the policy would contain surplus language. The court said that a contract must, where possible, be interpreted so as to give reasonable meaning to each provision without rendering any portion superfluous. Thus, the court added that *direct physical loss* must mean something other than *direct physical damage*. **Indeed, the court said that if "direct physical loss required physical damage, the policy would not cover theft, since one can steal property without physically damaging it; and ISOP did not contend that the policy did not cover theft."**[79]
>
> (Id., italics emphasis in original; bold emphasis added)

121. If loss were interpreted as damage or destruction, there would be no (or extremely limited) coverage under the Policy for those coverages that did not require damage to property. Accordingly, loss must be interpreted as the loss of use or function of property in order for the Policy to provide the full scope of its express coverages.[80]

---

[79] This case is not cited for its holding or precedential value, but only because Malecki cited it to make his point regarding the meaning of both direct physical loss and direct physical damage.

[80] This does not mean that there is not actual physical damage to the properties from the coronavirus. For example, such damage is pointed out in numerous other state and local closure orders.

122.    The foregoing would most certainly be the case for the all risk Businessowners' policy, issued around the same time, and which provided even broader coverage for losses, such as from theft.  As one insurance industry author has noted, "[a]n 'all risks' insurance coverage is broader basically than specified perils coverage" (Rodda, p. 185).  There is another critical difference between the two types of policies.  Under "an 'all-risks' type of policy there is a presumption of coverage unless the insurance company can show that the exclusions in the policy apply to the loss.  In case of doubt as to the exact cause of a loss, the insured is in a better position with an 'all risk' type of coverage than he is with a specified perils type" (Id.).  Indeed, pursuant to insurance industry standards, the insurer must resolve doubts in coverage in favor of insured (See Popow, §5.34).  Similarly, FC&S has noted that, "it is not enough for the insurer to simply cite the exclusion; the insurer must prove the exclusion's applicability.  It is an axiom of insurance contract interpretation that the insurer has the responsibility to prove the applicability of exclusionary clauses" ("Latent Defect Exclusion," FC&S Bulletin).

123.    The significance of the all risk policy here cannot be overestimated.  The insurance industry-drafted open perils or all risk policy provides broad coverage to an insured.  This broad coverage carries over to the Business Income coverage.  Accordingly, the Business Income coverage must also be interpreted broadly and, pursuant to insurance industry standards, only be limited if there is a clear limitation on coverage.  As observed in one insurance industry publication, "[c]ourts in many states have held that exclusions in an insurance policy must be conspicuous.  They cannot be buried

EXPERT REPORT OF CHARLES M. MILLER
Page 76

in the fine print. They must be somehow set apart from the rest of the policy in a format that would call attention to them. Courts have held that setting off exclusions in their own sections or identifying them with bold type makes them sufficiently conspicuous" (Olson, Robin K. & Scislowski, Richard J., Fundamentals of Insurance Law [IRMI, 2010], ch. 7, "Rules of Policy Construction"). The all risk nature of the Policy therefore informs all decisions regarding the scope of the Policy coverage, including the Business Income coverage.

         **c.**    **The Inclusion of Coverage for Loss of or Damage to Covered Property in The ISO Business Income Policy Form Expanded Coverage to Include Loss of Use or Function.**

124.    In order to be consistent with the use of the word "loss" in the 1984 property policy, "loss" in the Business Income section must also be construed as providing coverage for the loss of the property, or in the case of real and personal property, its loss of use or function.[81]

---

[81] The 1985 form also provided coverage for Extra Expense, which stated in pertinent part:

> We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described locations.

> (Id., p. 4)

Again, the Extra Expense coverage extends to both loss or damage, consistent with the Business Income insuring agreement. No "Civil Authority" coverage was provided in the basic policy form, but would be added in later forms.

125.    The foregoing accords with the insurance industry standard for the interpretation and application of insurance policies.  Significantly, the words "loss" and "damage," are separated by the disjunctive "or."  In the insurance industry, "or" stands "for the disjunctive or alternative" (Wollner, p. 94).  Accordingly, in order to interpret "loss of or damage to," the words "loss" and "damage" must be considered and defined separately, as they are set forth as alternative scopes of coverage.[82]

126.    The words loss and damage are not defined in the Policy.  In the insurance industry, phrases and words in an insurance policy are "to be given their plain, ordinary meaning" (Olson, Robin K. & Scisiowski, Richard J., Fundamentals of Insurance Law [IRMI, June 2010], ch. 7, "Rules of Policy Construction," p. 5).[83]  Accordingly, it is presumed that the "parties [to the

---

[82] See Knutsen & Stempel, p. 247, "Some courts have held that the disjunctive "or" between  "physical loss of or damage to" property must mean that "loss" must mean that "loss" must mean something different than "damage" (typically it is held to mean an absence of property, as in theft).  In that regard, "loss" could mean "loss of use" or "Loss of function" such that it renders the property useless to the policyholder (i.e., if you lost the useful use of the property, it is as if you lsot it, even though it did not physically go away."

[83] The International Risk Management Institute ("IRMI") publishes several volumes on various types of insurance policies, such as professional liability, commercial liability, commercial property, and personal property policies, including this volume on insurance claims handling.  These volumes are also used widely in the insurance industry to assist claims personnel in the interpretation and application of insurance policies.  According to the IRMI "Personal Risk Management & Insurance" publication, the publication "was designed, researched, and written by the staff of IRMI, with the assistance of technical advisers. . . . It is designed to be used by those with a working knowledge of insurance—insurance . . . adjusters—to give them detailed and practical information about specific topics on which they questions. . . . The research for the [publication] involved a thorough review of insurance literature, legal research, and interviews with many underwriters, agents, attorneys, and

contract] meant to use the common, ordinary dictionary definition of the words they employ in their written contracts" (Id.).  Pursuant to insurance industry standards, we must turn to the common dictionary definitions for these words.[84]

127.    Direct is defined as "stemming immediately from a source," or as "characterized by close logical causal, or consequential relationship" (www.merriam-webster.com/dictionary/direct).

128.    Loss is defined as the "act of losing possession: DEPRIVATION" (www.merriam-webster.com/dictionary/loss).

129.    Damage is defined as a "loss or harm resulting from injury to person, property, or reputation" (www.merriam-webster.com/dictionary/damage).

130.    The foregoing definitions correspond to the insurance industry's understanding of their meaning.[85]  In the insurance industry, loss is "[t]he basis of a claim for damages under the terms of a policy. . . . Broadly categorized, the types of losses of concern to risk managers include personal loss, property loss,

---

adjusters.  Virtually all of the text was written by IRMI staff and has been extensively reviewed by insurance professionals not affiliated with the firm.  In addition, each section written by us was carefully reviewed internally and revised as necessary" (1st reprint, September 2004, Preface).

[84] See Knutsen & Stempel, p. 253, fn. 161, noting that "there is ample evidence in dictionaries and thesauruses suggesting the plain and ordinary meaning approach augers in favor of finding loss when a policyholder's use of property is restricted by viral infection or government order."

[85] See Kuntsen & Stempel, pp. 234-237, wherein the authors discuss the various definitions of loss, damage and physical, and conclude that, "[a]pplying this mix of Merriam-Webster definitions [among other dictionary definitions] suggests that one might reasonably find a "physical loss" when a ppolicyholder is deprived of something material-such s use of one's business, especially if the loss takes place in an unanticipated manner through something like a pandemic that spurs government-ordered use of the business property."

time element loss, and legal liability loss" (IRMI Glossary, "Loss").  Likewise, the

phrase "direct damage" is understood to mean "physical damage to property, as

distinguished from time element loss, such as business interruption or extra

expense that results from the inability to use the damaged property" (Id., "Direct

Damage").  As IRMI has pointed out:

> The word "direct" was added to property policies
> long ago in an effort to modify the operation of the
> common law proximate cause rule in sequence of
> events fact patterns, where an initial covered peril is
> followed by an unrelated excluded peril, and the
> subsequent excluded peril is what actually causes
> the damage.  In those kinds of fact patterns courts
> normally hold that the initial covered peril that sets
> the sequence of events in motion is the proximate
> cause for purposes of first-party insurance.  Because
> the initial peril is covered, courts normally hold that
> the loss is covered.
>
> . . .
>
> [M]ost courts read the word "direct" to mean that the
> policy covers losses that naturally and reasonably
> follow from covered perils.  If it was natural and
> reasonable that the subsequent excluded peril would
> have followed the initial covered peril, they consider
> the loss to have followed "directly" from the initial
> covered peril within the meaning of the policy.
>
> ("Annotated CP 0010 – Insurance Agreement," IRMI,
> p. 2)

131.    Applying the foregoing definitions and understandings to the

words "loss" and "damage" leads to the following conclusion:  Whereas damage

refers to physical damage, the word "loss" clearly does not and cannot.[86]

---

[86] See Knutsen & Stempel, p. 27, noting that, "[r]egarding the distinction
between the words "loss" and "damage", it should be noted that courts typically
subscribe to the "surplusage" canon of construction, which posits that each

EXPERT REPORT OF CHARLES M. MILLER

Page 80

Indeed, "loss" broadly refers to the loss of use of a property and does not require any physical damage to be present.[87]  Accordingly, and consistent with the history of business income policies,[88] coverage is provided for the loss of use or function of the property.[89]

### d.    ISO Continues Coverage for Loss of or Damage to Covered Property in the 1999 Business Income Policy Form.

132.    The foregoing policy language was substantially continued in the ISO 1999 version of the Businessowners policy.  Coverage was provided pursuant to the ISO Businessowners Special Property Coverage Form (hereinafter, the "Businessowners Form"), form number BP0002 (12/99), which is the 1999 ISO version of this form (attached hereto as Exhibit L).  The 1999 Policy covers direct physical loss of or damage to covered property, regardless

---

word in a document (statute, contract, regulation) should be given its own meaning and not treated as a mere repetition by synonym."

[87]  Id., "the word "loss" should be viewed as meaning something different than "damage."

[88] As Knutsen & Stempel point out "the words should be construed in accord with party intent and overall purpose rather than through textual assessment alone." (Id. at p. 233, fn. 90).  The history and development of business income coverage provides that "purpose."  It is evident from the history that the purpose of the modern ISO business interruption and income loss coverages was to discard the limitation on coverage to only "damage or destruction" to property and to expand that coverage to include not only damage but also loss.

[89] HCC suggests that "loss" does not equate with "pure economic loss" (HCC Reply, pp. 3-4).  To the extent that HCC contends that policyholders such as Trapped Escape Room are merely making a claim for purely "economic loss," and that such losses are not covered, that would be contrary to the coverage afforded by business income insurance.  The purpose of business income insurance is to provide coverage for economic loss, that is the loss of profits resulting from a covered cause of loss, as here.

of cause, unless it is otherwise excluded or limited. As noted, this is commonly referred to as an "all risk" policy. The all risk scope of the policy is set forth in the Businessowners Form definition of Covered Causes of Loss:

> 3. Covered Causes of Loss
>
> Risks of Direct Physical Loss unless the loss is:
>
>     a. Excluded in Section B, Exclusions, or
>
>     b. Limited in Paragraph A.4., Limitations; that
>        follow.
>
> (1999 Policy, Page 2)

133. The 1999 Policy also contains Business Income coverage, which, like its predecessor, states (in pertinent part):

> We will pay for the actual loss of Business Income
> you sustain to your "operations" during the "period of
> restoration". The suspension must be caused by
> direct **physical loss of or damage to** property at
> the described premises. The loss or damage must
> be caused by or resulted from a Covered Cause of
> Loss.
>
> (Id., p. 4; emphasis added)

134. The 1999 Policy also provides coverage for Extra Expense as follows (in pertinent part):

> We will pay necessary Extra Expense you incur
> during the "period of restoration" that you would not
> have incurred if there had been no **direct physical
> loss or damage to property** at the described
> premises. The loss or damage must be caused by
> or resulted from a Covered Cause of Loss.
>
> (Id., p. 5; emphasis added)

135. The Business Income coverage also includes coverage for losses arising from acts by civil authorities, which provides in pertinent part:

> We will pay for the actual loss of Business Income
> you sustain and necessary Extra Expense caused by

action of civil authority that prohibits access to the described premises due to direct physical loss or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

(Id., p. 6; emphasis added).

### e. The 1986 ISO Revisions to the Business Income Form.

136. In 1986, there was a "major overhaul" of the Business Income policy (Business Income Insurance: How It Works [BJ Publications, 2nd ed., 1989], p. 2). This included the introduction of Form CP 00 30, which is a "combination form that provides both business income and extra expense coverage" ("Introduction—Business Income and Extra Expense Coverage Form Annotated Discussion," IRMI, p. 1). As IRMI noted, the form "was first introduced in 1986, as part of an entirely new ISO simplified language forms portfolio" (Id.). The form has been revised several times since then (Id.). The insuring agreements have not been changed. All ISO Business Income forms, from 1986 to date, still provide coverage for "loss of or damage to" covered property (See ISO Form CP 00 30 10 12). Likewise, the Building and Personal Property Coverage Form CP 00 10 was first introduced in 1986, again "as part of an entirely new ISO simplified language forms portfolio" ("Annotation of Building and Personal Property Coverage Form (CP 00 10)," IRMI, p. 1). This form as well has been modified many times since 1986; however, the insuring agreement has not changed, and it still provides coverage for "loss of or damage to" covered property. Despite the changes, ISO's Business Income Form also continued to provide coverage for loss of or damage to physical

property (See ISO Form CP 00 10 10 12).

### f. ISO's 2012 Business Income Policy Forms Continued Coverage for Loss of or Damage to Physical Property.

137.    ISO also developed Business Income policy forms that were not included in the Businessowners Form, but could be endorsed thereto, or to other policy forms.  This included the most recent of the forms, the 2012 ISO form CP 00 30 10 12, Business Income (And Extra Expense) Coverage Form (hereinafter, the "ISO 2012 Policy"; attached hereto as Exhibit M).[90]

138.    The ISO 2012 Policy also contains Business Income coverage, which states (in pertinent part):

> We will pay for the actual loss of Business Income
> you sustain due to the
> necessary "suspension" of your "operations" during
> the "period of restoration."  The "suspension" must
> be caused by **direct physical loss of or damage to
> property** at premises which are described in the
> Declarations and for which a Business Income Limit
> of Insurance is shown in the Declarations.

> (ISO 2012 Policy, p. 1; emphasis added)[91]

---

[90]  This endorsement is now commonly attached to the updated version of the ISO all risk Businessowners policy. The all risk scope of the Policy is set forth in the Causes of Loss Form, and not the Businessowners' Form itself, and provides: "When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in the policy."

[91] It has been noted that ISO "conducts ongoing research and review of state insurance laws and insured-related case law in order to be responsive to

139.    The ISO 2012 Policy also provides coverage for Extra Expense

as follows (in pertinent part):

> Extra Expense means necessary expenses you
> incur during the "period of restoration" that you would
> not have incurred if there had been no direct
> physical loss or damage to property caused by or
> resulting from Covered Cause of Loss.
>
> (ISO 2012 Policy, p. 1)

140.    The Business Income coverage also includes coverage for losses

arising from acts by civil authorities, which provides in pertinent part:

> We will pay for the actual loss of Business Income
> you sustain caused by action of civil authority that
> prohibits access to the described premises due to
> direct physical loss of or damage to property, other
> than at the described premises, caused by or
> resulting from any Covered Cause of Loss.
>
> (Id., p. 2).

### C.    ISO Has Acknowledged That Property Policies Provide Coverage for Losses From a Virus.

necessary changes in prospective loss costs, policy forms, endorsements, factors, classifications or manuals, as applicable" (DC Market Conduct Exam, p. 12).  In addition, the ISO Advisory organization "has processes in place to identify and provide subscribers with necessary changes (by virtue of changes in state laws or case law) to advisory forms, rules and loss costs" (Id., p. 45). Despite ISO's monitoring of case law, ISO has not changed the insuring agreement in either the Businessowners or Business Income Forms since at least 1985.  This is significant because, during this period, several courts held that the phrase "loss of or damage to" included coverage for the loss of use or function of an insured's operation (See e.g., _Western Fire Ins. Co. v. First Presbyterian Church_, 437 P.2d 52, 55 (Colo. 1968); _Cook v. Allstate Ins. Co._, No. 48D02-0611-PL-01156, slip op. at 6-8 (Ind. Super. Nov. 30, 2007); and _Matzner v. Seaco Ins. Co._, No. 96-0498-B, 1998 WL 566658, at *4 (Mass. Super. Aug. 12, 1998).  Despite this recognized body of case law, ISO did not remove the word "loss" from the insuring agreements, in apparent recognition that policy forms covered loss of use and function.  Indeed, these policy forms had to provide such coverage.

141.     ISO has acknowledged that viruses can cause physical damage. After the SARS outbreak in 2003,[92] the insurance industry realized that claims for pandemics could be deemed covered under the standard ISO Special Causes of Loss Coverage form, due to the extremely broad protection it provides.[93]  This is certainly consistent with the history of the form.

142.     Initially ISO considered the adoption of a new contamination exclusion that would address viruses.  A draft of this endorsement was set forth in a 2005 ISO document (Hartford Action, Bates No. ISO_4700).[94]  The Draft Contamination Exclusion, in pertinent parts, states:

> **Introduction**
>
> This filing introduces a new exclusion specific to naturally occurring or manmade contamination.
>
> Some examples of contamination of property include:
>
> . . .

---

[92] The SARS outbreak was recognized and discussed in detail in one ISO document (See Hartford Action, Bates Nos. ISO_4709–4710).

[93] FC&S received the following question: "Our insured accidentally threw away some digital x-ray sensors in the trash.  Now, they want to be compensated for them.  The BOP policy, Section I Property, Coverage agreement states, "we will pay for direct physical loss…"  I believe the coverage agreement precludes coverage as this is not "direct physical loss".  Nothing happened to them-they were simply thrown away.  Do you believe coverage exists?"  On June 27, 2011, FC&S responded. "There is no exclusion that applies to this loss.  There does not need to be any impact on or damage to the items themselves for there to be a direct physical loss—just like when items are stolen.  But, **there is a loss in that they are no longer available to the insured**." (emphasis added).

[94] The ISO documents discussed herein were produced in the matter of *Hartford Fire Ins. Co. v. Moda LLC, et al.*, Sup. Ct., Jud. Dist of Hartford At Hartford, Docket No.: HHD-CV-20-6127638-S ("Hartford Action"). (See Affidavit of Christine A. Montenegro in the Hartford Action).  These documents are not subject to a protective order.

- Contamination of office equipment and/or products by anthrax <u>or by a virus</u> such as Severe Acute Respiratory (SARS) or Avian Influenza.[95]

**Background**

The pollution exclusion is constructed as an extremely broad exclusion intended to encompass contamination. In recent years, however, there has been a trend to treat various subjects ("hot" topics, emerging exposures or frequently encountered types of loss) with more focused exclusion. Examples are the mold exclusion in Property and Liability policies and a General Liability exclusion (recently filed) addressing silica dust. <u>The "laser" treatment may enhance an insured's understanding of the policy and avert claims disputes and litigation</u>.

. . .

**Explanation of Changes**

We are adding a new exclusion to specifically address the risk of loss due to contamination.

**Impact**

<u>This change is a reduction in coverage</u>.

(Id., bold emphasis in original; underline emphasis added; and see Hartford Action, ISO_4705)

143. As the foregoing indicates, ISO, in 2005, recognized that a virus could contaminate physical objects, such as office equipment or products. Indeed, at least initially, ISO concluded that the proposed Contamination Exclusion would be a reduction in coverage.[96] ISO noted that an insured's

---

[95] Likewise, the following was noted in another ISO document: "**Contamination**-The anthrax and SARS epidemics bring up issues of contamination and clean-up." (ISO "EIP-20050002B Minutes/Attachment, June 21, 2005/ Hartford Action, Bates No. ISO-4723; emphasis in original).

[96] ISO later changed this position, apparently because "[s]ince the existing Pollution exclusion is intended to encompass contamination, I believe we should state, "There is no change in coverage" (Id.). The existing pollution exclusion

understanding of the scope of such an exclusion would be "enhanced" by expressly including a contamination exclusion in the property policy with specific reference to viruses (Id.).  This also indicates that ISO had concern that then current property policies and their exclusions (i.e., for mold, etc.) may not put an insured clearly on notice that damage from a virus is excluded.  The apparent failure to property put an insured on notice that a particular peril is not covered would be contrary to insurance industry standards.  "Courts in many states have held that exclusions in an insurance policy must be conspicuous. They cannot be buried in the fine print. They must be somehow set apart from the rest of the policy in a format that would call attention to them. Courts have held that setting off exclusions in their own sections or identifying them with bold type makes them sufficiently conspicuous" (Olson, Robin K. & Scislowski, Richard J., Fundamentals of Insurance Law [IRMI, 2010], ch. 7, "Rules of Policy Construction").

144.    In a document entitled "CPP-2005-008 Biological Contamination and Errors in Production" (Meeting of September 28, 2005, ISO Commercial Property Panel),[97] ISO's Commercial Property Panel again recognized that viruses could contaminate physical property.

---

did not contain a specific reference to viruses, thereby not complying with the insurance industry standards for exclusions.

[97] According to a November 10, 2004, ISO document entitled "**To the Members of the Commercial Property Panel**," the Commercial Property Panel consisted of nine members, all of whom were from insurance companies, such as The Hartford, CNA, St. Paul Travelers, and Safeco (Hartford Action, Bates No. ISO_4931; emphasis in original, and see Bates No. ISO_5190).

Some examples of contamination of property
include:

- Aforementioned growth of listeria bacteria in milk;

- Bacterial contamination of meat processing
equipment;

- Contamination of office equipment and /or
products by anthrax or by a virus such as SARS.

(Hartford Action, Bates No. ISO_4716)[98]

145.    The notes from the same meeting, under "**PANEL DISCUSSSION**," contain the following observation: "The contamination exclusion is intended to encompass contamination of any Covered Property, including premises and products" (Hartford Action, Bates No. ISO_4720, emphasis in original; and see Bates No. ISO_5205).  It is difficult to understand why any "Covered Property" would be subject to a contamination exclusion, which expressly included viruses, unless it was recognized that viruses could damage physical property, as ISO had recognized elsewhere.

146.    The ISO documents from this period also contain the following significant handwritten entry:

Contam implies the intrusion of or contact with an
external force as the cause of the contam; There
need not be a change in the product's form or
substances (damage is sufficient).

_____

[98] Likewise, in an ISO document entitled "Draft of Contamination Exclusion (difference between original draft and the draft shown in bold," the following policy exclusion language was proposed: "We will not pay for loss or damage caused by or resulting from any of the following: Contamination by any pathogenic or poisonous biological agent, including but not limited to viruses and bacteria" (Agenda CPP-2005-008, Meeting of September 28, 2005, Attachment, Hartford Action, Bates No. ISO_4719).  Further, in another copy of the same document, just opposite the three bullet points, appears the following handwritten notion: "bacteria + viruses" (Hartford Action, Bates No. ISO_4938).

(Hartford Action, Bates No. ISO_5433)[99]

147.    It is recognized in the ISO documents that the mere presence of a substance (e.g., a virus) can cause contamination, without any need for a change in the form or substance of the object where the virus appears.  This statement is also consistent with ISO's other statements recognizing that viruses can damage physical property.  Together, these statements are directly contrary to the position now taken by many insurers that a "tangible" change in property is necessary for there to be coverage under a commercial property policy.  On the other hand, they are consistent with the long-standing insurance industry approaches to the interpretation and application of insurance policies.

148.    ISO subsequently decided not to go forward with the contamination exclusion (See Hartford Action, Bates No. ISO_4703).  Rather, ISO proceeded with the 2006 "Exclusion of Loss Due to Virus or Bacteria" (hereinafter, the "Virus Exclusion").  ISO submitted the Virus Exclusion to many state departments of insurance for approval.  This included a July 18, 2006, submission to the Massachusetts Division of Insurance (hereinafter, "MDI"; See Hartford Action, Bates No. ISO_4199).  In response to the submission, on

---

[99] Indeed, this statement appears to be contrary to Casillo's October 2, 2006, statement to Cullen, in which he wrote: "Various other known substances (such as rotovirus) are not mold, do not become visible, do not alter the physical appearance of property and typically cause no property damage.  But their mere presence may be alleged to be property damage (for example alleged on of (sic) property).  Our objective is to convey that, even if there were property damage (or alleged property damage) by disease-causing microorganisms, there is no coverage" (Hartford Action, Bates No. ISO_4237).  This is, at the least, an implicit recognition that viruses may cause property damage, consistent with ISO's earlier internal recognitions that viruses can cause property damage.

August 17, 2006, Sheri Cullen, an MDI Policy Form reviewer, requested the

following from Anne Casillo of ISO:

> 1.  Provide examples of virus, bacterium, or microorganism that damages property but would not be considered mold, Fungus, mildew, or any mycotoxins, spores, scents, or byproduct produced by the mold.

> (Hartford Action, Bates No. ISO 4203)

149.  On November 7, 2006, Casillo responded:

> For business income coverage to apply, the loss of business income must be caused by direct physical loss or damage to property and must be caused by or result from a Covered Cause of Loss.  Loss or damage caused by viral or bacterial contaminants are not intended to be covered under the current property policies. . . . The new Exclusion of Loss Due to Virus or Bacteria endorsement reinforces this by specifically excluding contaminant by disease-causing viruses or bacteria or other disease-causing mircroorganisms.

> (Hartford Action, Bates No. ISO_4206; and see Bates Nos. ISO_4208–4209, Casillo's November 17, 2006, email to Cullen; and Hartford Action, Bates No. ISO_4977)

150.  The foregoing response would appear to be contrary to ISO's

internal recognition that viruses can cause property damage.  Indeed, it is

difficult to understand why ISO would want to include a virus exclusion if, as ISO

contends, the policy in the first instance does not cover damage from viruses.[100]

ISO's attempt to justify such an exclusion is simply that the exclusion

"reinforces" the policy intent.  The policy intent to not cover viruses, however, is

---

[100] See Knutsen  & Stempel, p. 191, pointing out that "[i]f the insuring agreement or other exclusions in those policies had sufficiently precluded coveage, there logically would have been no need for a specific virus exclusion."

EXPERT REPORT OF CHARLES M. MILLER

Page 91

nowhere clearly expressed. Indeed, that purported intent would be contrary to the historic development of the commercial property policy.

151. When ISO submitted the Virus Exclusion for approval to departments of insurance across the country, ISO stated the following as support for form approval (in pertinent part):

> An example of bacterial contamination of a product is the growth of listeria bacteria in milk. In this example, bacteria develop and multiply due in part of inherent qualities in the property itself. Some other examples of viral and bacterial contaminants are rotavirus, SARS, influenza (such as avian flu) legionella and anthrax. The universe of disease-causing organisms is always in evolution.

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior buildings surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[101]

152. Clearly, ISO again admitted that disease causing viruses may result in a wide range of insurance claims, including business income claims.

**D.** **Coverage for Business Income Losses Arising From the Coronavirus Pandemic Is Demonstrated Where an Insurer Has Failed, as Here, to Expressly Exclude Loss or Damage Arising From Viruses and Pandemics.**

---

[101] It appears that ISO misrepresented the reason for the exclusion to the regulators (See, e.g., ISO's June 29, 2006, submission for approval to the Ohio Director of Insurance, for approval of the Virus Exclusion, and see Knutsen & Stempel, pp. 241-242, discussing pre-2006 court decisions finding "direct physical loss or use" where there was no actual physical or structural damage.).

153.    Pursuant to insurance industry standards, when an insurer does not attach any virus or pandemic exclusion to a policy, even though such exclusions were available and could have been attached to the Policy, that is strong evidence for Business Income coverage.[102]  After the SARS outbreak in 2006, the insurance industry realized that claims for pandemics could also be deemed covered under the standard ISO Special Causes of Loss Coverage form due to the extremely broad protection it provides. In response, ISO submitted virus exclusions for approval to departments of insurance across the country. In submitting this exclusion for approval in each state, ISO acknowledged coverage for claims arising out of virus exposure.

154.    Given ISO's admission that disease-causing viruses may result in a wide range of insurance claims, including business income claims, and ISO's issuing the Virus Exclusion, it must be concluded that policies issued without the Virus Exclusion provide such coverage.

155.    While the ISO Virus Exclusion may arguably exclude damage caused by a virus under certain circumstances, when reading policies lacking the Virus Exclusion, that is not the case.  In fact, the opposite conclusion must be drawn.

_____

[102] See Knutsen & Stempel, p. 274, concluding that "i]f an insurer has not specifically excluded viruses as a cause of loss, then pandemic-related losses resulting from virus contamination or civil authority orders attempting to quell virus spread would appear to be within the concept of covered losses (as long as the policyholder can prove there was a "direct physical loss of or damage to" covered property."

EXPERT REPORT OF CHARLES M. MILLER
Page 93

156. Pursuant to insurance industry standards for the drafting, interpretation, and application of insurance policy provisions, where an insurer does not use policy language that limits coverage, where that language is known and used in the insurance industry, it is understood that the insurer did not intend to so limit the coverage (See Wollner, p. 20, "If a contract provision lists particular items, it is presumed that what it is left out was purposefully omitted"). That is clearly the case here.

