# EXHIBIT 28

```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

PHILADELPHIA EAGLES          .      No. 2:21-cv-01776-MMB
LIMITED PARTNERSHIP,         .
                             .
          Plaintiff,         .      United States Courthouse
                             .      601 Market Street
     v.                      .      Philadelphia, PA 19106
                             .
FACTORY MUTUAL               .      November 17, 2021
INSURANCE COMPANY,           .      1:58 p.m.
                             .
          Defendant.         .
. . . . . . . . . . . . . . .       (Courtroom 3A)

                    MOTION TO REMAND HEARING
              BEFORE HONORABLE MICHAEL M. BAYLSON
             SENIOR UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:
For the Plaintiff:          LINDA D. KORNFELD, ESQ.
                            DICKSTEIN SHAPIRO, LLP
                            2049 Century Park East, Suite 700
                            Los Angeles, CA 90067-3109

                            CHARLES A. FITZPATRICK, IV, ESQ.
                            JAMES T. GILES, ESQ.
                            BLANK ROME, LLP
                            One Logan Square
                            130 North 18th Street
                            Philadelphia, PA 19103-6998

For the Defendant:          RICHARD D. GABLE, JR., ESQ.
                            ADAM B. MASEF, ESQ.
                            BUTLER WEIHMULLER KATZ CRAIG, LLP
                            1818 Market Street, Suite 2740
                            Philadelphia, PA 19103

Audio Operator:             LORI DiSANTI

Transcribed by:             DONNA MORRIS, CET-1284
                            KELLI RAY, CET-349
                            Court Transcribers
                            Lawrence Court Transcription & Video
                            P.O. Box 530790
                            DeBary, FL 32753
                            833-800-LCTV
```

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

1      (Court in session at 1:58 p.m.)

2           JUDGE MICHAEL M. BAYLSON:  Okay.  Good afternoon,

3 everyone.

4           ALL:  Good afternoon, Your Honor.

5           THE COURT:  All right.  Please be seated.  The

6 lighting seems to be low in this -- is that -- can we --

7           THE CLERK:  I have a call in.

8           THE COURT:  Okay.  Thank you.

9           Okay.  We're here today for argument in a case

10 captioned Philadelphia Eagles Limited Partnership vs. Factory

11 Mutual Insurance Company, civil action, 21-1776.

12           Present for the Plaintiffs are Linda Kornfeld.  Good

13 afternoon.

14           MS. LINDA D. KORNFELD:  Good afternoon.

15           THE COURT:  Charles Fitzpatrick.  Good afternoon.

16           And Judge Giles.

17           MR. JAMES T. GILES:  Good afternoon, Your Honor.

18           THE COURT:  Good afternoon to you.

19           MR. CHARLES A. FITZPATRICK, IV:  Good afternoon, Your

20 Honor.

21           THE COURT:  And for the Defendant, Richard Gable, Jr.

22 and Adam Masef.  Okay.

23           MR. RICHARD D. GABLE, JR.:  Good afternoon.

24           THE COURT:  All right.  We have -- just by way of

25 history, this is a case which was removed by the Defendant from

1  the Common Pleas Court in Philadelphia.  The complaint sought a

2  declaratory judgment concerning an insurance policy issued by

3  the Defendant arising out of the other court case.  The dispute

4  arises out of the well-known COVID-19 epidemic -- pandemic,

5  whatever you may want to call it, that has affected our society

6  in many severe ways.

7          And I had an argument in this case in July -- July

8  1st, I think, which as I characterize, it was mainly procedural

9  to ascertain what was happening with the case relative to some

10  other cases and we were all aware that there was a case pending

11  in the Third Circuit which was -- a decision was handed down

12  August 18, 2021, in *DiAnoia's Eatery*, D-I-A-N-O-I-A, *DiAnoia's*

13  *Eatery vs. Motorists Mutual Insurance Company*, 10 F.4th 192.

14  And after that decision came down, I allowed the -- I invited

15  counsel to file supplemental memorandum, which both sides did,

16  and then I listed it for this argument, and as I frequently do,

17  I sent counsel a few questions.

18          And what we're going to do is first proceed with the

19  questions in my letter of November 16th and give each side just

20  a few minutes to answer each question and then I will have a

21  couple of other questions that were not in my letter and then

22  I'll give each attorney a chance to sum up or say anything else

23  that they want to say that they haven't said so far.  And then

24  I will take the matter under advisement.  I don't intend to

25  make any decision today.

4

1          And with that, let me -- I want to make one comment.

2          In reading the supplemental briefs, both sides

3 asserted that the Third Circuit's decision in *DiAnoia's Eatery*

4 supported their position.  I want to make it clear to both of

5 you that neither -- in my view, neither of you are correct.  I

6 do not consider that opinion to have decided this case.  If it

7 did, I wouldn't be having this argument.  I view the Third

8 Circuit's opinion as a important direction to District Courts

9 as to the things that should be considered by us in resolving

10 these issues on -- on -- on insurance -- on a motion for

11 declaratory judgment concerning insurance coverage and I do not

12 -- do not -- do not waste your time telling me that you won

13 your -- that the Third Circuit supported your position.  What

14 the Third Circuit did is -- it in some detail went through the

15 eight factors that a judge has to consider.  The only thing the

16 Third -- or did hold is that the three -- three judges whose

17 opinions were under review, I think there were three, did not

18 explore the issues carefully enough.  So that's why I scheduled

19 this argument and that's why I'm going to have these eight

20 questions.

21          So what we're going to do is I'm going to read the

22 factors off and because this is a motion to remand by the

23 Plaintiff, I'm going to ask the Plaintiff counsel to speak

24 first and then Defense counsel.  All right?  And -- and then

25 we'll move on to the next one.  And I'm going to limit you to

1  just a couple of minutes on each point.  And what I usually do

2  and I will do in this case, then when we're all done, I will

3  give you a chance to file a very short supplemental memorandum,

4  if you want to, because of something you left out or you want

5  to remake, remembering the famous politician who said there

6  were always three speeches.  There was the one the politician

7  prepared, there was the one the politician delivered, and there

8  was the one the politician wished they had delivered.  And that

9  applies to lawyers too.  So if you forget to say anything or

10  you don't have enough time, you'll get a chance to put it in a

11  short supplemental memorandum and we'll talk about the due date

12  for that.

13          Okay.  So item number one is the likelihood that a

14  federal court declaration will resolve the uncertainty of

15  obligation which gave rise to the controversy.

16          All right.  Who wants to -- Ms. Kornfeld, you want to

17  argue these or Mr. Fitzpatrick?

18          MS. KORNFELD:  Yes, Your Honor, I'll be arguing.

19          THE COURT:  Go ahead.

20          MS. KORNFELD:  Your Honor, we -- in reading very

21  carefully -- and I -- and I pronounce it wrong every time, so

22  I've started to refer to it as the Eatery case, *DiAtona's*

23  [sic] --

24          THE COURT:  Yeah.

25          MS. KORNFELD:  In reading carefully the Third

1 Circuit's opinion in *DiAtona -- DiAtona's Eatery*, we -- we do
2 not intend to tell you today that we won and we should all go
3 home now.  We do believe that what the Court did in that case
4 was focus in on the third factor -- the third *Reifer* factor,
5 which is the public interest in settlement of the
6 uncertainty --

7         THE COURT:  All right.  Well, I'll come to the third
8 *Reifer* factor.  If you don't think they've talked about number
9 one, just say that.

10         MS. KORNFELD:  Your Honor, I believe they spoke about
11 number one, but I believe that their conclusion was that this
12 Court could resolve the issues in this case and, therefore,
13 factor number one did not weigh in favor of remand.