157. Insurers often contend that, to be covered under the Policy, there must be damage that physically and materially alters the insured's property, such as tangible damage to property. None of this language appears in the Policy. It would therefore be impossible for a policyholder to understand that the Policy meant what the insurers contend that it means. An insurer cannot simply add words to a Policy in an attempt to explain its unilateral meaning of the Policy. Rather, the Policy must be interpreted by the recognized standards in the insurance industry, which means it must be read as to how the terms would commonly be understood.

158. Further, to contend that there is only coverage when there is "tangible damage to property" would ignore the long history of business income coverage which changed that exact requirement. As previously discussed, for decades, coverage was only provided for damage or destruction to property. Clearly, this was limited to physical damage to physical property. That, however, was clearly changed when ISO changed the language to "loss of or damage to" property. Pursuant to accepted insurance industry standards, this

meant that the business income coverage was expanded to include both physical damage and loss of use or function of property.

### E. The Policy's "Repair or Replace" Language in the Business Income Coverage Does Not Limit Coverage to Only Structural Damage.

159.    Business income policies commonly require that the business income claim is only viable from the date of loss up to the time that, with reasonable diligence, the property is rebuilt, repaired, or replaced.  Indeed, this requirement was present in the very early Use and Occupancy policies.  An important distinction, however, is that commercial property and business income policies in use prior to (and even during) this period provided coverage only a named peril basis.  The named perils were invariably physical perils, such as fire, tornados, smoke, and so forth.  Standardized property policies did not provide coverage for the loss of use of property which was not damaged, such as loss due to theft.  Indeed, for decades, commercial property coverage was limited to claims where the property was "damaged or destroyed."  Accordingly, it was reasonable to conclude that the rebuild, repair, and replace requirement likewise only applied to physical damage—indeed, there was no other covered damage the requirement could apply to.

160.    Subsequently, ISO issued all risk business income policies that provided coverage for "loss of or damage to" covered property.  At the same time, the ISO Businessowner's policy, which either included the business income coverage or had the business income coverage endorsed or attached

thereto,[103] provided coverage for many types of losses that did not require physical damage. This necessitated the use of the word loss in the insuring agreements. At the same time, ISO did not change the "rebuild, repair or replace" requirement in the ISO Business Income policy. This requirement, which in the past only applied to physical damage to physical property, now had to be applied consistently with the new "loss of or damage to" coverage. To maintain the historic application of "rebuild, repair or replace" would result in the vitiation of the coverage provided by "loss of."

161. Nonetheless, insurers now frequently contend that the Business Income policy only covers actual structural damage to covered property because the business income coverage provides that the insurer will pay to "repair or replace" property (See HCC Reply, p. 11). This is a misreading of the Policy.

162. The Business Income policy provides that the "Period of Restoration," ends on "[t]he date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality." The words "repaired, rebuilt [and] replaced" are not defined in the Business Income policy. Accordingly, we must turn, pursuant to insurance industry standards, to the commonly understood meaning of these words. Repair is defined as "to restore to a sound or healthy state," or to "make good"

---

[103] "**Endorsements and riders are part of the policy** and are not to be given greater effect than the body of the policy, except to the extent that the endorsement or rider expressly states that it is in substitution for a part of the body of the policy" (See Thomas & Reed, p. 50, citing to "C.J.S.," vol. 44, Section 300; emphasis added).

(www.merriam-webster.com/dictionary/repair). Clearly, the definition of repair encompasses the cleaning or other remediation of an insured's property. Indeed, there is nothing in the all risk policy that excludes such coverage. Absent a clear statement to that effect in the Policy, it must be concluded, pursuant to insurance industry standards, that repair includes such activities as cleaning or remediation of a property

163. This application of the "repair, restore or rebuild" coverage accords with the significant change (and expansion) of coverage in the ISO Business Income coverage. Indeed, this understanding, pursuant to insurance industry standards, does not eliminate (without notice to the insured) the coverage for loss, which would otherwise occur.

**F.   Business Income Loss Coverage Is Provided for Both Temporary and Permanent Loss of Use or Function.**

164. Consistent with the history and development of first-party property insurance, coverage is provided whether the damage is permanent or temporary. Nonetheless, HCC has taken the position, contrary to that history and insurance industry standards, that the "mere presence of the virus requires only disinfection, and disinfecting the premises would not result in physical repairs or alterations to the property" (HCC Motion to Dismiss, p. 8). This position is contrary to the coverage provided by the Policy and insurance industry standards.

165. An excellent example of coverage under commercial property policies for temporary damage that frequently only requires cleaning is the coverage provided for smoke damage. Smoke damage has long been a

EXPERT REPORT OF CHARLES M. MILLER
Page 97

covered cause of loss under both commercial and homeowners' policies.  For example, the ISO HO3 policy, which provides homeowners coverage, expressly insures the peril of "sudden and accidental damage from smoke" (See "Smoke – Homeowners," IRMI).  It has also long been recognized in the insurance industry that real and personal property can be returned to its pre-loss condition by cleaning the smoke from walls and other surfaces (See Popow, Donna J. [Ed.], <u>Property Claim Practices</u> [The Institutes, 1st ed., 2011], §4.6).  Claims handlers are advised that "[f]ire restoration companies specialize in working with insurance companies and adjusters to perform early cleaning and prevent further damage caused by hot and cold smoke" (Id.).

166.    Indeed, widely circulated insurance industry publications provide extensive guidance to claims handlers on the cleaning of smoke damage (See Pinto, Michael A., "Can better cleaning techniques eliminate fire residues?", <u>Claims</u> magazine, June 18, 2019; Campbell, Ken, "Understanding the Benefits of Contents Restoration," <u>Claims</u> magazine, February 12, 2018; and Harman, Patricia, "The 7 new technologies that are changing the insurance business," <u>Claims</u> magazine, July 28, 2014).

167.    Likewise, the American Counsel for Accredited Certification has provided guidance on cleaning smoke damage aimed at returning "properties as closely as possible to their pre-damage state" (See <u>Council-Certified Fire and Smoke Damage (CFSx) Certification Program</u> [Am. Council for Accredited Certification, 2016], p. 49).

168.    The cleaning of smoke-damaged real or personal property frequently results in a loss of short duration.  Although the occupants of a residence or other building may be required to leave during the cleaning, they can return upon the completion of the cleaning.

169.    In addition to smoke damage claims, there are other provisions in the commercial property policies which demonstrate that they provide coverage for temporary losses that do not result in the complete destruction of the insured's property.  For example, Businessowners policies commonly contain a "Recovered Property" provision which states:

> If either you or we recover any property after loss settlement, that party must give the other prompt notice.  At your option, the property will be returned to you.  You must then return to us the amount we paid to you for the property.  We will pay recovery expenses and the expense to repair the recovered property, subject to the Limit of Insurance.
>
> (ISO Building and Personal Property Coverage Form, form no. CP 00 10 04 02, p. 10)[104]

170.    Accordingly, where an insured has suffered loss of property due to theft, and the stolen property is recovered, the insured can recover the property even though it has been paid for by the insurer.  In this event, the insured has only lost use of the property for a limited or temporary period of time.

171.    Indeed, the ISO commercial property forms discussed herein expressly provide that the insurer can pay for either the "cost to repair, rebuild or replace" the property following a loss.  Where the insurer selects the repair

_____

[104] The Policy contains an identical provision (HC-CP-00-001 (09/11), p. 48).

option, the real or personal property may be physically repaired and then returned to the insured for their use.  This does not result in a permanent loss of the property.

172.   In many respects, ISO commercial property policies do not require that property be permanently damaged in order for coverage to apply.  Indeed, coverage is provided for a wide range of loss circumstances, including temporary or short-term losses.

**G.     Civil Authority Coverage Applies to the Coronavirus Claims.**

173.   Civil Authority coverage does not require damage or loss at the insured's premises; rather, the requirement is that access is denied to other property "due to direct physical loss of or damage to property."  Since March 2020, many Civil Authority orders closed numerous businesses, thereby denying access to those businesses and resulting in their loss of use or function.  Under the ISO Business Income coverage, this is a covered cause of loss.

174.   Civil Authority coverage applies where "the action of civil authority . . . prohibits access to the described premises."  Many orders by Governors and Mayors specifically address the risk of damage to property from the coronavirus as a basis for their orders.  HCC contends that the civil authority orders applicable here were not issued in order to protect property.  This is not

correct.[105]  For example, the Nevada Governor's March 12, 2020, Declaration of Emergency for COVID-19 expressly provides that the Governor "hereby declare[s] an emergency and direct[s] all state agencies to supplement the efforts of all impacted and threatened counties to save lives, **protect property**, and protect the health and safety of persons in this state" (emphasis added). Likewise, the California Governor's March 19, 2020, Executive Order N-33-20 provides that the order is issued to "preserve the public health and safety" (Bates No. HCC_268).  There is nothing in the order that limits the Executive Order's application to only the prevention of the spread of the virus.  Further, demonstrating the concern for property damage in California from the virus is the March 19, 2020 (Revised May 27, 2020) City of Los Angeles Public Order Under City of Los Angeles Emergency Authority, which provides that the "order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time" (Bates No. HCC_258).

175.    Likewise, several other civil authority orders in California and elsewhere demonstrate further that COVID-19 emergency measures were adopted to protect, among other things, property loss or damage.  For example, the San Francisco Mayor's February 25, 2020, Order, states: "**WHEREAS**, Conditions of extreme peril to the safety of persons and property have arisen"

---

[105] See Plaintiffs' Amended Answers and Objections to Defendant's First Set of Interrogatories to Plaintiffs, pp. 5–8, for a list of civil authority orders applicable to Trapped Escape Room's properties.

(emphasis in original; and see the City of New York Emergency Executive Order of March 15, 2020, which provides: "WHEREAS, this order is given because of the propensity of the virus to spread person to person and also because the **virus physically is causing property loss and damage**" [emphasis in bold added]; and the Broward County [FL] Administrator's Emergency Order 20-01, March 22, 2020, which provides, "WHEREAS, THIS Emergency Order is necessary because of the propensity of the virus to spread person to person and also because **the virus is physically causing property damage** due to its proclivity to attach to surfaces for prolonged periods of time" [emphasis in bold added]). Such orders should serve as the basis for seeking business income loss coverage because of civil authority action.

176.    But even if the applicable civil authority does not mention property loss or damage or can be reasonably interpreted to apply to property loss or damage, the insurer's investigation must not stop at the order.  Rather, the insurer must investigate to determine if there is any basis for coverage.  An insurer must look for coverage and not just ways to deny coverage (See Markham, p. 13, "[T]he claims representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims"; and p. 9, "[C]laim representatives must investigate the facts of each claim because policyholders do not know exactly what is covered, under exactly what circumstances it is covered, or exactly what amount should be paid").  The Policy only requires an order of closure where there is "physical loss or damage to property."  It is then up to the insurer to determine whether that requirement is

met.[106]  This requires a thorough investigation into the closures within the radius required by the Civil Authority coverage.

177.    HCC also incorrectly contends that, in order for the Civil Authority coverage to apply to Trapped Escape Room's claim, there must be a complete bar to entry to Trapped Escape Room's property (See HCC Reply, p. 12).  This contention hinges on the claim that the Civil Authority coverage does not apply where access to the insured property is merely hampered, discouraged, or partially prevented.  HCC's interpretation of the Policy is incorrect and contrary to insurance industry standards.  Trapped Escape Room is clearly entitled to business income coverage, even if access to its property is only partially prevented and where, as a result, Trapped Escape Room suffers even a partial loss of income.

178.    In order to address this issue, it is first necessary to review the history and purpose of the entire Policy.  This review begins with the Policy's Business and Personal Property Coverage Form (hereinafter, the "Form"), which, in pertinent part, provides:

---

[106] An insurer has an obligation, pursuant to insurance industry standards, to conduct a thorough and timely investigation before it can deny coverage.  "An investigation must often be undertaken to develop fully the facts needed to determine coverage.  Good faith claim practices require that this investigation be objective, thorough, and timely" (Markham, p. 29; see also Jones, §1.14, that insurers have a good faith duty to perform investigations promptly and thoroughly; and Rokes, p. 114, that insurers have a duty to conduct prompt investigations).  Similarly, Barry Zalma, in his recent text on insurance claims handling, writes: "There is no excuse, regardless of the size of the loss, for failing to complete a thorough investigation" (Insurance Claims: A Comprehensive Guide [Nat'l. Underwriter, 2015], p. 420).

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

179.   It is initially noteworthy that there is no limitation that the "risk of direct physical loss" be total or partial, as both types of losses are covered. Indeed, the Policy repeatedly provides coverage for partial losses.  For example, under the coverage for "Collapse of Buildings," coverage is provided for collapse of "any part of a building."  The Policy also clearly states when the exclusion only applies to a part of a loss.  For example, the exclusion for "Inventory Computation," provides that coverage is not provided for "[l]oss of property or that part of any loss."  It is evident that coverage under the Policy extends to both partial and complete losses unless otherwise clearly and openly stated, which is not the case for the business income coverage.

180.   This is consistent with the long history of business income coverage, which has, with one historic exception, always provided coverage for partial business income loss.

181.   The same is the case for present-day business income coverage, which also provides coverage for only partial losses.  As previously noted, the Policy's Business Income and Extra Expense coverage provides:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss.

182.    The definition of "suspension" demonstrates that the Policy provides coverage for both partial and total losses.  Suspension is defined as the "partial or complete cessation of your business activities."   Indeed, earlier business income forms defined "suspension" as only "suspension of operations."  As a result, Courts construed the word suspension to mean total, and not partial, suspension of operations, which was contrary to the insurance industry intent (See, e.g., *Home Indem. Co. v. Hyplains Beef, L.C.,* 893 F. Supp. 987, 991–992 (D. Kan. 1995)).  As pointed out by IRMI,

> A definition of "suspension" was added to the 2000 edition of the [Business Income] form, to make it explicit that a complete cessation of the insured's operations is not required in order for coverage to apply.

> Beginning with the 2000 edition of the form, the word "suspension" is a defined term. The definition specifies that suspension means either a slowdown or cessation of the insured's business activities or, with respect to rental value coverage, the untenantability of part or all of the premises.

> This change to the form was made because some insurers had interpreted the word "suspension" to mean only a complete cessation of the insured's operations and refused to pay for otherwise covered business income loss because the insured's operations did not completely cease during the period of restoration. **This interpretation is contrary to the concept and purpose of business income insurance, which is to do for the insured business what it would have done for itself had there been no direct physical loss—no more, and no less. It would be analogous to interpreting the direct damage portion of a standard commercial property policy to require that an insured building must be completely destroyed for the insured to be entitled to any insurance recovery for damage to the building.**

> ("'Suspension' Definition in the Business Income and Extra Expense Coverage Form (CP 00 30)," p. 1 of 3; emphasis added)

EXPERT REPORT OF CHARLES M. MILLER
Page 105

183.    The insurance industry changed the definition of suspension to include "partial suspensions, because that was the original intent of the coverage" (Id., p. 2, "ISO's addition of a definition of "suspension" to the business income coverage form was intended to prevent these misinterpretations by insurers and courts").

184.    Based on the foregoing, and pursuant to insurance industry custom and practice, the Policy business income coverage clearly provides coverage for partial losses, such as those sustained by Trapped Escape Room.

**H.      Pursuant to Industry Coverage Standards, the Policy's Extra Expense Coverage Applies to Trapped Escape Room's Claim.**

185.    Extra Expense policy forms were first published "by the Board of Fire Underwriters of the Pacific on October 1, 1935" (Klein, p. 221.  As with the basic business interruption coverage, the Extra Expense coverage applied only where the "described property . . . has been damaged or destroyed by fire" (Klein, p. 228).

186.    By the mid-1960s, one Extra Expense Form provided the following coverage:

> INSURING CLAUSE:  If buildings, structures, or personal property on the described premises, or personal property of the named insured within 100 feet thereof in the open or in vehicles, are **destroyed or so damaged** by the perils insured against hereunder, occurring during the term of this policy, that a necessary interruption of business directly results and if the Insured exercises due diligence and dispatching continue, as nearly as practicable, the normal operation of the business on the same or other premises by making use of other property or facilitates or stock (raw, in process or finished) at the location(s) described herein or elsewhere and if the

EXPERT REPORT OF CHARLES M. MILLER
Page 106

Insured is unable to make up lost production within a reasonable period of time (not limited to the period during which the business is interrupted), including the use of extra time or overtime, if necessary, then the Underwriters shall be liable

(a)  For the Excess of the total cost of the operation of the business during the period of restoration (as hereinafter defined) over and above the total cost of such operation that would normally have been incurred during the same period, had there been no interruption of business;

(b)  For expense in excess of normal operating expenses necessarily incurred by the Insured in making up lost production;

(c)  For the reduction in Gross Earnings (as hereinafter defined) during the period of restoration less charges and expense which do not necessarily continue during such period,

All not to exceed the ACTUAL LOSS SUSTAINED by the Insured.

(February 8, 1965, letter from Bernard J. Daenzer, President Wolreich Anderson, LTD, to William H. Lyon, Jr., and enclosure thereto; capitalized emphasis in original; bold emphasis added)

187.   The importance of the foregoing is that Extra Expense coverage, from its inception, up to at least the mid-1960s, as well as later, continued to apply only to claims arising from damage or destruction of property.  No coverage was provided for loss.  This was consistent with the basic Business Interruption coverage during (and after) the same period.

188.   ISO subsequently changed the Extra Expense coverage, consistent with other changes in the business income coverages, as follows:

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from Covered Cause of Loss.

EXPERT REPORT OF CHARLES M. MILLER
Page 107

189.    The Extra Expense coverage now applied to both loss and damage to property.  This also accords with the Policy's Extra Expense Coverage.  Accordingly, coverage would also apply to the loss of use or function of the covered property.

190.    Extra Expense coverage is certainly needed in addressing COVID-19 pandemic cases.  This is because of the extensive and continuing cleaning and maintenance required of many properties.  Although protocols for cleaning properties before reoccupancy were still in their early stages of development, it is important to note that the IICRC, on March 19, 2020, issued its "Preliminary Report for Restoration Contractors Assisting Clients with COVID-19 Concerns," in which the IICRC noted the following:

> With the proper training, equipment, supplies and personal protective gear, restoration contractors who have experience dealing with other hazardous microorganisms, such as sewage mitigation and mold remediation, can offer valuable services to combat COVID-19.  **The most basic service will likely be enhanced cleaning of touchpoints and application of disinfectants to other surfaces.**

(Id.; emphasis added)

191.    Extra Expense coverage may also extend to continuing payroll expenses.  Although coverage for continuing payroll may be provided by endorsement (See ISO CP 15 04 06 07, "Discretionary Payroll Expense"), the Extra Expense coverage may also provide coverage for continuing payroll (See *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.,* 601 F.Supp. 58, 61 (E.D. Mo. 1984; and Thayler, Gregory S., "Hurricane Insurance Claims: Key Coverages in

the Property Policy," Lexisnexis.com, November 6, 2008, "Even without

[ordinary payroll] coverage, some policyholders announce that they include

these costs in the claim as reasonable extra expenses especially if it reduced

other losses in the claim."

## I.    HCC's Reliance on the Acts or Decisions Exclusions Was Contrary to Insurance Industry Standards.

192.    The Policy provides:

> 3.  We will not pay for loss or damage caused by or resulting from any of the following **B.3.a** through **B.3.a.**  But if an excluded cause of loss that is listed in **B.3.a** through **B.3.c** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> **b.  Acts or decisions**
>
> Acts or decisions, including the failure to act or decide, of any person, group, organization of governmental body.

(Bates No. SA 076; emphasis in original)

193.    HCC has contended that the "Acts or Decisions" exclusion applies

to Trapped Escape Room's claim because "[a]t least one court has found that a

governmental order exclusion containing in the same "Causes of Loss-Special

Form" that is attached to the Property Coverage part of the HCC policy operates

to prevent COVID-19 shutdown orders from being deemed a "covered cause of

loss" (HCC's Reply, pp. 15–16, fn. 5).[107]

---

[107] The assertion of this coverage position on February 2, 2021, the date of filing for HCC's Reply, would also be contrary to the insurance industry standard that requires an insured to timely advise the insured of the insurer's coverage positions.

194.   HCC's application of the "Acts or Decisions" exclusion to Trapped Escape Room's claim is clearly improper and contrary to insurance industry standards.  If the exclusion were applied to the Civil Authority coverage, it would vitiate the coverage without any notice to the insured.  Indeed, the exclusion does not reference the Civil Authority coverage.  As a result, the insured would not be on notice that the Civil Authority coverage was being taken away. Indeed, Courts in many states have held that exclusions in an insurance policy must be conspicuous. They cannot be buried in the fine print. They must be somehow set apart from the rest of the policy in a format that would call attention to them. Courts have held that setting off exclusions in their own sections or identifying them with bold type makes them sufficiently conspicuous (Olson, Robin K. & Scislowski, Richard J., <u>Fundamentals of Insurance Law</u> [IRMI, 2010], ch. 7, "Rules of Policy Construction").

195.   As pointed out by one insurance industry commentator:

> Taken literally, this exclusion could swallow the entire coverage provided by a property insurance policy because, in almost every instance imaginable, there is some act or decision, or failure to act, in the chain of causation of every loss.  For example, in a fire loss caused by faulty wiring, negligence by the contractor who installed the wiring would result from act or failure to act, leading to the fire. Consequently, the exclusion could be read to apply, precluding coverage for the loss.  Likewise, a windstorm loss could be traced back to the roofer's decision to use a certain method of fastening, as opposed to a stronger method of fastening, or the township's decision not to enact and enforce a higher level of building code.
>
> Fortunately, most courts have recognized the inordinate breadth of the acts or decisions exclusion

if applied literally and have refused to accept such an invitation from insurers.

(Levin, Jay M., "The Acts or Decisions Exclusion That Tried to Swallow the Policy," IRMI, December 2006, p. 2)

196.   A similar approach must be used here; otherwise, the express Civil Authority coverage provided to Trapped Escape Room would be excluded, even though Trapped Escape Room paid a premium for that coverage.

197.   Further, the "ensuing loss" provision applies to the exclusion.  This provision provides coverage where the excluded cause of loss (the act or decision) results in a "Covered Cause of Loss."  As pointed out in the FC&S Bulletins, "the ensuing loss is covered unless it too is the subject of a specific exclusion" (FC&S publication, "Homeowners Exclusions," September 2000, p. 2).  This is because "the intent" of the ensuing loss provision "is to cover unexcluded ensuing losses caused by any of the excluded perils" (Id.).  IRMI, in its three-volume publication Personal Risk Management and Insurance, similarly concludes that, "any ensuing loss to the dwelling and other structures not excluded by any other provision in this policy is covered" (§10.E.13).

198.   There is no evidence that HCC conducted any investigation into the application of the ensuing loss provision to Trapped Escape Room's claim, as would be required.  Indeed, this potential coverage for Trapped Escape Room's claim was ignored, which is clearly contrary to insurance industry claims handling standards.

### J. Coverage for Business Income Losses Arising From the COVID-19 Pandemic Accords With Trapped Escape Room's Reasonable Expectations.

199.　The insured's reasonable expectations of coverage must also be considered because the Policy provides broad coverage, the operative Policy words and phrases provide coverage for the loss of use of property as well as its actual physical damage, and the Policy does not contain a virus or pandemic exclusion.[108]

200.　The insurance industry is well aware of the rule of an insured's reasonable expectations and how it should be applied to insurance claims.  In the insurance industry, the insured's reasonable expectations are described as follows:

> This doctrine [reasonable expectations] allows coverage to apply when the reasonable expectations of the insured would result in a claim payment, despite the lack of a policy provision excluding coverage or ambiguous language.
>
> . . .
>
> The doctrine places a burden on insurers to communicate coverage and exclusions of policies accurately and clearly.
>
> . . .

---

[108] See Knutsen & Stempel, p. 260, concluding that a "reasonable policyholder likely expected that a product marketed and labeled as "business interruption insurance" or "civil authority coverage" would extend coverage to the policyholder's income stream in the event the policyholder was unable to access or reasonably use its business premises.  The reasonable policyholder purchasing an "all risk" policy likely would not have though that such coverage would hang on how the damage—if any—to the property occurred.  Rather, their focus would likely be on their income loss due to either virus contamination or prevention of use of their property due to governmental orders."

The trend also seems to be that this doctrine is more likely to be successfully argued when courts find peculiar or atypical policy definitions or when exclusions remove the primary purpose of the insurance policy.

("Characteristics of Insurance Contracts," IRMI, pp. 11–12)

201.   FC&S has also addressed an insured's reasonable expectations at length:

Two things are clear from the original outline of the doctrine: (1) the insured's expectations of coverage must be *objectively* reasonable, and (2) the insured may be able to recover under a policy containing language that *unambiguously* excludes coverage.

. . .

[D]evelopment of the doctrine was necessary to protect individuals with little knowledge of insurance who buy standard, nonmanuscripted policies.  For example, there has been some application of the doctrine to advertising brochures . . . where the brochures have seemed to indicate broad coverage that the policy exclusions substantially narrowed.

. . .

[T]he correct formulation of reasonable expectations should be as follows.  Policy provisions should not be binding on an insured if:

  1.  The policy is an adhesion contract.[109]

_____

[109] In the insurance industry, an adhesion contract is understood as a contract "that the insured must accept or adhere to the entire contract, with all of its terms and conditions. The insurer develops and promulgates the policy by itself, and the insured typically has to accept it in its entirety or reject it.  The insurer has the clear advantage of writing the terms of the agreement to suit its particular needs and purposes.  In most cases, the insured cannot insist or bargain that it be rewritten or that certain phrases be added or removed" ("Characteristics of Insurance Contracts," IRMI, pp. 10–11).  Indeed, insurers commonly train their claims personnel on this and other important principles concerning insurance policy interpretation.  Farmers, in its Personal Lines – Property training publication "The Insurance Contract," notes that "[d]ue to the

EXPERT REPORT OF CHARLES M. MILLER

Page 113

2. The enforcement of the provision would
defeat the reasonable expectations of the
great majority of policyholders who would
have relevant claims.

3. The provision in question was not explained
to the insured when he or she purchased the
policy.[110]

4. The provision is either unclear and
inconspicuous, misleading, obscure, or unfair,
in that it either eviscerates any nonstandard
terms specifically agreed to or eliminates the
dominant purpose of the transaction.

. . .

[I]nsurance professionals will have to become
increasingly vigilant about creating circumstances
that might lead to a finding that reasonable
expectations of coverage were created. Marketing
materials need to be worded carefully as to not
create expectations of coverage that the policy does
not provide. Careful review of the policy with the
insured, particularly the exclusions section, should
become standard procedure for producers.

("Reasonable Expectations," FC&S, February 13,
2015)[111]

---

relationship between an insurance company and its insureds, as well as the
social significance of insurance, insurance contracts are considered by the
courts to be 'contracts of adhesion'" (Id., p. 4).

[110] In this regard, it is important to note that, in the insurance industry, it is
recognized that "insureds generally do not read their policies, and even if they
do, the nature and extent of their coverages are not often fully understood"
(Markham, p. 12).

[111] Similarly, in the American Educational Institute, Inc. publication,
"Fundamentals in Coverage and Claims Law" (AEI, 2002), the following is
noted: "What the reasonable expectations rule does is allow the court to
consider the policy language from the perspective of the insured who has
purchased the policy and who often is unsophisticated in insurance matters and
may not be aware of how policies work. If the exclusions to coverage are
obscure or inconsistent with the coverage afforded in the insurance agreements
of the policy, a court may, even if the exclusionary language itself is clear and
unambiguous, interpret the policy to afford coverage to the insured if it is the

EXPERT REPORT OF CHARLES M. MILLER

Page 114

202.    Applying the foregoing to Trapped Escape Room's claim, it must be concluded, pursuant to insurance industry custom and practice, that coverage for Trapped Escape Room's claim falls within Trapped Escape Room's reasonable expectations.

**K.    HCC Failed to Timely Pay Trapped Escape Room's Claim.**

203.    It is imperative that an insurer timely evaluate and pay the full amount of the loss (See Markham, p. 291, that it is an unfair claim settlement practice to not attempt "in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear"; see also Nevada Act, NRS 686A.310(e), California Act, §790.03(h)(50), and Texas Regulations, §21.203(4)).

204.    Business Income claims such as Trapped Escape Room's require extensive investigation.  Daniel Torpey, in his insurance industry text on business interruption claims, points out how business income losses are calculated. "[T]he loss of business income is calculated by adding the net profit (or loss) with necessary continuing operating expenses and comparing that with what would have been earned *but for* the loss. . . . Business income losses are *based on* a comparison of the level of income before and after the loss" (Torpey, Daniel T., et al., <u>The Business Interruption Book: Coverage, Claims and Recovery</u> [Nat'l Underwriter Co., 2004; hereinafter, "Torpey"], pp. 31–32;

---

insured's reasonable expectation that the policy provides coverage" (Id., p. 27; and see Wiening & Malecki, p. 379, "When the *reasonable expectations doctrine* is applied, an insurance policy is interpreted to provide the protection that the insured might reasonably have expected, even though that expectation is not clearly expressed in or supported by the policy"; emphasis in original).

emphasis in original).  Popow also sets forth the basic parameters of a standard

business interruption loss investigation:

> Loss of business income is the net income that
> would have been earned plus the continuing normal
> operating expenses.  As stated previously, the
> coverage provided for loss of business income is
> conceptually simple.  The net income loss is the
> gross revenue (or sales) that would have occurred
> minus the expenses that would have been incurred.
> These must be estimated from pre-loss business
> records allowing for overall trends in business and
> seasonable fluctuations.  The continuing expenses
> are determined by a case-by-case analysis of which
> general operating expenses will continue and at
> what rate.  Both net income and continuing
> expenses are limited by the time reasonably
> necessary to complete damaged property's repair or
> replacement.