14         THE COURT:  Okay.  All right.  Mr. Gable.

15         MR. GABLE:  We would agree.  We would agree, Your
16 Honor.  We think that the --

17         THE COURT:  Okay.  Okay.

18         MR. GABLE:  -- that factor --

19         THE COURT:  All right, factor number two, the
20 convenience of the parties; Ms. Kornfeld.

21         MS. KORNFELD:  Your Honor, we think that factor is
22 neutral.

23         THE COURT:  Okay.  Mr. Gable.

24         MR. GABLE:  Your Honor, we -- we would say that it's
25 neutral or it's to our -- in favor of keeping the case here.  I

1  mean, the Plaintiff --

2          THE COURT:  Why?

3          MR. GABLE:  -- is a Philadelphia entity and, you

4  know, there's no reason not to keep the case right where it

5  sits.  It's about as convenient as it gets.

6          THE COURT:  All right.  All right, three, the public

7  interest in settlement of the uncertainty of obligation.

8          MS. KORNFELD:  Your Honor, we believe that is the key

9  factor and that that factor weighs in favor of the Court

10 exercising its discretion to remand the case to allow the state

11 court, the Court of Common Pleas, to address novel and

12 unsettled rules of state insurance law.

13         THE COURT:  All right.  Mr. Gable.

14         MR. GABLE:  Your Honor, we would agree that it -- it

15 is the issue that the court left open for the -- for the courts

16 to analyze.  I mean, I think they -- they remanded on all the

17 issues, for consideration of all the issues, but that's the one

18 that got the most attention.  You know, our view of that is

19 that the court made clear that novel facts don't make novel

20 legal issues.  And I think that was the argument we made here

21 the first time and -- and so not to claim victory, but -- but

22 we think that -- that what the court said is, in order to

23 articulate a basis for remand, we need to show that there's

24 truly an undetermined issue of state law that requires the case

25 be in state court, that this court can't address, like all the

8

1   other federal courts that have addressed insurance coverage

2   issues dealing with COVID, that there's an issue here that's

3   different and it's so weighty that this Court would need to

4   send the case back to state court.  So I feel we may want to

5   address that in a little more detail, because I do think that

6   that --

7          THE COURT:  All right.  Well, this -- this goes back

8   to -- this will come up again under my question number three,

9   about the record.  Okay.  All right.  We can come back to that.

10          All right, four, the availability and relative

11  convenience of other remedies; Ms. Kornfeld.

12          MS. KORNFELD:  Your Honor, we believe that -- that is

13  a neutral factor.

14          THE COURT:  Mr. Gable.

15          MR. GABLE:  Right, Your Honor, and we think it weighs

16  back in favor of keeping the case here.  There are no -- the

17  only real remedy that's available is a decision on the

18  declaratory judgment action and it's currently in front of Your

19  Honor.  So there's really no reason for this case to go any

20  -- any place else.  You can grant complete relief.

21          THE COURT:  Well, if -- if I were to -- if I were to

22  decide this -- if I were to say I'm going to deny the motion to

23  remand and I'm going to deny the motion to dismiss, that means

24  -- how would the case proceed in this court under that

25  scenario?

9

1          MR. GABLE:  So we would begin discovery and we would

2  begin --

3          THE COURT:  Well, do -- do -- but I thought your

4  position in your motion to dismiss is that this is clear as a

5  matter of law that you're entitled to have the complaint

6  dismissed?

7          MR. GABLE:  Correct, Your Honor.  And we would assume

8  that if you denied that, you would tell us why you thought we

9  were wrong.  And so if you -- if you felt that you denied the

10 motion to dismiss and that there were, you know, factual issues

11 that required or -- or that Plaintiff was entitled to discover,

12 then I think we would -- we would move into the discovery phase

13 of the case.  It's also possible, Your Honor, you could tell us

14 that you think we're wrong and that the Plaintiff is right and

15 in -- in that context, I assume that Plaintiff would take some

16 additional steps.

17         THE COURT:  Well -- well -- well wait a minute.

18 Let's just pause for a minute.  If I -- if I were to agree with

19 you completely, I would deny the motion to remand and I would

20 grant the motion to dismiss and the case would be over.  Right?

21         MR. GABLE:  Correct.

22         THE COURT:  And the Plaintiffs could appeal.  Okay?

23 If I deny the motion to remand and I also deny the motion to

24 dismiss, because I may feel there's some factual issues, I may

25 -- I may not identify all the factual issues.  I may say that

1  this has to go into discovery and that I -- I would want to

2  listen to counsel more before I would determine what were

3  factual issues.

4          Your -- your position would be, I presume, that

5  whatever facts -- that unless some factual dispute was genuine

6  -- was genuine and material, using the language of Rule 56,

7  that you'd be entitled to summary judgment.  Right?

8          MR. GABLE:  That's correct, Your Honor.

9          THE COURT:  Okay.  Can you envision any scenario in

10 which this case would go to trial in this court?

11         MR. GABLE:  It is -- I mean, it is possible in this

12 case.  You know, and Plaintiffs have argued in their complaint

13 that they can prove that their stadium, for example, was

14 damaged by the presence of COVID.  While we disagree with that,

15 we don't think legally their -- their position is accurate.  It

16 is, at least, theoretically possible and there are at least

17 -- I believe, within -- around the country, there may have been

18 one or two cases that have actually gone to trial.  So it is

19 possible, but I would agree with the Court, it's very unlikely

20 that the case could go to trial if the Court were to find a

21 dispute of fact.

22         THE COURT:  Well, if I did, what -- what -- how else

23 could it be resolved?

24         MR. GABLE:  Right.

25         THE COURT:  So, in that event, you agree there could

1  be a trial?

2          MR. GABLE:  That's correct.

3          THE COURT:  Now, why would a trial be better here

4  than in state court?

5          MR. GABLE:  Well, I would say a trial here would be

6  better in that the case is already here.  I think the federal

7  court would permit -- there's no witnesses that we wouldn't be

8  able to bring into court.  They would all be within the

9  subpoena power of -- of the Court.  And I can't see any reason

10 why a -- a jury at city hall, should the case, you know,

11 proceed to a jury, would -- would be any different than a jury

12 here.  I guess there would be a bit of a different jury pool,

13 but -- but on the whole, I -- I don't think -- I mean, I think

14 a jury -- I think the case here would be better, frankly,

15 humbly, because I -- I -- I, frankly, think federal procedure

16 is more streamlined, but I don't know if that's what you're --

17 what you're asking me about.

18         THE COURT: All right.  Ms. Kornfeld, you want to

19 respond to that, to what Mr. Gable just said?  You don't have

20 to, but if you want to, you can.

21         MS. KORNFELD:  Well, Your Honor, I would.  And I

22 would -- I would point out that, you know, we -- we are

23 involved in a number of these COVID cases with different

24 clients, with different facts and the issues here for the

25 Eagles are unique from other cases that we're involved in

1  because, one, we have Pennsylvania law and the Third Circuit

2  law.  We have something -- you know, we have a case called *Port*

3  *Authority* and another case in Pennsylvania called *Hardinger* and

4  both of those courts have stated that you don't need to

5  actually see a broken table or a broken roof in order to

6  trigger coverage under property policy.  It's enough that you

7  can have enough of a dangerous substance in the air space of

8  your building to create coverage.  The question is whether you

9  have enough of a dangerous air space -- dangerous substance in

10  your building.

11          So whether this is a case that could proceed to

12  trial, we think it's quite likely that it could proceed to

13  trial with experts battling each other as they were in the *Port*

14  *Authority* case and as the court directed -- as the Third

15  Circuit directed the trial court to delve into in *Hardinger*

16  over the factual question of, you know, the extent to which the

17  air space at the stadium was dangerous and so we think science,

18  experts, and battling experts on that science would -- would be

19  something that could press this case to trial.

20          With respect to the courtroom, that would be better

21  situated to have this trial.  It -- it is our view that there

22  is a very important issue in this case with respect to

23  regulatory estoppel and we -- you know, what little facts we've

24  been able to glean from the public record before we've been

25  able to conduct discovery of FM's files shows us that when FM's

1   was seeking to get the regulators to approve its contamination

2   exclusion, it made statements that appear not to be accurate

3   and so we will be pursuing a regulatory estoppel claim and we

4   believe that the state courts --

5            THE COURT:  Well, that -- that --

6            MS. KORNFELD:  -- are uniquely positioned to --

7            THE COURT:  Well, let me --

8            MS. KORNFELD:  -- to police those regulatory issues.

9            THE COURT:  Let me ask you about the regulatory

10  estoppel, because I saw that in your brief and the Defendant's

11  assert that it's really nothing to do with this case.  I mean,

12  this -- isn't this case determined by the -- the terms of the

13  -- of the insurance policy?