> The adjuster must evaluate the revenue and
> expenses so that the policy does for the business
> what it would have done for itself had no loss
> occurred; that is, normal operating expenses are
> paid and expected net income is received. . . . It
> should also be recognized that the loss settlement is
> based on the analysis, interpretation, and projection
> of historical business data.

> (Popow, §§11.21–11.22)

205.    In determining the business income loss, "[n]ormal operating

expenses should be included in any determination of business income.  The

definition of business income clarifies that it intends to cover the insured's

expected net income plus *normal* operating expenses that continue" (Id.,

§11.23; emphasis in original).

206.    It is important to note that "[e]valuation of revenue trends is

essential in calculating a business income loss" (Id., §11.24).  This is done by

developing trend sheets, which "are spreadsheets created by organizing a

business's historical gross revenue data in a series of days, weeks, months, quarters, or years" (Id.). Further, insurance industry claims handling standards recognize that, "adjusters typically spend a lot of their time calculating the period of restoration" (Torpey, p. 111).

207. In adjusting a business income claim, "adjusters must make great efforts to ensure that their evaluations are well-reasoned and clearly documented" (Popow, §11.42). In order to assure that evaluations meet these standards, a thorough and timely investigation is required. A key component of this investigation is an early and thorough interview of the insured regarding the loss.

208. HCC, contrary to insurance industry standards, conducted none of the foregoing investigation and evaluation despite the facts that coverage for Trapped Escape Room's claim was clearly owed and that Trapped Escape Room has provided HCC with substantial evidence of its business income losses.

## V. CONCLUSION

209.    I understand that there is additional discovery yet to be completed in this case. The opinions expressed herein are subject to change or modification, depending on the results of any future investigation and discovery in this case.

20th day of July, 2021

# EXHIBIT A

# CV

**Charles M. Miller, Esq.**
INSURANCE LAW CENTER
1442A Walnut St. #55
Berkeley, CA 94709
Phone: (510) 549-9736
Fax: (510) 549-9726
Cell Phone: (510) 701-2963
E-Mail: cmiller.ilc@earthlink.net
EIN: 94-3335685

Expert Witness on Insurance
Claims Handling, Insurance Coverage,
Insurance Company Organization and Operations

## The Insurance Law Center

The Insurance Law Center provides an exclusive combination of resources on insurance claims practices.  These include:

- Extensive experience in testifying on insurance industry claims practices.

- Experience in testifying on insurance policy interpretation based on insurance industry publications.

- An extensive and unique library on insurance industry claims practices and policy interpretations that provide a sound basis for expert opinions.

- A one of its kind data base of well over one million pages of insurance company documents, depositions, manuals and policies and procedures that can be used in discovery as well as the basis for expert opinions.

- See attached for complete list of Insurance Law Center Services.

## Experience:

Mr. Miller was employed by Fireman's Fund Insurance Company for eighteen years in insurance claims. Mr. Miller has held several insurance claims positions, including senior adjuster, branch office general adjuster, and claims manager. Mr. Miller also managed an asbestos claims facility and a nationwide major claims unit. Mr. Miller has practiced insurance law since 1990. Mr. Miller has extensive experience with the interpretation and application of first- and third-party insurance policy forms.

1

Since 1997, Mr. Miller has been retained in over 200 cases in at least fifteen states and territories (federal and state courts) as an expert on insurance coverage and claims handling, including cases concerning construction defects, first-party fire and water losses, disability claims, automobile liability including underinsured and uninsured motorist claims, professional liability claims, claims under various automobile insurance policies, comprehensive commercial liability policies, and excess and umbrella policies. Mr. Miller has been retained in both federal and state courts, including those in Arizona, California, Idaho, Nevada, New Mexico, South Carolina, Pennsylvania, Florida, the U.S. Virgin Islands, Washington, Oregon, Utah, Arkansas, Missouri, Mississippi, South Carolina, Louisiana, Massachusetts, West Virginia, and Toronto, Ontario, Canada. Mr. Miller has been qualified as an expert on insurance industry claims handling standards and practices in Arizona, Nevada, Arkansas, Idaho, Florida, Colorado, Hawaii, New Mexico, Ohio, Missouri, Louisiana, Washington, Kansas, Texas, South Carolina, West Virginia, and California.

Insurance Industry Experience:

1972-1980

- Held several positions at Fireman's Fund Insurance Company, including Senior and Branch Office General Adjuster.

- Experienced in the handling of first-party claims, including claims arising out of collision losses, theft losses, residential fires, and burglaries from commercial establishments.

- Experienced in handling a wide variety of commercial and personal liability claims, including construction and auto accidents, underinsured and uninsured motorist claims, environmental claims, construction defects, and personal injury claims.

- Responsible for the management and supervision of litigation.

1980-1986

- Managed insurance company asbestosis claims facility. Responsible for the supervision of litigation, investigation, and evaluation of over 600 claims for asbestosis-related injuries.

- Continued responsibility for the handling, investigation, and resolution of both third- and first-party claims as Branch Office General Adjuster.

1986-1990

- Managed insurance company major claims unit.

- Responsible for nationwide management of a variety of specialized claims, including construction defect, investment advisors professional liability, and sexual discrimination and harassment.

- Responsibilities included interpretation of insurance policy provisions and management of insurance coverage declaratory relief actions brought by either the policyholder or the company.

Legal Practice:

| 2004-Present | Insurance Law Center, Berkeley, California |
| 2000-2004 | Special Counsel, Wendel Rosen Black & Dean, Oakland, California. |
| 1998-2000 | Law Office of Charles M. Miller, San Francisco, California |
| 1995-1998 | Associate, Gray Cary Ware & Freidenrich. Practice in Insurance Litigation |
| 1992-1995 | Associate, Pettit & Martin |
| 1990-1992 | Associate, Heller, Ehrman, White & McAuliff |

Education:

| University of San Francisco | 1990 J.D. (Magna Cum Laude) Law Review |
| Western Washington University | 1970-1971 Masters Studies Political Science |
| Western Washington University | 1970 B.A. Political Science (President's List) |

Insurance Training:

Insurance Institute of America, Associate in Claims

Attendance at seminars, conventions, and other programs put on by insurance industry organizations covering a variety of topics related to insurance claims handling and insurance policy interpretation and application.

Teaching and Presentations:

"Insurance Issues and COVID-19 Part III," Trial Guides Webinar, July 31, 2020.

"Post Loss Duties," AAJ Annual Meeting, July 14, 2020.

"Insurance Issues and COVID-19," Trial Guides Webinar, May 27, 2020.

"Corona Virus And Insurance Coverage," New Mexico TLA Webinar, May 8, 2020

"COVID-19 and Insurance Business Interruption Claims," Colorado TLA Webinar, April 27, 2020.

"Insurance Issues and COVID-19," Trial Guides Webinar, April 1, 2020.

First Party Claims Conference, FPCC, "Handling The Insurance Claim Prior to Litigation," October 2019, Providence, RI.

First Party Claims Conference, FPCC, "Addressing Policyholders Claims in an Ethical Manner with Insureds and Insurance Companies when Experts are Involved," March, 27, 2019, Marina De Rey, CA.

Back to School in Insurance Law Seminar, NM TLA, "Insurance Industry Practices in Handling First Party Claims," and ""Use of Experts in Support of Claim Denials," Feb. 22, 2019, Albuquerque, NM.

Oct. 2018, "Insurer's Use of Experts in First Party Claims," First Party Claim Conference, Providence, RI.

March 2017, "Developing the UM/UIM Claim," New Mexico TLA Annual Insurance Law Seminar

August 2016, "Discovery in Bad Faith Cases," and "Institutional Bad Faith," Montana TLA, Missoula, Mt.

August 2016, "Institutional Bad Faith," AAJ Convention, Los Angeles.

First Party Claims Conference, FPCC , March 2016, "Anatomy of a Bad Faith Case."

February 2016, "Discovery in Bad Faith Cases," and "Institutional Bad Faith," New Mexico TLA Annual Insurance Law Seminar.

January 2016, "Institutional Bad Faith," Washington State AJ annual insurance law seminars, Seattle and Spokane, WA.

June 10, 2014, Farmers Organization and Claims Operation, Farmers Annual Agent's Association Meeting, Las Vegas, NV.

October 2013, "Use of Experts in Insurance Bad Faith Cases," First Party Claim Conference, Providence, RI.

April 2013, "Use of Experts in Insurance Bad Faith Cases," North Carolina Bar Association program, "Why Do We Call It 'Bad Faith'?", Charlotte, NC.

March 2013, NAPIA/CAPIA Conference, "The Wear and Tear and Similar Exclusions in Wind and Water Damage Claims."

April 2012, "Bad Faith Issues In Business Interruption Claims," ABA Property Insurance Law Section, Los Angeles, CA.

September 2012, "Use of Experts in Insurance Bad Faith Cases," UTAH TLA, Salt Lake City, UT.

August 2011, "Developments In Insurance Claims Practices," AAJ, New York, NY.

August 2009, "Insurance Bad Faith and Settlement Institute," Advocacy Institute, Las Vegas, NV.

December 2009, "Insurance Coverage for Chinese Drywall Claims," Testimony before the NAIC Catastrophe Insurance Working Group, San Francisco, CA.

May 2009, "Presenting the Coherent Case," Claims Practices Seminar, Miami, FL.

October 2008, "Issues in Insurance Claims Practices," Claims Practices Seminar, Reno, NV.

September 2008, Presentations on Ethics and Claims Adjusting, Western Regional PLRB Convention, Sacramento, CA.

May 2008, Presentations on Ethics and Claims Adjusting, Eastern Regional PLRB Convention, Tampa, FL.

November 2007, "Issues in Insurance Claims Practices," Claims Practices Seminar, Reno, NV.

October 2006, "Issues in Insurance Claims Practices," Claims Practices Seminar, Deadwood, SD.

June 2006, "Discovery in Insurance Bad Faith Cases and Related Issues," Mississippi TLA, Memphis, TN.

April 2006, "Insurance Industry Claims Practices," Claims Practices Seminar, Reno NV.

April 2006, "Institutional Bad Faith Issues and Pay for Performance in the Insurance Industry," Ontario TLA, Toronto, Ontario, Canada.

5

May 2005, "Discovery in Insurance Bad Faith Cases and Related Issues," North Dakota TLA, Fargo, ND.

November 2004, "Insurance Industry Claims Practices," Claims Practices Seminar, Reno, NV.

September 2004, "Discovery in Insurance Bad Faith Cases and Related Issues," Utah TLA, Salt Lake City, UT.

September 2004, "Institutional Bad Faith Issues and Pay for Performance in the Insurance Industry," New Mexico TLA, Albuquerque, NM.

July 2004, "Incentive Pay's Effect on Claim Practices," Claims Practices Seminar, Reno, NV.

May 2004, "Recognizing Improper Claim Practices," Claims Practices Seminar, Deadwood, SD.

April 2004, "Discovery in Insurance Bad Faith Cases and Related Issues," Arkansas TLA, Little Rock, AR.

February 2004, "Incentive-Driven Claim Practices," Claims Practices Workshop, Reno, NV.

December 2003, "Non-Rate Action Plans," Claims Practices Workshop, Reno, NV.

June 2003, "Claim Practices Cases – Looking Ahead," Claims Practices Workshop, Reno, NV.

March 2003, "Claim Practices in Non-Rate Marketing Actions," Claim Practices Workshop, Reno, NV.

January2003, "Farmers Ins. Group Corporate Organization and Operations," WTLA, Seattle, WA.

November 2002, "The Effects of Performance-Based Pay for Adjusters," Claim Practices Workshop, Reno, NV.

May 2002, "SFXOL – Settle for X or Less," Property-Casualty Claim Practices Workshop, Reno, NV.

December 2001, "A de novo Review of Claim Practices," Property-Casualty Claim Practices Workshop, Reno, NV.

1993-1996, Presented updates on Environmental Insurance Law at Santa Clara County Annual Environmental Law Update Conferences.

1992-1995, Presentations on environmental and insurance law issues at Federal Publications Seminars in Los Angeles, Phoenix, San Francisco, and Sacramento.

1972-1990, During employment in the insurance industry, responsible for the presentation of several courses and lectures on various aspects of insurance claims handling.

Organizations:

California Bar Association

American Bar Association

San Francisco Bar Association

American Association for Justice

Consumer Attorneys of California

Alameda Bar Association

San Francisco Trial Lawyers Association


Publications:

 "Cleanup Claim," *San Francisco Daily Journal*, October 19, 1998

"Just The Facts, Just the Facts: Discovery in Insurance Bad Faith Cases" *Forum,* May 2005.

"Discovery in Insurance Bad Faith Cases," 2005, Utah TLA

"Proving Insurance Bad Faith," *The Litigator*, Fall 2005

"Discovery in Insurance Bad Faith Cases, Part I," *The Litigator*, Winter 2006

"Discovery in Insurance Bad Faith Cases, Part II," *The Litigator*, Spring 2006

"The Insurance Company Deposition in Insurance Bad Faith Cases," *The Litigator*, Winter 2006

"The Use of Experts in Insurance Bad Faith Cases," *The Litigator*, Summer 2006

"The Use of Experts in Insurance Bad Faith Cases," *Forum*, March 2007

"Protesting Insurer Protective Orders," *Trial*, July 2007

"Behind the Scenes in the Insurance Industry: How the Insurance Industry Has Revolutionized Claims Handling," *Forum*, June/July 2007

"Behind the Scenes in the Insurance Industry: How the Insurance Industry Has Revolutionized Claims Handling," *Louisiana Advocates,* Aug. 2008, Vol. XXIII, No. 8.

"The Scope of Expert Testimony in Insurance Bad Faith Cases: Can the Expert Testify on the Meaning of the Insurance Policy," *Conn. Ins. Law Journal*, 15(1) (2008-2009), p. 211.

"Professional Liability Claims: The Risk Professional's Role," *The Risk Report,* Vol. XXXII, International Risk Management Institute ("IRMI"), June 2010

"Behind the Scenes in the Insurance Industry," *Trial Trends*, Spring 2011

"Key Coverage Issues in Personal Lines Claims: The Rules of Insurance Contract Interpretation," IRMI, May 2011

"Key Coverage Issues in Personal Lines Claims: The Duty To Defend ," IRMI, May 2011

"Key Coverage Issues in Personal Lines Auto Claims: Auto Coverage for Using or Occupying a Vehicle," IRMI, May 2011

"Key Coverage Issues in Personal Lines Auto Claims: When Is a Driver a Permissive User?" IRMI, May 2011

"Key Coverage Issues in Homeowner's Claims: The Wear and Tear Exclusion," IRMI, September 2011

"Key Coverage Issues in Homeowners' Claims: When Is a Collapse a Collapse?", IRMI, September 2011

"The Cooperation Clause: When Is There Cooperation and When Is There Not?", IRMI, April 2012

"When Are Emotional Distress Claims Bodily Injury?", IRMI, April 2012

"Evaluating Serious Injury Claims Under Personal Lines Policies," IRMI, 2012

"Negligent Entrustment: Liability and Coverage," IRMI, 2012

"The Water Damage Exclusion," IRMI, 2013

"The Business Pursuits Exclusion," IRMI, 2013

"Concurrent Causation in First Party Property Claims," IRMI, September 2013

"The Homeowners Policy Ensuing Loss Provision," IRMI, September 2013.

"Behind the Scenes in the Insurance Claims Industry: How Insurance Companies Have Revolutionized Insurance Claims Handling, An Update," *Forum,* 46(1), January/February 2016, p. 22

"Behind The Scenes in the Insurance Claims Industry: How Insurance Companies Have Revolutionized Insurance Claims Handling, An Update," *The New Mexico Trial Lawyer*, 47(2), March/April 2016, p. 1.

"Bad Faith: Revisiting an insurer's affirmative duty to settle," *Advocate,* Sept. 2016, p. 72.

"The Obligation of Insurers to Pay The Undisputed Amount of Underinsured And Uninsured Motorists' Claims," *Advocate,* Sept. 2017.

"The Homeowner's Policy and the Debate Over Cosmetic Damage," IRMI, September 2017.

"Like Kind and Quality: It's Meaning and Application," IRMI, January 2018.

"Appraisal Process: Scope of Loss and Causation Included?," ABA/TIPS/PILC Newsletter, Summer, 2018.

"Current Issues in first-party property claims," *Advocate*, Sept, 2018, p. 76.

"Depreciation of Labor in Property Damage Estimates," IRMI, Oct. 2018.

"The Homeowners Policy Ensuing Loss Provision," IRMI, Oct. 2018.

"Handling the Wild-Fire Insurance Claim Prior to Litigation," *Advocate*, March 2019

"Burned Out And Underinsured," *Advocate*, Sept. 2019.

"Professional Liability Claims Management: The Role of The Risk Manager, Agent or Broker," IRMI, April 2020.

"Business-income Insurance and Covid-19," *Advocate*, July 2020.

Opinions Cited In:

*Gerawan Farming Partners, Inc., v. Westchester Surplus Lines Ins. Co., et al.*, (Jan. 4, 2008) 2008 WL 80711 (E.D. Cal.)

*Bruce D. Bell, et al. v. Dietz-Crane Builders LLC, et al.*, Maricopa Cty., AZ, June 12, 2008

Recommendations:

Provided upon request.

# EXHIBIT B

RULE 26 DISCLOSURE

EXPERT CASES: DEPOSITION AND/OR TRIAL TESTIMONY

CHARLES M. MILLER, ESQ.

**Page is intentionally blank**

2

*Carolyn Mann, et al. v. GEICO*
    USDC, Dist. NV
    Case No.: 2:15-cv-00340-APG-PAL
    Plaintiff's Counsel: William Brenske
    Defense Counsel:  Thomas Winner
    Deposition:  October 2016

*Victoria White v. Safeway Ins. Co.*
    2nd Jud. Dist. Ct., Bernalillo Cty, NM
    Case No.: CV 2011-05632
    Plaintiff's Counsel:  Richard Gerding
    Defense Counsel: James Johansen
    Deposition: October 2016
    Trial:  August 2017

*Brandt v. Lloyds*
    Sup. Ct., Los Angeles Cty., CA/Central Dist.
    Case No.: BC580577
    Plaintiff's Counsel: Philip Cook
    Defense Counsel: Michael Robinson
    Deposition: September 2016
    Trial:  October 2016

*Pam Smith v. Nationwide Affinity Ins. Co., et al.*
    USDC, No. Dist. IN., Fort Wayne Div.
    Case No.: 1:15-cv-00010-TLS-SLC
    Plaintiff's Counsel:  Mike Schultz
    Defense Counsel:  Richard Shoultz
    Deposition:  October 2016

*Marshall v. State Farm*
    Sup. Ct., Maricopa Cty., AZ
    Case No.: CV2014-055997
    Plaintiff's Counsel: Stephen Silverman
    Defense Counsel:  Karl Tilleman
    Deposition:  November 2016

*Gower v. American Family*
　　　　NV. Dist. Ct., Clark Cty., NV.
　　　　Case No.: A697535
　　　　Plaintiff's Counsel: Jennifer Morales
　　　　Defense Counsel: Scott Flinders
　　　　Deposition: December 2016

*Columbian Chemicals Co., et al. v. Westchester Fire
Ins. Co., et al.*
　　　　Cir. Ct., Marshall Cty., WV
　　　　Case No.: 11-C-153K
　　　　Plaintiff's Counsel: J. Kevin Buster
　　　　Defense Counsel: Joseph Ziemianski
　　　　Deposition: December 2016.

*Wilshire Manor Apts. ,LLC  v. State Farm General Ins.
Co.*
　　　　USDC, Central Dist. Ca.
　　　　Civil Action: 2:16-cv-04363-R-GJS
　　　　Plaintiff's Counsel: Denise Sze
　　　　Defense Counsel: Michael R. Davisson
　　　　Deposition: December 2016

*Kingham v. State Farm Auto. Ins. Co., et al.*
　　　　USDC, Dist. NV.
　　　　Case No.: 2:15-cv-01555-APG-GWF
　　　　Plaintiff's Counsel: W. Brenske
　　　　Defense Counsel: Pamela L. McGaha
　　　　Deposition: January 2017

*M. Hathaway v. Trinity Universal Ins. Co., et al.*
　　　　USDC, Dist MT, Missoula Div.
　　　　Cause No.: CV-16-44-DLC
　　　　Plaintiff's Counsel: Jeff Ellingson
　　　　Defense Counsel: John E. Boyer
　　　　Deposition: January 2017

*MI Windows & Doors, LLL. et al. v. Liberty Mutual Fire
Ins. Co.*
　　　　USDC  Middle Dist of FL, Tampa Div.
　　　　Case No.: 8:14-cv-03139-SDM-MAP
　　　　Plaintiff's Counsel: Meagan S. Moore
　　　　Defense Counsel: Gary J. Guzzi
　　　　Deposition: February 2017

*Tetravue, Inc. v. St. Paul Fire & Marine Ins. Co.*
    USDC So. Dist. CA
    Case No.: 14-cv-2021 W BLM
    Plaintiff's Counsel: Thomas L. Tosdal
    Defense Counsel: John T. Brooks
    Deposition: May 2017

*All Islands Inc. v. Partners E&O Ins. Services, Inc.*
    Cir. Ct., First Cir. Hawaii
    Civil No.: 13-1-0547-02 KKS
    Plaintiff's Counsel: Allan VanEtten
    Defense Counsel: Randall Schmitt
    Deposition: July 2017
    Trial: August 2017

*Amy Leigh Sauvain, et al. v. Acceptance Indem. Ind. Co.*
    Cir. Court, Clay Cty., Missouri
    Case No. 10CY-CV10410
    Plaintiff's Counsel: W. Blake Heath
    Defense Counsel: Patrick K. McMonigle
    Deposition: October 2017

*Liberty Ins. Underwriters, Inc. v. Anne C. Ream, et al.*
    USDA, W. Dist. MO, So. Div.
    Case No.: 6:16-CV-3324
    Plaintiff's Counsel: Grant Rahmeyer
    Defense Counsel: Bruce A. Moothart
    Deposition: October 2017

*Artyun Vardanyan v. AMCO Ins. Co., et al.*
    Sup. Ct., Fresno Cty., CA
    Case No.: 11 CE CG 02112
    Plaintiff's Counsel: Dylan L. Schaffer
    Defense Counsel: Marc S. Hines
    Deposition: October 2017

*Tripointe Business Center Owner's Accoc. Inc v. Federal Ins. Co.*
    USDC, Dist. CO.
    Civil Action No.: 1:16-cv-02145-RM
    Plaintiff's Counsel: Chris Mammel
    Defense Counsel: Christopher S. Clemson
    Deposition: November 2017

*William Garamella v. Combined Ins. Co. of Am.*
    USDC, No. Dist. WV
    Civ. Action No.: 5:16-CV-00178
    Plaintiff's Counsel:  James Bordas
    Defense Counsel:  Melanie M. Norris
    Deposition:  November 2017

*Linda Nanney v. Farmers Insurance Co. of Arizona*
    2d Jud. Dist. Ct., Bernalillo Cty., NM.
    Civil Action No.: D-202-CV-20167-05043
    Plaintiff's Counsel:  Charles R. Finley
    Defense Counsel: Daniel J. O'Brien
    Deposition:  December 2017

*Main St. Power Mail, Inc., et al. v. Erie Ins. Exch.*
    Hamilton Circuit Ct., Ind.
    Cause No.: 29C01-1509-OL-7272
    Plaintiff's Counsel:  Mike Schultz
    Defense Counsel:  James P. Strenski
    Deposition:  December 2017

*Kai Gruber, et. al. v. USAIG, et al.*
    Dist. Ct., Riley Cty., Kansas
    Case No.: 14CV302
    Plaintiff's Counsel:  Lynn R. Johnson
    Defense Counsel: Timothy S. Frets
    Deposition:  January 2018
    Trial:  May 2018

*Kara Stidd, et al. v. Erie Ins. Prop. and Cas. Co.*
    USDC, No. Dist. WV
    Case No.: 5:17-cv-00056-JPB
    Plaintiff's Counsel: James G. Bordas
    Defense Counsel: Robert E. Dapper, Jr.
    Deposition:  March 2018

*Rachael Evensen v. Mid-Century Ins. Co., et al.*
    Sup. Ct., Sonoma Cty., CA
    Case No.: SCV-260346
    Plaintiff's Counsel: Scott Montgomery
    Defense Counsel:  Valerie Moore
    Deposition: March 2018

*Hector Fava, et al. v. Liberty Ins. Corp.*
    USDC, Dist. NM
    Case No.: 1-17-cv-00456-WJ-LF
    Plaintiff's Counsel:  Brian Moore
    Defense Counsel:  Meena Allen
    Deposition: April 2018

*Fred Farley, Sr. v. Lincoln Heritage Life Ins. Co.*
    Cir. Ct., Mercer Cty., WV
    Civ. Action No.: 17-C74MW
    Plaintiff's Counsel:  James Bordas
    Defense Counsel: Glen Murphy
    Deposition: April 2018

*Jeffrey Wunderlich v. National General Ins. Online, Inc.*
    Cir. Ct., Jackson Cty, MO
    Case No.: 1716-CV12514
    Plaintiff's Counsel:  Jason Pottenger
    Defense Counsel:  John Mullen
    Deposition: April 2018

*Wyman Bryant v. Dalton Anderson, et al.*
    Cir. Ct., Jasper Cty., MO
    Case No.: 16AO-CC00238
    Plaintiff's Counsel:  Chandler Gregg
    Defense Counsel:  Michael Belancio
    Deposition:  April 2018

*Adam Cooper, et al. v. Federated Nat'l. Ins. Co.*
    Cir. Ct., 18th Jud. Cir., Brevard Cty., FL
    Case No.: 05-2016-CA-029716
    Plaintiff's Counsel:  Matthew Struble
    Defense Counsel: Jay Green
    Deposition:  May 2018
    Trial:  June 2018

*Bentley Plummer, et al.  v. The Travelers Home and Marine Insurance Company*
    Cir. Ct., Christian Cty., MO.
    Case No. 17CT-CC00387
    Plaintiff's Counsel:  Chandler Gregg
    Defense Counsel:  Clay Crawford
    Deposition:  August 2018

*Yegiazaryan v. Mercury Ins. Co.*
> Sup. Ct., Los Angeles Cty.
> Case No.: BC 646 385
> Plaintiff's Counsel: Stephen Bernard
> Defense Counsel: Tod M. Costronovo
> Deposition: September 2018
> Trial:

PURE Ins. Co. v. Renae Strain, et al.
> Dist Ct., Johnson Cty., Kansas
> Case No. 17CV06365
> Plaintiff's Counsel: Douglas R. Bradley
> Defense Counsel: Eric Van Beber
> Deposition: November 2018

*Three Rivers Hydroponics v. Florists' Mut. Ins. Co.*
> USDC, W. Dist. Penn.
> Civ. Action No.: 2:15-cv-00809-MRH
> Plaintiff's Counsel: Doug Olcott
> Defense Counsel: R. Brandon McCullough
> Deposition: January 2019

*Monitor Rockrimmon, LLC v. The Cincinnati Ins. Co.*
> USDC, Dist. CO.
> Civ. Action No.: 17-cv-01270-RBJ
> Plaintiff's Counsel: John Bukowski
> Defense Counsel: Daniel G. Litchfield
> Deposition: February 2019

*Babak Hazini v. Josh R. Page, et al.*
> Bernalillo Cty., NM, Second Judicial Dist. Ct.
> Case No." D-202-CV-2014-00570
> Plaintiff's Counsel: George Bleus
> Defense Counsel: Daniel J. O'Brien
> Deposition: March 2019

*Richard and Elizabeth Leseman v. Modern USA Ins. Co.*
> Cir. Ct., 9th Jud. Cir., Orange Cty., FL.
> Case No.: 2017-CA-8310-O
> Plaintiff's Counsel: Christine D. Skubala
> Defense Counsel: John V. Garaffa
> Deposition: April 2019

*Thomas Scott Wood v. Provident Life and Accident Ins. Co.*
> USDC, Dist. AZ
> Case No.: 2:17-cv-02330-DGC
> Plaintiff's Counsel: Michael Poli
> Defense Counsel: Stephen M. Bressler
> Deposition: April 2019.