14           MS. KORNFELD:  Your --

15           THE COURT:  Do you -- do you have any authority that

16  in determining a case like this, with this declaratory

17  judgment, for an insurance -- for a insurance policy that

18  regulatory estoppel is -- is a factor?

19           MS. KORNFELD:  Yes, Your Honor.  It's the

20  *Sunbeam* case from the Supreme Court of -- Pennsylvania Supreme

21  Court, where the court said that regulatory estoppel, what an

22  insurer says to its regulator when it's, for example, seeking

23  to get approval of a new exclusion, and if what the insurer

24  says is not accurate, it's up to the courts in Pennsylvania to

25  police that issue.  And regulatory estoppel is -- you know,

1   it's not a theory that is accepted in all states and, in fact,

2   many states don't, but Pennsylvania does, New Jersey does, and

3   in -- in cases where regulatory estoppel is at issue, the

4   courts have said that even if the insurance policy -- the

5   exclusion you're looking at and the one we're talking about

6   here is the contamination exclusion, even if the court

7   determines that it is clear and unambiguous on its face as to

8   its application, because the insurer misrepresented to the

9   regulator the impact of the new language when it was seeking to

10  get it approved, that's enough for the court to prevent

11  enforcing that exclusion against the policy holder.

12         THE COURT:  All right.  Briefly, Mr. Gable, what's

13  your position on that argument on regulatory estoppel?

14         MR. GABLE:  Your Honor, first of all, the key issue

15  for today's purpose is whether the law on regulatory estoppel

16  is uncertain such that this Court has to remand the case to

17  state court because it can't apply Pennsylvania law and

18  regulatory estoppel.  We'd suggest that a -- a quick Westlaw

19  search would show that more than a dozen cases in this district

20  alone have dealt with similar arguments at the motion to

21  dismiss state.

22         THE COURT:  Yeah, but this is a diversity case, so I

23  have to apply Pennsylvania law.

24         MR. GABLE:  No.  Understood.  And even under

25  Pennsylvania law, courts in this -- in this -- in the Eastern

1  District, other judges here have already dealt with this issue

2  of regulatory.  It's not uncertain.  The legal construct behind

3  the regulatory estoppel argument is not uncertain or in

4  dispute.  We would -- as to the merits of the argument, we

5  would say that what they have pointed to belatedly in their

6  most recent briefing, which was not part of their original

7  complaint, it is not really briefed in the motion to dismiss,

8  is a document from the state of Illinois from 2006 in which

9  Factory Mutual changed its -- added a definition of

10 contamination to its policy form.  It made an editorial change

11 to the policy form to define what it was meant by

12 contamination.  That's all it did.  And it didn't -- it -- what

13 regulatory estoppel is designed to apply to is where Factory

14 Mutual takes one position in front of the regulators and tries

15 to take a different position when it comes to its policy

16 holders.

17          THE COURT:  Right.  Okay.  Well --

18          MR. GABLE:  It didn't do that.

19          THE COURT:  All right.  Ms. Kornfeld, I -- I -- I

20 don't think regulatory estoppel is in your complaint, so the

21 question is whether you feel you want to amend your complaint

22 to add a -- a cause of action under that.  I'm not telling you,

23 you have to, but I think you ought to think about that.

24          MS. KORNFELD:  Your Honor, one thing that we would,

25 at the end of the conversation regarding remand, like to

1  discuss with you is that the -- the world of COVID coverage is

2  ever evolving.  As much as we're learning about the virus as

3  the days go on and on, we're learning a lot more about the

4  coverage.  And what I mean by that is some of the cases against

5  Factory Mutual, for example, have proceeded past the motion to

6  dismiss phase and discovery is happening and there is

7  information coming out that we didn't have access to when we

8  drafted our complaint.

9          THE COURT:  Yeah.  I'm not being critical, I'm just

10  saying that --

11          MS. KORNFELD:  We --

12          THE COURT:  -- when I read your brief, you -- you

13  discuss regulatory estoppel as a theory of recovery and -- but

14  it's not in your complaint.  So I think you ought to make some

15  decision as to whether you would want to amend your complaint.

16  I mean, I would be inclined to allow you to do that because

17  this is in a very early stage.  And I'm not sure -- so I -- I

18  think you ought to discuss that with your client and let me

19  know if you want to do that or not.  And I don't know if the

20  Defendant would object or not, but I would be inclined to allow

21  it, just so you have all your theories, you know, in black and

22  white on -- on paper.

23          MS. KORNFELD:  Your --

24          THE COURT:  So you --

25          MS. KORNFELD:  Your Honor, we  --

1          THE COURT:  -- you ought to -- you ought to consider
2   that.
3          MS. KORNFELD:  We -- we have and we've -- we've
4   actually reached out to the other side to ask if they agree to
5   let us amend our complaint.  It may be premature at this point,
6   because the remand issue hasn't been decided, but if the Court
7   were to decide to keep our case, we would, the next day, be
8   asking to amend our complaint in light of what's come up since.
9          THE COURT:  Well, if -- if I grant the motion to
10  remand, obviously, it's -- it's moot.
11         MS. KORNFELD:  Right.
12         THE COURT:  I -- I no longer have the case and you
13  can, you know, talk about it in the Third Circuit or on the --
14  on Common Pleas Court.  But, you know, I think the Defendant
15  would have a right to appeal if I granted the remand and if you
16  -- you should think whether -- if that happens and you're
17  arguing in front of the Third Circuit, somebody in the Third
18  Circuit might ask you, well, why didn't you take up the
19  invitation to amend your complaint?  I'm not -- I'm not going
20  to answer that question for you, but I think you ought to think
21  about it.
22         MS. KORNFELD:  Thank you, Your Honor.
23         THE COURT:  All right.  Let's go to question number
24  -- factor number five, a general policy of restraint when the
25  same issues are pending in a state court.

1    Now, I should add to this number five is that there
2  are some cases that say that it should be the same issues in
3  state court and the same parties and some of the cases you've
4  both cited on this issue make that point that it will be the
5  same parties.  Now, you've -- you've all discussed the *Sammy*
6  (Phonetic) case or the *Summy* case, S-U-M-M-Y, and I don't
7  consider that case to be particularly controlling about what I
8  should do, because in that case, and that was my colleague,
9  Judge Robreno, was reversed, because the case pending in state
10 court was actually between the same parties and the First
11 Circuit relied heavily on that fact in saying that Judge
12 Robreno should have granted the motion to remand.

13    Now, here, we don't have any case pending in state
14 court between the -- you two parties, the Eagles and -- and
15 Factory Mutual.  But I wonder whether the cases that say it has
16 to be the same parties are strictly applicable when we are
17 talking about a huge block of litigation that -- and that has
18 arisen out of this terrible pandemic that has affected every
19 aspect of human life on the entire planet, not just in the
20 Eastern District of Pennsylvania or the state of Pennsylvania.

21    So it seems to me that the fact that the same issues
22 are pending in state court is relevant here, even though
23 they're not in front of the same parties, but I leave that --
24 you have any comment, Ms. Kornfeld, on that?

25    MS. KORNFELD:  Yes, Your Honor.  It is our view -- we

1  -- we read the Eateries' opinion and saw the Eateries'

2  discussion -- the -- the Third Circuit discussion of factor

3  five in that opinion and acknowledging that there are

4  circumstances where you may have an issue that is being

5  addressed by multiple parties who are not the same parties, but

6  in state court and same issue that's being addressed in federal

7  court.  And -- and that might suggest that the fifth factor

8  would weigh in favor of remand and then the court ultimately

9  decided not because it thought it could create a mess.