*Charles Navarro, et al. v. Travelers Cas. Ins. Co. of Am.*
> USDC, Central Dist Ill., Urbana Div.
> Case No.: 2:17-cv-2267
> Plaintiff's Counsel: Anthony J. Bruozas
> Defense Counsel: Matthew S. Ponzi
> Deposition, May 2019

*William Chou, et al. v. USAA Cas. Ins. Co.*
> Sup. Ct., Orange Cty., CA
> Case No.: 30-2017-00959464-CR-IC-CXC
> Plaintiff's Counsel: Neil R. Anapol
> Defense Counsel: Robert S. McLay
> Deposition: June 2019.
> Trial: July 2019

*Stetson Pointe Retail Center, LLC v. Owners Ins. Co.*
> USDC Dist. CO.
> Case No.: 1:18-cv-01902-DDD-KMT
> Plaintiff's Counsel: John Bukowski
> Defense Counsel: Linda J. Knight
> Deposition: Sept. 2019

*Gaslight Inn LLC, et al. v. Mutual of Enumclaw Ins.*
> Sup. Ct. Maricopa Cty., AZ
> Case No.: CV2018-011699
> Plaintiff's Counsel: Michael Poli
> Defense Counsel: Alicyn M. Freeman
> Deposition: October 2019

*Kenneth Koberling, et al. v. Federated Mut. Ins. Co.*
> Cir. Ct., 17th Jud. Cir., Broward Cty., FL
> Case No.: CACE-18-003491
> Plaintiff's Counsel: Matthew Struble
> Defense Counsel: Charles Watkins
> Deposition: October 2019

*Barry Donnellan, et al. v. Country Mut. Ins. Co., et al*
    Sup. Ct., 4th Jud. Dist, Faribanks, AK
     Case No.: 4FA-18-02181CI
    Plaintiff's Counsel:  Robert A. Sparks
    Defense Counsel: Rebecca J. Hozubin
    Deposition: November 2019

*Sunset Stone v. Union Ins. Co.*
    USDC, Dist. CO
    Civ. Action No.: 1:18-cv-00541-WJM-SKC
    Plaintiff's Counsel:  Jonathan Bukowski
    Defense Counsel:  Terence M. Ridley
    Deposition: January 2020

*Nathaniel Realty, LLC, et al. v. State Farm Fire & Cas. Co.*
    Civ. Action No.: 18-C-116
    Cir. Ct., Ohio Cty., WV
    Plaintiff's Counsel:  Scott Blass
    Defense Counsel: Tiffany R. Durst
    Deposition:  January 2020

*Lester v. Shelter Mut. Ins. Co.*
    Case No.: 18NW-CV01064
    Cir. Ct., Newton Cty., MO
    Plaintiff's Counsel:  Jeremy Brown, Esq.
    Defense Counsel: Scott E. Bellm, Esq.
    Deposition, February 2020

*Brenda Estes v. Board of Trustees of the Missouri Public Entity Risk Management Fund.*
    Case No.: 18BU-CV01719
    Cir. Ct., Buchanan Cty., MO
    Plaintiff's Counsel: Kirk Presley
    Defense Counsel: Michael G. Berry
    Deposition, February 2020

*Smith v. Liberty Mut. Fire Ins. Co., et al.*
    Case No.: 1:18-cv-00793-RB-JFR
    USDC, Dist. NM
    Plaintiff's Counsel:  George Bleus
    Defense Counsel: Christopher J. Tebo
    Deposition, April 2020

*Amber Porter v. Safeco Ins. Co. of Am.*
  Case No.: 2:18-cv-00969-JB/GBW
  USDC, Dist. NM
  Plaintiff's Counsel: Mike Doyle
  Defense Counsel: Christopher J. Tebo
  Deposition, May 2020

*Nancy Granados, et al. v. Key Ins. Co.*
  Case No.: 2018-cv-000496
  Dist. Ct., Wyandotte Cty., Kansas
  Plaintiff's Counsel: Jared A. Rose
  Defense Counsel: James P. Maloney
  Deposition, June 2020
  Trial, November 24, 2020

*Whitney J. Cagle v. Westfield Ins. Co., et al*
  Case No.: 1816-CV22073
  Cir. Ct. Jackson Cty., MO
  Plaintiff's Counsel: Kenneth Barnes
  Defense Counsel: Douglas Beck
  Deposition, August 2020

*Wolverine World Wide v. The Am. Ins. Co., et al.*
  Case No.: 1:19-CV-00010
  USDC W. Dist. Michigan, So. Div.
  Plaintiff's Counsel: Kevin B. Dreher
  Defense Counsel: Charles W. Browning
  Deposition, September 2020

*Cheryl Kisner v. State Farm Fire & Cas. Co.*
  Case No.: 5:19-CV-194
  USDC No. Dist WV, Wheeling Div.
  Plaintiff's Counsel: Erica Cross Conti
  Defense Counsel: Ashley Hardesty Odell
  Deposition, September 2020

*Thomas Clark, et al. v. Modern USA Ins. Co.*
  Case No.: 05-2018-CA-106450
  Cir. Ct., 18th Jud. Cir., Brevard Cty., FL
  Plaintiff's Counsel: Christine M. Deis
  Defense Counsel: John V. Garaffa
  Deposition, October 2020

*Cajun Conti, LLC., et al. v. Lloyd's*
Case No. 2020-02558
Civ. Dist. Ct., Parish of Orleans, LO.
Plaintiff's Counsel:  John Houghtaling
Defense Counsel:
Deposition:  December 2020
Trial: December 14, 2020

*Murphy-Brown LLC., et al. v. ACE Am. Ins. Co., et al.*
Case No. 19-CVS-2793
Gen'l. Ct. Justice, Wake Cty., NC
Plaintiff's Counsel:  Evan T. Knott
Defense Counsel:
Deposition:  April 22, 2021

*Revival Apts., LLLP. V. Starr Surplus Lines Ins. Co., et al*
Case No. CV2014-013126
Sup. Ct., Maricopa Cty., AZ
Plaintiff's Counsel:  Michael Poli
Defense Counsel:
Trial Testimony: May 11, 2021

*Lloyd's v. Whispering Pines West*
Arbitration
Plaintiff's Counsel: Christopher Mammel
Defense Counsel:  Christopher J. Shannon
Arbitration testimony: June 18, 2021

13

**14**

# EXHIBIT C

## R&J ENTERTAINMENT, ET AL. v. HCC SPECIALTY INS. CO., ET AL.

### MASTER LIST – INDEX OF DOCUMENTS

Court Filings/Orders/Pleadings:

1. Class Action Complaint Demand for Jury Trial
2. Defendant Houston Casualty Company's Rule 12(B)(6) Motion to Dismiss and Memorandum of Support
3. Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss Complaint and Memorandum in Support
4. Defendant Houston Casualty Company's Reply in Support of Motion to Dismiss
5. Rule 16 Scheduling Order
6. Docket Control Order
7. Plaintiffs' Notice of Intent to Serve Subpoenas
8. Plaintiffs' Amended Answers and Objections to Defendant's First Set of Interrogatories to Plaintiffs
9. Defendant Houston Casualty Company's Responses and/or Objections to Plaintiff's First Set of Requests for Production
10. Defendant Houston Casualty Company's Answers and/or Objections to Plaintiff's First Set of Interrogatories
11. Plaintiffs' Amended Responses to Initial Discovery Protocols for Business Interruption Insurance Litigation Arising From the Covid-19 Pandemic and Similar Public Health Threats

Other Documents:

1. Working Documents
2. Policy
3. Acts and Regulations
4. Policy Research
5. American Claims Management Notice of Coverage Declination, June 4, 2020
6. ISO Letter dated 6/3/21 Objecting to Subpoena
7. R&J Entertainment-Trapped! California - Business Income Loss and Extra Expense: 3/20/20-6/18/20
8. R&J Entertainment-Trapped! Las Vegas - Business Income Loss and Extra Expense: 3/21/20-5/7/20
9. Spreadsheets with Gross and Net Sales

Bates Stamped:

1. TRAPPED_000173-000193 – Executive Orders, State of Nevada and County of San Bernardino
2. TRAPPED_000194 – Contact information for Daryl Davis
3. TRAPPED_000195-000329 – Policy

4. TRAPPED_000330-000404 – Extension and Amendment of Lease
5. TRAPPED_000405-000415 – Emails and Account transactions
6. TRAPPED_000704-001047 – Confidential 2017, 2018, and 2019 Individual Tax Returns, Mark Sherman, CPA
7. TRAPPED_001048-001154 – Confidential 2019 S Corporation Tax Return, Arlint CPA
8. TRAPPED_001294-001311 – Copies of Expense Receipts
9. TRAPPED_001751-001752 – Profit and Loss Trapped, California 6/14/20-6/20/20
10. HCC_00000258-00000269 – Public Order Under City of Los Angeles Emergency Authority and State of California Executive Order
11. HCC_00000001-00000755 – Houston Casualty Company's Discovery Response
12. ISO_00000001-00000354 – Confidential ISO Documents – ISO Filing
13. ISO_00000643-00000644 – Confidential ISO Documents – Amended Transmittal Form

# EXHIBIT D

Case 2:21-cv-73049-SRC-BOMB Document 7-6 Filed 08/02/19 Page Page 151 of 261 PageID: 525

# AGENTS MANUAL

---

## USE AND OCCUPANCY INSURANCE

### OR

## BUSINESS INTERRUPTION INDEMNITY

including

### Rents, Profits and Leasehold

### Insurance

---

BY

**L. E. FALLS, Special Agent**

---

Copyright by

**The American Insurance Company**

Newark, N. J.

his production, giving proper consideration to his past and probable future operations and the condition of the industry in general and this plant in particular.

Lightning and electrical exemption clauses; permission to work later than 10.00 p.m., work and material clause; and other insurance permits are included in the form. Sprinkler clauses, watchmen clauses, and railway waiver permits should be attached the same as to the fire property damage policies covering the same premises.

No co-insurance, reduced rate contribution or average clause should be used, as the present wording of the form has the effect of an average clause and due consideration has been given this in the make-up of Use and Occupancy rates.

**Mortgage**     Mortgage clause: The "subject of this insurance" is net profits and fixed expenses, and even if the physical or real property comprising the plant be mortgaged, no mortgage clause should be attached to the Use and Occupancy policies.

### USE AND OCCUPANCY FORM No. 1

(For Use on Either Fire or Tornado Policies)
(Manufacturing)

$..........On the use and occupancy of the following described property..........

..................The description and location of the property..................

..................that would occasion the loss of use and occupancy..................

..................must be clearly indicated..................

City } of..........................................State of..........................
Town

The word "business," wherever used in this contract, shall be construed to mean "the production of goods."

The word "stock," wherever used in this contract, shall be construed to mean "materials" or "raw stock" entering into "the production of goods."

The word "day," however modified, wherever used in this contract, shall be held to cover a period of twenty-four (24) hours.

The conditions of this contract are that if the building......... described above, and/or machinery and/or equipment..........(insert "and/or stock" if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover) contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained consisting of net

8

profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, for not exceeding such length of time (commencing with the date of the fire and not limited by the date of expiration of this policy), as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of said building...... and machinery and equipment ....................(Insert "and stock" if covering liability for suspension of business due to damage to or destruction of stock) as may be destroyed or damaged, subject to the following conditions and limits, to wit:

*Total Suspension Clause:* The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding 1/300.....................* of the amount of this policy for each business day of such suspension, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

\**Note*—Where the business is carried on without suspension on Sundays and holidays the per diem limit of liability shall be stated as "Not exceeding 1/365 of the amount of this policy."

*Partial Suspension Clause:* The per diem liability under this policy during the time of a partial suspension of business shall be limited to the "Actual Loss Sustained," not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

The liability hereunder shall not exceed the amount of insurance by this policy, nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the insured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse, or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that as soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the property described herein, the net profits so earned shall be applied to the reduction of the loss and adjustment shall be made as provided herein for partial suspensions.

It is a condition of this insurance that surplus machinery or duplicate parts thereof, equipment or supplies, and (*if this policy covers liability for suspension of business due to damage to or destruction of stock*) surplus or reserve stock, which may be owned, controlled or used by the insured shall, in the event of loss, be used in placing the property in condition for continuing or resuming business.

It is a condition of this insurance, *if covering liability for suspension of business due to damage to, or destruction of stock:* (1) that this company shall not be liable for loss on account of damage to, or destruction of the finished product or for the time required to reproduce any finished product which may be damaged; (2) that liability for suspension of business due to damage to, or destruction of raw materials shall be limited to that period of time for which the damaged or destroyed raw materials would have furnished operating conditions for the plant, but no liability shall exist on this account unless or until actual suspension of business shall have occurred through the insured's inability to procure suitable materials to take the place of those damaged or destroyed.

It is a condition of this insurance, if this policy covers liability for suspension of business due to damage to, or destruction of *building....*, *machinery and equipment only*, that this company shall not be liable for any loss due to or occasioned by damage to or destruction of finished product, and/or such materials as enter into and become a part of the finished product.

9

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

## USE AND OCCUPANCY FORM No. 3

(For Use on Either Fire or Tornado Policies)
(Manufacturing Plants)
("Seasonal" or "Fluctuating" Earnings)

$..........On the use and occupancy of the following described property........

.................The description and location of the property...............

...............that would occasion the loss of use and occupancy...............

...................................must be clearly indicated...............................

--------------------------------------------------------------------------------

City }  of..............................................State of.........................
Town

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

The word "business," wherever used in this contract, shall be construed to mean "the production of goods."

The word "stock," wherever used in this contract, shall be construed to mean "materials" or "raw stock" entering into "the production of goods."

The word "day," however modified, wherever used in this contract, shall be held to cover a period of twenty-four (24) hours.

The conditions of this contract are that if the building......, described above, and/or machinery and/or equipment............................(insert "and/or stock" if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover) contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained consisting of net profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, for not exceeding such length of time (commencing with the date of the fire and not limited by the date of expiration of this policy), as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace, as soon as possible after the fire, such part of said building......, and machinery and equipment........................(insert "and stock" if covering liability for suspension of business due to damage to or destruction of stock) as may be destroyed or damaged, subject to the following conditions and limits, to wit:

Total Suspension Clause: The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding the amounts stated for each day of the respective periods defined in the following table* and during no other time, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

*(State periods during which liability attaches with per diem amount for each period; also state periods during which no liability attaches, followed by the word "Nothing.")

| Month—Day | | Month—Day | |
|---|---|---|---|
| For each business day from............to the following............(incl.) $ ...... |
| For each business day from............to the following............(incl.) $....... |
| For each business day from............to the following............(incl.) $....... |
| For each business day from............to the following............(incl.) $....... |
| For each business day from............to the following............(incl.) $....... |

# EXHIBIT E

# AGENTS MANUAL

—

## USE AND OCCUPANCY INSURANCE

### OR

## BUSINESS INTERRUPTION INDEMNITY

including

Rents, Profits and Leasehold

Insurance

—

BY

L. E. FALLS, Special Agent

—

Copyright by
The American Insurance Company
Newark, N. J.

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

## USE AND OCCUPANCY FORM No. 3

### (FOR USE ON EITHER FIRE OR TORNADO POLICIES)
### (Manufacturing Plants)
### ("Seasonal" or "Fluctuating" Earnings)

$...........On the use and occupancy of the following described property..........

.....................*The description and location of the property.....................*

.................*that would occasion the loss of use and occupancy.................*

...................................*must be clearly indicated.................................*

.................................................................................................

City }
Town } of..................................................State of...........................

.................................................................................................

.................................................................................................

The word "business," wherever used in this contract, shall be construed to mean "the production of goods."

The word "stock," wherever used in this contract, shall be construed to mean "materials" or "raw stock" entering into "the production of goods."

The word "day," however modified, wherever used in this contract, shall be held to cover a period of twenty-four (24) hours.

The conditions of this contract are that if the building....., described above, and/or machinery and/or equipment......................*(insert "and/or stock" if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover)* contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the *actual loss sustained* consisting of net profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, for not exceeding such length of time (commencing with the date of the fire and not limited by the date of expiration of this policy), as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace, as soon as possible after the fire, such part of said building....., and machinery and equipment......................*(insert "and stock" if covering liability for suspension of business due to damage to or destruction of stock)* as may be destroyed or damaged, subject to the following conditions and limits, to wit:

*Total Suspension Clause:* The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding the amounts stated for each day of the respective periods defined in the following table* and during no other time, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

*(State periods during which liability attaches with per diem amount for each period; also state periods during which no liability attaches, followed by the word "Nothing.")

| Month—Day | Month—Day | |
|---|---|---|
| For each business day from............to the following............(incl.) $ ...... |
| For each business day from............to the following............(incl.) $...... |
| For each business day from............to the following............(incl.) $...... |
| For each business day from............to the following............(incl.) $...... |
| For each business day from............to the following............(incl.) $...... |

| Month—Day | | Month—Day | |
|---|---|---|---|
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |
| For each business day from | to the following | (incl.) $ |

*Note*—The stated per diem amounts, multiplied by the respective number of business days (including Sundays and holidays, if business is normally operated on these days) during which each amount applies shall not in the aggregate for an entire policy year exceed the total amount of the policy, and the per diem amounts shall be so fixed that the liability under the policy for total suspension of business for an entire policy year shall be the same whether such suspension be caused by several fires occurring at different periods of the year or by a single fire.

*Partial Suspension Clause:* The per diem liability under this policy during the time of a partial suspension of business shall be limited to the "Actual Loss Sustained," not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

The liability hereunder shall not exceed the amount of insurance by this policy, nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the insured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse, or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that as soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced; and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the property described herein, the net profits so earned shall be applied to the reduction of the loss and adjustment shall be made as provided herein for partial suspensions.

It is a condition of this insurance that surplus machinery or duplicate parts thereof, equipment or supplies, and (*if this policy covers liability for suspension of business due to damage to, or destruction of stock*) surplus or reserve stock, which may be owned, controlled or used by the insured shall, in the event of loss, be used in placing the property in condition for continuing or resuming business.

It is a condition of this insurance, *if covering liability for suspension of business due to damage to, or destruction of stock:* (1) that this company shall not be liable for loss on account of damage to, or destruction of the finished product or for the time required to reproduce any finished product which may be damaged; (2) that liability for suspension of business due to damage to, or destruction of raw materials shall be limited to that period of time for which the damaged or destroyed raw materials would have furnished operating conditions for the plant, but no liability shall exist on this account unless or until actual suspension of business shall have occurred through the insured's inability to procure suitable materials to take the place of those damaged or destroyed.

It is a condition of this insurance, if this policy covers liability for suspension of business due to damage to, or destruction of *buildings, machinery and equipment only*, that this company shall not be liable for any loss due to or occasioned by damage to or destruction of finished product, and/or such materials as enter into and become a part of the finished product.

11

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

## MERCANTILE RISKS
### (Non-Manufacturing)

The merchant derives his gross profit from the sale of goods. So soon after a fire as the building which he occupies (whether or not he owns it) can be replaced or repaired, and he can replace the damaged or destroyed stock, he can resume business. (This is equally true of a hotel owner or operator, a restaurateur, or other assured who does not manufacture a product.) In the meantime he loses net profits and the fixed expenses which must continue, as he has no gross profit out of which to pay them.

Finished Stock

Unlike the manufacturer's policy, the terms "stock replacement" in a Use and Occupancy policy to a merchant or non-manufacturer covers *finished stock* as well as supplies and materials which are kept for sale. These non-manufacturing assured have no need for "Profits Insurance," if they carry Use and Occupancy. The payment of the fire property damage insurance loss on stock enables the merchant to buy other stock, and this may be supplemented by reserves of stock which were unaffected by the fire. The assured is expected to reduce the period of suspended business by using other suitable space which may be available, and expense so incurred is included in his claim for Use and Occupancy loss, while any profits so made are credits to such loss.

Some merchants have been advised to carry Rents and Profits Insurance and drop their Use and Occupancy policies. Unless the assured manufactures the product he sells, he has no accrued profit in the *finished stock*, and therefore suffers no loss for completed operations in which he has no investment. The scale for measuring a merchant's Use and Occupancy loss is *business operation* during which a gross profit is made. As before stated, the

# EXHIBIT F

Case 2:21-cv-13150-SRC-JBC Document 64 Filed 08/02/22 Page 160 of 261 PageID: 535

# AGENTS MANUAL

---

## USE AND OCCUPANCY INSURANCE

### OR

## BUSINESS INTERRUPTION INDEMNITY

including

Rents, Profits and Leasehold

Insurance

---

BY

L. E. Falls, Special Agent

---

Copyright by

The American Insurance Company

Newark, N. J.

Case 2:21-cv-23540-SRC-CLW Document 7-6 Filed 08/02/19 Page Page 162 of 261 PageID: 536

proceeds of fire property damaged insurance will replace the value of the finished stock on hand at the time of the fire.

To repeat—PROFITS INSURANCE does not apply to a non-producer, whether or not he carries Use and Occupancy.

**Profits Insurance**

If our assured leases the premises which he occupies, and the lease, by its terms, is cancelled in event of fire, do not include rents in making up the total of Use and Occupancy insurance to carry.

Form 2 quoted herewith covers merchants or other non-manufacturing assureds with constant operation. Form 4 covers fluctuating or seasonal earnings for the same classes of business.

## USE AND OCCUPANCY FORM No. 2

### (For Use on Either Fire or Tornado Policies)
### (Mercantile or Non-manufacturing)

$..........On the use and occupancy of the following described property..........

..........*The description and location of the property*..........

..........*that would occasion the loss of use and occupancy*..........

..........*must be clearly indicated*..........

City
Town } of..........State of..........

The word "business," wherever used in this contract, shall be construed to mean "the sale of goods" or "the carrying on of the business operations usual to the class."

The word "day," however modified, wherever used in this contract, shall be held to cover a period of twenty-four (24) hours.

The conditions of this contract are that if the building......, described above, and/or machinery and/or equipment..........(*insert "and/or stock" if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover*) contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the *actual loss sustained* consisting of net profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, for not exceeding such length of time (commencing with the date of the fire and not limited by the date of expiration of this policy), as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of said building......, and machinery and equipment..........(*insert "and stock" if covering liability for suspension of business due to damage to or destruction of stock*) as may be destroyed or damaged, subject to the following conditions and limits, to wit:

13

*Total Suspension Clause:* The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding 1/300 _____* of the amount of this policy for each business day of such suspension, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

*"Note*—Where the business is carried on without suspension on Sundays and holidays the per diem limit of liability shall be stated as "Not exceeding 1/365 of the amount of this policy."

*Partial Suspension Clause:* The per diem liability under this policy during the time of a partial suspension of business shall be limited to the "Actual Loss Sustained," not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

The liability hereunder shall not exceed the amount of insurance by this policy, nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the insured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse, or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that as soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the property described herein, the net profits so earned shall be applied to the reduction of the loss and adjustment shall be made as provided herein for partial suspensions.

It is a condition of this insurance that surplus machinery or duplicate parts thereof, equipment or supplies, and (*if this policy covers liability for suspension of business due to damage to or destruction of stock*) surplus or reserve stock, which may be owned, controlled or used by the insured shall, in the event of loss, be used in placing the property in condition for continuing or resuming business.

It is a condition of this insurance, if this policy covers liability for suspension of business due to damage to, or destruction of *building____ machinery and equipment only*, that this company shall not be liable for any loss due to or occasioned by damage to or destruction of finished product, and/or such materials as enter into and become a part of the finished product.

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

## USE AND OCCUPANCY FORM No. 4

### (For Use on Either Fire or Tornado Policies)

#### (Mercantile or Non-manufacturing)

#### ("Seasonal" or "Fluctuating" Earnings)

$_____On the use and occupancy of the following described property_____
_____The description and location of the property_____
_____that would occasion the loss of use and occupancy_____
_____must be clearly indicated_____

City } of_____State of_____
Town }

_____

_____

14

# EXHIBIT G

Case 2:21cv-23590-SRC-BM Document 76-4 Filed 08/02/119 Page Page 165 of 261 PageID: 539

# AGENTS MANUAL

—

## USE AND OCCUPANCY INSURANCE

OR

## BUSINESS INTERRUPTION INDEMNITY

including

Rents, Profits and Leasehold

Insurance

—

BY

L. E. FALLS, Special Agent

—

Copyright by

The American Insurance Company

Newark, N. J.

*Total Suspension Clause:* The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding 1/300............................* of the amount of this policy for each business day of such suspension, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

*\*Note*—Where the business is carried on without suspension on Sundays and holidays the per diem limit of liability shall be stated as "Not exceeding 1/365 of the amount of this policy."

*Partial Suspension Clause:* The per diem liability under this policy during the time of a partial suspension of business shall be limited to the "Actual Loss Sustained," not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

The liability hereunder shall not exceed the amount of insurance by this policy, nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the insured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse, or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that as soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the property described herein, the net profits so earned shall be applied to the reduction of the loss and adjustment shall be made as provided herein for partial suspensions.

It is a condition of this insurance that surplus machinery or duplicate parts thereof, equipment or supplies, and *(if this policy covers liability for suspension of business due to damage to or destruction of stock)* surplus or reserve stock, which may be owned, controlled or used by the insured shall, in the event of loss, be used in placing the property in condition for continuing or resuming business.

It is a condition of this insurance, if this policy covers liability for suspension of business due to damage to, or destruction of *building...., machinery and equipment only,* that this company shall not be liable for any loss due to or occasioned by damage to or destruction of finished product, and/or such materials as enter into and become a part of the finished product.

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

## USE AND OCCUPANCY FORM No. 4

(For Use on Either Fire or Tornado Policies)

(Mercantile or Non-manufacturing)

("Seasonal" or "Fluctuating" Earnings)

$............On the use and occupancy of the following described property........

........................*The description and location of the property*....................

....................*that would occasion the loss of use and occupancy*..............

................................*must be clearly indicated*.................................

City } of..............................................State of.............................
Town }

..........................................................................................

..........................................................................................

14

The word "business," wherever used in this contract, shall be construed to mean "the sale of goods" or "the carrying on of the business operations usual to the class."

The word "day," however modified, wherever used in this contract, shall be held to cover a period of twenty-four (24) hours.

The conditions of this contract are that if the building_____, described above, and/or machinery and/or equipment_____(insert *stock*" if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover) contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained consisting of net profits on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, for not exceeding such length of time (commencing with the date of the fire and not limited by the date of expiration of this policy), as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace, as soon as possible after the fire, such part of said building_____, and machinery and equipment_____(insert "and stock" if covering liability for suspension of business due to damage to or destruction of stock) as may be destroyed or damaged, subject to the following conditions and limits, to wit:

*Total Suspension Clause:* The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the "Actual Loss Sustained," not exceeding the amounts stated for each day of the respective periods defined in the following table* and during no other time, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

*(State periods during which liability attaches with per diem amount for each period; also state periods during which no liability attaches, followed by the word "Nothing.")

| Month—Day | Month—Day | |
|---|---|---|
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |
| For each business day from_____to the following_____(incl.) $_____ | | |

*Note*—The stated per diem amounts, multiplied by t h e respective number of business days (including Sundays and holidays, if business is normally operated on these days) during which each amount applies shall not in the aggregate for an entire policy year exceed the total amount of the policy, and the per diem amounts shall be so fixed that the liability under the policy for total suspension of business for an entire policy year shall be the same whether such suspension be caused by several fires occurring at different periods of the year or by a single fire.

*Partial Suspension Clause:* The per diem liability under this policy during the time of a partial suspension of business shall be limited to the "Actual Loss Sustained," not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

15

The liability hereunder shall not exceed the amount of insurance by this policy, nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, and whether collectible or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the insured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse, or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that as soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the property described herein, the net profits so earned shall be applied to the reduction of the loss and adjustment shall be made as provided herein for partial suspensions.

It is a condition of this insurance that surplus machinery or duplicate parts thereof, equipment or supplies, and (*if this policy covers liability for suspension of business due to damage to, or destruction of stock*) surplus or reserve stock, which may be owned, controlled or used by the insured shall, in the event of loss, be used in placing the property in condition for continuing or resuming business.

It is a condition of this insurance, if this policy covers liability for suspension of business due to damage to, or destruction of *building........ machinery and equipment only*, that this company shall not be liable for any loss due to or occasioned by damage to or destruction of finished product, and/or such materials as enter into and become a part of the finished product.

It is a condition of this insurance that in case the insured and this company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

# CONTRIBUTING USE AND OCCUPANCY
## (Also called Contingent Use and Occupancy)

**Contributing Use and Occupancy**

Some manufacturers buy all or a portion of their parts from other manufacturers, and assemble these parts into a finished product.

Should one of these other plants be prevented by fire from producing the needed parts, our client would likewise have his production reduced or stopped.

To cover this loss of net profits and fixed expenses, we issue a contributing Use and Occupancy policy, and charge the rate applicable to to the plant or plants from which the parts are secured, and the burning of which would "contribute" to the loss of assured.

In the form here given, the first described location is the plant of our assured and the second that of the plant from which he obtains goods or product.

16

# EXHIBIT H

Case 2:21-cv-23540-STRC-JBM Document 76-4 Filed 08/02/19 Page Page of 7260 of PageID: 544



# BUSINESS INTERRUPTION

### Gross Earnings Form for Mercantile or Non-Manufacturing Risks

CF 15 03
(Ed. 05 77)

Insurance applies to this item(s) only when "Business Interruption", a specific amount and a coinsurance percentage are specified therefor in this policy, and, unless otherwise provided, all provisions and stipulations of this form and policy shall apply separately to each such item

## SECTION I—DESCRIPTION OF COVERAGE

1. This policy insures against loss resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property by the peril(s) insured against, during the term of this policy, on premises occupied by the insured and situated as herein described.

2. In the event of such damage or destruction this Company shall be liable for the ACTUAL LOSS SUSTAINED by the insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss.

3. Resumption of Operations: It is a condition of this insurance that, if the insured could reduce the loss resulting from the interruption of business,

  A. by complete or partial resumption of operation of the property herein described, whether damaged or not, or

B. by making use of merchandise or other property, at the location(s) described herein or elsewhere,

such reduction shall be taken into account in arriving at the amount of loss hereunder.