10        But I think if there's any scenario where the fifth

11 factor should be used to weigh in favor of remand, where you've

12 got multiple parties arguing the identical issue, this would be

13 the circumstance.  It is extremely unusual to have a situation

14 like this, where you have so many litigants arguing over the

15 same thing at the same time.  You know, I -- I've been

16 practicing as a coverage lawyer since 1991 and I've not seen a

17 situation like this, so if there were a circumstance where the

18 fifth -- the fifth factor would promote the interest of justice

19 and allow for judicial economy and avoid waste of judicial

20 resources at the federal court level, including both in your

21 courtroom and in the Third Circuit.  It would seem that this

22 would be that circumstance, given the number of litigants

23 addressing the same issues in state court right now.

24        THE COURT:  All right.  Mr. Gable.

25        MR. GABLE:  Your Honor, I think -- well, what Ms.

1  Kornfeld just argued is -- is exactly what the Third Circuit
2  said was not to be considered, that -- that I think our reading
3  of that case is that it is this -- you know, this -- this body
4  of law grows out of issues in the third party liability realm
5  and it is not uncommon that there is an ongoing suit, whether
6  it be a tort action or a coverage action in state court and an
7  insurer goes to federal court in order to get relief on a
8  declaratory judgment action while there are a -- the same case
9  or a very similar case pending in state court.

10        And -- and our read of *DiAnoia's Eatery* is the Third
11  Circuit was reminding the trial level courts that -- that
12  simply because COVID cases are being litigated is not enough to
13  put the fifth factor weighing in favor of remand, that it
14  should be not only the same issues, but the same parties.  And
15  the second part of that is, if you look at Plaintiff's
16  complaint and their arguments both on the motion to dismiss and
17  the motion to remand, they have argued several occasions that
18  the Factory Mutual policy is unique, that its grant of coverage
19  is unique, that its contamination exclusion is unique, and so
20  under the, you know, Title, you can't have your cake and eat it
21  too.  I don't believe you can say that -- that Factory Mutual's
22  policy is unique and yet say that all of these other cases that
23  are preceding in the state court have some connection with this
24  litigation.

25        So for -- for those reasons, Your Honor, we don't

1 believe that the fifth factor weighs in favor of remand.  In

2 fact, we don't think -- we think it's clear that there are no

3 other cases out there involving the contract between Factory

4 Mutual and the Philadelphia Eagles and that's the relevant

5 consideration for this Court.

6          THE COURT:  All right.  Thank you.

7          All right.  The sixth factor is avoidance of

8 duplicative litigation.  That's somewhat similar to the fifth

9 factor.  Ms. Kornfeld, what's your view?

10          MS. KORNFELD:  Your Honor, we agree that it is --

11 that the fifth factor, as I was just arguing it, is -- is

12 similar.  And -- and I note that we do believe that we should

13 prevail on a motion to dismiss -- overcoming a motion to

14 dismiss because of the unique nature of the language in the FM

15 policy and our unique facts, but there are cases presently

16 pending in the state court that have, for example, the same

17 contamination exclusion we're addressing here.  We presented

18 those cases to Your Honor when we were here last time and so

19 while there are many issues, policy language -- different

20 policy language at issue in cases in -- in --

21          THE COURT:  Well, but -- but you're -- you -- I think

22 your answer somewhat contradicts what you said about the fifth

23 factor.  You said for the fifth factor it had to be the same

24 parties.  Now you're telling me under the sixth factor that --

25          MS. KORNFELD:  No, no, no, Your Honor.  I'm sorry.

1  No.  I -- my argument with respect to the fifth factors is that
2  in the context of COVID it need not be the same parties.
3          THE COURT:  Okay.  All right.  Well, then you're both
4  in agreement on that.
5          Okay.  All right.  The seventh -- oh, Mr. Gable,
6  anything you want to say on the sixth factor?
7          MR. GABLE:  No, Your Honor.  I -- I -- I think Your
8  Honor can give complete relief.  There would be no need for any
9  further litigation and so this case will resolve it, so we
10 believe the sixth factor weighs in favor of keeping the case
11 here.
12         THE COURT:  All right.  Seventh factor, prevention of
13 the use of the declaratory action as a method of procedural
14 fencing or as a means to provide another forum in a race for
15 res judicata.  Ms. Kornfeld.
16         MS. KORNFELD:  Your Honor, I -- I -- I believe that
17 the Plaintiffs in these cases have an interest in having these
18 state court issues resolved in state court and the Defendants
19 have an interest in having these cases resolved in federal
20 court.  I don't think anyone is playing games or engaged in
21 procedural fencing.  I think it's just the reality of the
22 strategic determinations by the parties between the different
23 court systems.
24         THE COURT:  All right.  Mr. Gable.
25         MR. GABLE:  Yeah, Your Honor, I think -- I think, as

1  I said before, this -- this -- this factor comes up where there

2  might be litigation in state court brought by one of the

3  parties and the other party runs to federal court and -- and

4  it's basically saying, listen, if that was the case, remand may

5  be appropriate because the -- the court shouldn't --

6         THE COURT:  Well, that's the *Summy* case.

7         MR. GABLE:  Right.  And -- and what we're saying, in

8  this case, a first party case, there's really -- first party

9  property case, there's really no reason to consider this factor

10  at all because it -- it's really not relevant.  But -- but it

11  -- to the extent the Court considers it, it surely doesn't

12  favor remand.

13         THE COURT:  Well, let me -- let me ask you both a

14  slightly -- a -- a different question on -- on a similar issue.

15  I -- we have had many judges in this court, including myself,

16  who have had strictly coverage issues presented on COVID-19.  I

17  had several against a company called Cincinnati and I granted

18  summary judgment -- or I think I -- it was either summary

19  judgment or I granted a 12(b)(6) motion because the policy was

20  clear -- there was a clear exclusion for something like COVID-

21  19 coverage.

22         And how does -- Ms. Kornfeld, how does this case

23  differ from those?

24         MS. KORNFELD:  Well, I was prepared to argue this in

25  detail last time we here, Your Honor, and I've been focused on

24

1  the remand motion today, but I -- I can tell you that the

2  -- and, in particular, the cases that were presented to you,

3  Your Honor, I believe they had a -- an ISO virus exclusion,

4  which was the virus exclusion created by the Insurance Services

5  Office back in 2006.

6          THE COURT:  The -- I think they did.  You're right.

7  But you have a -- we'll come -- you have a virus exclusion in

8  this policy too.

9          MS. KORNFELD:  We have -- we have a contamination

10 exclusion and for many --

11         THE COURT:  Which includes virus under the definition

12 of contamination.

13         MS. KORNFELD:  It includes the word virus, but for

14 many complex reasons that go into looking at the policy

15 language, the totality of the policy language, including what

16 Factory Mutual said when it was trying to get this language

17 approved with the regulators, we believe that there -- there

18 needs to be discovery to determine what this exclusion actually

19 applies to, if it applies at all.

20         THE COURT:  All right.  Mr. Gable.

21         MR. GABLE:  Your Honor, I -- we would suggest that

22 this case is really not much different than the case that you

23 decided.  The Factory Mutual policy only insures direct

24 physical -- for damage.  We don't believe that the presence of

25 a virus causes -- damages property, and we don't believe that

1   -- you know, the theory here -- counsel mentioned the *Port*
2   *Authority* and the *Hardinger* cases in her earlier comments.  The
3   difference here is that in order to fill the stadium, assuming
4   you could fill the stadium with COVID virus to the point you
5   would make it uninhabitable, the only way to do that would be
6   to inhabit the stadium.  And, in fact, the reality that we know
7   now, a year later, is that COVID within the community is --
8   there's probably more cases in the community today than there
9   were this time last year, yet Plaintiff is holding games where
10  there's 67,000 people in that stadium every Sunday.  So if
11  COVID was really damaging the property, there shouldn't be
12  anybody there now.  Not to mention that the standard under the
13  *Port Authority* and *Hardinger* cases is that you have to make the
14  property uninhabitable.

15          In -- in this case, the property was inhabited.  They
16  -- they -- the entire 2020 home schedule of the Philadelphia
17  Eagles went off as scheduled.  The only difference was, there
18  was some limited -- either there were 1500 fans or some
19  slightly greater amount of fans, but the stadium was inhabited,
20  games were played, the practice facility was used, so the
21  standard in those cases is extraordinarily high for good
22  reason, because there is no physical damage to property.