4. Gross Earnings: For the purposes of this insurance "Gross Earnings" are defined as the sum of:

  A. Total net sales, and

  B. Other earnings derived from operations of the business,

less the cost of:

  C. Merchandise sold, including packaging material therefor,

  D. Materials and supplies consumed directly in supplying the service(s) sold by the insured, and

  E. Service(s) purchased from outsiders (not employees of the insured) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

In determining Gross Earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

5. Definition of "Normal": The condition that would have existed had no loss occurred.

## SECTION II—EXTENSIONS OF COVERAGE

1. Alterations and New Buildings: Permission granted to make alterations in or to construct additions to any building described herein and to construct new buildings on the described premises. This policy is extended to cover, subject to all its provisions and stipulations, loss resulting from damage to or destruction of such alterations, additions or new buildings while in course of construction and when completed or occupied, provided that, in the event of damage to or destruction of such property (including building materials, supplies, machinery or equipment incident to such construction or occupancy while on the described premises or within 100 feet thereof) so as to delay commencement of business operations of the insured, the length of time for which this Company shall be liable shall be determined as otherwise provided herein but such determined length of time shall be applied and the loss hereunder calculated from the date that business operations would have begun had no damage or destruction occurred.

This clause does not waive or modify any of the conditions of the Automatic Sprinkler Clause, if any, attached to this policy.

2. Expenses to Reduce Loss: This policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this policy (except expense incurred to extinguish a fire), but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced. Such expenses shall not be subject to the application of the Coinsurance Clause.

3. Interruption by Civil Authority: This policy is extended to include the actual loss sustained by the insured, resulting directly from an interruption of business as covered hereunder, during the length of time, not exceeding 2 consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority; except, that when as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority.

## SECTION III—COINSURANCE

This Company shall not be liable for a greater proportion of any loss than the amount of insurance specified for this item bears to the amount produced by multiplying the Gross Earnings that would have been earned (had no loss occurred) during the 12 months immediately following the date of damage to or destruction of the described property by the coinsurance percentage applicable (specified on the first page of this policy, or by endorsement).

## SECTION IV—LIMITATIONS AND EXCLUSIONS

1. Electrical Apparatus Clause: This Company shall not be liable for any loss resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire as insured against ensues, and then this Company shall be liable for only its proportion of loss caused by the ensuing fire

2. Limitation—Media For Electronic Data Processing: With respect to loss resulting from damage to or destruction of media for, or programming records pertaining to, electronic data processing or electronically controlled equipment, including data thereon, by the peril(s) insured against, the length of time *or which this Company shall be liable hereunder shall not exceed—

  A. 30 consecutive calendar days; or

  B. the length of time that would be required to rebuild, repair or replace such other property herein described as has been damaged or destroyed;

whichever is the greater length of time.

3. Nuclear Clause (Not applicable in New York): The word "fire" in this policy or endorsements attached hereto is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not insured against by this policy or said endorsements, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by "fire" or any other perils insured against by this policy or said endorsements; however, subject to the foregoing and all provisions of this policy, loss by "fire" resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this policy.

4. Nuclear Clause (Applicable in New York): This policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under this policy.

**5. Special Exclusions:** This Company shall not be liable for any increase of loss resulting from:

    A. enforcement of any ordinance or law regulating the use, construction, repair or demolition of property; or

    B. interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of business; or

    C. the suspension, lapse or cancellation of any lease, license, contract or order unless such suspension, lapse or cancellation results directly from the interruption of business, and then this Company shall be liable for only such loss as affects the insured's earnings during, and limited to, the period of indemnity covered under this policy;

nor shall this Company be liable for any other consequential or remote loss.

## SECTION V—OTHER PROVISIONS

**1. Control of Property:** This insurance shall not be prejudiced by any act or neglect of any person (other than the insured), when such act or neglect is not within the control of the insured.

**2. Divisible Contract Clause:** If this policy covers two or more buildings or the contents of two or more buildings, the breach of any condition of the policy in any one or more of the buildings covered or containing the property covered shall not prejudice the right to recover for loss occurring in any building covered or containing the property covered, where at the time of loss a breach of condition does not exist.

**3. Inspection of Property and Operations:** This Company and any person or organization making inspections on this Company's behalf shall be permitted but not obligated to inspect the insured's property and operations at any time. Neither the right of this Company and any person or organization to make such inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

**4. Liberalization Clause:** If during the period that insurance is in force under this policy, or within 45 days prior to the inception date thereof, on behalf of this Company there be adopted, or filed with and approved or accepted by the insurance supervisory authorities, all in conformity with law, any changes in the form attached to this policy by which this form of insurance could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the insured hereunder as though such endorsement or substitution of form had been made.

**5. Loss Clause:** Any loss hereunder shall not reduce the amount of this policy.

**6. Pro Rata Clause:** The liability under this policy shall not exceed that proportion of any loss which the amount of insurance hereunder bears to the insurance, whether collectible or not, covering in any manner the loss insured against by this policy.

**7. Protective Safeguards:** It is a condition of this insurance that the insured shall maintain so far as is within his control such protective safeguards as are set forth by endorsement hereto.

Failure to maintain such protective safeguards shall suspend this insurance, only as respects the location or situation affected, for the time of such discontinuance.

**8. Requirements in Case Loss Occurs:** The insured shall give immediate written notice to this Company of any Business Interruption loss and protect the property from further damage that might result in extension of the period of interruption; and within 60 days following the date of damage to or destruction of the real or personal property described, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following:

    A. the time and origin of the property damage or destruction causing the interruption of business,

    B. the interest of the insured and of all others in the business,

    C. all other contracts of insurance, whether valid or not, covering in any manner the loss insured against by this policy,

    D. any changes in the title, nature, location, encumbrance or possession of said business since the issuing of this policy, and

    E. by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction,

and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of business interruption value and loss claimed, accompanied by detailed exhibits of all values, costs and estimates upon which such amounts are based.

The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examof said business since the issuing of this policy, and

    E. by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction,

and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of business iby this Company or its representative, and shall permit extracts and copies thereof to be made.

**9. Subrogation Clause:** This insurance shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for loss occurring to the property described.

## EXTENDED COVERAGE ENDORSEMENT
### (PERILS OF WINDSTORM, HAIL, SMOKE, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT AND VEHICLES)

This policy is extended to insure against direct loss by Windstorm, Hail, Smoke, Explosion, Riot, Riot Attending A Strike, Civil Commotion, Aircraft and Vehicles as hereinafter provided, only when premium for EXTENDED COVERAGE is shown on the first page of this policy or by endorsement.

## SECTION I—PERILS INSURED AGAINST

**1. Windstorm or Hail,** excluding loss caused directly or indirectly by frost or cold weather, or ice (other than hail), snow or sleet, whether driven by wind or not.

    A. This Company shall not be liable for loss to the interior of the building(s) or the property covered therein caused:

        (1) by rain, snow, sand or dust, whether driven by wind or not, unless the building(s) covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail and then shall be liable for loss to the interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail; or

        (2) by water from sprinkler equipment or from other piping, unless such equipment or piping be damaged as a direct result of wind or hail.

    B. This Company shall not be liable for Windstorm or Hail damage to the following property:

        (1) Windmills, wind pumps or their towers;

        (2) Crop silos or their contents;

        (3) Metal smokestacks; or

        passages which conduct the gases of combustion therefrom.

    A. This Company shall not be liable for loss by explosion of steam boilers, steam pipes, steam turbines or steam engines, if owned by, leased by or operated under the control of the insured.

    B. The following are not explosions within the intent or meaning of these provisions:

        (1) Shock waves caused by aircraft, generally known as "sonic boom",

        (2) Electric arcing,

        (3) Rupture or bursting of rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown,

CF 15 03 (Ed 05 77)

*Copyright, Insurance Services Office, 1977*

Page 2 of 3

Case 2:21cv-23640-SRC-CLW Document 7-6 Filed 08/02/21 Page 1 of 1 PageID: 545

(4) Water hammer,

(5) Rupture or bursting of water pipes,

(6) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water,

(7) Rupture, bursting or operation of pressure relief devices.

4. Riot, Riot Attending a Strike or Civil Commotion, including direct loss by acts of striking employees of the owner or tenant(s) of the due to change in temperature or humidity or interruption of operations whether or not such loss is covered by this policy as to other perils.

5. Aircraft or Vehicles, meaning only direct loss resulting from actual physical contact of an aircraft or a vehicle with the property covered or with

the building(s) containing the property covered, except that loss by aircraft includes direct loss by objects falling therefrom.

This Company shall not be liable for loss:

A. by any vehicle owned or operated by an insured or by any tenant of the described premises;

B. by any vehicle to fences, driveways, walks, or when outside of buildings, to lawns, trees, shrubs or plants;

C. to any aircraft or vehicle including its contents other than stocks of aircraft or vehicles in process of manufacture or for sale.

The word "vehicles" means vehicles running on land or tracks but not aircraft. The word "aircraft" shall include self-propelled missiles and spacecraft.

## SECTION II—GENERAL EXCLUSIONS—OTHER PROVISIONS

1. Nuclear Exclusion (Not applicable in New York): (This clause applies to all perils insured against hereunder except the perils of fire and lightning which are otherwise provided for in this policy): Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, is not insured against by this policy, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any by any of the following:

A. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;

B. water which backs up through sewers or drains;

C. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows, or any other opening in such sidewalks, driveways, foundations, walls or floors;

unless fire or explosion as insured against ensues, and then this Company shall be liable for only its proportion of loss caused by the ensuing fire or explosion.

3. War Risk (This clause applies to all perils insured against hereunder except the perils of fire, lightning and removal which are otherwise provided for in this policy): This Company shall not be liable for loss caused directly or indirectly by:

A. hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack,

(1) by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces; or

(2) by military, naval or air forces; or

(3) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;

B. insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

4. Other Provisions: This endorsement does not increase the amount(s) of insurance provided in this policy.

If this policy covers on two or more items, the provisions of this endorsement shall apply to each item separately.

5. Apportionment: This Company shall not be liable for a greater proportion of any loss less the amount of the deductible, if any, from any peril or perils included in this policy than:

A. the amount of insurance under the policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance whether collectible or not, and whether or not such other fire insurance covers against the additional peril or perils insured against hereunder; nor

B. for a greater proportion of any loss less the amount of the deductible, if any, than the amount hereby insured bears to all insurance, whether collectible or not, covering in any manner such loss, or which would have covered such loss except for the existence of this insurance, except if any type of insurance other than fire extended to cover additional perils or windstorm insurance applies to any loss to which this insurance also applies, or would have applied to any such loss except for the existence of this insurance, the limit of liability of each type of insurance for such loss, hereby designated as "joint loss", shall first then fire extended to cover additional perils or windstorm insurance applies to any loss to which this insurance also applies, or would have applied to any such loss except for the existence of this insurance, the limit of liability of each type of insurance for such loss, hereby designated as "joint loss", shall first be determined as if it were the only insurance, and this type of insurance shall be liable for no greater proportion of joint loss than the limit of its liability for such loss bears to the sum of all such limits. The liability of this Company (under this policy) for such joint loss shall be limited to its proportionate part of the aggregate limit of this and all other insurance of the same type. The words "joint loss", as used in the foregoing, mean that portion of the loss in excess of the highest deductible, if any, to which this policy and other types of insurance above referred to both apply.

6. Provisions Applicable Only When This Policy Covers Business Interruption, Tuition Fees, Extra Expense, Rent or Rental Value, Leasehold Interest or Other Consequential Loss: The term "direct", as applied to loss, means loss, as limited and conditioned in this policy, resulting from direct loss to described property from the peril(s) insured against. If the business of the owner or tenant(s) of the described building(s) is interrupted by a strike at the described location, this Company shall not be liable for any loss due to interference by any person(s) with rebuilding, repairing or replacing the property damaged or destroyed or with the resumption or continuation of business.

### CAUTION

WHEN THIS ENDORSEMENT IS ATTACHED TO ONE FIRE POLICY, THE INSURED SHOULD SECURE LIKE COVERAGE ON ALL FIRE POLICIES COVERING THE SAME PROPERTY.

CF 15 03 (Ed. 05 77)

Copyright, Insurance Services Office, 1977

# EXHIBIT I

Case 2:21ac-23540-SXC-JBM-Document 44 Filed 08/02/11 Page 174 of 260 PageID: 548

# BUSINESSOWNERS STANDARD
# PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION H - PROPERTY DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:

a. **Buildings,** meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Permanently installed:

   (a) Fixtures;

   (b) Machinery; and

   (c) Equipment;

(3) Your personal property in apartments or rooms furnished by you as landlord;

(4) Outdoor fixtures;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

   (a) Fire extinguishing equipment;

   (b) Outdoor furniture;

   (c) Floor coverings; and

   (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

   (a) Additions under construction, alterations and repairs to the buildings or structures;

   (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

b. **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control; but this property is not covered for more than the amount for which you are legally liable, plus the cost of labor, materials or services furnished or arranged by you on personal property of others; and

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

   (a) Made a part of the building or structure you occupy but do not own; and

   (b) You acquired or made at your expense but cannot legally remove.

Case 2:21-cv-... SPX-CMB Document 76-4 Filed 06/02/19 Page 7 of 26 PageID: 549

## 2. Property Not Covered

Covered Property does not include:

a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b. Bullion, money or securities;

c. Contraband, or property in the course of illegal transportation or trade;

d. Land (including land on which the property is located), water, growing crops or lawns;

e. Outdoor fences, radio or television antennas, including their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants, all except as provided in the:

   (1) Outdoor Property Coverage Extension; or

   (2) Outdoor Signs Optional Coverage;

f. Watercraft (including motors, equipment and accessories) while afloat.

## 3. Covered Causes of Loss

a. Fire.

b. Lightning.

c. Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

   (1) Rupture, bursting or operation of pressure relief devices; or

   (2) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

d. Windstorm or Hail, but not including:

   (1) Frost or cold weather;

   (2) Ice (other than hail), snow or sleet, whether driven by wind or not;

   (3) Loss of or damage to awnings or canopies of fabric or slat construction, including their supports, outside of buildings; or

   (4) Loss of or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

e. Smoke, causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

f. Aircraft or Vehicles, meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the Covered Property or with the building or structure containing the Covered Property. This cause of loss includes loss or damage by objects falling from aircraft.

   We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

g. Riot or Civil Commotion, including:

   (1) Acts of striking employees while occupying the described premises; and

   (2) Looting occurring at the time and place of a riot or civil commotion.

h. Vandalism, meaning willful and malicious damage to, or destruction of, Covered Property.

   We will not pay for loss or damage:

   (1) To glass (other than glass building blocks) that is part of a building, structure, or an outdoor sign; but we will pay for loss of or damage to other property caused by or resulting from breakage of glass by vandals.

   (2) Caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

i. Sprinkler Leakage, meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

Copyright, Insurance Services Office, Inc., 1984, 1989          BP 00 01 09 89

Case 2:10-cv-23618-CMA-JMS Document 7-4 Filed 08/02/19 Page 176 of 261 PageID: 550

If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

(1) Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

   (a) Results in sprinkler leakage; or

   (b) Is directly caused by freezing.

(2) Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

Automatic Sprinkler System means:

(a) Any automatic fire protective or extinguishing system, including connected:

   (i) Sprinklers and discharge nozzles;

   (ii) Ducts, pipes, valves and fittings;

   (iii) Tanks, their component parts and supports; and

   (iv) Pumps and private fire protection mains.

(b) When supplied from an automatic fire protective system:

   (i) Non-automatic fire protective systems; and

   (ii) Hydrants, standpipes and outlets.

j. **Sinkhole Collapse,** meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(1) The cost of filling sinkholes; or

(2) Sinking or collapse of land into man-made underground cavities.

k. **Volcanic Action,** meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(1) Airborne volcanic blast or airborne shock waves;

(2) Ash, dust or particulate matter; or

(3) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

l. **Transportation,** meaning loss or damage caused by:

(1) Collision, derailment or overturn of a vehicle;

(2) Stranding or sinking of vessels; and

(3) Collapse of bridges, culverts, piers, wharves or docks.

This cause of loss applies only to Covered Property in course of transit.

4. **Additional Coverages**

a. **Debris Removal**

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

   (a) The date of direct physical loss or damage; or

   (b) The end of the policy period.

(2) The most we will pay under this Additional Coverage is 25% of:

   (a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

   (b) The deductible in this policy applicable to that loss or damage.

   But this limitation does not apply to any additional debris removal limit provided in paragraph (4) below.

(3) This Additional Coverage does not apply to costs to:

   (a) Extract "pollutants" from land or water; or

   (b) Remove, restore or replace polluted land or water.

(4) If:

   (a) The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

CP 00 01 06 89

Case 2:23-cv-... Document ... Filed ... Page ... PageID: 551

(b) The debris removal expense exceeds the amount payable under the 25% Debris Removal coverage limitation in paragraph (2) above:

we will pay up to an additional $5,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**b. Preservation of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 10 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

**d. Business Income**

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

Business Income means the:

(1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

(2) Continuing normal operating expenses incurred, including payroll.

**e. Extra Expense**

We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from a Covered Cause of Loss.

Extra Expense means expense incurred:

(1) To avoid or minimize the suspension of business and to continue "operations:"

(a) At the described premises; or

(b) At replacement premises or at temporary locations, including:

(i) Relocation expenses; and

(ii) Costs to equip and operate the replacement or temporary locations.

(2) To minimize the suspension of business if you cannot continue "operations."

(3) (a) To repair or replace any property; or

(b) To research, replace or restore the lost information on damaged valuable papers and records;

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage d., Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

  Copyright, Insurance Services Office, Inc., 1984, 1989  BP 00 01 06 89

### f. Pollutant Clean Up and Removal

We will pay your expense to extract "pollutants" from land or water at the described premises if the release, discharge or dispersal of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

(1) The date of direct physical loss or damage; or

(2) The end of the policy period.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

### 5. Coverage Extensions

In addition to the Limits of Insurance, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

### a. Personal Property at Newly Acquired Premises

(1) You may extend the insurance that applies to Business Personal Property to apply to that property at any premises you acquire.

The most we will pay for loss or damage under this Extension is $10,000 at each premises.

(2) Insurance under this Extension for each newly acquired premises will end when any of the following first occurs:

(a) This policy expires.

(b) 30 days expire after you acquire or begin construction at the new premises; or

(c) You report values to us.

We will charge you additional premium for values reported from the date you acquire the premises.

### b. Personal Property Off Premises

You may extend the insurance that applies to Business Personal Property to apply to covered Business Personal Property, other than money and securities, while it is in course of transit or temporarily at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $1,000.

### c. Outdoor Property

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas, signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense, caused by or resulting from any of the following causes of loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant.

### d. Valuable Papers and Records - Cost of Research

You may extend the insurance that applies to Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged valuable papers and records, including those which exist on electronic or magnetic media, for which duplicates do not exist. The most we will pay under this Extension is $1,000 at each described premises.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Copyright, Insurance Services Office, Inc., 1984, 1989

## a. Ordinance or Law

The enforcement of any ordinance or law:

(1) Regulating the construction, use or repair of any property; or

(2) Requiring the tearing down of any property, including the cost of removing its debris.

## b. Earth Movement

(1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if loss or damage by fire or explosion results, we will pay for that resulting loss or damage.

(2) Volcanic eruption, explosion or effusion. But if loss or damage by fire or volcanic action results, we will pay for that resulting loss or damage.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to Covered Property.

## c. Governmental Action

Seizure or destruction of property by order of governmental authority.

But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

## d. Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if loss or damage by fire results, we will pay for that resulting loss or damage.

## e. Power Failure

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

## f. War and Military Action

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## g. Water

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up from a sewer or drain; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting loss or damage.

2. We will not pay for loss or damage caused by or resulting from:

Copyright, Insurance Services Office, Inc., 1984, 1989

BP 00 01 06 89

Case 1:Case 1:21:21:2v-01576-SRC-76-CMBoDocument-1-6 4-6 Filed 08/02/11 Page Page of 18260 of 261 ID: 554

a. **Electrical Apparatus:** Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

   But if loss or damage by fire results, we will pay for that resulting loss or damage.

b. **Burst Piping:** Rupture or bursting of water pipes (other than Automatic Sprinkler Systems) unless caused by a Covered Cause of Loss.

c. **Water Discharge:** Leakage or discharge of water or steam resulting from the breaking or cracking of any part of a system or appliance containing water or steam (other than an Automatic Sprinkler System), unless the system or appliance is damaged by a Covered Cause of Loss.

d. **Steam Apparatus:** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

   But if loss or damage by fire or combustion explosion results, we will pay for that resulting loss or damage.

e. **Mechanical Breakdown:** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

   But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

3. **Business Income and Extra Expense Exclusions.** We will not pay for:

a. Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

   (1) Delay in rebuilding, repairing or replacing the property or resuming "operations," due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

   (2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations," we will cover such loss that affects your Business Income during the "period of restoration."

b. Any other consequential loss.

## C. LIMITS OF INSURANCE

1. The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

2. The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

3. The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

4. **Building Limit - Automatic Increase**

   a. The Limit of Insurance for Buildings will automatically increase by the annual percentage shown in the Declarations.

   b. The amount of increase will be:

      (1) The Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit, times

      (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

      (3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Building limit, divided by 365.

   Example:

   If: The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

   The amount of increase is
   $100,000 x .08 x 146 ÷ 365 = $3,200.

5. **Business Personal Property Limit - Seasonal Increase**

   a. The Limit of Insurance for Business Personal Property will automatically increase by 25% to provide for seasonal variations.

CP 00 01 06 89          Copyright, Insurance Services Office, Inc., 1984, 1989          Page 7 of 17  □

**b.** This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

   **(1)** The 12 months immediately preceding the date the loss or damage occurs; or

   **(2)** The period of time you have been in business as of the date the loss or damage occurs.

## D. DEDUCTIBLES

**1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

**2.** Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is $250:

   **a.** Burglary and Robbery;

   **b.** Employee Dishonesty;

   **c.** Exterior Grade Floor Glass; and

   **d.** Outdoor Signs.

But this $250 deductible will not increase the deductible shown in the Declarations. This deductible will be used to satisfy the requirements of the deductible in the Declarations.

**3.** No deductible applies to the following Additional Coverages:

   **a.** Fire Department Service Charge;

   **b.** Business Income; and

   **c.** Extra Expense.

## E. PROPERTY LOSS CONDITIONS

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

You must see that the following are done in the event of loss or damage to Covered Property:

**a.** Notify the police if a law may have been broken.

**b.** Give us prompt notice of the loss or damage. Include a description of the property involved.

**c.** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**d.** Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the limit of insurance.

**e.** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**f.** Permit us to inspect the property and records proving the loss or damage.

Also permit us to take samples of damaged property for inspection, testing and analysis.

Copyright, Insurance Services Office, Inc., 1984, 1989
BP 00 01 06 89

g. If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

h. Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

i. Cooperate with us in the investigation or settlement of the claim.

j. Resume all or part of your "operations" as quickly as possible.

## 4. Legal Action Against Us

No one may bring a legal action against us under this insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## 5. Limitation – Electronic Media and Records

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1–September 1. Loss during the period September 2–October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1–September 29 (60 consecutive days). Loss during the period September 30–October 15 is not covered.

## 8. Loss Payment

In the event of loss or damage covered by this policy:

a. At our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

b. We will give notice of our intentions within 30 days after we receive the sworn statement of loss.

c. We will not pay you more than your financial interest in the Covered Property.

d. We will determine the value of Covered Property as follows:

(1) At replacement cost (without deduction for depreciation), except as provided in (2) through (7) below.

Copyright, Insurance Services Office, Inc., 1984, 1989

(a) You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

(b) We will not pay on a replacement cost basis for any loss or damage:

   (i) Until the lost or damaged property is actually repaired or replaced; and

   (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

(c) We will not pay more for loss or damage on a replacement cost basis than the least of:

   (i) The cost to replace, on the same premises, the lost or damaged property with other property:

      i. Of comparable material and quality; and

      ii. Used for the same purpose; or

   (ii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(2) If the "Actual Cash Value-Buildings" option applies, as shown in the Declarations, paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

(3) The following property at actual cash value:

   (a) Used or second-hand merchandise held in storage or for sale;

   (b) Property of others;

(c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

(d) Manuscripts;

(e) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) Tenants' Improvements and Betterments at:

   (a) Replacement cost if you make repairs promptly.

   (b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

      (i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

      (ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

      If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

   (c) Nothing if others pay for repairs or replacement.

(6) Valuable Papers and Records, including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

   (a) Blank materials for reproducing the records; and

   (b) Labor to transcribe or copy the records.

(7) Applicable only to the Optional Coverages:

   (a) Money at its face value; and

Copyright, Insurance Services Office, Inc., 1984, 1989

BP 00 01 06 89

(b) Securities at their value at the close of business on the day the loss is discovered.

The value of United States Government Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully determined on the following property held for sale will not be considered in determining the value of Covered Property:

    (a) Distilled spirits;

    (b) Wines;

    (c) Rectified products; or

    (d) Beer.

e. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn statement of loss, if:

    (1) You have complied with all of the terms of this policy; and

    (2) (a) We have reached agreement with you on the amount of loss; or

        (b) An appraisal award has been made.

## 7. Recovered Property

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

## 8. Resumption of Operations

We will reduce the amount of your:

a. Business Income loss, other than Extra Expense, to the extent you can resume your "operations," in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

b. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

## 9. Vacancy

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage, we will:

a. Not pay for any loss or damage caused by:

    (1) Vandalism; or

    (2) Sprinkler leakage, unless you have protected the system against freezing.

b. Reduce the amount we would otherwise pay for the loss or damage by 15%.

A building is vacant when it does not contain enough business personal property to conduct customary "operations."

Buildings under construction are not considered vacant.

## F. PROPERTY GENERAL CONDITIONS

### 1. Control of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### 2. Mortgage Holders

a. The term "mortgage holder" includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

Copyright, Insurance Services Office, Inc., 1984, 1989

Case 2:23-cv-33149-SRC-BBM Document 26-4 Filed 08/02/11/22 Page Page 185 of 261 PageID: 559

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

(1) Pays any premium due under this policy at our request if you have failed to do so;

(2) Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this policy will then apply directly to the mortgage holder.

e. If we pay the mortgage holder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

(1) The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgage holder at least:

(1) 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgage holder at least 10 days before the expiration date of this policy.

3. No Benefit to Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

4. Policy Period, Coverage Territory

Under this form:

a. We cover loss or damage commencing:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

b. The coverage territory is:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

## G. OPTIONAL COVERAGES

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

1. Outdoor Signs

a. We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

b. Paragraph A.3., Covered Causes of Loss and Section B., Exclusions, do not apply to this Optional Coverage, except for:

(1) Paragraph B.1.c., Governmental Action;

(2) Paragraph B.1.d., Nuclear Hazard; and

(3) Paragraph B.1.f., War and Military Action.

Copyright, Insurance Services Office, Inc., 1984, 1989   BP 00 01 06 89   □

c. We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Rust;

(4) Corrosion; or

(5) Mechanical breakdown.

d. The most we will pay for loss of or damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

e. The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Exterior Grade Floor Glass**

a. We will pay for direct physical loss of or damage to all exterior grade floor and basement glass, including all lettering and ornamentation, located at the described premises and:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

b. We will also pay for necessary:

(1) Expenses incurred to put up temporary plates or board up openings;

(2) Repair or replacement of encasing frames; and

(3) Expenses incurred to remove or replace obstructions.

c. Paragraph A.3., Covered Causes of Loss, and Section B., Exclusions, do not apply to this Optional Coverage, except for:

(1) Paragraph B.1.c., Governmental Action;

(2) Paragraph B.1.d., Nuclear Hazard; and

(3) Paragraph B.1.f., War and Military Action.

d. We will not pay for loss or damage caused by or resulting from:

(1) Wear and tear;

(2) Hidden or latent defect;

(3) Corrosion; or

(4) Rust.

**3. Burglary and Robbery**

a. We will pay for direct physical loss of or damage to Business Personal Property, including money and securities, at the described premises resulting directly from actual or attempted:

(1) Burglary, meaning the taking of property from inside the described premises by a person unlawfully entering or leaving the premises as evidenced by marks of forcible entry or exit; or

(2) Robbery, meaning the taking of property from the care and custody of a person by one who has:

(a) Caused or threatened to cause that person bodily harm; or

(b) Committed an obviously unlawful act witnessed by the person from whom the property was taken.

b. Coverage for money and securities extends to that property while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having care and custody of the property, at the described premises, or in transit between any of these places.

c. We will not pay for loss or damage:

(1) To household and personal effects in living quarters occupied by you, your partner, officer, director or stockholder or any relative of any of these.

(2) To accounts, deeds, evidences of debt and manuscripts.

(3) Of property that is missing when there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory.

(4) Resulting from any dishonest or criminal act:

(a) That you or any of your partners commit whether acting alone or in collusion with other persons; or

Copyright, Insurance Services Office, Inc., 1984, 1989

CP 00 01 06 89

Page 13 of 17

(b) Committed by any of your employ-
ees, directors, trustees or authorized
representatives:

(i) Acting alone or in collusion with
other persons; or

(ii) While performing services for
you or otherwise.

(5) Resulting from voluntary parting with
any property by you or anyone else to
whom you have entrusted the property
if induced to do so by any fraudulent
scheme, trick, device or false pretense.

(6) Of property that has been transferred to
a person or place outside the described
premises on the basis of unauthorized
instructions.

(7) Resulting from delay, loss of use or loss
of market.