23          And so from that perspective, Your Honor, we -- we
24  -- we feel that -- that they -- that this Court should not
25  allow this case to go forward on discovery because it's a

1  burden that can't be met even accepting what's been pled in the

2  complaint.

3         Secondly, as to the contamination exclusion, Your

4  Honor, other courts throughout the country have -- have granted

5  motions to dismiss, have found that the Factory Mutual

6  contamination exclusion also applies under these facts and so

7  we briefed that in our -- in our motion to dismiss and -- and

8  -- and we -- it has a virus, you know, in the definition of

9  contamination, and we believe it -- it -- it squarely applies.

10 So we believe if the Court were to allow the case to stay here

11 and were to consider our motion to dismiss on the merits, we

12 think we would be successful.

13         MS. KORNFELD:  Your Honor --

14         THE COURT:  Do you want to briefly respond?

15         MS. KORNFELD:  Yes.  Your Honor, with respect to the

16 trigger question --

17         THE COURT:  Yes.

18         MS. KORNFELD:  -- the -- the question under *Hardinger*

19 and -- and *Port Authority* is -- is the extent to which the air

20 space within -- well, the air space, that was *Port Authority*,

21 and the groundwater, which was *Hardinger*, is rendered dangerous

22 because of a foreign substance, an invisible substance that's

23 imperceivable to taste and smell.

24         So, at least in the Third Circuit, the argument

25 that's being addressed elsewhere in the country about whether

1  you need a broken pipe or a broken roof, in the Third Circuit,

2  you don't need that.  It's sufficient to have an invisible

3  substance making a place dangerous.  The question is, is there

4  enough of it to make it dangerous enough to impact its

5  function?  It is not true that the standard is

6  uninhabitability.  While that word is used in the *Port*

7  *Authority* case, there's also reference to loss of utility and

8  loss of function.  The function of a football stadium is to

9  have sixty-some odd thousand people in their stands, hugging,

10  screaming, yelling, doing all kinds of things to cause aerosols

11  to come from them and go to others, but, you know, that's a

12  fact question, the extent to which the stadium was made

13  dangerous and whether we could --

14          THE COURT:  Well, but --

15          MS. KORNFELD:  -- get our full utility from the

16  stadium.

17          THE COURT:  But your -- your claim is that, you know,

18  the last -- the last season, you were unable to use the

19  stadium.  Isn't that -- isn't that basically what your claim

20  is?

21          MS. KORNFELD:  Yes, Your Honor.

22          THE COURT:  Yeah, that last season.  I mean 20 --

23  2020.  We're now in 20 --

24          MS. KORNFELD:  We lost the utility --

25          THE COURT:  -- now -- you're now in 2021 and -- and

1  you're using the stadium, so Mr. Gable has a point that you

2  -- you haven't been deprived of it permanently, but that you

3  still have your claim that you couldn't use it in 2020; is that

4  right?

5          MS. KORNFELD:  There's -- there's no requirement that

6  you have permanent loss of function in order to trigger

7  coverage.  And there's no question that since 2020, we have

8  vaccines, we have masks, we have other activities in which

9  business owners have engaged to make the gathering of people

10 together a much safer experience.  So we are -- this case is

11 focused on what happened in 2020 and what the circumstances

12 were, what the science was back then.

13         Also, with respect to, you know, the -- the

14 -- whether coverage was triggered, there is -- you know, when

15 we filed our complaint, as I said earlier, there was no

16 discovery that had been conducted of Factory Mutual by anybody.

17 And since then, there is discovery that has been conducted and

18 we are in the process of trying to get access to that discovery

19 to determine what Factory Mutual was saying behind the scenes

20 when it was drafting this policy language and its view as to

21 coverage for these kinds of things, that it was saying

22 internally, not in briefs that were filed by Factory Mutual

23 once the policy holders were filing these cases.

24         And then with respect to the exclusion, we -- there's

25 a multitude of arguments as to why we -- we believe factual --

1          THE COURT:  No.  I don't want you to go through all

2   the argument.

3          MS. KORNFELD:  Yeah.

4          THE COURT:  They're -- they're in your brief.

5          MS. KORNFELD:  But I would say, Your Honor, that so

6   much has happened since we briefed these issues that if you

7   were to keep the case -- well, one, we would -- we do plan to

8   amend our complaint, and as a result of that, re-briefing would

9   likely happen, but if for some reason the amended complaint

10  were not accepted, we would ask that the Court provide the --

11  the -- both -- both sides the opportunity to update the Court

12  with respect to the facts that have developed since we last

13  briefed, the law that has developed and the arguments that have

14  been determined based upon the developed facts and law.

15         THE COURT:  All right.  Well, I -- yeah.  Let me just

16  address your last comment.  You know, neither I or many judges

17  here -- I think this was true when your colleague, Judge Giles,

18  was here.  We don't accept correspondence about new

19  developments, you know, as having any relevance.  If you feel

20  that you need to add facts to your complaint, you've got to

21  file an amended complaint or a supplemental complaint under

22  Rule 15.  I'm not looking for updates as to the situation.  I'm

23  not a -- this is not a weather station.  Okay?  So you have to

24  make a strategic decision.

25         Now, I said before, you know, if you -- you -- you

1  want to think about amending about regulatory estoppel.  You

2  may have other reason to amend.  I'm not making any promise

3  that I'm going to decide these motions in the next week.  I'm

4  going to -- I consider these important and I -- and -- very

5  important, not only for you, the parties here, but also for,

6  you know, establishing, you know, a precedent that other judges

7  may want to follow or not follow.

8           And so the one thing I'll say is that I -- if you

9  decide to amend the complaint promptly, I'm not going to

10 consider that as relevant as to whether I should remand or not.

11 I don't want you to think that if I -- if you amend that that's

12 a reason I should deny the motion to remand.  So put that out

13 of your mind, because I -- I wouldn't do that.  Okay?

14          MS. KORNFELD:  Thank you, Your Honor.

15          THE COURT:  All right.  Let's go to number eight.  In

16 the insurance context an inherent conflict of interest between

17 an insurers duty to defend in the state court and its attempt

18 to characterize that suit in federal court as falling within

19 the scope of a policy exclusion.

20          All right.  Well, both of you have addressed this in

21 part in the prior discussion.  What's your brief response to

22 this one, Ms. Kornfeld?

23          MS. KORNFELD:  Your Honor, we don't believe that this

24 factor bears on the considerations before the Court here.

25          THE COURT:  All right.  Mr. Gable?

1          MR. GABLE:  Yeah.  Your Honor, we don't believe that

2   it supports a remand in this case.

3          THE COURT:  Okay.  Okay.  All right.  Now, let me go

4   to other questions in my letter.  So both the *Reifer* case, R-E-

5   I-F-E-R and the Third Circuit's opinion in the -- the *DiAnoia's*

6   *Eatery* case refer to the record.  This is not one of the eight

7   factors.  And I just want to make sure I understand what your

8   position is as to what the record -- what the Third Circuit

9   meant by the word record.  And whether that's other state court

10  decisions or the contents of the pleadings or the briefs or

11  something else.

12         So, Mr. Gable, I'm going to let you go first for this

13  one.

14         MR. GABLE:  Thanks, Your Honor.  I -- our, if you

15  look at -- if you look at the opinion and you read some of the

16  other Third Circuit decisions, it seems that the standard is to

17  show that there is truly a, you know, undecided issue or

18  uncertain issue within the state courts.  And so if you look at

19  Reifer, for example, there was case law in the Commonwealth of

20  Pennsylvania that -- appellate case law that held that in the

21  context of a claims made policy that an insurer did not need to

22  show prejudice for a late notice defense.  And in the context

23  of an occurrence based policy it did.  And the claimant in that

24  case made an argument that said that it couldn't get relief in

25  this court because if the court applied the law as it was on

1  the books, she wouldn't have -- she wouldn't win because the

2  argument she was making is that the law that was on the books

3  was contrary to the intent of the Pennsylvania Supreme Court

4  and its rules of professional conduct.  And so that the only

5  way that she could get relief for her, what was truly a novel

6  argument, was to go to state court.  And so in that case I

7  think the court looked at the existence of appellate case law

8  in the Commonwealth that was in -- on conflict.  As well as the

9  fact that the Pennsylvania Supreme Court was the one who put

10 the rules in the rules of professional conduct.