(8) Occurring during a fire at the described
premises.

d. The most we will pay for loss or damage
in any one occurrence is:

(1) The limit shown in the Declarations for
Inside the Premises for money and se-
curities while:

(a) In or on the described premises; or

(b) Within a bank or savings institution;

(2) The limit shown in the Declarations for
Outside the Premises for money and
securities while anywhere else; and

(3) 25% of the Business Personal Property
Limit of Insurance for all other property.
But each of the following types of
property are covered only up to $2,500:

(a) Furs, fur garments and garments
trimmed with fur;

(b) Jewelry, watches, watch move-
ments, jewels, precious and semi-
precious stones, gold, silver,
platinum and other precious alloys
or metals. This limit does not apply
to jewelry and watches worth $100
or less per item; and

(c) Patterns, dies, molds and forms.

e. All loss or damage:

(1) Caused by one or more persons; or

(2) Involving a single act or series of re-
lated acts;

is considered one occurrence.

4. Employee Dishonesty

a. We will pay for direct loss of or damage to
Business Personal Property, including
money and securities, resulting from dis-
honest acts committed by any of your em-
ployees acting alone or in collusion with
other persons (except you or your partner)
with the manifest intent to:

(1) Cause you to sustain loss or damage;
and also

(2) Obtain financial benefit (other than
salaries, commissions, fees, bonuses,
promotions, awards, profit sharing,
pensions or other employee benefits
earned in the normal course of em-
ployment) for:

(a) Any employee; or

(b) Any other person or organization.

b. We will not pay for loss or damage:

(1) Resulting from any dishonest or crimi-
nal act that you or any of your partners
commit whether acting alone or in
collusion with other persons.

(2) The only proof of which as to its exist-
ence or amount is:

(a) An inventory computation; or

(b) A profit and loss computation.

c. The most we will pay for loss or damage
in any one occurrence is the Limit of In-
surance for Employee Dishonesty shown
in the Declarations.

d. All loss or damage:

(1) Caused by one or more persons; or

(2) Involving a single act or series of re-
lated acts;

is considered one occurrence.

 Copyright, Insurance Services Office, Inc., 1984, 1989 BP 00 01 06 89

**e.** We will pay only for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

**f.** This Optional Coverage does not apply to any employee immediately upon discovery by:

(1) You; or

(2) Any of your partners, officers or directors not in collusion with the employee;

of any dishonest act committed by that employee before or after being hired by you.

**g.** We will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.

**h.** If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

(1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

(2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under paragraph h. above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

(1) This Optional Coverage as of its effective date; or

(2) The prior insurance had it remained in effect.

**5. Mechanical Breakdown**

**a.** We will pay for direct damage to Covered Property caused by an Accident to an Object. The Object must be:

(1) Owned by you or in your care, custody or control; and

(2) At the described premises.

**b.** Accident means a sudden and accidental breakdown of the Object or a part of the Object. At the time the breakdown occurs, it must manifest itself by physical damage to the Object that necessitates repair or replacement.

**c.** None of the following is an Accident:

(1) Depletion, deterioration, corrosion or erosion;

(2) Wear and tear;

(3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(4) Breakdown of any vacuum tube, gas tube or brush;

(5) Breakdown of any electronic computer or electronic data processing equipment;

(6) Breakdown of any structure or foundation supporting the Object or any of its parts;

(7) The functioning of any safety or protective device; or

(8) The explosion of gases or fuel within the furnace of any Object or within the flues or passages through which the gases of combustion pass.

**d.** Object means any of the following equipment:

(1) Boiler and Pressure Vessels:

(a) Steam heating boilers and condensate return tanks used with them;

(b) Hot water heating boilers and expansion tanks used with them;

(c) Hot water supply boilers;

Copyright, Insurance Services Office, Inc., 1984, 1989

CP 00 01 06 89

(d) Other fired or unfired vessels used for maintenance or service of the described premises but not used for processing or manufacturing;

(e) Steam boiler piping, valves, fittings, traps and separators, but only if they:

    (i) Are on your premises or between parts of your premises;

    (ii) Contain steam or condensate of steam; and

    (iii) Are not part of any other vessel or apparatus;

(f) Feed water piping between any steam boiler and a feed pump or injector.

**(2) Air Conditioning Units** - Any air conditioning unit that has a capacity of 60,000 Btu or more, including:

(a) Inductors, convectors and coils that make use of a refrigerant and form part of a cooling, humidity control or space heating system;

(b) Interconnecting piping, valves and fittings containing only a refrigerant, water, brine or other solution;

(c) Vessels heated directly or indirectly that:

    (i) Form part of an absorption type system; and

    (ii) Function as a generator, regenerator or concentrator;

(d) Compressors, pumps, fans and blowers used solely with the system together with their driving electric motors; and

(e) Control equipment used solely with the system.

**e.** Object does not mean:

**(1)** As Boiler and Pressure Vessels:

(a) Equipment that is not under internal vacuum or internal pressure other than weight of contents;

(b) Boiler settings;

(c) Insulating or refractory material; or

(d) Electrical, reciprocating or rotating apparatus within or forming a part of the boiler or vessel.

**(2)** As Air Conditioning Units, any:

(a) Vessel, cooling tower, reservoir or other source of cooling water for a condenser or compressor, or any water piping leading to or from that source; or

(b) Wiring or piping leading to or from the unit.

**f.** We will not pay for an Accident to any Object while being tested.

**g. Suspension**

Whenever an Object is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an Accident to that Object. This can be done by delivering or mailing a written notice of suspension to:

**(1)** Your last known address; or

**(2)** The address where the Object is located.

If we suspend your insurance, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

## H. PROPERTY DEFINITIONS

**1.** "Operations" means your business activities occurring at the described premises.

**2.** "Period of Restoration" means the period of time that:

**a.** Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

 Copyright, Insurance Services Office, Inc., 1984, 1989

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of "pollutants."

The expiration date of this policy will not cut short the "period of restoration."

**3.** **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Copyright, Insurance Services Office, Inc., 1984, 1989

# EXHIBIT J

COMMERCIAL PROPERTY
CP 10 20 10 12

# CAUSES OF LOSS – BROAD FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Covered Causes Of Loss

When Broad is shown in the Declarations, Covered Causes of Loss means the following:

1. Fire.

2. Lightning.

3. Explosion, including the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass. This cause of loss does not include loss or damage by:

   a. Rupture, bursting or operation of pressure-relief devices; or

   b. Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water.

4. Windstorm or Hail, but not including:

   a. Frost or cold weather;

   b. Ice (other than hail), snow or sleet, whether driven by wind or not;

   c. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

   d. Loss or damage by hail to lawns, trees, shrubs or plants which are part of a vegetated roof.

5. Smoke causing sudden and accidental loss or damage. This cause of loss does not include smoke from agricultural smudging or industrial operations.

6. Aircraft or Vehicles, meaning only physical contact of an aircraft, a spacecraft, a self-propelled missile, a vehicle or an object thrown up by a vehicle with the described property or with the building or structure containing the described property. This cause of loss includes loss or damage by objects falling from aircraft.

   We will not pay for loss or damage caused by or resulting from vehicles you own or which are operated in the course of your business.

7. Riot or Civil Commotion, including:

   a. Acts of striking employees while occupying the described premises; and

   b. Looting occurring at the time and place of a riot or civil commotion.

8. Vandalism, meaning willful and malicious damage to, or destruction of, the described property.

   We will not pay for loss or damage caused by or resulting from theft, except for building damage caused by the breaking in or exiting of burglars.

9. Sprinkler Leakage, meaning leakage or discharge of any substance from an Automatic Sprinkler System, including collapse of a tank that is part of the system.

   If the building or structure containing the Automatic Sprinkler System is Covered Property, we will also pay the cost to:

   a. Repair or replace damaged parts of the Automatic Sprinkler System if the damage:

      (1) Results in sprinkler leakage; or

      (2) Is directly caused by freezing.

   b. Tear out and replace any part of the building or structure to repair damage to the Automatic Sprinkler System that has resulted in sprinkler leakage.

   Automatic Sprinkler System means:

   (1) Any automatic fire-protective or extinguishing system, including connected:

      (a) Sprinklers and discharge nozzles;

      (b) Ducts, pipes, valves and fittings;

      (c) Tanks, their component parts and supports; and

      (d) Pumps and private fire protection mains.

   (2) When supplied from an automatic fire-protective system:

      (a) Non-automatic fire-protective systems; and

      (b) Hydrants, standpipes and outlets.

© Insurance Services Office, Inc., 2011

10. Sinkhole Collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

   a. The cost of filling sinkholes; or

   b. Sinking or collapse of land into man-made underground cavities.

11. Volcanic Action, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. Airborne volcanic blast or airborne shock waves;

   b. Ash, dust or particulate matter; or

   c. Lava flow.

   With respect to coverage for Volcanic Action as set forth in 11.a., 11.b. and 11.c., all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   This cause of loss does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

12. Falling Objects

   But we will not pay for loss or damage to:

   a. Personal property in the open; or

   b. The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

13. Weight Of Snow, Ice Or Sleet

   But we will not pay for loss or damage to personal property outside of buildings or structures, or for loss or damage to lawns, trees, shrubs or plants which are part of a vegetated roof.

14. Water Damage

   a. Water Damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance, that is located on the described premises and contains water or steam.

   However, Water Damage does not include:

   (1) Discharge or leakage from:

      (a) An Automatic Sprinkler System;

   (b) A sump or related equipment and parts, including overflow due to sump pump failure or excessive volume of water; or

   (c) Roof drains, gutters, downspouts or similar fixtures or equipment;

   (2) The cost to repair any defect that caused the loss or damage;

   (3) Loss or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more; or

   (4) Loss or damage caused by or resulting from freezing, unless:

      (a) You do your best to maintain heat in the building or structure; or

      (b) You drain the equipment and shut off the water supply if the heat is not maintained.

   b. If coverage applies subject to a. above, and the building or structure containing the system or appliance is Covered Property, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or steam escapes. But we will not pay the cost to repair any defect that caused the loss or damage.

B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   a. Ordinance Or Law

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

      (a) An ordinance or law that is enforced even if the property has not been damaged; or

© Insurance Services Office, Inc., 2011

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

    **(a)** Foundations, walls, floors or paved surfaces;

    **(b)** Basements, whether paved or not; or

    **(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h.** **"Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

    **(1)** Electrical or electronic wire, device, appliance, system or network; or

    **(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

    **(a)** Electrical current, including arcing;

    **(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

    **(c)** Pulse of electromagnetic energy; or

    **(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

**c.** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**d.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** **Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a.** **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

    **(a)** Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(2) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(3) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

(4) Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

(5) Any other consequential loss.

**b. Leasehold Interest Coverage Form**

(1) Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

(2) We will not pay for any loss caused by:

(a) Your cancelling the lease;

(b) The suspension, lapse or cancellation of any license; or

(c) Any other consequential loss.

**c. Legal Liability Coverage Form**

(1) The following exclusions do not apply to insurance under this Coverage Form:

(a) Paragraph **B.1.a.** Ordinance Or Law;

(b) Paragraph **B.1.c.** Governmental Action;

(c) Paragraph **B.1.d.** Nuclear Hazard;

(d) Paragraph **B.1.e.** Utility Services; and

(e) Paragraph **B.1.f.** War And Military Action.

(2) The following additional exclusions apply to insurance under this Coverage Form:

(a) **Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

(i) Your assumption of liability was executed prior to the accident; and

(ii) The building is Covered Property under this Coverage Form.

(b) **Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**C. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **C.1.** through **C.7.**

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

© Insurance Services Office, Inc., 2011

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; breakage of building glass; falling objects; weight of snow, ice or sleet; water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; all only as insured against in this Coverage Part;

   b. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   c. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   d. Weight of people or personal property;

   e. Weight of rain that collects on a roof;

   f. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation. However, if such collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

This Additional Coverage, Collapse, does not limit the coverage otherwise provided under this Causes Of Loss Form for the causes of loss listed in 2.a.

3. This **Additional Coverage – Collapse** does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   b. Awnings, gutters and downspouts;

   c. Yard fixtures;

   d. Outdoor swimming pools;

   e. Fences;

   f. Piers, wharves and docks;

   g. Beach or diving platforms or appurtenances;

   h. Retaining walls; and

   i. Walks, roadways and other paved surfaces;

   If an abrupt collapse is caused by a cause of loss listed in 2.b. through 2.f. we will pay for loss or damage to that property only if:

   (1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

   (2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is not the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

   a. The collapse of personal property was caused by a cause of loss listed in 2.a. through 2.f. above;

   b. The personal property which collapses is inside a building; and

   c. The property which collapses is not of a kind listed in 4., regardless of whether that kind of property is considered to be personal property or real property.

   The coverage stated in this Paragraph 5. does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

© Insurance Services Office, Inc., 2011

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in C.1. through C.7.

**D. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **D.2.** and **D.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

   a. A Covered Cause of Loss other than fire or lightning; or

   b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

   This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

   c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **D.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of Covered Causes of Loss (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

   If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **b.** of Covered Cause Of Loss **9. Sprinkler Leakage**, or Paragraph **b.** of Covered Causes Of Loss **14. Water Damage**, or under the Additional Coverage, Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

   a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**E. Limitation**

We will pay for loss of animals only if they are killed or their destruction is made necessary.

**F. Definitions**

"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.



© Insurance Services Office, Inc., 2011

CP 10 20 10 12

# EXHIBIT K

**COMMERCIAL PROPERTY**
CP 10 30 09 17

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of or compliance with any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

SAMPLE

c. **Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

d. **Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

e. **Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

f. **War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water**

(1) Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

(2) Mudslide or mudflow;

(3) Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings; or

(5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

© Insurance Services Office, Inc., 2016

CP 10 30 09 17

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

(1) Applies whether or not an act occurs during your normal hours of operation;

(2) Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, l., does not apply to damage to glass caused by chemicals applied to the glass.

m. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

© Insurance Services Office, Inc., 2016

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

### 5. Additional Exclusion

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

## C. Limitations

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

   However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

   g. Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

      (1) Dampness or dryness of atmosphere or of soil supporting the vegetation;

      (2) Changes in or extremes of temperature;

      (3) Disease;

      (4) Frost or hail; or

      (5) Rain, snow, ice or sleet.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

   However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

© Insurance Services Office, Inc., 2016

(2) To Business Income Coverage or to Extra Expense Coverage.

3. The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

a. $2,500 for furs, fur garments and garments trimmed with fur.

b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

c. $2,500 for patterns, dies, molds and forms.

d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

## D. Additional Coverage – Collapse

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(1) A cause of loss listed in **2.a.** or **2.b.**;

(2) One or more of the "specified causes of loss";

(3) Breakage of building glass;

(4) Weight of people or personal property; or

(5) Weight of rain that collects on a roof.

3. This **Additional Coverage – Collapse** does not apply to:

a. A building or any part of a building that is in danger of falling down or caving in;

b. A part of a building that is standing, even if it has separated from another part of the building; or

c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

b. Awnings, gutters and downspouts;

c. Yard fixtures;

d. Outdoor swimming pools;

e. Fences;

f. Piers, wharves and docks;

g. Beach or diving platforms or appurtenances;

h. Retaining walls; and

i. Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

(1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

(2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

a. The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

b. The personal property which collapses is inside a building; and

c. The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

E. **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

a. A "specified cause of loss" other than fire or lightning; or

b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.

© Insurance Services Office, Inc., 2016

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph F.2. (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

6. The following, 6.a. or 6.b., applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration") but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

1. **Property In Transit**

This Extension applies only to your personal property to which this form applies.

a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

b. Loss or damage must be caused by or result from one of the following causes of loss:

(1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

(2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

(3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

c. The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

### 3. Glass

a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension **F.3.** does not increase the Limit of Insurance.

### G. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      (1) The cost of filling sinkholes; or

      (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss or damage to:

      (1) Personal property in the open; or

      (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means:

      (1) Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

      (2) Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe caused by wear and tear, when the pipe is located off the described premises and is connected to or is part of a potable water supply system or sanitary sewer system operated by a public or private utility service provider pursuant to authority granted by the state or governmental subdivision where the described premises are located.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss," such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.

© Insurance Services Office, Inc., 2016

CP 10 30 09 17

# EXHIBIT L

# BUSINESSOWNERS SPECIAL
# PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section H. - Property Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this policy, means the type of property as described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery; and

(b) Equipment;

(4) Your personal property in apartments or rooms furnished by you as landlord;

(5) Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(6) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

b. Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

(1) Property you own that is used in your business;

(2) Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition E.6.d.(3)(b);

(3) Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove; and

(4) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph A.1.b.(2).

### 2. Property Not Covered

Covered Property does not include:

a. Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

b. "Money" or "securities" except as provided in the:

(1) Money and Securities Optional Coverage; or

(2) Employee Dishonesty Optional Coverage;

c. Contraband, or property in the course of illegal transportation or trade;

d. Land (including land on which the property is located), water, growing crops or lawns;

Copyright, Insurance Services Office, Inc., 1999
SA000085

e. Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants, all except as provided in the:

(1) Outdoor Property Coverage Extension; or

(2) Outdoor Signs Optional Coverage;

f. Watercraft (including motors, equipment and accessories) while afloat.

## 3. Covered Causes Of Loss

Risks Of Direct Physical Loss unless the loss is:

a. Excluded in Section B., Exclusions; or

b. Limited in Paragraph A.4., Limitations;

that follow.

## 4. Limitations

a. We will not pay for loss of or damage to:

(1) Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

(2) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

(3) Property that is missing, but there is no physical evidence to show what happened to it, such as shortage disclosed on taking inventory. This limitation does not apply to the Optional Coverage for Money and Securities.

(4) Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

b. With respect to glass (other than glass building blocks) that is part of the interior of a building or structure, or part of an outdoor sign, we will not pay more than $500 for the total of all loss or damage in any one occurrence. Subject to the $500 limit on all loss or damage, we will not pay more than $100 for each plate, pane, multiple plate insulating unit, radiant or solar heating panel, jalousie, louver or shutter.

This Limitation does not apply to loss or damage by the "specified causes of loss", except vandalism.

c. We will not pay for loss of or damage to fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken, unless caused by the "specified causes of loss" or building glass breakage. This restriction does not apply to:

(1) Glass that is part of the interior of a building or structure;

(2) Containers of property held for sale; or

(3) Photographic or scientific instrument lenses.

d. For loss or damage by theft, the following types of property are covered only up to the limits shown:

(1) $2,500 for furs, fur garments and garments trimmed with fur.

(2) $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

(3) $2,500 for patterns, dies, molds and forms.

## 5. Additional Coverages

a. Debris Removal

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

Copyright, Insurance Services Office, Inc., 1999

SA000066

(a) The date of direct physical loss or damage; or

(b) The end of the policy period.

(2) The most we will pay under this Additional Coverage is 25% of:

  (a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

  (b) The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in Paragraph (4) below.

(3) This Additional Coverage does not apply to costs to:

  (a) Extract "pollutants" from land or water; or

  (b) Remove, restore or replace polluted land or water.

(4) If:

  (a) The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or

  (b) The debris removal expense exceeds the amount payable under the 25% Debris Removal Coverage limitation in Paragraph (2) above;

we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for your liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

**d. Collapse**

(1) We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following:

  (a) The "specified cause of loss" or breakage of building glass, all only as insured against in this policy;

  (b) Hidden decay;

  (c) Hidden insect or vermin damage;

  (d) Weight of people or personal property;

  (e) Weight of rain that collects on a roof;

  (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **d.(1)(a)** through **d.(1)(e)**, we will pay for the loss or damage even if use of defective material or methods in construction, remodeling or renovation, contributes to the collapse.

(2) If the direct physical loss or damage does not involve collapse of a building or any part of a building, we will pay for loss or damage to Covered Property caused by the collapse of personal property only if:

  (a) The personal property which collapses is inside a building insured under this policy; and

  (b) The collapse was caused by a cause of loss listed in **d.(1)(a)** through **d.(1)(f)** above.

(3) With respect to the following property:

  (a) Awnings;

  (b) Gutters and downspouts;

  (c) Yard fixtures;

  (d) Outdoor swimming pools;

  (e) Piers, wharves and docks;

  (f) Beach or diving platforms or appurtenances;

Copyright, Insurance Services Office, Inc., 1999

SA000067

(g) Retaining walls; and

(h) Walks, roadways and other paved surfaces;

if the collapse is caused by a cause of loss listed in d.(1)(b) through d.(1)(f), we will pay for loss or damage to that property only if such loss or damage is a direct result of the collapse of a building insured under this policy and the property is Covered Property under this policy.

(4) Collapse does not include settling, cracking, shrinkage, bulging or expansion.

**e. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage; but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

(1) Results in discharge of any substance from an automatic fire protection system; or

(2) Is directly caused by freezing.

**f. Business Income**

(1) **Business Income**

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(a) The portion of the building which you rent, lease or occupy; and

(b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage.

Business Income means the:

(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii) Continuing normal operating expenses incurred, including payroll.

Ordinary payroll expenses mean payroll expenses for all your employees except:

(a) Officers;

(b) Executives;

(c) Department Managers;

(d) Employees under contract; and

(e) Additional Exemptions shown in the Declarations as:

(i) Job Classifications; or

(ii) Employees.

Copyright, Insurance Services Office, Inc., 1999

SA000068

Ordinary payroll expenses include:

(a) Payroll;

(b) Employee benefits, if directly related to payroll;

(c) FICA payments you pay;

(d) Union dues you pay; and

(e) Workers' compensation premiums.

**(2) Extended Business Income**

If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 30 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

This Additional Coverage is not subject to the Limits of Insurance.

**g. Extra Expense**

**(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(a) The portion of the building which you rent, lease or occupy; and

(b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(2)** Extra Expense means expense incurred:

(a) To avoid or minimize the suspension of business and to continue "operations":

(i) At the described premises; or

(ii) At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

(b) To minimize the suspension of business if you cannot continue "operations".

(c) To:

(i) Repair or replace any property; or

(ii) Research, replace or restore the lost information on damaged "valuable papers and records":

Copyright, Insurance Services Office, Inc., 1999

SA000069

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage f. Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

### h. Pollutant Clean Up And Removal

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

**(1)** The date of direct physical loss or damage; or

**(2)** The end of the policy period.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

### i. Civil Authority

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

The coverage for Business Income will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins.

The coverage for necessary Extra Expense will begin immediately after the time of that action and ends:

**(1)** 3 consecutive weeks after the time of that action; or

**(2)** When your Business Income coverage ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance.

### j. Money Orders And Counterfeit Paper Currency

We will pay for loss due to the good faith acceptance of:

**(1)** Any U.S. or Canadian post office, express company, or national or state (or Canadian) chartered bank money order that is not paid upon presentation to the issuer; or

**(2)** Counterfeit United States or Canadian paper currency;

in exchange for merchandise, "money" or services or as part of a normal business transaction.

The most we will pay for any loss under this Additional Coverage is $1,000.

### k. Forgery And Alteration

**(1)** We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

**(2)** If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

**(3)** The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500.

### l. Increased Cost Of Construction

**(1)** This Additional Coverage applies only to buildings insured on a replacement cost basis.

Copyright, Insurance Services Office, Inc., 1999

SA000070

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in I.(3) through I.(9) of this Additional Coverage.

(3) The ordinance or law referred to in I.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

    (a) You were required to comply with before the loss, even when the building was undamaged; and

    (b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

(6) The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $5,000.

The amount payable under this Additional Coverage is additional insurance.

(7) With respect to this Additional Coverage:

    (a) We will not pay for the Increased Cost of Construction:

        (i) Until the property is actually repaired or replaced, at the same or another premises; and

        (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    (b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

    (c) If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment Property Loss Condition in this Coverage Form do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in I.(6) of this Additional Coverage, is not subject to such limitation.

m. Exterior Building Glass

(1) We will pay for direct physical loss of or damage to glass, including lettering or ornamentation, that is part of the exterior of a covered building or structure at the described premises. The glass must be owned by you, or owned by others but in your care, custody or control. We will also pay for necessary:

    (a) Expenses incurred to put up temporary plates or board up openings;

    (b) Repair or replacement of encasing frames; and

    (c) Expenses incurred to remove or replace obstructions.

(2) Paragraph A.3., Covered Causes Of Loss and Section B., Exclusions do not apply to this Additional Coverage, except for:

    (a) Paragraph B.1.b., Earth Movement;

    (b) Paragraph B.1.c., Governmental Action;

    (c) Paragraph B.1.d., Nuclear Hazard;

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000071

**(d)** Paragraph **B.1.f.**, War And Military Action; and

**(e)** Paragraph **B.1.g.**, Water.

**(3)** We will not pay for loss or damage caused by or resulting from:

**(a)** Wear and tear;

**(b)** Hidden or latent defect;

**(c)** Corrosion; or

**(d)** Rust.

**(4)** The most we pay under this Additional Coverage is the Building Limit of Insurance shown in the Declarations.

However, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property, the most we will pay under this Additional Coverage is the Tenant's Exterior Building Glass Limit of Insurance shown in the Declarations.

## 6. Coverage Extensions

In addition to the Limits of Insurance, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, unless a higher Limit of Insurance is shown in the Declarations.

### a. Personal Property At Newly Acquired Premises

**(1)** You may extend the insurance that applies to Business Personal Property to apply to that property at any premises you acquire.

The most we will pay for loss or damage under this Extension is $100,000 at each premises.

**(2)** Insurance under this Extension for each newly acquired premises will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire or begin construction at the new premises; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the premises.

### b. Personal Property Off Premises

You may extend the insurance that applies to Business Personal Property to apply to covered Business Personal Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or temporarily at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $5,000.

### c. Outdoor Property

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense, caused by or resulting from any of the following causes of loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, but not more than $500 for any one tree, shrub or plant.

### d. Personal Effects

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or your employees. This extension does not apply to:

**(1)** Tools or equipment used in your business; or

**(2)** Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

### e. "Valuable Papers And Records"

**(1)** You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research lost information on "valuable papers and records" for which duplicates do not exist.

Copyright, Insurance Services Office, Inc., 1999

SA000072

**(2)** This Coverage Extension does not apply to:

  **(a)** Property held as samples or for delivery after sale;

  **(b)** Property in storage away from the premises shown in the Declarations.

**(3)** The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $5,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $2,500.

**(4)** Section **B. Exclusions** of this Coverage Form does not apply to this Coverage Extension except for:

  **(a)** Paragraph **B.1.c.,** Governmental Action;

  **(b)** Paragraph **B.1.d.,** Nuclear Hazard;

  **(c)** Paragraph **B.1.f.,** War And Military Action;

  **(d)** Paragraph **B.2.f.,** Dishonesty;

  **(e)** Paragraph **B.2.g.,** False Pretense;

  **(f)** Paragraph **B.3.;** and

  **(g)** The Accounts Receivable and "Valuable Papers And Records" Exclusions.

**f. Accounts Receivable**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

  **(a)** All amounts due from your customers that you are unable to collect;

  **(b)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

  **(c)** Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

  **(d)** Other reasonable expenses that you incur to re-establish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

**(2)** The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $5,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $2,500.

**(3)** Section **B. Exclusions** of this Coverage Form does not apply to this Coverage Extension except for:

  **(a)** Paragraph **B.1.c.,** Governmental Action;

  **(b)** Paragraph **B.1.d.,** Nuclear Hazard;

  **(c)** Paragraph **B.1.f.,** War And Military Action;

  **(d)** Paragraph **B.2.f.,** Dishonesty;

  **(e)** Paragraph **B.2.g.,** False Pretense;

  **(f)** Paragraph **B.3.;** and

  **(g)** The Accounts Receivable and "Valuable Papers And Records" Exclusions.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance Or Law**

The enforcement of any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

**(1)** An ordinance or law that is enforced even if the property has not been damaged; or

**(2)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

Copyright, Insurance Services Office, Inc., 1999

**b. Earth Movement**

(1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(2) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust, or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Power Failure**

The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

But if failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**f. War And Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if Water, as described in **B.1.g.(1)** through **B.1.g.(4)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

Copyright, Insurance Services Office, Inc., 1999

SA000074

b. Paragraph **A.3., Covered Causes Of Loss,** and Section **B., Exclusions,** do not apply to this Optional Coverage, except for:

   (1) Paragraph **B.1.c.,** Governmental Action;

   (2) Paragraph **B.1.d.,** Nuclear Hazard; and

   (3) Paragraph **B.1.f.,** War And Military Action.

c. We will not pay for loss or damage caused by or resulting from:

   (1) Wear and tear;

   (2) Hidden or latent defect;

   (3) Rust;

   (4) Corrosion; or

   (5) Mechanical breakdown.

d. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

e. The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Interior Glass**

a. We will pay for direct physical loss of or damage to items of glass that are permanently affixed to the interior walls, floors or ceilings of a covered building or structure at the described premises, provided each item is:

   (1) Described in the Declarations as covered under this Optional Coverage; and

   (2) Located in the basement or ground floor level of the building or structure, unless the Declarations show that this Optional Coverage is applicable to interior glass at all floors; and

   (3) Owned by you, or owned by others but in your care, custody or control.

b. We will also pay for necessary:

   (1) Expenses incurred to put up temporary plates or board up openings;

   (2) Repair or replacement of encasing frames; and

   (3) Expenses incurred to remove or replace obstructions.

c. Paragraph **A.3., Covered Causes Of Loss,** and Section **B., Exclusions,** do not apply to this Optional Coverage, except for:

   (1) Paragraph **B.1.c.,** Governmental Action;

   (2) Paragraph **B.1.d.,** Nuclear Hazard; and

   (3) Paragraph **B.1.f.,** War And Military Action.

d. We will not pay for loss or damage caused by or resulting from:

   (1) Wear and tear;

   (2) Hidden or latent defect;

   (3) Corrosion; or

   (4) Rust.

e. This Optional Coverage supersedes all limitations in this policy that apply to interior glass.