11            THE COURT:  Okay.

12            MR. GABLE:  In *Summy*, which is another case, there

13 was --

14            THE COURT:  Well, we discussed Summy already.

15            MR. GABLE:  Right.  But on -- I was just on the

16 standard, on the issue of what the record was.

17            THE COURT:  Yeah.

18            MR. GABLE:  The issue -- in *Summy* the record was

19 there was an appellate court, a superior court decision that

20 held that there was an exclusion that would apply.  And there

21 was another panel of the superior court considering the same

22 issue that had asked, even with knowledge of the first superior

23 court decision, had requested en banc argument.  This was

24 clearly a split that the court identified as being one of the

25 factors.

1    So to answer your question, and if I went on longer

2 than need by, I apologize.  We think that you'd have to show

3 that there's truly uncertain or undetermined law that this

4 Court wouldn't be able to apply and that you would need to

5 submit the case to the state court in order for Plaintiff to

6 obtain relief.

7    THE COURT:  All right.  Ms. Kornfeld?

8    MS. KORNFELD:  Your Honor, I just -- Your Honor, I

9 would just want to follow up on one point, which is the

10 standard for remand is not that there's an issue of law that

11 this Court could not apply, it's a question of whether in the

12 interest of justice and given the state interest in insurance

13 issues the Court should apply or rule on that piece of law.

14 But that's irrespective of the question that you asked me,

15 which is what we believe the record would look like.  And I

16 think the best way to answer that question would be to look at,

17 you know, one of the two issues that the *Eatery's* court seems

18 to have sent back for further explanation to the district

19 courts is the question of whether Plaintiff suffered physical

20 loss or damage from a government order.  The question of

21 whether the Plaintiff suffered physical loss or damage is, you

22 know, short formed in -- to being discussed as the quote,

23 unquote, trigger question.  The trigger question where the

24 court who that, you know, this issue has come back to the

25 federal court that put that issue before the circuit court.

1  And the federal court is going to have to build a record around

2  the question of whether phys -- whether Plaintiff suffered

3  physical loss or damage from a government order.

4          From our perspective the record will be one,

5  identifying what the court believes is the nov -- the novel or

6  unsettled rule of state law.  And then in identifying it it's

7  then explaining why its novel or unsettled.  So with respect to

8  the trigger question, prior to COVID, the -- no appellate

9  court, whether that's the Superior Court or the Supreme Court

10 in the state of Pennsylvania stated the standard for

11 determining what direct physical loss or damage means as a

12 trigger provision in a property policy.  That standard didn't

13 exist.

14          Post-COVID, there are a number of courts in the state

15 of Pennsylvania, state, you know, trial courts that are ruling

16 on that very specific issue.  And those rulings are in conflict

17 with each other.  So prior to COVID, there was no legal

18 authority to explain and provide guidance to a federal court

19 regarding what those terms mean and how they apply.  Now there

20 are a number of state courts who are ruling inconsistently.

21 And that tells me that there is an unsettled issue of state law

22 with respect to that issue.

23          THE COURT:  Okay.  Well, let me ask you this.  You

24 know, as I indicated before, in the pure coverage, the sort of

25 garden variety coverage question that we get frequently, before

1  COVID and nothing to do with COVID.  I think all the judges in

2  this court have had these cases have been consistent that

3  there's no coverage for COVID under the terms of those

4  policies, such as *Cincinnati*.

5          Now you're saying, your argument here is that the

6  language in this policy is different.  Is that your most

7  important argument?

8          MS. KORNFELD:  That is an important argument, Your

9  Honor.

10          THE COURT:  All right.  Okay.  Are you also saying

11  that we were wrong in all these other decisions where we denied

12  coverage or you don't want to take a position on that?

13          MS. KORNFELD:  Your Honor --

14          THE COURT:  And you don't -- I'm not trying to put

15  you in a box.  If you don't want to express it to me, you've

16  got your policy, you don't have to express any opinion.  But if

17  you think we were wrong, I mean I'd like to know that and why.

18          MS. KORNFELD:  Your Honor, I don't want to call

19  anyone wrong.  The extent to which a ruling may be -- may have

20  been a correct or incorrect application of the policy language

21  by federal courts in this -- by judges in this courthouse,

22  again depends on policy language and it depends on the

23  allegations in the complaints at issue.  So to the extent --

24  and the business at issue.  I believe, Your Honor, that whether

25  coverage is triggered under these policies is a very factual

1   issue and it depends on the nature of the business at issue.

2   So that if you have a business where one person comes in your

3   business daily and you're shut down and you're saying it's

4   COVID and you're losing all this money, the risks associated

5   with the spread of COVID in your business are quite small.  And

6   whether you meet the standard under *Port Authority* or *Hardinger*

7   or other cases given that factual scenario is different than if

8   you have a football stadium where the whole point is to have,

9   you know, 70,000 people there together.

10          So I believe whether the trigger language is

11  appropriate for denying coverage or granting coverage depends

12  significantly on the facts.  But what I do know is that the

13  trigger language was sent back to one of the courts right when

14  the -- when the Third Circuit ruled so that they, that court,

15  could make a better record as to why it's novel.  And with

16  respect to that particular case, there's no question that the

17  issue of trigger is very much unsettled in the state courts.

18  And we'd be happy to present the Court with the rulings that

19  have come out of the state courts so far showing the complete,

20  you know, different judges having very different views on the

21  same language.  And that to us says it's unsettled.  And it

22  being unsettled would mean that that would be a reason for a

23  federal court to let the state courts figure it out at the

24  appellate court level and ultimately the supreme court level so

25  that the federal court judges do not need to spend the

1  resources in their courtrooms on an issue that they're

2  predicting but that is in the process the live and very active

3  process of getting resolved at the state court level.  It will

4  be before the Pennsylvania Supreme Court very short -- very

5  shortly.

6          THE COURT:  Mr. Gable, anything briefly on that?  I

7  think you've covered it.

8          MR. GABLE:  Nothing to add, Your Honor.

9          THE COURT:  All right.  I want to go to the question

10  3C.  And I'd like a yes or a no.  Absent all other Reifer

11  factors, is the existence of unsettled or novel state law

12  issues alone enough to warrant or deny remand?  Mr. Gable,

13  what's your answer -- what's your position on that?

14          MR. GABLE:  I'll do my best to get to yes or no.  The

15  only -- the only caveat I would say, Judge, is I don't think

16  the rulings that I looked at say that.  I don't think there's

17  an answer to that question.  We looked because you posed the

18  question to us.  We would say that there doesn't appear to be

19  an example of a case that was remanded where only one factor

20  weighed in favor of remand.  But I didn't see anything in the

21  Third Circuit cases addressing this that said it was

22  impossible.  So if that's my best answer --

23          THE COURT:  Okay.  Fair enough.  Ms. Kornfeld?

24          MS. KORNFELD:  Yes.

25          THE COURT:  Yes?  Okay.  I'm not going to go through

1    four.  I'll give you a chance if -- here's the thing.  I have a
2    couple of other questions to ask.  And I'll come back to that.
3            All right.  I want to go to two of the arguments that
4    have been made by the Plaintiff.  And this arises out of the
5    policy language.  Which I thought I have here.  Let me -- wait
6    a minute.  Just one second.
7            Okay.
8            THE LAW CLERK:  Do you want me to grab them?
9            THE COURT:  Yeah.  Listen, it's right on my desk with
10   your little yellow -- I stuck some yellow papers in it.  I
11   thought I brought them in here.
12           THE LAW CLERK:  The policy itself?
13           THE COURT:  Yeah, it's the policy itself.  But it has
14   your little yellow tabs.  It has some yellow -- just get --
15   I'll ask another question while my law clerk is getting that.
16           One of the things, Mr. Gable, that the Plaintiff's
17   have brought out was that in a different case pending in the
18   District of New Mexico entitled *Factory Mutual Insurance*
19   *Company versus Federal Insurance Company*, a civil action, 17-
20   760.  The lawyer for your client there, whose name is Maureen
21   Sanders, wrote a brief in which she took the position that mold
22   infestation was covered under the policy.  And she said mold
23   infection -- infestation as well as the costs incurred to
24   remediate it and return the facility to its pre-loss condition
25   is not physical loss under the federal insurance company

1 policy.  And she wanted -- your client wanted to exclude any

2 evidence of that.