**3. Money And Securities**

a. We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

   (1) Theft, meaning any act of stealing;

   (2) Disappearance; or

   (3) Destruction.

b. In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

   (1) Resulting from accounting or arithmetical errors or omissions;

   (2) Due to the giving or surrendering of property in any exchange or purchase; or

   (3) Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

c. The most we will pay for loss in any one occurrence is:

   (1) The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

      (a) In or on the described premises; or

      (b) Within a bank or savings institution; and

   (2) The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

Copyright, Insurance Services Office, Inc., 1999

SA000083

## F. Property General Conditions

### 1. Control Of Property

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

### 2. Mortgageholders

a. The term "mortgageholder" includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this policy at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this policy will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

### 3. No Benefit To Bailee

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

### 4. Policy Period, Coverage Territory

Under this form:

a. We cover loss or damage commencing:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

b. The coverage territory is:

(1) The United States of America (including its territories and possessions);

(2) Puerto Rico; and

(3) Canada.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

### 1. Outdoor Signs

a. We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

(1) Owned by you; or

(2) Owned by others but in your care, custody or control.

°//°BP0002-199812

Copyright, Insurance Services Office, Inc., 1999

SA000082

(ii) The amount of the accounts that you are able to re-establish or collect;

(iii) An amount to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

e. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy, and

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

**7. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**8. Resumption Of Operations**

We will reduce the amount of your:

a. Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

b. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**9. Vacancy**

**a. Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner of a building, building means the entire building. Such building is vacant when 70% or more of its total square footage:

(i) Is not rented; or

(ii) Is not used to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

Copyright, Insurance Services Office, Inc., 1999

SA000081

(e) The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(2) If the "Actual Cash Value - Buildings" option applies, as shown in the Declarations, Paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

(3) The following property at actual cash value:

(a) Used or second-hand merchandise held in storage or for sale;

(b) Property of others, but this property is not covered for more than the amount for which you are liable, plus the cost of labor, materials or services furnished or arranged by you on personal property of others;

(c) Household contents, except personal property in apartments or rooms furnished by you as landlord;

(d) Manuscripts;

(e) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) Tenants' Improvements and Betterments at:

(a) Replacement cost if you make repairs promptly.

(b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(I) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(II) Divide the amount determined in (I) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing if others pay for repairs or replacement.

(6) "Valuable papers and records", including those which exist on electronic or magnetic media (other than prepackaged software programs), at the cost of:

(a) Blank materials for reproducing the records; and

(b) Labor to transcribe or copy the records.

This condition does not apply to "valuable papers and records" that are actually replaced or restored.

(7) Applicable only to the Optional Coverages:

(a) "Money" at its face value; and

(b) "Securities" at their value at the close of business on the day the loss is discovered.

(8) Applicable only to Accounts Receivable:

(a) If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

(I) We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

(II) We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

(b) The following will be deducted from the total amount of accounts receivable, however that amount is established:

(I) The amount of the accounts for which there is no loss or damage;

Copyright, Insurance Services Office, Inc., 1999

SA000080

**Example No. 1:**

A Covered Cause of Loss damages a computer on June 1. It takes until September 1 to replace the computer, and until October 1 to restore the data that was lost when the damage occurred. We will only pay for the Business Income loss sustained during the period June 1 – September 1. Loss during the period September 2 – October 1 is not covered.

**Example No. 2:**

A Covered Cause of Loss results in the loss of data processing programming records on August 1. The records are replaced on October 15. We will only pay for the Business Income loss sustained during the period August 1 – September 29 (60 consecutive days). Loss during the period September 30 – October 15 is not covered.

**6. Loss Payment**

In the event of loss or damage covered by this policy:

**a.** At our option, we will either:

   **(1)** Pay the value of lost or damaged property;

   **(2)** Pay the cost of repairing or replacing the lost or damaged property;

   **(3)** Take all or any part of the property at an agreed or appraised value; or

   **(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **d.(1)(e)** below.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** Except as provided in **(2)** through **(8)** below, we will determine the value of Covered Property as follows:

   **(1)** At replacement cost without deduction for depreciation, subject to the following:

     **(a)** If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

      **(i)** The Limit of Insurance under this policy that applies to the lost or damaged property;

      **(ii)** The cost to replace, on the same premises, the lost or damaged property with other property:

       **a.** Of comparable material and quality; and

       **b.** Used for the same purpose; or

      **(iii)** The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

     **(b)** If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

      **(i)** The actual cash value of the lost or damaged property; or

      **(ii)** A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the cost of repair or replacement.

     **(c)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

     **(d)** We will not pay on a replacement cost basis for any loss or damage:

      **(i)** Until the lost or damaged property is actually repaired or replaced; and

      **(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000079

## 2. Appraisal

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

## 3. Duties In The Event Of Loss Or Damage

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

(9) Resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

## 4. Legal Action Against Us

No one may bring a legal action against us under this Insurance unless:

a. There has been full compliance with all of the terms of this insurance; and

b. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## 5. Limitation - Electronic Media And Records

We will not pay for any loss of Business Income caused by direct physical loss of or damage to Electronic Media and Records after the longer of:

a. 60 consecutive days from the date of direct physical loss or damage; or

b. The period, beginning with the date of direct physical loss or damage, necessary to repair, rebuild or replace with reasonable speed and similar quality, other property at the described premises due to loss or damage caused by the same occurrence.

Electronic Media and Records are:

(1) Electronic data processing, recording or storage media such as films, tapes, discs, drums or cells;

(2) Data stored on such media; or

(3) Programming records used for electronic data processing or electronically controlled equipment.

**BP0002 (12/99)  Page 14 of 23**

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000078

(3) Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

## C. Limits Of Insurance

1. The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

2. The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

3. The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

4. **Building Limit - Automatic Increase**

   a. The Limit of Insurance for Buildings will automatically increase by the annual percentage shown in the Declarations.

   b. The amount of increase will be:

      (1) The Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit, times

      (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

      (3) The number of days since the beginning of the current policy year of the effective date of the most recent policy change amending the Building limit, divided by 365.

   Example:

   If: The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

   The amount of increase is $100,000 x .08 x 146 Divided by 365 = $3,200.

5. **Business Personal Property Limit - Seasonal Increase**

   a. The Limit of Insurance for Business Personal Property will automatically increase by 25% to provide for seasonal variations.

b. This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

   (1) The 12 months immediately preceding the date the loss or damage occurs; or

   (2) The period of time you have been in business as of the date the loss or damage occurs.

## D. Deductibles

1. We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

2. Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages and the Additional Coverage - Exterior Building Glass in any one occurrence is the Optional Coverage/Exterior Building Glass Deductible shown in the Declarations:

   a. Money and Securities;

   b. Employee Dishonesty;

   c. Interior Glass; and

   d. Outdoor Signs.

   But this Optional Coverage/Exterior Building Glass Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

3. No deductible applies to the following Additional Coverages:

   a. Fire Department Service Charge;

   b. Business Income;

   c. Extra Expense; and

   d. Civil Authority.

## E. Property Loss Conditions

1. **Abandonment**

   There can be no abandonment of any property to us.

Copyright, Insurance Services Office, Inc., 1999

SA000077

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in **B.2.k.(1)** through **B.2.k.(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

3. We will not pay for loss or damage caused by or resulting from any of the following **B.3.a.** through **B.3.c.** But if an excluded cause of loss that is listed in **B.3.a.** through **B.3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

   **a. Weather Conditions**

   Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

   **b. Acts Or Decisions**

   Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   **c. Negligent Work**

   Faulty, inadequate or defective:

   (1) Planning, zoning, development, surveying, siting;

   (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   (3) Materials used in repair, construction, renovation or remodeling; or

   (4) Maintenance;

   of part or all of any property on or off the described premises.

4. **Business Income And Extra Expense Exclusions**

   We will not pay for:

   a. Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

   (1) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

(2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".

   b. Any other consequential loss.

5. **Accounts Receivable And "Valuable Papers And Records" Exclusions**

   The following additional exclusions apply to the Accounts Receivable and "Valuable Papers And Records" Coverage Extensions:

   a. We will not pay for loss or damage caused by or resulting from electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

   (1) Programming errors or faulty machine instructions;

   (2) Faulty installation or maintenance of data processing equipment or component parts;

   But we will pay for direct loss or damage caused by lightning.

   b. Applicable to "Valuable Papers and Records" only:

   We will not pay for loss or damage caused by or resulting from any of the following:

   (1) Errors or omissions in processing or copying. But if errors or omissions in processing or copying results in fire or explosion, we will pay for the direct loss or damage caused by the fire or explosion.

   (2) Wear and tear, gradual deterioration or latent defect.

   c. Applicable to Accounts Receivable only:

   We will not pay for:

   (1) Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

   This exclusion applies only to the extent of the wrongful giving, taking or withholding.

   (2) Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

**BP 0002 (12/99)   Page 12 of 23**

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000076

**a. Electrical Apparatus**

Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires.

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by fire.

**b. Consequential Losses**

Delay, loss of use or loss of market.

**c. Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**e. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

**f. Dishonesty**

Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others;

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

**g. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**i. Collapse**

Collapse, except as provided in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**j. Pollution**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

**k. Other Types Of Loss**

(1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force; or

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

Copyright, Insurance Services Office, Inc., 1999

SA000075

1  Transcript of Testimony, Michael L. Averill, the manager of the Commercial
   Casualty Division of ISO in New York, December 18, 1985

2

3  Trawick, David, The Business's Policy, NARS

4  Vaughn, Emmet J., & Vaughn, Therese, *Fundamentals of Risk and Insurance*
   (John Wiley & Sons, Inc., 9th ed., 2003)

5  Wagner, Tim, "Insurance Rating Bureaus," Journal of Insurance Regulations

6
   White, George A. (Ed) *Organizational Behavior in Insurance, Vol. 1* (IIA, 1st ed.,
7  1992)

8  Wiening, Eric A., & Malecki, Donald S., *Insurance Contract Analysis* (Am. Inst.
   of CPCU, 1st ed., 1992)

9
   Withers, K.W., *Business Interruption Insurance Coverage and Adjustment*, (The
10   Howell-North Press, 1973)

11 Wollner, Kenneth S., *How to Draft and Interpret Insurance Policies* (Cas. Risk
12   Pub., LLC, 1999)

13 Wood, Joseph G., *The Standard Fire Policy*, (The Rough Notes Co., 2d ed.
   1930)
14

15 Barry Zalma, *Insurance Claims: A Comprehensive Guide* [Nat'l. Underwriter,
   2015]

16

17

---

## Miscellaneous Sources

18

19 Butler, E.L., F.C.I.I., "Principles and Practice of Profits Insurance" (London
   Buckley Press Limited, 1962)
20

21 Riley, Denis, "Consequential Loss Insurances and Claims," Third Edition
   (London Sweet & Maxwell Limited, 1967)

22

23

24

25

26

27

28

Olson, Robin K. & Scisiowski, Richard, J, "Fundamentals of Insurance Law," (IRMI, June 2010)

Pandemic Definition, www.merriam-webster.com/dictionary/pandemic

Petitta, Joseph P., Insurance Practice for the Millennium (2000)

Phelan, John D., *Business Interruption Primer*, (Rough Notes, 8th ed. 1976)

Popow, Donna J., *Property Loss Adjusting* (Am. Inst. of CPCU, 3rd ed., 2004)

Rejda, George E., *Principles of Risk Management and Insurance* [Addison Wesley, 8th ed., 2003]

Repair Definition (www.merriam-webster.com/dictionary/repair)

Rodda, William H., *Fire and Property Insurance*, (Prentice-Hall Inc., 1956)

Rhodda, William H., *Property And Liability Insurance*, (Prentice-Hall, Inc., 1966)

Rokes, Willis Park, *Aggressive Good Faith and Successful Claims Handling* [IIA, 1st ed., 1987]

Rose, Michael D., "Regulation of Property and Casualty Insurance Rates in Ohio," 32 Ohio St. Law Journal 487 (1971)

Shifrin, CPCU, Robert L., (Transportation Insurance Rating Bureau, 1959) *Agent & Broker* (May 1980)

Siver, Edward W. CPCU, CLU, *The Handbook of Commercial Property And Casualty Insurance*, (Insurers Press, Inc., 1972)

Soule, Charles E., *Disability Income Insurance: A Unique Risk* (Am. College, 4th ed., 1998)

Suspension Definition in the Business Income and Extra Expense Coverage Form (CP 00 30)

Talley, Douglas, "Stock and Mutual Insurer Contract Wordings," (IRMI June 2011)

Thayler, Gregory S., "Hurricane Insurance Claims: Key Coverages in the Property Policy," Lexisnexis.com (Nov. 6, 2008)

"The Role of Advisory Organizations in Commercial Property Insurance: Insurance Services Office," IRMI

Thomas, Paul & Reed, Prentiss, *Adjustment of Property Losses* (McGraw Hill, 4th ed., 1977)

ISO Form CP 00 10 10 12

ISO Form CP 00 30 10 12

Jones, James R., *Liability Claim Practices* [IIA, 1st ed., 2001]

Klein, Henry C. & Clapp, Jr., Wallace L., *Business Interruption Insurance And Extra Expense Insurance As Written By Fire Insurance Companies in the United States And Canada*, (The Rough Notes Co., 1st ed., 1964)

Levin, Jay M., "The Acts or Decisions Exclusion That Tried To Swallow the Policy," (IRMI, Dec. 2006)

Lightcap, Jane S., *Managing Claim Department Operations* (Int'l. Claim Assoc., 1997)

Loot or looting Definition (www.merriam-webster.com/dictionary/loot)

Loss Definition, (www.merriam-webster.com/disctionary/loss)

MaGee, John S. & Serbein, Oscar N., *Property and Liability Insurance,* (Richard D. Irwin, Inc., 4th ed. 1967)

Malecki, Donald, S., *Commercial Property Coverage Guide*, (Nat'l. Underwriter Co., 5th ed. 2013)

Mangan, Joseph F., "The Right Way to Measure Business Income Losses," Insurance Advocate, March 4, 2000

*Manpower Inc. v. Insurance Co. of the State Of Pennsylvania*, 2009 WL 3738099 (E.D. Wisc. November 3, 2009)

Markham, James J. [Ed.], et al., *The Claims Environment* [Insurance Institute of America, 1st ed., 1993]

Mehr, Ann E., & Markham, James J., *Insurance Operations, Regulation and Statutory Accounting* (IIS, 2nd ed., 2004)

Mehr, Robert I., & Cammack, Emerson, *Principles of Insurance* (R. D. Irwin Inc., 5th ed., 1972)

Mueller, Werner A., *Insurance Quiz of the Month,* Agent & Broker (Aug. 1975)

Mueller, CPCU, Werner A., *Insurance Quiz of the Month*, American Agent & Broker, (Feb. 1978)

Murdock, Michael T., *Claims Operations: A Practical Guide* (IRMI, 1st ed., 2010)

Mut. Ins. Institute, Educational Division of Kemper Ins., MII 2002, Ser. 631

Falls, L.E., *Agents Manual-Use and Occupancy Insurance of Business Interruption Indemnity including Rents, Profits and Leasehold Insurance* (Am Ins. Co., 1929)

Fire Policy Business Interruption Form (Annotated)

Foster, W.S., *Removing the Mystery From U & O Insurance*, (Nat'l. Underwriter Co., 1927)

Glendening, CPA, Frank S., *Business Interruption Insurance What is Covered*, (Nat'l Underwriter Co. 1st ed. 1980)

*Golden Eagle Insurance Co. v. Ins. Co. of the West*, 99 Cal.App.4th 837, 838 [Cal. App. 2002]

Gordis, Philip & Chilanda, Edward A., *Property and Casualty Insurance*, (Rough Notes, 27th ed. 1982)

Greene, Richard, *Buying a Comeback* (Forbes, October 1, 1979)

*Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 601 F.Supp. 58, 61 (E.D. Mo. 1984)

*Home Indem. Co. v. Hyplains Beef, L.C.*, 893 F. Supp. 987, 991–992 (D. Kan. 1995)

Hirsch, Donald J., *Casualty Claim Practice* (Irwin/McGraw Hill, 6th ed., 1996)

*Insurance Claims: A Comprehensive Guide* [Nat'l. Underwriter, 2015]

IRMI, "Introduction—Business Income And Extra Expense Coverage Form Annotated Discussion"

IRMI, Annotation of Building and Personal Property Coverage Form (CP 00 10)

IRMI, Characteristics of Insurance Contracts

IRMI, "Builders Risk Policy Language—Nonphysical Loss to Inbuilt Property"

IRMI Glossary, "Loss"

IRMI, "A Historical View of "Cause Test" Caselaw

IRMI, "The Cause Test and Construction Defect Cases"

IRMI, "The Role of Advisory Organizations in Commercial Property Insurance: Insurance Services Office"

IRMI, "Number of Occurrences: The Cause Test"

ISO 2012 Policy

BIBLIOGRAPHY TO EXPERT REPORT OF CHARLES M. MILLER
Page 2

# Bibliography

Alliance Insurers, "Policy Kit For Students of Insurance," (25th ed., 1987)

Alliance, Form BU 00 02 (Ed. 05 76)

Annotated CP 0010 – Insurance Agreement

Bardwell, E.C., *New Profits—Business Interruption Insurance*, (Rough Notes Co., 1970)

Bardwell, Edward C., "Guide for Computation of Business Interruption Insurance Under Actual Loss Policy, Form 6," (1964)

Boggs, Chris, *One Person's View: 7 Wonders of P/C Insurance History*, Insurance Journal (Feb. 21, 2010)

Bradford, E.N., C.P.C.U., *The ABC's of Handling Business Interruption Claims*,

Business Income Insurance How it Works, (B J Publications, 2d ed.)

Business Interruption Form 4," *Rough Notes* Monthly Policy, Form & Manual Analysis," No. 132.10

Businessowners Policy, (Ins. Institute of Am., 1st ed., 1981)

*Cherokee Nation, et al. v. Lexington Ins. Co.,* 2021 WL 506271 (January 28, 2021 and see *Liberty Mutual Fire Ins. Co.,* October 20, 2010

Cho, Diane J., "What is a Pandemic & Why Has the Coronavirus Become One? Everything You Need to Know," March 11, 2020, https://people.com/health/cornoavirus-pandemic-explainer)

Christiansen, R.S., *Business Interruption And Extra Expense Insurance*, published in Insurance Costs and Controls: A Reappraisal, (Ins. Div., Am. Mgt. Assoc., Inc., 1958)

Crum & Forster Group, "Business Interruption Insurance" 1959 and 1960

Damage Definition (www.merriam-webster.com/disctionary/damage)

Direct Definition (www.merriam-webster.com/disctionary/direct)

FC&S Article, "Business Income Information Introductory History And Development." (September 24, 2019)

FC&S Bulletin, "Latent Defect Exclusion"

FC&S Publication, "Homeowners Exclusions," September 2000

FC&S "Reasonable Expectations," February 13, 2015

FC&S, "That Particular Part," June 2004

# EXHIBIT P

## SECTION V—OTHER PROVISIONS

**1. Control of Property:** This insurance shall not be prejudiced by any act or neglect of any person (other than the Insured), when such act or neglect is not within the control of the Insured.

**2. Divisible Contract Clause:** If this policy covers two or more buildings or the contents of two or more buildings, the breach of any condition of the policy in any one or more of the buildings covered or containing the property covered shall not prejudice the right to recover for loss occurring in any building covered or containing the property covered, where at the time of loss a breach of condition does not exist.

**3. Inspection of Property and Operations:** This Company and any person or organization making inspections on the Company's behalf shall be permitted but not obligated to inspect the Insured's property and operations at any time. Neither the right of this Company and any person or organization to make such inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

**4. Liberalization Clause:** If during the period that insurance is in force under this policy, or within 45 days prior to the inception date thereof, on behalf of this Company there be adopted, or filed with and approved or accepted by the insurance supervisory authorities, all in conformity with law, any changes in the form attached to this policy by which this form of insurance could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Insured hereunder as though such endorsement or substitution of form had been made.

**5. Loss Clause:** Any loss hereunder shall not reduce the amount of this policy.

**6. Other Insurance:** It is a condition of this insurance that if at the time of damage or destruction there are other kinds of insurance which cover in any manner Extra Expense as covered by this policy, then this insurance shall apply only as excess insurance and in no event as contributing insurance, and then only to the amount of Extra Expense over and above the amount due the Insured under such other forms of insurance. In no event, however, shall the liability hereunder exceed the amount of this policy nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance of the same kind, whether collectible or not.

**7. Protective Safeguards:** It is a condition of this insurance that the Insured shall maintain so far as is within his control such protective safeguards as are set forth by endorsement hereto.

Failure to maintain such protective safeguards shall suspend this insurance, only as respects the location or situation affected, for the time of such discontinuance.

**8. Requirements in Case Loss Occurs:**

A. The Insured shall give immediate written notice to this Company of any Extra Expense as covered by this policy and protect the property from further damage that might result in extension of the period of restoration; and within 60 days following the date of damage to or destruction of the real or personal property described, unless such time is extended in writing by this Company, the Insured shall render to this Company a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

(1) the time and origin of the property damage or destruction causing the Extra Expense as covered by this policy,

(2) the interest of the Insured and of all others in the business,

(3) all other contracts of insurance, whether valid or not, covering in any manner the loss insured against by this policy,

(4) any changes in the title, nature, location, encumbrance or possession of said business since the issuing of this policy, and

(5) by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction,

and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of Extra Expense loss claimed, accompanied by detailed exhibits of all values, costs and estimates upon which such amounts are based.

B. The Insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

**9. Subrogation Clause:** This insurance shall not be invalidated should the Insured waive in writing prior to a loss any or all right of recovery against any party for loss occurring to the property described.

Case 2:21-cv-23540-VRC-JBM Document 76-4 Filed 08/02/19 Page 237 of 260 PageID: 612

Insurance applies to this item(s) only when "Extra Expense" and a specific amount are specified therefor in this policy and, unless otherwise provided, all provisions and stipulations of this form and policy shall apply separately to each such item.

## SECTION I—DESCRIPTION OF COVERAGE

1. This policy covers the necessary Extra Expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the normal operation of the Insured's business following damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, which property is on premises occupied by the Insured and situated as herein described.

2. In the event of such damage or destruction, this Company shall be liable for such necessary Extra Expense incurred for only such length of time, hereinafter referred to as the "period of restoration", as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of damage or destruction and not limited by the date of expiration of this policy.

3. Resumption of Operations: It is a condition of this insurance that as soon as practicable the Insured shall resume normal operation of the business and shall dispense with such Extra Expense.

4. Extra Expense: The term "Extra Expense", wherever used in this form, is defined as the excess (if any) of the total cost incurred during the period of restoration chargeable to the operation of the Insured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

5. Definitions: The following terms wherever used in this contract shall mean:

    A. "Month"—thirty consecutive days.

    B. "Normal"—the condition that would have existed had no loss occurred.

## SECTION II—EXTENSIONS OF COVERAGE

1. Alterations and New Buildings: Permission granted to make alterations in or to construct additions to any building described and to construct new buildings on the described premises. This policy is extended to cover, subject to all its provisions and stipulations, Extra Expense resulting from damage to or destruction of such alterations, additions or new buildings while in course of construction and when completed or occupied, provided that, in the event of damage to or destruction of such property (including building materials, supplies, machinery or equipment incident to such construction or occupancy while on the described premises or within 100 feet thereof) so as to delay commencement of business operations of the Insured, the length of time for which this Company shall be liable as determined as otherwise provided herein but such determined length of

time shall be applied and the loss hereunder calculated from the date that business operations would have begun had no damage or destruction occurred.

This clause does not waive or modify any of the conditions of the Automatic Sprinkler Clause, if any, attached to this policy.

2. Interruption by Civil Authority: This policy is extended to include necessary Extra Expense incurred by the Insured as covered hereunder during the length of time, not exceeding 2 consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority.

## SECTION III—LIMIT OF LIABILITY

The limit of liability hereunder shall in no event exceed that percentage of the amount of this policy which is stated below for the determined period of restoration:

    40% when the period of restoration is not in excess of one month;

80% when the period of restoration is in excess of one month, but not in excess of two months; or

100% when the period of restoration is in excess of two months.

## SECTION IV—LIMITATIONS AND EXCLUSIONS

1. Electrical Apparatus: This Company shall not be liable for any Extra Expense resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire as insured against ensues, and then this Company shall be liable for only its proportion of Extra Expense caused by the ensuing fire.

2. Nuclear Clause (Not applicable in New York): The word "fire" in this policy or endorsements attached hereto is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not insured against by this policy or said endorsements, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by "fire" or any other perils insured against by this policy or said endorsements; however, subject to the foregoing and all provisions of this policy, loss by "fire" resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this policy.

3. Nuclear Clause (Applicable in New York): This policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under this policy.

4. Special Exclusions and Limitations: This Company shall not be liable for any Extra Expense resulting from:

    A. enforcement of any ordinance or law regulating the use, construction, repair or demolition of property;

    B. interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of business; or

    C. the suspension, lapse or cancellation of any lease or license, contract or order beyond the period of restoration.

nor shall this Company be liable for:

    D. loss of income;

    E. the cost of repairing or replacing any of the real or personal property herein described, or the cost of research or other expense necessary to replace or restore damaged or destroyed books of account, abstracts, drawings, card index systems or other records (including film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing), that have been damaged or destroyed by the peril(s) insured against, except cost in excess of the normal cost of such repair, replacement or restoration necessarily incurred for the purpose of reducing loss under this policy. In no event shall such excess cost exceed the amount by which the total Extra Expense loss otherwise payable under this policy is hereby reduced; or

    F. any other consequential or remote loss.

 © 1982

B. The following are not explosions within the intent or meaning of these provisions:

(1) Shock waves caused by aircraft, generally known as "sonic boom,"

(2) Electric arcing,

(3) Rupture or bursting of rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown,

(4) Water hammer,

(5) Rupture or bursting of water pipes,

(6) Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water,

(7) Rupture, bursting or operation of pressure relief devices.

**4. Riot, Riot Attending a Strike or Civil Commotion,** including direct loss by acts of striking employees of the owner or tenant(s) of the described building(s) while occupied by said striking employees and shall also include direct loss from pillage and looting occurring during and at the immediate place of a riot, riot attending

a strike or civil commotion. This Company shall not be liable for loss resulting from damage to or destruction of property due to change in temperature or humidity or interruption of operations whether or not such loss is covered by this policy as to other perils.

**5. Aircraft or Vehicles,** meaning only direct loss resulting from actual physical contact of an aircraft or a vehicle with the property covered or with the building(s) containing the property covered, except that loss by aircraft includes direct loss by objects falling therefrom.

This Company shall not be liable for loss:

A. by any vehicle owned or operated by an insured or by any tenant of the described premises;

B. by any vehicle to fences, driveways, walks, or when outside of buildings, to lawns, trees, shrubs or plants;

C. to any aircraft or vehicle including its contents other than stocks or aircraft or vehicles in process of manufacture or for sale.

The word "vehicles" means vehicles running on land or tracks but not aircraft. The word "aircraft" shall include self-propelled missiles and spacecraft.

## SECTION II—GENERAL EXCLUSIONS—OTHER PROVISIONS

**1. Nuclear Exclusion (Not applicable in New York):** (This clause applies to all perils insured against hereunder except the perils of fire and lightning, which are otherwise provided for in this policy): Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing, is not insured against by this policy, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any of the perils insured against by this endorsement; and nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, is not "explosion" or "smoke".

**2. Water Exclusion:** This Company shall not be liable for loss caused by, resulting from, contributed to or aggravated by any of the following:

A. flood, surface water, waves, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not;

B. water which backs up through sewers or drains;

C. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows, or any other opening in such sidewalks, driveways, foundations, walls or floors;

unless fire or explosion as insured against ensues, and then this Company shall be liable for only its proportion of loss caused by the ensuing fire or explosion.

**3. Volcanic Eruption:** This Company shall not be liable for loss caused by volcanic eruption unless direct loss by fire or breakage of glass or safety glazing material ensues. In this event, this Company shall be liable for only the direct loss to the property insured caused by the ensuing fire and if an insured peril, the ensuing breakage of glass or safety glazing material.

Volcanic eruption means the eruption, explosion or effusion of a volcano.

**4. War Risk:** (This clause applies to all perils insured against hereunder except the perils of fire, lightning and removal which are otherwise provided for in this policy): This Company shall not be liable for loss caused directly or indirectly by:

A. hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack,

(1) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

(2) by military, naval or air forces; or

(3) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;

B. insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

**5. Other Provisions:** This endorsement does not increase the amount(s) of insurance provided in this policy.

If this policy covers on two or more items, the provisions of this endorsement shall apply to each item separately.