3       And then on page 3 of the brief she -- it says it is

4 undisputed that the mold infestation destroyed the aseptic and

5 rendered room 152 unfit for its intended use, manufacturing

6 injectable pharmaceutical products.  Numerous courts have

7 concluded that the loss of functionality or reliability under

8 similar circumstances constitutes physical loss or damage.

9 That appeared to me to be somewhat inconsistent with the

10 arguments you're making here.  Do you have any comment on that?

11       MR. GABLE:  Well, a couple of things, Your Honor.

12 First of all, it was mold in a clean room.  This was an area

13 where you, I believe, they manufactured computer chips.  And so

14 -- and if I'm wrong about that, I apologize.  But it was a

15 clean room.  And the question was would mold infestation in

16 that situation constitute physical loss or damage under the law

17 of the state, which I believe you're correct, Your Honor, it

18 was New Mexico.

19       So from that standpoint we would say, A, it's

20 factually dissimilar.  B, it's mold.  And I think, and again, I

21 don't want to become a medical professional that I'm not trying

22 to be, but in my experience mold actually, you know, physically

23 consumes building products.  That if you have drywall and mold

24 sits on drywall it actually consumes the drywall.  It doesn't

25 just float in the air.  In particular in that case the mold I

1  would have rendered the, you know, the room unfit because, A,

2  it would have damaged the building materials it was on.  And,

3  B, it sounds like in the context of a clean room, you probably

4  can't go forward with whatever you're doing if it's, you know,

5  if the environment is different.

6          THE COURT:  Right.

7          MR. GABLE:  So I don't know.  And I think we

8  addressed this in our brief on the motion to dismiss.  So I

9  apologize that I'm --

10          THE COURT:  Yeah, I think you did.

11          MR. GABLE:  I'm not --

12          THE COURT:  All right.  Anything you want to say

13  briefly, Ms. Kornfeld, on that?  I mean it's in your brief.

14          MS. KORNFELD:  Yes, Your Honor.  The key with respect

15  to that statement made by Factory Mutual long before COVID was

16  the focus on loss of functionality.  Factory Mutual now, at

17  least with respect to the COVID cases, is saying that loss of

18  functionality is not the question.  The question is have you

19  physically -- do you have physical damage that you can look at

20  to your structure.  And that's loss or damage.  Here they're

21  saying that physical loss can be loss of functionality.  And

22  functionality is the standard that we're relying upon in

23  significant part with respect to our stadium.  The Eagles still

24  had a stadium.  I believe that FM is saying the stadium was

25  standing, you could walk into it and therefore you have no

1  covered loss.  And our argument is, but we lost -- we --

2           THE COURT:  Okay.

3           MS. KORNFELD:  -- functionality.,

4           THE COURT:  Thank you.  All right.  Next question.

5  There's a citation here to a Judge -- a case that Judge Glazer

6  has in the Court of Common Pleas in which he issued a footnote

7  order in which he denied pending preliminary objections.  And

8  it would seem to me that that case raises similar issues,

9  although the parties are different.  Do -- are any of you

10 familiar with that or do you have any views on whether that

11 case is -- has a policy similar to this one?  Mr. Gable?

12          MR. GABLE:  I am not.  I will note though with regard

13 to Judge -- and I mean I'm familiar generally with the case,

14 I'm not familiar whether the exact policy language is in

15 effect.  But I would note that Judge Glazer later issued an

16 order sustaining preliminary objections in a COVID coverage

17 case much like this.  And in that order he said that he

18 invited, to the extent that his order and opinion in that case

19 was different from his opinion in the earlier case, that he

20 invited the parties to take the issue back up.  So what I would

21 -- what I would surmise from that is that Judge Glazer having

22 spent a little more time contemplating whether COVID triggers

23 coverage under a property insurance policy, thought --

24 concluded that it didn't.  But for whatever reason in that

25 first case he went ahead and denied preliminary objections.

1  But I do feel that he, before he left the Commerce Court he did

2  change his view on that.

3          THE COURT:  All right.  Ms. Kornfeld, any views?

4          MS. KORNFELD:  Your Honor, the only thing I would

5  state is that with respect to courts that have addressed more

6  than one COVID case, we have seen a number of judges who in one

7  case have allowed the case to proceed and in another case have

8  not allowed the case to proceed.  And we don't see that as a

9  judge changing his or her mind.  We understand based upon what

10 the judges have said in those cases is that they believe that

11 different policy language and different facts warrant different

12 resolutions.

13         THE COURT:  All right.  You're not -- I gather

14 neither of you are aware of any case with the exact language of

15 this policy?  Is that right, Ms. Kornfeld?

16         MS. KORNFELD:  I don't believe that in Pennsylvania

17 -- I know that in Pennsylvania there are contamination

18 exclusions that look like this.  But I would have to check

19 back, and we'd be happy to address that in a -- in the memo

20 that you invited --

21         THE COURT:  Okay.

22         MS. KORNFELD:  -- in looking at Judge Glazer's

23 opinion.

24         THE COURT:  All right.  All right.  The next question

25 is, and this arises out of on page 12 of the amended complaint,

1  paragraph 35.  The Plaintiff there points out that they are

2  proceeding under two applicable coverages.  The first one

3  subparagraph A is property loss, time element losses resulting

4  from risk of physical loss or damage.  And it's clear to me

5  that that is what is at issue here.  But then they have a

6  second paragraph B under response costs/time element losses due

7  to actual presence of communicable disease at Eagle's locations

8  which provides up to $1 million worth of coverage.

9       And I gather, Mr. Gable, that your position is that

10 you're providing coverage under that clause, under communicable

11 disease.  Is that right?

12      MR. GABLE:  That is correct.  And I believe since the

13 -- since the --

14      THE COURT:  Is that under reservation of rights or --

15      MR. GABLE:  No, Your Honor.  And I -- I believe this

16 is new, and it may be new to Ms. Kornfeld, so I apologize.  My

17 understanding is that Factory Mutual has agreed to afford

18 coverage under the communicable disease provision.  And that

19 the only issue right now is trying to figure out if the million

20 dollars in coverage that is -- exists under that has been

21 incurred.  That's my understanding.  That was not my

22 understanding at the time the complaint was filed and the time

23 that our motion to dismiss was filed.  But that is my

24 understanding today.

25      THE COURT:  All right.  What -- what's the

1  Plaintiff's viewpoint?

2         MS. KORNFELD:  Your Honor, with respect to the -- I

3  understand that Factory Mutual will be making a payment under

4  the communicable disease coverage.  With respect to the

5  communicable disease coverage and the broader business

6  interruption coverage, time element coverage, our understanding

7  of how those two coverages work together, and it's based

8  actually on correspondence that we've received from Factory

9  Mutual, is that the communicable disease coverage is a very

10  narrow coverage that addresses certain response costs if

11  there's an event of communicable disease.  And it doesn't

12  require direct physical loss or damage to property to trigger

13  the coverage.

14         As I was stating before, with respect to *Port*

15  *Authority*, there can be direct physical loss of or damage to

16  property by an invisible substance if there's enough of it.

17  And so the *Port Authority* standard requires some measurement of

18  the substance that would make the location dangerous.  And so

19  in a circumstance where you don't have enough of it to be

20  direct physical loss of or damage to property, you're left with

21  only one coverage which is the commun --

22         THE COURT:  All right.  Well --

23         MS. KORNFELD:  -- communicable disease coverage.

24         THE COURT:  Excuse me for interrupting you, but

25  you're getting a little beyond my point.  My question is is

1  when you drafted this complaint are you seeking coverage under

2  both of these?