**6. Apportionment:** This Company shall not be liable for a greater proportion of any loss less the amount of the deductible, if any, from any peril or perils included in this policy than:

A. the amount of insurance under the policy bears to the whole amount of fire insurance covering the property, or which would have covered the property except for the existence of this insurance, whether collectible or not, and whether or not such other fire insurance covers against the additional peril or perils insured against hereunder, nor

B. for a greater proportion of any loss less the amount of the deductible, if any, than the amount hereby insured bears to all insurance, whether collectible or not, covering in any manner such loss, or which would have covered such loss except for the existence of this insurance; except if any type of insurance other than fire extended to cover additional perils or windstorm insurance applies to any loss to which this insurance also applies, or would have applied to any such loss except for the existence of this insurance, the limit of liability of each type of insurance for such loss, hereby designated as "joint loss", shall first be determined as if it were the only insurance, and this type of insurance shall be liable for no greater proportion of joint loss than the limit of its liability for such loss bears to the sum of all such limits. The liability of this Company (under this policy) for such joint loss shall be limited to its proportionate part of the aggregate limit of this and all other insurance of the same type. The words "joint loss" as used in the foregoing, mean that portion of the loss in excess of the highest deductible, if any, to which this policy and other types of insurance above referred to both apply.

**7. Provisions Applicable Only When This Policy Covers Business Interruption, Tuition Fees, Extra Expense, Rent or Rental Value, Leasehold Interest or Other Consequential Loss:** The term "direct", as applied to loss, means loss, as limited and conditioned in this policy, resulting from direct loss to described property from the peril(s) insured against. If the business of the owner or tenant(s) of the described building(s) is interrupted by a strike at the described location, this Company shall not be liable for any loss due to interference by any person(s) with rebuilding, repairing or replacing the property damaged or destroyed or with the resumption or continuation of business.

**CAUTION**

WHEN THIS ENDORSEMENT IS ATTACHED TO ONE FIRE POLICY, THE INSURED SHOULD SECURE LIKE COVERAGE ON ALL FIRE POLICIES COVERING THE SAME PROPERTY.

**4. Nuclear Clause (Not applicable in New York):** The word "fire" in this policy or endorsements attached hereto is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not insured against by this policy or said endorsements, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by "fire" or any other perils insured against by this policy or said endorsements; however, subject to the foregoing and all provisions of this policy, loss by "fire" resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this policy.

**5. Nuclear Clause (Applicable in New York):** This policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under this policy.

**6. Special Exclusions:** This Company shall not be liable for any increase of loss resulting from:

A. enforcement of any ordinance or law regulating the use, construction, repair or demolition of property; or

B. interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of business; or

C. the suspension, lapse or cancellation of any lease, license, contract or order unless such suspension, lapse or cancellation results directly from the interruption of business, and then this Company shall be liable for only such loss as affects the Insured's earnings during, and limited to the period of indemnity covered under this policy;

nor shall this Company be liable for any other consequential or remote loss.

## SECTION V—OTHER PROVISIONS

**1. Control of Property.** This insurance shall not be prejudiced by any act or neglect of any person (other than the Insured), when such act or neglect is not within the control of the Insured.

**2. Divisible Contract Clause:** If this policy covers two or more buildings or the contents of two or more buildings, the breach of any condition of the policy in any one or more of the buildings covered or containing the property covered shall not prejudice the right to recover for loss occurring in any building covered or containing the property covered, where at the time of loss a breach of condition does not exist.

**3. Inspection of Property and Operations:** This Company and any person or organization making inspections on this Company's behalf shall be permitted but not obligated to inspect the Insured's property and operations at any time. Neither the right of this Company and any person or organization to make such inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrent that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

**4. Liberalization Clause:** If during the period that insurance is in force under this policy, or within 45 days prior to the inception date thereof, on behalf of this Company there be adopted, or filed with and approved or accepted by the insurance supervisory authorities, all in conformity with law, any changes in the form attached to this policy by which this form of insurance could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Insured hereunder as though such endorsement or substitution of form had been made.

**5. Loss Clause:** Any loss hereunder shall not reduce the amount of this policy.

**6. Pro Rata Clause:** The liability under this policy shall not exceed that proportion of any loss which the amount of insurance hereunder bears to all insurance, whether collectible or not, covering in any manner the loss insured against by this policy.

**7. Protective Safeguards:** It is a condition of this insurance that the Insured shall maintain so far as is within his control such protective safeguards as are set forth by endorsement hereto.

Failure to maintain such protective safeguards shall suspend this insurance, only as respects the location or situation affected, for the time of such discontinuance.

**8. Requirements in Case Loss Occurs:** The Insured shall give immediate written notice to this Company of any Business Interruption loss and protect the property from further damage that might result in extension of the period of interruption; and within 60 days following the date of damage to or destruction of the real or personal property described, unless such time is extended in writing by this Company, the Insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the Insured as to the following:

A. the time and origin of the property damage or destruction causing the interruption of business,

B. the interest of the Insured and of all others in the business,

C. all other contracts of insurance, whether valid or not, covering in any manner the loss insured against by this policy,

D. any changes in the title, nature, location, encumbrance or possession of said business since the issuing of this policy, and

E. by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction,

and shall furnish a copy of all the descriptions and schedules in all policies, and the actual amount of business interruption value and loss claimed, accompanied by detailed exhibits of all values, costs and estimates upon which such amounts are based.

The Insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

**9. Subrogation Clause:** This insurance shall not be invalidated should the Insured waive in writing prior to a loss any or all right of recovery against any party for loss occurring to the property described.

## EXTENDED COVERAGE ENDORSEMENT

### (PERILS OF WINDSTORM, HAIL, SMOKE, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT AND VEHICLES)

This policy is extended to insure against direct loss by Windstorm, Hail, Smoke, Explosion, Riot, Riot Attending A Strike, Civil Commotion, Aircraft and Vehicles as hereinafter provided, only when premium for EXTENDED COVERAGE is shown on the first page of this policy or by endorsement.

## SECTION I—PERILS INSURED AGAINST

**1. Windstorm or Hail,** excluding loss caused directly or indirectly by frost or cold weather, or ice (other than hail), snow or sleet, whether driven by wind or not.

A. This Company shall not be liable for loss to the interior of the building(s) or the property covered therein caused:

(1) by rain, snow, sand or dust, whether driven by wind or not, unless the building(s) covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail and then shall be liable for loss to the interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail; or

(2) by water from sprinkler equipment or from other piping, unless such equipment or piping be damaged as a direct result of wind or hail.

B. This Company shall not be liable for Windstorm or Hail damage to the following property:

(1) Windmills, wind pumps or their towers;

(2) Crop silos or their contents;

(3) Metal smokestacks; or

(4) When outside of buildings,

(a) Grain, hay, straw or other crops,

(b) Lawns, trees, shrubs or plants,

(c) Awnings of fabric or slat construction, canopies of fabric or slat construction, including their supports,

(d) Signs or radio or television antennas, including their lead-in wiring, masts or towers.

**2. Smoke,** meaning sudden and accidental damage from smoke, other than smoke from agricultural smudging or industrial operations.

**3. Explosion,** including direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom.

A. This Company shall not be liable for loss by explosion of steam boilers, steam pipes, steam turbines or steam engines, if owned by, leased by or operated under the control of the Insured.

**CF 15 04** (Ed. 01 83)

Case 2:21-cv-23540-SRC-JBC Document 7-6 Filed 08/02/21 Page 24 of 26 PageID: 615

Insurance applies to this item(s) only when "Business Interruption", a specific amount and a coinsurance percentage are specified therefor in this policy, and, unless otherwise provided, all provisions and stipulations of this form and policy shall apply separately to each such item.

## SECTION I—DESCRIPTION OF COVERAGES

1. This policy insures against loss resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property, except finished stock, by the peril(s) insured against, during the term of this policy, on premises occupied by the Insured and situated as herein described.

2. In the event of such damage or destruction this Company shall be liable for the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

3. Resumption of Operations: It is a condition of this insurance that if the Insured could reduce the loss resulting from the interruption of business,

A. by complete or partial resumption of operation of the property herein described, whether damaged or not, or

B. by making use of other property at the location(s) described herein or elsewhere, or

C. by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere,

such reduction shall be taken into account in arriving at the amount of loss hereunder.

4. Gross Earnings: For the purposes of this insurance "Gross Earnings" are defined as the sum of:

A. Total net sales value of production,

B. Total net sales of merchandise, and

C. Other earnings derived from operations of the business,

less the cost of:

D. Raw Stock from which such production is derived,

E. Supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the service(s) sold by the Insured,

F. Merchandise sold, including packaging materials therefor, and

G. Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

In determining Gross Earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

5. Definitions: The following terms wherever used in this policy shall mean:

A. "Raw Stock": material in the state in which the Insured receives it for conversion by the Insured into finished stock.

B. "Stock in Process": raw stock which has undergone any aging, seasoning, mechanical or other process of manufacture at the location(s) herein described but which has not become finished stock.

C. "Finished Stock": stock manufactured by the Insured which in the ordinary course of the Insured's business is ready for packing, shipment or sale.

D. "Merchandise": goods kept for sale by the Insured which are not the product of manufacturing operations conducted by the Insured.

E. "Normal": the condition that would have existed had no loss occurred.

## SECTION II—EXTENSIONS OF COVERAGE

1. Alterations and New Buildings: Permission granted to make alterations in or to construct additions to any building described herein and to construct new buildings on the described premises. This policy is extended to cover, subject to all its provisions and stipulations, loss resulting from damage to or destruction of such alterations, additions or new buildings while in course of construction and when completed or occupied, provided that, in the event of damage to or destruction of such property (including building materials, supplies, machinery or equipment incident to such construction or occupancy while on the described premises or within 100 feet thereof) so as to delay commencement of business operations of the Insured, the length of time for which this Company shall be liable shall be determined as otherwise provided herein but such determined length of time shall be applied and the loss hereunder calculated from the date that business operations would have begun had no damage or destruction occurred.

This clause does not waive or modify any of the conditions of the Automatic Sprinkler Clause, if any, attached to this policy.

2. Expenses Related to Reducing Loss: This policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this policy (except expense incurred to extinguish fire) and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the Insured to reduce loss under this policy; but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced. Such expenses shall not be subject to the application of the Coinsurance Clause.

3. Interruption by Civil Authority: This policy is extended to include the actual loss sustained by the Insured, resulting directly from an interruption of business as covered hereunder, during the length of time, not exceeding 2 consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority.

## SECTION III—COINSURANCE

This Company shall not be liable for a greater proportion of any loss than the amount of insurance specified for this item bears to the amount produced by multiplying the Gross Earnings that would have been earned (had no loss occurred) during the 12 months immediately following the date of damage to or destruction of the described property by the coinsurance percentage applicable (specified on the first page of this policy, or by endorsement).

## SECTION IV—LIMITATIONS AND EXCLUSIONS

1. Electrical Apparatus Clause: This Company shall not be liable for any loss resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire as insured against ensues, and then this Company shall be liable for only its proportion of loss caused by the ensuing fire.

2. Finished Stock: This Company shall not be liable for any loss resulting from damage to or destruction of finished stock nor for the time required to reproduce said finished stock.

3. Limitation—Media For Electronic Data Processing: With respect to loss resulting from damage to or destruction of media for, or programming records pertaining to, electronic data processing or electronically controlled equipment, including data thereon, by the peril(s) insured against, the length of time for which this Company shall be liable hereunder shall not exceed—

A. 30 consecutive calendar days; or

B. the length of time that would be required to rebuild, repair or replace such other property herein described as has been damaged or destroyed;

whichever is the greater length of time.



**Alliance**
of American Insurers

# policy kit

## for students of insurance

Sample Insurance Policies, Endorsements & Forms

Fire     Marine     Life

Casualty

Working to Make Insurance Work Better

# EXHIBIT O

tively short period of time, but the receipts from the swimming lesson program would be lost. The same problem exists for bowling alleys with bowling leagues.

**Q.4. Is there any solution for the lag problem in business interruption insurance?**

**A.** A business interruption endorsement has been designed to cover the lag after restoration of the property. The formal name is "Endorsement Extending the Period of Indemnity." This form is available for use with either Gross Earnings Form #3 or Gross Earnings Form #4 and is approved in all states. Coverage under this endorsement commences on the date when repair or replacement of the property is completed, or on the date when the insurer's liability under the basic interruption coverage ceases.

The endorsement covers the actual loss sustained beyond the period covered by the normal business interruption policy. While the business interruption policy covers the loss until such time, with the exercise of due diligence, as the property is restored, the extended period of indemnity coverage provides for the payment of the actual loss sustained until the insured is able to restore his business to the condition that would have existed had no loss occurred. The key difference is that the endorsement covers the period until restoration of business, while the basic business interruption policy covers the period until replacement of property.

**Q.5. How is this insurance written and how is it rated?**

**A.** Coverage for the extended period of indemnity is written in multiples of 30 days. While the rating of this coverage varies by jurisdiction, normal rating is as follows: 30 days—10% of the annual business interruption rate; 60 days—18%; 90 days—25%; 120 days—33%; 150 days—42%; 180 days—50%; 210 to 270 days—55%; 300 to 360 days—60%. It is advisable to check your individual rating bureau for the rating methods applicable in your jurisdiction.

**Q.6. How is the amount of insurance determined?**

**A.** Herein lies the major problem in writing insurance to cover the lag after restoration of the property. The agent normally is in a relatively poor position to advise the insured on the appropriate amount of insurance, because he seldom has the businessman's expertise in knowing the seasonal fluctuations of the business. As a general rule, the agent can offer only broad guidelines for the insured to follow in determining the amount of insurance necessary to protect him against the lag after restoration.

An insured is wise to consider that it is possible to lose an entire season's business if repairs cannot be completed in advance of the seasonal peak. Furthermore, only the insured can judge the speed of his business "pickup" after the restoration of his property. The speed with which he can match the business loss will reduce the amount of his loss substantially. The judgment and business knowledge of the insured must be relied upon to establish the amount of insurance, and the insured must be aware that, in this particular case, it is far better to over-insure than to under-insure.

**Q.7. How does an inadequacy in the basic business interruption form affect the extended period of indemnity?**

**A.** Because the endorsement extending the period of indemnity is an extension of the basic business interruption contract, any coinsurance penalty assessed under that basic contract also will be assessed against the extended period of indemnity endorsement. For this reason, it gener-



**means**
**WIDE INTELLIGENCE**
**that's**
**WEGHORN INTERNATIONAL...**

wide intelligence about the right
markets to give you full coverage for
all your Excess/Surplus
requirements.

Unexcelled Service in
Unusual Coverage
PRIMARY THRU EXCESS

Excess Automobile (over A.R.)          Builders Risks
Excess Workers Compensation            All Risks
Errors & Omissions                     Products Insurance
Fine Arts, Jewelry, Furs               Directors & Officers Liability
Investment Counsellors (E & O)         Automobile Physical Damage
Umbrella Liability                     Restaurants Property & Liability
Aircraft Products Liability            Layers—Sections I & II
Kidnap/Ransom Insurance                Excess Umbrella
Fire, Extended Coverage, VM & M        Primary Liability
Jumbo Property Lines                   Buffer Layers
Difference in Conditions               Architects & Engineers
Mortgage Impairment                    Fiduciary Liability
                                       Bumbershoot Liability ...and more!

**WEGHORN INTERNATIONAL, Inc. 156 William Street**
New York, N.Y. 10038   (212) 227-4600
**WEGHORN INTERNATIONAL—N.J., Inc. 31 South Street,**
Morristown, N.J. 07960   (201) 267-1127
                                            TELEX: 127383

Case 2:21cv-23540-SRC-CBM Document 64 Filed 08/02/21 Page 2 of 256 PageID: 619



# Insurance Quiz of the Month

### by Werner A. Mueller, CPCU

## Full Coverage Business Interruption Insurance

Business interruption insurance has never received the enthusiastic support of the business community, nor has it received the enthusiastic support of agents and brokers. Businessmen as a group do not understand business interruption insurance, and agents and brokers have learned through disappointing experience that the business interruption contract has built-in conditions and limitations that make for protracted loss adjustment and often disappointing results.

Through the years, changes have been made in business interruption insurance that have been designed to eliminate most of the problems. The most serious problems connected with business interruption insurance are as follows: 1) limitation of perils to fire, lightning, extended coverage and vandalism; 2) period of indemnity limited to the time necessary to repair and replace; 3) coinsurance requirements.

In this Quiz we will discuss three endorsements designed to eliminate the objections related to coinsurance and the limitation on the period of restoration. The first problem, limitation of perils insured, probably is the most easily solved and will be discussed first.

**Q.1. How can business interruption coverage be broadened?**

**A.** Many companies will permit the broadening of business interruption insurance to follow the same form of coverage that is used on building and contents. If the insured purchases all-risk forms to cover building and contents, business interruption coverage can be written on all-risk basis.

Most frequently, however, package policies will apply all-risk coverage to building and contents and then leave the business interruption coverage on a fire, lightning, extended coverage and vandalism basis. Usually this is an oversight on the part of a businessman, agent or broker who is not aware that many companies now are willing to write broader coverage on business interruption.

**Q.2. Why is the length of reconstruction important in business interruption losses?**

**A.** Business interruption insurance pays for the loss of profit and for continuing expenses only for the length of time necessary to repair or replace the damaged property. This limitation in the contract presupposes that an insured will be able to return to the full level of business activity the day after repairs have been completed. The return to full profitability seldom happens so quickly. The insured may suffer a substantial business reduction until he is able to restore the same level of business activity that he had prior to the loss. During the period of a business shutdown, customers establish new buying connections and new buying habits. It is not at all unusual for a business to be able to repair the damaged property long before it can repair the break in customer activity. The lag between the period of restoration and the period of full business activity is not covered by the business interruption policy. Many businessmen become disillusioned with their agents and their insurance companies when they discover that the insurance purchased to protect against loss of profit

really was only partial protection.

**Q.3. Are many businesses subject to this "lag" from the time of reconstruction until full business restoration?**

**A.** With very few exceptions, all businesses suffer some lag between the time of property restoration and full restoration of business. In some cases, where demand for a product or service is extremely great, the lag is unimportant. In other instances, where competition is keen, the problem becomes a very, very serious problem indeed. Restaurants, florists, drug stores and automobile dealers all are examples of highly competitive businesses in which customers are difficult to recapture after extended business shutdowns. The examples in this field are countless, and discussion with any merchant probably will reveal that he is more concerned about recapturing a business volume than about the short-term loss of profits.

Seasonal businesses have an even greater concern than businesses with relatively stable monthly business volumes. Schools, bowling alleys and swimming pools all are examples of seasonal operations where the time lag problem becomes critical. A large portion of the swimming pool income consists of fees for swimming lessons. Students enrolled in the swimming lesson programs normally are recruited early in the swimming season. The swimming pool where the clubhouse suffers a loss during this period of recruitment would find very few customers for an extended swimming instruction program. The clubhouse might be rebuilt in a rela-

# EXHIBIT N

### F. Definitions

**1.** "Finished stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**3.** "Period of restoration" means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means Business Income that consists of:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

**b.** Continuing normal operating expenses incurred in connection with that premises, including:

**(1)** Payroll; and

**(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**6.** "Suspension" means:

**a.** The slowdown or cessation of your business activities; or

**b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

 © Insurance Services Office, Inc., 2011

Case 2:21-cv-23548-SRC-CLW Document 71-6 Filed 08/02/19 Page 2 of 246 PageID: 622

b. The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

   (1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

   (2) The Limit Of Insurance shown in the Declarations.

## 2. Monthly Limit Of Indemnity

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

   (1) The Limit of Insurance, multiplied by

   (2) The fraction shown in the Declarations for this Optional Coverage.

**Example**

| When: | The Limit of Insurance is: | $ 120,000 |
|---|---|---|
| | The fraction shown in the Declarations for this Optional Coverage is: | 1/4 |
| | The most we will pay for loss in each period of 30 consecutive days is: | $ 30,000 |
| | ($120,000 x 1/4 = $30,000) | |
| | If, in this example, the actual amount of loss is: | |
| | Days 1–30: | $ 40,000 |
| | Days 31–60: | $ 20,000 |
| | Days 61–90: | $ 30,000 |
| | | $ 90,000 |
| | We will pay: | |
| | Days 1–30: | $ 30,000 |
| | Days 31–60: | $ 20,000 |
| | Days 61–90: | $ 30,000 |
| | | $ 80,000 |

The remaining $10,000 is not covered.

## 3. Business Income Agreed Value

a. To activate this Optional Coverage:

   (1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

      (a) During the 12 months prior to the date of the Work Sheet; and

      (b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

   (2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

      (a) The Coinsurance percentage shown in the Declarations; multiplied by

      (b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

b. The Additional Condition, Coinsurance, is suspended until:

   (1) 12 months after the effective date of this Optional Coverage; or

   (2) The expiration date of this policy;

   whichever occurs first.

c. We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

   (1) Within 12 months of the effective date of this Optional Coverage; or

   (2) When you request a change in your Business Income Limit of Insurance.

d. If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

   (1) The Business Income Limit of Insurance; divided by

   (2) The Agreed Value.

**Example**

| When: | The Limit of Insurance is: | $ 100,000 |
|---|---|---|
| | The Agreed Value is: | $ 200,000 |
| | The amount of loss is: | $ 80,000 |

Step (1): $100,000 ÷ $200,000 = .50

Step (2): .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

## 4. Extended Period Of Indemnity

Under Paragraph A.5.c., **Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

© Insurance Services Office, Inc., 2011
CP 00 30 10 12

**IRMI HYPERPOLICY™    SAMPLE ISO POLICY**

Instead, we will determine the most we will pay using the following steps:

Step (1):  Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step (2):  Divide the Limit of Insurance for the described premises by the figure determined in Step (1); and

Step (3):  Multiply the total amount of loss by the figure determined in Step (2).

We will pay the amount determined in Step (3) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

(1)  Prepaid freight – outgoing;

(2)  Returns and allowances;

(3)  Discounts;

(4)  Bad debts;

(5)  Collection expenses;

(6)  Cost of raw stock and factory supplies consumed (including transportation charges);

(7)  Cost of merchandise sold (including transportation charges);

(8)  Cost of other supplies consumed (including transportation charges);

(9)  Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

(10)  Power, heat and refrigeration expenses that do not continue under contract (if Form CP 15 11 is attached);

(11)  All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

(12)  Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

When:     The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been:      $ 400,000

The Coinsurance percentage is:      50%

The Limit of Insurance is:      $ 150,000

The amount of loss is:      $  80,000

Step (1):  $400,000 x 50% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2):  $150,000 ÷ $200,000 = .75

Step (3):  $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

When:     The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been:      $ 400,000

The Coinsurance percentage is:      50%

The Limit of Insurance is:      $ 200,000

The amount of loss is:      $  80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E.  Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1.  Maximum Period Of Indemnity**

a.  The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

CP 00 30 10 12      © Insurance Services Office, Inc., 2011      **Page 7 of 9**

**IRMI HYPERPOLICY™    SAMPLE ISO POLICY**

### 3. Loss Determination

**a.** The amount of Business Income loss will be determined based on:

  **(1)** The Net Income of the business before the direct physical loss or damage occurred;

  **(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

  **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

  **(4)** Other relevant sources of information, including:

    **(a)** Your financial records and accounting procedures;

    **(b)** Bills, invoices and other vouchers; and

    **(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

  **(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

    **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

    **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

  **(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

### c. Resumption Of Operations

We will reduce the amount of your:

  **(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

  **(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

### 4. Loss Payment

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

## D. Additional Condition

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

IRMI HYPERPOLICY™     SAMPLE ISO POLICY

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

## 2. Duties In The Event Of Loss

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation – Interruption Of Computer Operations does not apply based on Paragraph A.4.d. therein.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

(c) If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage, Interruption Of Computer Operations, does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

### 6. Coverage Extension

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

    © Insurance Services Office, Inc., 2011

IRMI HYPERPOLICY™        SAMPLE ISO POLICY

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

(1) New buildings or structures, whether complete or under construction;

(2) Alterations or additions to existing buildings or structures; and

(3) Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

(a) Used in the construction, alterations or additions; or

(b) Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

(1) **Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

(ii) 60 consecutive days after the date determined in (1)(a) above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(2) **"Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

(b) Ends on the earlier of:

(i) The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

(ii) 60 consecutive days after the date determined in (2)(a) above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

---

(2) Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

### 3. Covered Causes Of Loss, Exclusions And Limitations

See applicable Causes Of Loss form as shown in the Declarations.

### 4. Additional Limitation – Interruption Of Computer Operations

a. Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

b. Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

c. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

d. This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

### 5. Additional Coverages

a. Civil Authority

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends;

whichever is later.

© Insurance Services Office, Inc., 2011

COMMERCIAL PROPERTY
CP 00 30 10 12

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

© Insurance Services Office, Inc., 2011

# EXHIBIT M

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

7. "Valuable papers and records" means inscribed, printed, or written:

a. Documents;

b. Manuscripts; and

c. Records;

including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean:

d. "Money" or "Securities";

e. Converted Data;

f. Programs or instructions used in your data processing operations, including the materials on which the data is recorded.

**BP0002 (12/99)  Page 23 of 23**
*//*BP0002-199912*

Copyright, Insurance Services Office, Inc., 1999

SA000087

### g. Suspension

Whenever an Object is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss from an Accident to that Object. This can be done by delivering or mailing a written notice of suspension to:

(1) Your last known address; or

(2) The address where the Object is located.

If we suspend your insurance, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

## H. Property Definitions

1. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

2. "Operations" means your business activities occurring at the described premises.

3. "Period of restoration" means the period of time that:

   a. Begins:

      (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

      (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

      caused by or resulting from any Covered Cause of Loss at the described premises; and

   b. Ends on the earlier of:

      (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2) The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

(2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

4. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

5. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

6. "Specified Causes of Loss" means the following:

   Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      (1) The cost of filling sinkholes; or

      (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss of or damage to:

      (1) Personal property in the open; or

      (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

*//*BP0002-189912

Copyright, Insurance Services Office, Inc., 1999

SA000086

(1) Owned by you or in your care, custody or control; and

(2) At the described premises.

b. **Accident** means a sudden and accidental breakdown of the Object or a part of the Object. At the time the breakdown occurs, it must manifest itself by physical damage to the Object that necessitates repair or replacement.

c. None of the following is an Accident:

(1) Depletion, deterioration, corrosion or erosion;

(2) Wear and tear;

(3) Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

(4) Breakdown of any vacuum tube, gas tube or brush;

(5) Breakdown of any electronic computer or electronic data processing equipment;

(6) Breakdown of any structure or foundation supporting the Object or any of its parts;

(7) The functioning of any safety or protective device; or

(8) The explosion of gases or fuel within the furnace of any Object or within the flues or passages through which the gases of combustion pass.

d. **Object** means any of the following equipment:

(1) Boiler and Pressure Vessels:

(a) Steam heating boilers and condensate return tanks used with them;

(b) Hot water heating boilers and expansion tanks used with them;

(c) Hot water supply boilers;

(d) Other fired or unfired vessels used for maintenance or service of the described premises but not used for processing or manufacturing;

(e) Steam boiler piping, valves, fittings, traps and separators, but only if they:

(i) Are on your premises or between parts of your premises;

(ii) Contain steam or condensate of steam; and

(iii) Are not part of any other vessel or apparatus;

(f) Feed water piping between any steam boiler and a feed pump or injector.

(2) Air Conditioning Units – Any air conditioning unit that has a capacity of 60,000 Btu or more, including:

(a) Inductors, convectors and coils that make use of a refrigerant and form part of a cooling, humidity control or space heating system;

(b) Interconnecting piping, valves and fittings containing only a refrigerant, water, brine or other solution;

(c) Vessels heated directly or indirectly that:

(i) Form part of an absorption type system; and

(ii) Function as a generator, regenerator or concentrator;

(d) Compressors, pumps, fans and blowers used solely with the system together with their driving electric motors; and

(e) Control equipment used solely with the system.

e. **Object** does not mean:

(1) As Boiler and Pressure Vessels:

(a) Equipment that is not under internal vacuum or internal pressure other than weight of contents;

(b) Boiler settings;

(c) Insulating or refractory material; or

(d) Electrical, reciprocating or rotating apparatus within or forming a part of the boiler or vessel.

(2) As Air Conditioning Units, any:

(a) Vessel, cooling tower, reservoir or other source of cooling water for a condenser or compressor, or any water piping leading to or from that source; or

(b) Wiring or piping leading to or from the unit.

f. We will not pay for an Accident to any Object while being tested.

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000085

d. All loss:

  (1) Caused by one or more persons; or

  (2) Involving a single act or series of related acts;

is considered one occurrence.

e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

## 4. Employee Dishonesty

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

  (1) Cause you to sustain loss or damage; and also

  (2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

    (a) Any employee; or

    (b) Any other person or organization.

b. We will not pay for loss or damage:

  (1) Resulting from any dishonest or criminal act that you or any of your partners commit whether acting alone or in collusion with other persons.

  (2) The only proof of which as to its existence or amount is:

    (a) An inventory computation; or

    (b) A profit and loss computation.

c. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

d. All loss or damage:

  (1) Caused by one or more persons; or

  (2) Involving a single act or series of related acts;

is considered one occurrence.

e. We will pay only for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

f. This Optional Coverage does not apply to any employee immediately upon discovery by:

  (1) You; or

  (2) Any of your partners, officers or directors not in collusion with the employee;

of any dishonest act committed by that employee before or after being hired by you.

g. We will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.

h. If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

  (1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

  (2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

i. The insurance under Paragraph h. above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

  (1) This Optional Coverage as of its effective date; or

  (2) The prior insurance had it remained in effect.

## 5. Mechanical Breakdown

a. We will pay for direct damage to Covered Property caused by an Accident to an Object. The Object must be:

*//*BP0002-199912

Copyright, Insurance Services Office, Inc., 1999

SA000084