3          MS. KORNFELD:  Yes, Your Honor.

4          THE COURT:  Okay.  Are you prepared to agree now that

5  you are getting all the coverage you're entitled to under

6  paragraph B?

7          MS. KORNFELD:  The communicable disease coverage?

8          THE COURT:  Yeah.  The communicable disease coverage.

9          MS. KORNFELD:  Your Honor, I don't know the status of

10 that negotiation between --

11         THE COURT:  Well, is that a factual issue in this

12 case?

13         MS. KORNFELD:  Presently, yes.

14         THE COURT:  Mr. Gable?

15         MR. GABLE:  Yeah.  Your Honor, I believe we've --

16 Factory Mutual has conceded the coverage applies with regard to

17 at least one of the locations.  And then the question is just

18 how much.  And if for some reason the response costs at one

19 location do not exceed the policy limit, then the -- Factory

20 Mutual will then move on to some of the other locations to see

21 whether the coverage has been triggered there.

22         THE COURT:   Well, another question I have is whether

23 there is a strict dividing line between the property loss and

24 the communicable disease loss and whether there is any blending

25 or blurring that would present a factual issue as to if there

1   was -- if there was presence of communicable disease.  I think

2   it was locations, which is the topic under paragraph B, 35(b),

3   whether that could be argued to also be physical loss or damage

4   to covered property as well as time element loss under

5   paragraph A.

6          MR. GABLE:  Yeah, Your Honor.  As Ms. Kornfeld said,

7   the policy, the communicable disease coverage does not have a

8   direct physical loss or damage trigger.

9          THE COURT:  I understand that.

10         MR. GABLE:  You can -- you can walk in so that --

11         THE COURT:  No, no.  That's not my question.  My

12  question is that if Factory Mutual is conceding -- conceding is

13  the wrong word.  The factual issue is agreeing that its policy

14  does provide coverage for the communicable disease coverage,

15  can the Plaintiffs argue that that agreement has some weight as

16  to whether there is also coverage under the property loss

17  provision.

18         MR. GABLE:  Your Honor, we --

19         THE COURT:  I know your answer is no.  I want --

20  what?

21         MR. GABLE:  Right.  I'll explain why.  I'll explain

22  why.  The -- and this is in our brief.  The communicable

23  disease coverage acts as an exception to the contamination

24  exclusion.  And so the -- and other courts have found this as

25  well.  And I hope they're cited in the brief, but I'll be glad

1  to supplement.  The communicable disease give back in essence

2  is an exception to the contamination exclusion.  And so it

3  doesn't operate to trigger any other coverage other than that

4  coverage afforded under the exception.  It's an exception to an

5  exclusion.  So we don't think that the acceptance of coverage

6  under that provision has any impact on the coverage for the

7  remainder of the policy.

8         THE COURT:  All right.  What's the Plaintiff's

9  position?

10         MS. KORNFELD:  Yeah.  Your Honor, the --

11         THE COURT:  If any.

12         MS. KORNFELD:  -- the only thing I'll note is that no

13  -- there are places in the policy where FM identifies certain

14  things as being exceptions to certain policy exclusions.

15  Nowhere does FM identity its communicable disease coverage as

16  being an exception to the contamination exclusion.  And so we

17  don't agree that that's how it applies.

18         THE COURT:  Well, I raise the same question I asked

19  you before.  You don't make this claim in your complaint, as I

20  read it.  And the question is, if you are making that claim do

21  you think you should amend your complaint?  You don't have to

22  answer me now, but look, here's what I'm going to do.  Just let

23  me consult with my law clerk about something before I finish up

24  here.

25         (Off record briefly.)

1           THE COURT:  Okay.  As I said, I would give you each a

2  short period of time to file a short supplemental memorandum.

3  All right.  I think six pages is all I'm going to allow.

4  There's been so much briefing.  So if you want to bring a case

5  to my attention, all you have to do is put the citation.  That

6  only takes one line.  You don't need to write a paragraph.  We

7  will read the case.

8           How much time do you want?  Would ten days be enough

9  from today?  I don't want to ruin anybody's Thanksgiving

10  holiday.  I could make it after Thanksgiving if you prefer or

11  before.  Today is the 17th.  So, Ms. Kornfeld, what's your

12  preference?

13           MS. KORNFELD:  Your Honor, only because I'm closing

14  on a house tomorrow in Delaware --

15           THE COURT:  Oh, good luck.

16           MS. KORNFELD:  -- and Thanksgiving is happening.

17           THE COURT:  I thought you were from Los Angeles?

18           MS. KORNFELD:  I am.

19           THE COURT:  Oh, okay.  Are you leaving -- moving

20  East?

21           MS. KORNFELD:  I'm not answering this question on the

22  record, Your Honor.

23           THE COURT:  Okay.  That's okay.  All right.  Well,

24  tell me what date -- what date you'd like?  It's going to be

25  simul -- you're both going to file on the same day.

1          MS. KORNFELD:  So if we -- if we could -- if we could

2  have two weeks from today --

3          THE COURT:  Two weeks, okay.

4          MS. KORNFELD:  -- Your Honor?  If that would --

5          THE COURT:  All right.

6          MR. GABLE:  That's fine with me.

7          THE COURT:  That would make it December 1st.

8          MR. GABLE:  December 1st.

9          THE COURT:  Is that all right with you, Mr. Gable?

10         MR. GABLE:  That's fine, Your Honor.

11         THE COURT:  Okay.  12/1, six pages.  All right.

12 Please order a copy of the transcript of this argument and

13 share the costs, please, so I'll have it before then.  Actually

14 I'd like to have the transcript -- well, two weeks would be

15 fine.  There's -- I'll get it on the same day you get your

16 brief.  All right.  We'll -- I will try to decide this before

17 Christmas.  That's not a promise.  It's just a goal.  Okay?

18         All right.  Thank you very much for coming in.  And

19 thank you.

20         Now, one other thing.  If there's any -- if a judge

21 decides an issue that you think is relevant, I mean really

22 relevant, on these issues because this policy is different than

23 the others that I -- my view is that this policy is different

24 than the Cincinnati policies that I had decided and many other

25 policies that other judges in this court have decided, where I

1  think we've been unanimous so far that there is no coverage

2  under the language in those policies.  But if you have a case

3  that you think is relevant, you -- first of all, if it's before

4  December 1st, just include it in your December 1st submission.

5  If it's after that, you're welcome to send me like a one line

6  letter.  Now, please review this and put the citation on it

7  without any comment or any argument.  Okay?

8              MR. GABLE:  Understood.

9              MS. KORNFELD:  Yes, Your Honor.

10             THE COURT:  All right.  Thank you all very much for

11  coming in.  Stay safe and healthy.

12             MS. KORNFELD:  Thank you.

13             MR. GABLE:  Thank you, Your Honor.

14             MS. KORNFELD:  Happy Thanksgiving.

15             MR. GABLE:  Thank you, Your Honor.

16        (The proceeding concluded at 3:11 p.m.)

17                       *  *  *  *  *

18

19

20

21

22

23

24

25

51

1                           * * * * *

2                 **C E R T I F I C A T I O N**

3          I, Donna Morris, CET-1284, court approved

4   transcriber, certify that the foregoing pages 1 to 30 is a

5   correct transcript from the official electronic sound recording

6   of the proceedings in the above-entitled matter, and to the

7   best of my ability.

8

9

10  _____

11  DONNA MORRIS, CET-1284              DATE:  NOVEMBER 18, 2021

12

13                **C E R T I F I C A T I O N**

14          I, Kelli Ray, court approved transcriber, certify

15  that the foregoing pages 31 to 50 is a correct transcript from

16  the official electronic sound recording of the proceedings in

17  the above-entitled matter, and to the best of my ability.

18

19  _____

20  Kelli Ray, CER-349, CET-349          Date: November 18, 2021

21

22

23

24

25