# EXHIBIT A

<div style="border">

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

</div>

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1824-21

AC OCEAN WALK, LLC,

     Plaintiff-Respondent,

v.

AMERICAN GUARANTEE
AND LIABILITY INSURANCE
COMPANY, AIG SPECIALTY
INSURANCE COMPANY,
and INTERSTATE FIRE AND
CASUALTY COMPANY,

     Defendants-Appellants,

and

NATIONAL FIRE & MARINE
INSURANCE COMPANY,

     Defendant.

_____

Argued May 9, 2022 – Decided June 23, 2022

Before Judges Sumners, Vernoia and Firko.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0703-21.

David R. Roth (Wiggin & Dana, LLP) of the Connecticut and New York bars, admitted pro hac vice, argued the cause for appellant American Guarantee and Liability Insurance Company (Ford Marrin Esposito Witmeyer & Gleser, LLP and Wiggin & Dana, LLP, attorneys; Edward M. Pinter, Jon R. Grabowski, Caroline McKenna, Jeffrey R. Babbin (Wiggin & Dana, LLP), of the Connecticut and District of Columbia bars, admitted pro hac vice, and David R. Roth, on the briefs).

Keith Moskowitz (Dentons US LLP) of the Connecticut, New York, and Illinois bars, admitted pro hac vice, argued the cause for appellant AIG Specialty Insurance Company (Dentons US LLP, attorneys; Shawn L. Kelly, on the brief).

DLA Piper LLP (US), attorneys for appellant Interstate Fire & Casualty Company, join in the brief of appellant American Guarantee and Liability Insurance Company.

Justin F. LaVella (Blank Rome, LLP) of the District of Columbia and Virginia bars, admitted pro hac vice, argued the cause for respondent AC Ocean Walk, LLC (Blank Rome, LLP, attorneys; Stephen M. Orlofsky, Justin F. LaVella, Alexander H. Berman (Blank Rome, LLP) of the Pennsylvania bar, admitted pro hac vice, Michael A. Iannucci, and Michael R. Darbee, on the briefs).

Wystan M. Ackerman (Robinson & Cole, LLP) of the Connecticut, Massachusetts, and New York bars, admitted pro hac vice, argued the cause for amicus

2

curiae Insurance Council of New Jersey and American
Property Casualty Insurance Association (Robinson &
Cole, LLP, attorneys; Daniel E. Bryer, on the brief).

Paul E. Breene argued the cause for amicus curiae
United Policyholders (Reed Smith, LLP, Lorelie S.
Masters (Hunton Andrews Kurth), of the District of
Columbia, admitted pro hac vice, attorneys; Lorelie
S. Masters and Kevin V. Small (Hunton Andrews
Kurth), on the brief).

PER CURIAM

By way of leave to appeal granted, defendant insurance carriers
American Guarantee and Liability Insurance Company (AGLIC), AIG
Specialty Insurance Company (AIG), and Interstate Fire and Casualty
Company (IFCC) (collectively defendants), appeal from a December 22, 2021
Law Division order denying their motion to dismiss plaintiff AC Ocean Walk
LLC's (Ocean) complaint.[1]   Ocean operates the Ocean Casino Resort in
Atlantic City.   In its complaint, Ocean sought property and business
interruption insurance under defendants' policies for losses of income during

_____

[1] We granted defendants' motion for leave to appeal on February 22, 2022.  In
addition, we permitted United Policyholders and Insurance Council of New
Jersey to participate as amicus curiae on behalf of plaintiff Ocean and
defendants respectively.

closure of its casino pursuant to COVID-19 Executive Orders issued by the Governor.

The trial court found Ocean sufficiently pled that COVID-19 caused a direct physical loss or damage to its casino to surmount defendants' motion to dismiss and the coverage sought by Ocean under various sections of the issued policies. The court determined that the contamination exclusion contained in the policies did not apply because they were ambiguous.[2] For the reasons that follow, we reverse.

## I.

The following facts are derived from the motion record. Ocean is a 138,000 square foot casino and gaming entertainment enterprise, the largest gaming suite in the United States. Ocean provides overnight accommodations; on-site bars, cafes, and restaurants; a nightclub and a beach club; meeting spaces; pools; a spa; fitness centers; and an on-site concert venue. The record shows Ocean purchased four separate property insurance policies (the policies) from defendants and NFMIC "for the express purpose of obtaining broad,

---

[2]   The trial court granted defendant National Fire and Marine Insurance Company's (NFMIC) motion to dismiss based on an endorsement exclusion in its policy that was not included in defendants' policies. NFMIC is not participating in this appeal.

multi-risk protection for losses that it might incur due to various causes of loss or damage to the Ocean."

Collectively, the policies insure Ocean for a cumulative $50,000,000 on a "quota share" basis, where several insurers share losses and premiums at fixed percentages.  Thus, defendants and NFMIC issued their own policy and share in the collective $50,000,000 policy limits at varying percentages.  Of the total $50,000,000 covered, AGLIC agreed to pay fifty percent or up to $25,000,000; AIG agreed to pay twenty-five percent or up to $12,500,000; IFCC agreed to pay ten percent or up to $5,000,000; and NFMIC agreed to pay fifteen percent or up to $7,5000,000.  The policy periods ran from January 4, 2020, to January 4, 2021.

Although defendants and NFMIC issued separate policies, each "were contemporaneously underwritten and contain identical . . . base policy forms." Specifically, "the [p]olicies provide numerous independent yet often overlapping, coverages that each insure different types of eventualities and are separately triggered by different factual circumstances found in [Ocean]'s multi-faceted loss."  The Insuring Agreement, § 1.01, found in each policy states:  "This Policy [i]nsures against direct physical loss of or damage caused by a <u>Covered Cause of Loss</u> to Covered Property, at an Insured Location . . .

5

all subject to the terms, conditions and exclusions stated in this Policy." (Emphasis added).  The policies define "Covered Cause of Loss" as "[a]ll risks of direct physical loss of or damage from any cause <u>unless excluded</u>." (Emphasis added).  However, the policies do not define the term "direct physical loss of or damage."

"The [p]olicies also cover certain Time Element losses, i.e., the loss of business income resulting from the suspension of [Ocean]'s business activities, subject to the [p]olicies' terms and conditions."[3]  The business interruption coverage provisions found in each policy, § 4.01.01, states:

> The [Insurer] will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary <u>Suspension</u> of the Insured's business activities at an Insured Location.  <u>The Suspension must be due to direct physical loss of or damage to Property</u> (of the type insurable under this Policy other than <u>Finished Stock</u>) caused by a <u>Covered Cause of Loss</u> at the <u>Location</u> . . . .

> [(Second emphasis added).]

Section 7.56.01 of the policies define "suspension" as "[t]he slowdown or cessation of the Insured's business activities."

---

[3]  Time Element coverage is frequently referred to as and interchangeable with "Business Interruption Coverage."

The policies also include various exclusions applicable to all the coverage parts within the policies.  Relevant to this appeal and common to all four insurers is the "Contamination Exclusion."  Section 3.03.01 of the policies states in pertinent part:

> This Policy excludes the following <u>unless</u> it results from direct physical loss or damage <u>not excluded by this Policy</u>:
>
>> <u>Contamination</u>, and any cost due to . . . <u>Contamination</u>[,] including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.
>
> [(First and second emphases added).]

Section 7.09 of the policies defines "contamination" and "contaminated" as "[a]ny condition of the property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, <u>pathogen or pathogenic organism</u>, bacteria, <u>virus</u>, disease causing or illness causing agent, <u>Fungus</u>, mold or mildew."  [(First and second emphases added).]  Under Section 7.10, contaminants are defined as "[a]ny solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be

A-1824-21

recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, Fungus or Spores." (Emphases added). Notably, "virus" and "pathogen or pathogenic organism" are not included.

"Each of the [p]olicies also contains a number of amendatory endorsements, some of which are inconsistent between and among the [p]olicies." Unique to NFMIC's policy is its "Biological or Chemical Substances Exclusion Endorsement." This exclusion added that NFMIC's

> policy does not provide any coverage for any loss, cost, expense or damage of any nature, however caused, directly or indirectly arising out of, resulting from, or in any way related to the actual or suspected presence or threat of any pathogenic or poisonous biological or chemical substance or material of any kind, including, but not limited to, any malicious use of such substance or material, whether isolated or wide-spread, regardless of any other cause or event contributing at the same time or in any sequence.[4]

Defendants' policies contain an "Interruption by Communicable Disease" (ICB) amendatory endorsement that provide business interruption coverage. The endorsement states in pertinent part:

> The [defendants] will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of

---

[4]  The trial court dismissed NFMCI from the action based on this exclusion, which is not an issue on appeal.

A-1824-21

the Insured's business activities at an Insured Location if the <u>Suspension</u> is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the <u>Location</u>.

[(Emphases added).]

Defendants' potential responsibility for Ocean's losses under the ICB endorsements is their "respective quota share of the losses not to exceed a $1,000,000 sublimit of liability."

Of the defendants, IFCC's policy provides a "Pollution Contamination Exclusion" endorsement that the trial court found "may not be used to preclude coverage." The endorsement states IFCC "will not pay for loss, damage, cost or expense caused directly or indirectly by" the "release, migration, discharge, escape or dispersal of Contaminants" unless such a peril is affirmatively covered by the policy. The endorsement continues to read:

In this exclusion . . . , the capitalized term "Contaminants" means materials that may be harmful to human health and include any impurity, pollutant, poison, toxin, <u>pathogen or pathogenic organism</u>, disease-causing or illness-causing agent, asbestos, dioxin, polychlorinated biphenyls, agricultural smoke, agricultural soot, vapor, fumes, acids, alkalis, bacteria, <u>virus</u>, and hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976,

9

A-1824-21

>Toxic Substances Control Act, or as designated by the
>United States Environmental Protection Agency or
>any other local governmental agency.

>[(Emphases added).]

And, AGLIC's policy includes an endorsement titled, "Amendatory Endorsement – Louisiana" (Louisiana Endorsement).  Relevant to the matter under review is the portion of the endorsement that deletes and replaces the Contamination Exclusion in its entirety with:  "Contamination or asbestos, and any cost due to Contamination or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy."  The endorsement proceeds to redefine "contamination" as "[a]ny condition of property due to the actual presence of any Contaminant(s)." "Contaminants" are redefined as "[a]ny solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores."

A.    COVID-19 Executive Orders

On March 9, 2020, Governor Murphy issued Executive Order (EO) 103 in response to the outbreak of COVID-19.  EO 103 stated COVID-19 was an imminent public health hazard and declared a state of emergency in New

A-1824-21

Jersey.  EO 103 also stated COVID-19 "is a contagious, and at times fatal, respiratory disease caused by the SARS-CoV-2 virus."

On March 11, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak a global pandemic.  As of March 16, 2020, the Centers for Disease Control and Prevention (CDC) had reported that there were more than 130,000 cases of COVID-19 worldwide, with more than 4,900 cases in the United States.  There were 178 positive cases in New Jersey.  Based on these facts, on March 16, 2020, Governor Murphy issued EO 104, which established "social mitigation strategies for combatting COVID-19."

To mitigate the spread of COVID-19 by limiting person-to-person interaction, EO 104 designated a subset of businesses within the State as "essential" and limited the scope of service and hours of operation for restaurants and some retail establishments, all to limit the spread of the disease.  EO 104 also ordered certain facilities to close and remain closed to the public for as long as EO 104 remained in effect effective 8:00 p.m. March 16, 2020.  Among such facilities were "nightclubs," "[c]asino gaming floors, including retail sports wagering lounges, and casino concert and entertainment venues."  However, "[o]nline and mobile sports and casino gaming services

11

[were permitted to] continue to be offered notwithstanding the closure of the physical facility."

In response to the rising infection rate of COVID-19, the Governor issued EO 107 on March 21, 2020.  To that end, EO 107 "ordered all non-essential retail businesses in the [S]tate to close and require[ed] individuals in the [S]tate to stay at home."  EO 107 also required that all brick-and-mortar premises of "non-essential" businesses remain closed to the public for as long as the order remained in effect.  <u>See</u> New Jersey Executive Order No. 107 (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf.

EO 107 also required "[a]ll recreational and entertainment businesses" closed to the public, if not already closed pursuant to EO 104.  Among this non-exhaustive list of such businesses were casino gaming floors, casino concert and entertainment venues, and nightclubs.  Restaurants and other "dining establishments" were "permitted to operate their normal business hours," but were "limited to offering only food delivery and/or take-out services."  EO 107 closed by stating:

> It shall be the duty of every person or entity in this State or doing business in this State and of the members of the governing body and every official, employee, or agent of every political subdivision in this State and of each member of all other governmental bodies, agencies, and authorities in this

12

> State of any nature whatsoever, to cooperate fully in
> all matters concerning this [EO].

The order took effect on March 21, 2020, at 9:00 p.m.

On June 29, 2020, Governor Murphy rescinded the stay-at-home order, but the restrictions on non-essential businesses—like casinos—remained in effect.  Shortly thereafter, the Governor issued EO 157 on July 2, 2020.  EO 157 permitted limited reopening of specific recreational and entertainment businesses, such as casino gaming floors and retail sports wagering lounges, subject to restrictions intended to mitigate the spread of COVID-19.  See Executive Order No. 157, Off. Governor (Jul. 2, 2020), https://www.nj.gov/infobank/eo/056murphy/pdf/EO-157.pdf.

B.    Coverage Issues

Because of EO 104 and the growing risk of COVID-19, Ocean suspended its casino and entertainment operations on March 16, 2020.  Ocean reopened its casino gaming and waging operations in a restricted fashion according to EO 157 on July 2, 2020.  Ocean submitted a timely claim under the policies to defendants and NFMIC on March 23, 2020.  The parties corresponded for several months disputing whether coverage was owed or not under the policies.  On October 2, 2020, defendants agreed to pay their proportionate share of a total $850,000 in ICB coverage to Ocean.  Ultimately,

on February 24, 2021, defendants and NFMIC's claims adjuster issued a letter denying coverage to Ocean under all provision of the policies, excluding the ICB endorsement.

Ocean alleged it was entitled to coverage under the following policy sections:  Section 3.01 for Property Damage Coverage; Section 4.01 for Time Element Coverage; Section 4.02.03 for Extra Expense Coverage; Section 5.02.03 for Civil or Military Authority Coverage; and Section 5.02.25 for Ingress/Egress Coverage.  Each of these sections conditions coverage on there being direct physical loss or damage.

On March 3, 2021, Ocean filed a complaint alleging that beginning March 16, 2020, it incurred "the physical loss of use of its property" and "loss of business revenue" "as a result of the risks associated with the [COVID-19] pandemic, including direct physical loss of or damage to covered property, and in compliance with government guidance and orders."  Ocean averred that the "actual presence" of COVID-19 on the property created "near-certain risk of danger and harm to its employees and customers" because of "airborne transmission."

Furthermore, Ocean asserted the property became unsafe due to respiratory droplets discharged from infected individuals landing on surfaces

14

and objects, thus "becoming a part of that surface" and physically changing the property.  Consequently, Ocean sought damages for breach of contract based on the denied coverage following a direct physical loss of or damage to Ocean and a declaration of coverage.  Defendants moved to dismiss the complaint in lieu of filing answers under Rule 4:6-2(e).

First, defendants asserted Ocean failed to and could not allege it "suffered direct physical loss or damage to the property, and all of the provisions under which [it] seek[s] coverage require[s] direct physical loss or damage."  The second reason advanced by defendants was "the policies at issue contain a contamination exclusion" and "[t]he contamination exclusion clearly and unambiguously uses the word 'virus'" in its definition that precludes coverage.  NFMIC argued independently that its "Biological or Chemical Substances Exclusion Endorsement" precluded coverage.  On December 8, 2021, the trial court heard oral arguments on the motions and reserved decision.

On December 22, 2021, the trial court issued a written opinion.  The court granted NFMIC's motion to dismiss but denied defendants' joint motions to dismiss the complaint.  The court found NFMIC's "Biological or Chemical Substance Exclusion Endorsement" precluded coverage because the

15

endorsement did not contain language derived from industrial or environmental pollution.  Instead, "[t]he language substantially mirrors a virus such as COVID-19" since COVID-19 is a pathogen.

The court denied defendants' motions on three grounds:

> (1) Ocean's claims constituted fact-based pleadings under <u>Rule</u> 4:6-2(e) because the pleadings sufficiently demonstrated COVID-19 damaged Ocean;

> (2) the phrase "direct physical loss of or damage" in the Insuring Agreement was found by the court to be ambiguous and "may be satisfied if the property becomes unusable for its intended purpose, whether or not the property is altered by the COVID-19 virus." The trial court examined several New Jersey state and federal cases holding a risk that renders an insured property unfit for its intended purpose can constitute a "direct physical loss or damage" under a policy without a physical alteration to the property.  Relying largely on <u>Wakefern Food Corp. v. Liberty Mutual Fire Insurance Co.</u>, 406 N.J. Super. 524 (App. Div. 2009), the trial court concluded plaintiff sufficiently pled "a cause of action as to the insuring agreements entitling plaintiff to coverage for COVID-19 damages;" and

> (3) the court held the Contamination Exclusion found in defendants' policies did not preclude coverage here because it related to "traditional environmental and industrial damages."

Construing the Contamination Exclusion as a traditional pollution exclusion clause, the trial court cited <u>Nav-Its, Inc. v. Selective Insurance Co. of America</u>,

16

A-1824-21

183 N.J. 110 (2005), and concluded "the exclusion remains applicable to more traditional environmental-related damages[,] and as such will not fulfill [defendants'] reasonable expectations."  Furthermore, noting the independent definitions of "contamination" and "contaminant," the court held inserting the term "virus" in the "contamination" definition "does not change the substance of the exemption."  The court denied defendants' motions and entered a memorializing order.

## II.

On appeal, defendants argue that the trial court erred by denying their motions to dismiss.  They contend COVID-19 did not cause direct physical loss of or damage to any of Ocean's covered property as required by the policies and Ocean's conclusory complaint is insufficient as a matter of law.  Defendants also assert the complaint does not allege causation; the trial court misapplied the holding in Wakefern and other key decisions; and the contamination exclusion bars coverage.

Because this appeal comes to us from the denial of defendants' motion to dismiss the complaint for failure to state a claim, we treat Ocean's "version of

17

the facts as uncontradicted and accord it all legitimate inferences.  We pass no judgment on the truth of the facts alleged; we accept them as fact only for the purpose of reviewing the motion to dismiss."  Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005) (citing R. 4:6-2(e)).  The critical concern is whether, upon review of the complaint, exhibits attached thereto and matters of public record, there exists "the fundament of a cause of action"; "the ability of the plaintiff to prove its allegations is not at issue."  Id. at 183 (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)).

We review a decision denying a motion to dismiss for failure to state a claim de novo applying the same standard as the Law Division judge.  MasTec Renewables Constr. Co. v. SunLight Gen. Mercer Solar, LLC, 462 N.J. Super. 297, 309 (App. Div. 2020) (citing Castello v. Wohler, 446 N.J. Super. 1, 14 (App. Div. 2016)).  "Moreover, when analyzing pure questions of law raised in a dismissal motion, . . . we undertake a de novo review."  Smith v. Datla, 451 N.J. Super. 82, 88 (App. Div. 2017) (citing Royster v. N.J. State Police, 227 N.J. 482, 493 (2017); Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013)).

Because Rule 4:6-2(e) motions to dismiss "are usually brought at the earliest stages of litigation, they should be granted in 'only the rarest instances.'"  Lieberman v. Port Auth. of N.Y. & N.J., 132 N.J. 76, 79 (1993)

(quoting <u>Printing Mart</u>, 116 N.J. at 772).  Nevertheless, "dismissal is mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted," <u>Rieder v. State, Dep't of Transp.</u>, 221 N.J. Super. 547, 552 (App. Div. 1987), or if "discovery will not give rise to such a claim," <u>Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C.</u>, 237 N.J. 91, 107 (2019).

Where, as in this case, the issue raised on appeal involves the interpretation of a contract and applying case law to the facts, we review the trial court's decision de novo.  <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cantone Rsch., Inc.</u>, 427 N.J. Super. 45, 57 (App. Div. 2012).  In doing so, we accord no "special deference" to the "trial court's interpretation of the law" or its judgment on "the legal consequences that flow from established facts." <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).  Here, the trial court found Ocean suffered a "direct physical loss of or damage to" its property as a result of the EO's issued relative to COVID-19 as was necessary to trigger coverage for revenue losses under the terms of defendants' policies.  We disagree.

The insured has the burden "to bring [a] claim within the basic terms of [an insurance] policy." <u>Reliance Ins. Co. v. Armstrong World Indus.</u>, 292 N.J.

Super. 365, 377 (App. Div. 1996).  There is a "general rule that an insured is chargeable with knowledge of the contents of an insurance policy in the absence of fraud or inequitable conduct" by the carrier.  Edwards v. Prudential Prop. & Cas. Co., 357 N.J. Super. 196, 204 (2003).  "[I]nsurance purchasers are expected to read their policies and 'the law may fairly impose upon [them] such restrictions, conditions and limitations as the average insured would ascertain from such reading.'"  Sears Mortg. Corp. v. Rose, 134 N.J. 326, 348 (1993) (second alteration in original) (quoting Bauman v. Royal Indem. Co., 36 N.J. 12, 25 (1961)).

When determining the meaning of an insurance policy provision, a court must "first look to the plain meaning of the language at issue."  Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co., 229 N.J. 196, 207 (2017). As with other types of contracts, the parties' agreement must "be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled."  Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010).  Thus, in the absence of a specific definition in a policy, a word or term "must be interpreted in accordance with [its] ordinary, plain and usual meaning."  Daus v. Marble, 270 N.J. Super. 241, 251 (App. Div. 1994).

"[A] court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one [they] purchased." Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008) (quoting Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272-73 (2001)). Thus, if there is no ambiguity in a policy's terms, those terms should be enforced "as written." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 597 (2001).

In contrast, if a policy's language is ambiguous, the court may utilize rules of construction beyond the four corners of the contract. Oxford Realty, 229 N.J. at 207. For example, courts will ordinarily "construe insurance contract ambiguities in favor of the insured via the doctrine of contra proferentem." Id. at 208. This doctrine takes into consideration "the vast differences in the bargaining positions between an insured and an insurance company in the drafting of an insurance policy," allowing a court to interpret a contract against the drafter. Villa v. Short, 195 N.J. 15, 23 (2008). Additionally, a court may consider the insured's "reasonable expectations." Oxford Realty, 229 N.J. at 208. That is, if the "policy's language fairly supports two meanings, one that favors the insurer, and the other that favors

the insured, the policy should be construed to sustain coverage." <u>President v.</u> <u>Jenkins</u>, 180 N.J. 550, 563 (2004).

Because insurance policies are very often contracts of adhesion, "courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." <u>Voorhees v. Preferred Mut. Ins. Co.</u>, 128 N.J. 165, 175 (1992).  To that end, the above doctrines are intended to protect members of the public, who "should not be subjected to technical encumbrances or to hidden pitfalls" in insurance contracts.  <u>Kievit v. Loyal</u> <u>Protective Life Ins. Co.</u>, 34 N.J. 475, 482 (1961).  The intent is for a policy be "construed liberally" in the insured's "favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'"  <u>Ibid.</u> (quoting <u>Danek v. Hommer</u>, 28 N.J. Super. 68, 76 (App. Div. 1953)).

However, these doctrines typically should only be utilized by a court to "read the policy in favor of the insured" if there is a "genuine ambiguity" in the contract, meaning "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." <u>Templo Fuente De</u> <u>Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 224 N.J. 189, 200 (2016) (quoting <u>Progressive Cas. Ins.</u>, 166 N.J. at 274).  A term or phrase in a "policy is not ambiguous merely because two conflicting interpretations of it are

22

suggested by the litigants." <u>Powell v. Alemaz, Inc.</u>, 335 N.J. Super. 33, 44 (App. Div. 2000).

If the policy's language is "direct and ordinary," can "be understood without employing subtle or legalistic distinctions," is not "obscured by fine print," and does not "require[] strenuous study to comprehend," it is not ambiguous. <u>Zacarias</u>, 168 N.J. at 601; <u>accord</u> <u>Katchen v. Gov't Emps. Ins. Co.</u>, 457 N.J. Super. 600, 606 (App. Div. 2019) (holding while insurer "could have included a definition of 'motor vehicle' in its policy," the term was not ambiguous simply because a definition was missing, since "[a]ny ordinary reasonable person understands" its meaning).

More rarely, an insurance contract may be read in favor of the insured if the language at issue is "perhaps not ambiguous," but "nevertheless insufficiently clear to justify depriving the insured of [his or] her reasonable expectation that coverage would be provided." <u>Sparks v. St. Paul Ins. Co.</u>, 100 N.J. 325, 336 (1985).  A court may "examine whether more precise policy language, if chosen by the insurance company, would have 'put the matter beyond reasonable question.'" <u>Homesite Ins. Co. v. Hindman</u>, 413 N.J. Super. 41, 46 (App. Div. 2010) (quoting <u>Doto v. Russo</u>, 140 N.J. 544, 557 (1995)). Nevertheless, in general "the insured's reasonable expectations should not be

considered where the policy is plain in its meaning unless the policy is 'inconsistent with public expectations [and] commercially accepted standards.'" Nunn v. Franklin Mut. Ins. Co., 274 N.J. Super. 543, 550 (App. Div. 1994) (alteration in original) (quoting Werner Indus. v. First State Ins. Co., 112 N.J. 30, 36 (1988)).

Ultimately, the language of an insurance policy "underscores the basic notion that the premium paid by the insured does not buy coverage for all . . . damage but only for that type of damage provided for in the policy." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 237 (1979). Thus, a policy may contain "limitations on coverage" that "are designed 'to restrict and shape the coverage otherwise afforded.'" Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 102 (2009) (quoting Weedo, 81 N.J. at 237). The doctrines dictating a court construe an insurance contract in the insured's favor thus should not be used to read into the agreement coverage "which is not there," if there is no showing that the policy somehow did not meet the insured's reasonable expectations at the time the contract was signed. Werner Indus., 112 N.J. 30 at 38 (quoting Tomaiuoli v. U.S. Fidelity & Guar. Co., 75 N.J. Super. 192, 207 (App. Div. 1962)).

A-1824-21

Here, the policies provide that defendants would pay Ocean for business income lost because of a suspension in its operations due to a "direct physical loss of or damage to" the property caused by a "covered cause of loss." "Direct physical loss of or damage to" was not defined in the property coverage sections of the policies.  Our courts have "adopted a broad notion of the term 'physical.'"  Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co., 446 N.J. Super. 419, 437 (App. Div. 2016).  However, when "physical" is paired with another word, such as in "physical injury," courts have found that the resulting term means a "detrimental alteration," or "damage or harm to the physical condition of a thing."  Id. at 438 (quoting Farm Bureau Mut. Ins. Co. of Am. v. Earthsoils, Inc., 812 N.W.2d 873, 876 (Minn. Ct. App. 2012)).  The Third Circuit, applying New Jersey law, has also stated that "[i]n ordinary parlance and widely accepted definition, physical damage to property means "a distinct, demonstrable, and physical alteration" of its structure."  Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 235 (3rd Cir. 2002) (internal quotation marks omitted) (quoting 10 Couch on Insurance, § 148.46 (3d ed. 1998)).

While "[f]ire, water, smoke and impact from another object are typical examples of physical damage" that can "demonstrably alter the components of

a building and trigger coverage" under a property insurance policy, damage to a building as an entity "by sources unnoticeable to the naked eye must meet a higher threshold."  Ibid.  For example, in Port Authority, the Third Circuit found that the presence of "large quantities of asbestos in the air of a building" would "make the structure uninhabitable and unusable" and would therefore cause a "physical loss" of property to its owner.  Id. at 236.  By contrast, if asbestos was present but "not in such form or quantity as to make the building unusable," there would be no such physical loss since the structure would "continue[] to function" without any detrimental change to its "utility."  Ibid.

In Wakefern, the plaintiff, a supermarket, purchased an insurance policy providing coverage "for consequential loss or damage resulting from interruption of" electrical power at its premises if the interruption resulted from "physical damage" to electrical equipment and property located elsewhere.  406 N.J. Super. at 531-32.  Wakefern filed a claim after a power outage at its store occurred when an "electrical 'cascade'" disrupted a large part of the nation's power grid.  Id. at 532-38.  It was determined in some places throughout the grid, the cascade damaged power generation and transmission equipment, but in other places, power was automatically shut off to protect equipment from experiencing power surges that could have caused damage.

26

Ibid.  The defendant insurance company argued Wakefern was not entitled to coverage for economic losses resulting from the power outage, because it had not shown any of the power lines or other equipment that supplied its supermarket had been physically damaged.  Id. at 537-38.

But we disagreed, finding "the undefined term 'physical damage'" in Wakefern's policy was "ambiguous" because it was susceptible to "at least two different reasonable interpretations":  (1) that the part of the grid serving Wakefern was not damaged because there was no detrimental alteration to its structure; and (2) that the grid was damaged because it was shut down due to the cascade elsewhere, rendering it physically incapable of providing electricity.  Id. at 540-41.  We concluded that in the context of the case, the term "physical damage" should be construed in Wakefern's favor, since "due to a physical incident or series of incidents" elsewhere, the grid as a whole had become "physically incapable of performing [its] essential function."  Id. at 540.  In addition, we explained that the average policyholder should "not be expected to understand the arcane functioning of the power grid" when submitting an insurance claim after an outage.  Id. at 541.  However, we stated we would have "reach[ed] a different result if, for example, a governmental

27

agency had ordered that the power [to the supermarket] be shut off to conserve electricity." Id. at 540 n.7.

In reaching our conclusion in Wakefern, we cited cases from this State and other states wherein coverage was found for a "physical loss of or damage to" property based on a "loss of functionality" rather than harm to the property's structure.  Id. at 542-43.  For example, in Customized Distribution Services v. Zurich Insurance Co., 373 N.J. Super. 480, 483-84 (App. Div. 2004), the plaintiff warehouse failed to appropriately store a customer's drink products before their expiration, rendering the goods unusable.  The customer sued plaintiff, who in turn sued the defendant insurer.  Ibid.  In our opinion, we determined "that, for coverage to apply, it was not necessary that the product's material or chemical composition be altered" because the bottles could have broken thus damaging the property without a change to its chemical composition.  Id. at 488.  Moreover, because the products had expired "as a result of an undue passage of time" caused by the plaintiff, the end-consumers' perception of the beverages changed, i.e., consumers would not purchase expired drinks from the plaintiff's customer.  Id. at 490.  Because of the expiration dates, and the consumers' new perception of the expired drinks, "the

product lost value as much from the outdating as if it had turned sour or gone bad in some more tangible or material way." Ibid.

Other cases from various federal and state courts throughout the country have also found insurance coverage in situations involving intangible physical damage to property causing a loss of that property's usability.  For example, in Gregory Packaging, Inc. v. Travelers Property Casualty Co. of America, Civ. No. 12-04418, 2014 U.S. Dist. LEXIS 165232, at *13 (D.N.J. Nov. 25, 2014), the District Court found that "property can sustain physical loss or damage without experiencing structural alteration."  In that case, the federal court concluded the plaintiff suffered such a loss when ammonia was inadvertently released within its facility, "physically transform[ing] the air" inside and rendering it unfit for occupancy until the gas could be dissipated.  Id. at *16-17.

The District Court held the ammonia discharge caused a "direct physical loss of or damage to" the facility "because the ammonia physically rendered the facility unusable for a period of time." Id. at *17; accord Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 401 (1st Cir. 2009) (physical injury to property found where unpleasant odor causing "headaches or other ill effects" rendered building unusable); Motorists Mut. Ins. Co. v. Hardinger,

131 Fed. Appx. 823, 825-27 (3rd Cir. 2005) (direct physical loss found where home rendered uninhabitable by bacterial contamination of water supply); TRAVCO Ins. Co. v. Ward, 715 F.Supp. 2d 699, 709-10 (E.D. Va. 2010) (finding direct physical loss where home rendered uninhabitable by toxic gases released by defective drywall), aff'd. 504 F. Appx. 251 (4th Cir. 2013).

By contrast, New Jersey courts have found that losses of business income were not covered where the link between the insured premises and physical damage to property elsewhere was more attenuated.  See, e.g., Arthur Andersen LLP v. Fed. Ins. Co., 416 N.J. Super. 334, 349 (App. Div. 2010) (finding plaintiff's losses following September 11th attacks on the World Trade Center and Pentagon were not covered under its insurance policy because no evidence supported the property damage at those locations caused any interruption of plaintiff's business).

Other federal and state courts throughout the country have reached similar conclusions.  In Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co., 17 F. Supp. 3d 323, 325 (S.D.N.Y. 2014), a utility provider shut off power to an area of New York City that included the plaintiff's premises in advance of Superstorm Sandy's arrival, to prevent greater damage to the electrical grid and related equipment.  The District Court held the plaintiff's

30

loss of income during the outage was not covered by its insurance policy, finding that the plaintiff did not suffer "physical loss or damage" to its office, but merely a loss of use.  Id. at 331; c.f. Wakefern, 406 N.J. Super. at 540 n.7 (noting the court would not have found a "direct physical loss or damage to" insured property if "a governmental agency had ordered that the power be shut off to conserve electricity").

The District Court stated the words "direct" and "physical," when used to modify the phrase "loss or damage," "ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure."  Great N. Ins. Co., 17 F. Supp. 3d at 331.  The court found the limitation on coverage in the plaintiff's policy to a "period of restoration" lent support to this conclusion, stating that "[t]he words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it."  Id. at 332.

Addressing the same COVID-19-related issue before this court and applying New Jersey law, the United States District Court for the District of New Jersey has recently granted several insurance companies' motions to

dismiss for failure to state a claim under the F.R.C.P. 12(b)(6) standard.[5]  The District Court found that insurance policies containing similar, if not identical, clauses to those in plaintiff's policies here "unambiguously limit[ed]" coverage to "physical loss or damage to . . . commercial property."  7th Inning Stretch LLC v. Arch Ins. Co., Civ. No: 20-8161, 2021 U.S. Dist. LEXIS 58477, at *4 (D.N.J. Mar. 26, 2021).  And, the District Court has further found this requires a showing of tangible damage to property, that the functionality of the property was nearly eliminated or destroyed, or that the property was made useless or uninhabitable as a result of a covered cause of loss.  Id. at *4-5.

The District Court has found that businesses requesting coverage for lost income resulting from Governor Murphy's EO's have not made and cannot make such a showing because there has been no physical loss of or damage to their property, and the presence of COVID-19 virus in the air or on the surfaces of their property is insufficient to demonstrate property loss or damage.  Ibid. (holding it is "not enough" to show the EOs limited access to plaintiff's facility without alleging the property was physically damaged);

---

[5]  The Third Circuit currently has fifty COVID-19 coverage-related appeals pending but has yet to render a decision.  See Covid Coverage Litigation Tracker: Appeals in Business Interruption Cases, PENN LAW, https://cclt.law.upenn.edu/appeals/ (last visited June 8, 2022).

accord <u>Emami v. CNA & Transp. Ins. Co.</u>, Civ. No. 20-18792, 2021 U.S. Dist. LEXIS 60753, at *4 (D.N.J. Mar. 11, 2021); <u>Blvd. Carroll Ent. Grp. v. Fireman's Fund Ins. Co.</u>, Civ. No. 20-11771, 2020 U.S. Dist. LEXIS 234659, at *4 (D.N.J. Dec. 14, 2020); <u>Ralph Lauren Corp. v. Factory Mut. Ins. Co.</u>, Civ. No. 20-10167, 2021 U.S. Dist. LEXIS 90526, at *6-9 (D.N.J. May 12, 2021); <u>Child.'s Place, Inc. v. Zurich Am. Ins. Co.</u>, Civ. No. 20-7980, 2021 U.S. Dist. LEXIS 177269, at *12-18 (D.N.J. Sept. 17, 2021); <u>Manhattan Partners, LLC v. Am. Guar. & Liab. Ins. Co.</u>, Civ. No. 20-14342, 2021 U.S. Dist. LEXIS 50461, *4-6 (D.N.J. Mar. 17, 2021).

Additionally, an overwhelming majority of federal Circuit Courts have similarly held that the mere loss of use of business property caused by the presence of COVID-19, and government restrictions in response to COVID-19, do not constitute a direct physical loss or damage to property under a commercial property insurance policy.   See, e.g., <u>10012 Holdings, Inc. v. Sentinel Ins. Co,</u>, 21 F.4th 216, 220-23 (2d Cir. 2021); <u>Uncork & Create LLC v. Cincinnati Ins. Co.</u>, 27 F.4th 926, 933-34 (4th Cir. 2022); <u>Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.</u>, 29 F.4th 252, 259 (5th Cir. 2022); <u>Santo's Italian Café LLC v. Acuity Ins. Co.</u>, 15 F.4th 398, 401 (6th Cir. 2021); <u>Sandy Point Dental, P.C. v. Cincinnati Ins. Co,</u>, 20 F.4th 327, 335 (7th Cir.

2021); <u>Oral Surgeons, P.C. v. Cincinnati Ins. Co.</u>, 2 F.4th 1141, 1144-45, 1145 n.3 (8th Cir. 2021); <u>Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.</u>, 15 F.4th 885, 892 (9th Cir. 2021); <u>Goodwill Indus. of Cent. Okla. Inc. v. Phila. Indem. Ins. Co.</u>, 21 F.4th 704, 710 (10th Cir. 2021); <u>Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.</u>, Civ. No. 21-11046, 2021 U.S. App. LEXIS 26196, at *2 (11th Cir. Aug. 31, 2021).

Numerous state appellate courts have reached the same conclusion in actions involving similar terms and claims.  <u>See, e.g.</u>, <u>Verveine Corp. v. Strathmore Ins. Co.</u>, 184 N.E.3d 1266, 1278-79 (Mass. 2022); <u>accord</u> <u>Wakonda Club v. Selective Ins. Co. of Am.</u>, ___ N.W.2d ___, ___ (Iowa Apr. 22, 2022) (slip op. at 9-21); <u>Inns-by-the-Sea v. Cal. Mut. Ins. Co.</u>, 286 Cal. Rptr. 3d 576, 593 (Ct. App. 2021); <u>Ind. Repertory Theatre v. Cincinnati Cas. Co.</u>, 180 N.E.3d 403, 410-11 (Ind. Ct. App. 2022); <u>Gavrilides Mgmt. Co., LLC v. Mich. Ins. Co.</u>, No. 354418, 2022 Mich. App. LEXIS 632, at *6 (Mich. Ct. App. Feb. 1, 2022).

Here, defendants assert that even if the COVID-19 virus was on the surfaces and in the air at Ocean, the property did not sustain any "direct physical loss of or damage" sufficient to trigger coverage under the policies. Instead, defendants maintain Ocean merely suffered a temporary loss of

business due to Governor Murphy's EO's without any tangible physical alteration to the property.

The term "direct physical loss of or damage to" insured premises was not defined in the policies. However, as noted, the lack of a definition does not always mean that a term is ambiguous. <u>Katchen</u>, 457 N.J. Super. at 606. "Sophisticated commercial insureds[] [like plaintiff] do not receive the benefit of having contractual ambiguities construed against the insurer." <u>Oxford Realty</u>, 229 N.J. at 208.

The matter under review clearly differs from <u>Wakefern</u> and the other cases cited above where insurance coverage was found despite a lack of damage to the structure of an insured building. In <u>Wakefern</u>, the plaintiff's policy explicitly covered losses of electrical power due to damage to offsite equipment owned by others. 406 N.J. Super. at 531-32. We found the policy included damage anywhere on the greater electrical grid that caused the plaintiff's power to be shut off. <u>Id.</u> at 540. In that case, unlike here, there was actual physical damage to property, which caused the plaintiff's losses of income. In <u>Wakefern</u>, we contrasted the facts with a situation where a business's loss of use of its property stemmed from a government order to shut off electrical power. <u>Id.</u> at 540 n.7; <u>c.f.</u> <u>Newman Myers</u>, 17 F. Supp. 3d at 330

35

(finding loss of income was not a result of direct physical loss or damage to property because governmental agency ordered shutting down electrical to conserve energy).

Moreover, some of these cases involved intangible damage to premises, such as toxic fumes, a landslide, or a noxious odor, that rendered the premises physically uninhabitable or unusable for a period of time. Specifically, the circumstances in Port Authority and Gregory Packaging differ from those here because the respective courts found such large quantities of asbestos and ammonia in the air that precluded human occupancy.  Consequently, the respective properties were stripped of their uses entirely until remediated.  Port Authority, 311 F.3d at 235-36; Gregory Packaging, slip op. at 16-17. Saliently, none of the cases that found coverage due to "loss of use" involved a government shutdown in the absence of demonstrable physical damage to structures or physical unfitness for human use or habitation.

As defendants argue, and prevalent caselaw maintains, the COVID-19 virus's presence in Ocean's air and on its surfaces did not physically alter the property's physical structure such that it qualifies as a direct physical loss of or damage to Ocean's property.  Whereas certain quantities of asbestos and ammonia in the air require extensive remediation before making a property fit

36

for humans, the COVID-19 virus can be eliminated from surfaces with household cleaning products and dissipates on its own.  See Sandy Point Dental, 20 F.4th at 335 (finding COVID-19 "may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days"); Verveine Corp., 184 N.E. 3d at 1276 ("Evanescent presence of a harmful airborne substance [like COVID-19] that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property.").

Here, the record supports the conclusion there was no damage to equipment or property on- or off-site that caused Ocean to lose its physical capacity to operate, and there was no physical alteration that made the casino resort too dangerous to enter.  Instead, Ocean was forced to close its casino gaming floor, sports wagering lounges, and entertainment venues to the public in accordance with Governor Murphy's EO's.  However, Ocean was able to continue operating its restaurants, bars, and hotel accommodations in a restricted manner, as well as its online gambling services, from March 16 to July 2, 2020.

Saliently, Ocean would have been able to continue operating its casino and performance venue without interruption had the EO's not been issued.  As

37

Insurance Council argues in its amici brief, COVID-19 did not preclude Ocean from using its business for all purposes, "and it resumed all activities at its premises when government orders allowed it do so, even while the COVID-19 virus was still circulating."  COVID-19 continued to spread, and the risks it presented during the government-mandated shutdown remained after EO 107 was superseded by EO 157 on July 2, 2020.

The trial court and Ocean's reliance on <u>Customized Distribution</u> is also misplaced.  As an initial matter, <u>Customized Distribution</u> involved a third-party liability insurance policy for beverages whereas the policies here are first-party property insurance contracts.  373 N.J. Super. at 485-86.  We held the beverages suffered the functional equivalent of a physical alteration sufficient to constitute a physical loss because they had lost all their value to the beverage company.  <u>Id.</u> at 490-91.  The drinks lost their value because they expired, making them unusable.  <u>Ibid.</u>  But here, Ocean did not lose its value and continued to operate some of its services in a limited fashion during the government shutdown, such as on-line betting.

Therefore, even applying a "generous and hospitable approach," <u>Printing Mart</u>, 116 N.J. at 746, Ocean's complaint does not allege facts "which, if proven, would constitute a valid cause of action" as to afford coverage under

defendants' policies.  <u>Leon v. Rite Aid Corp.</u>, 340 N.J. Super. 462, 472 (App. Div. 2001).   The COVID-19's presence and/or the government-mandated shutdown does not constitute a direct physical loss of or damage to Ocean as required under the policies.   Additionally, because Ocean's claims are based solely upon the language of the policies, further discovery would not render them viable.  <u>Dimitrakopoulos</u>, 237 N.J. at 107-108.   Therefore, the trial court erred in not granting defendants' motion to dismiss Ocean's complaint under <u>Rule</u> 4:6-2(e).   In our recent opinion in <u>Mattdogg, Inc. v. Philadelphia Indemnity Insurance Co.</u>, we considered and extensively addressed these identical issues.   ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 22-52). Our reasoning and holdings in <u>Mattdogg, Inc.</u> apply in the matter under review.

<div align="center">III.</div>

Even assuming Ocean successfully pled the COVID-19 virus caused an actual or imminent physical loss or damage to Ocean, the Contamination Exclusion unambiguously excludes coverage.  Defendants assert the trial court "violated fundamental rules of insurance-policy interpretation by ignoring the plain language of this exclusion and re-writing it to include only traditional environmental pollutants."   Ocean, however, argues that the court's narrow

<div align="center">39</div>

interpretation was appropriate under <u>Nav-Its.</u>  The trial court found "it is not unreasonable to conclude that pollution exclusions in an all-risk policy that are substantially directed at traditional environmental and industrial damaged do not pertain to damages for a virus such as COVID-19, which damages are the result of naturally occurring communicable diseases."  Again, we disagree.

Exclusionary provisions in insurance contracts "are presumptively valid and will be given effect if 'specific, plain, clear, prominent, and not contrary to public policy.'"  <u>Princeton Ins. Co. v. Chunmuang</u>, 151 N.J. 80, 95 (1997) (quoting <u>Doto</u>, 140 N.J. at 559).  However, "exclusions must be narrowly construed," and "the burden is on the insurer to bring the case within the exclusion."  <u>Ibid.</u>  This rule serves the greater doctrine that an "insured is entitled to protection to the full extent that any reasonable interpretation of [exclusionary clauses] will permit."  <u>S.N. Golden Ests., Inc. v. Cont'l Cas. Co.,</u> 293 N.J. Super. 395, 401 (App. Div. 1996) (quoting <u>Ruvolo v. Am. Cas. Co.,</u> 39 N.J. 490, 498 (1963)).

Nevertheless, "where the words of an exclusionary clause are clear and unambiguous, 'a court should not engage in a strained construction to support the imposition of liability.'"  <u>Aviation Charters v. Avemco Ins. Co.</u>, 335 N.J. Super. 591, 594 (App. Div. 2000) (quoting <u>Longobardi v. Chubb Ins. Co. of</u>

40

N.J., 121 N.J. 530, 537 (1990)).   "[W]hile where there are several interpretations of an exclusion's meaning" a court "would tend to favor the one for coverage," however, this does not mean "that any far-fetched interpretation of a policy exclusion will be sufficient to create an ambiguity requiring coverage."   Id. at 59-95 (second and third alterations in original) (quoting Stafford v. T.H.E. Ins. Co., 309 N.J. Super. 97, 105 (App. Div. 1998)).   This is because "clear, unambiguous exclusionary clauses . . . . directly affect the risk the insurer assumes and upon which premiums are established."   Id. at 596.

Here, the Contamination Exclusion unambiguously excludes coverage for "[c]ontamination, and any cost due to [c]ontamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy."   The policies further define "contamination" unambiguously as "[a]ny condition of property due to the actual presence of any   .   .   .   pathogen or pathogenic organism, bacteria, [or] virus." Unquestionably, this would encompass the COVID-19 virus.   Moreover, Ocean alleged in its complaint the COVID-19 virus was actually present at Ocean and caused it to incur losses.   And, because Governor Murphy issued the EO's to mitigate the spread of this highly contagious virus, as pled by

Ocean, the relief it seeks is inexplicably intertwined to the presence of the virus and is excluded under the policy.

"[W]here the words of an exclusionary clause are clear and unambiguous," as they are here, "a court should not engage in a strained construction to support the imposition of liability." Aviation Charters, 335 N.J. Super. at 594 (quoting Longobardi, 121 N.J. at 537). Furthermore, Ocean's complaint also confirms COVID-19 "is a highly contagious and easily transmitted human pathogen," thus excluding coverage under the Contamination Exclusion.[6]

Additionally, the definition of "contaminant" in the policies does not include the term virus. However, the term "contaminant" is not used or referred to in the Contamination Exclusion or definition of "contamination." Instead, the word "contaminant" is used in the base policies only in special coverages for environmental cleanup costs unrelated to the Contamination Exclusion. Nonetheless, the Pollution Contamination Exclusion endorsement in IFCC's policy, unique to IFCC, states IFCC "will not pay for loss, damage,

---

[6]  "SARS-CoV-2, the coronavirus that causes COVID-19, is a pathogenic virus." See Coronavirus:  What is an emerging viral pathogen claim?, EPA, https://www.epa.gov/coronavirus/what-emerging-viral-pathogen-claim   (last updated Apr. 11, 2022).

A-1824-21

cost or expense caused directly or indirectly by" the "release, migration, discharge, escape or dispersal of [c]ontaminants."  The endorsement continues to include "virus" in its definition of contaminants.

In an attempt to reconcile the differences between these definitions, the trial court erroneously found them ambiguous and confusing.  Relying on <u>Nav-Its</u>, the court held those "pollution exclusions are overly broad[] [and] unfair." In applying <u>Nav-Its</u>, the court concluded "the contaminants are associated with traditional environmental pollution damages, not reasonably related to the damages in this case, which are derived from a communicable disease." However, the court erred by conflating the applicability of terms used in the general Contamination Exclusion found in all the policies, and the Pollution Contamination Exclusion endorsement, along with its specific terms and definitions, only found in IFCC's policy.

Nonetheless, grouping viruses with environmental and industrial pollutants may be unusual, but Ocean does not cite any controlling cases construing "contamination" in its contractual definition.  A court may not interpret an insurance contract in a way that leaves part of the contract meaningless.  <u>Cypress Point Condo. Ass'n v. Adria Towers, L.L.C.</u>, 226 N.J.

A-1824-21

403, 416 (2016).  We conclude it was improper for the trial court to essentially rewrite the unambiguous and applicable Contamination Exclusion at issue.

Lastly, although not addressed in the trial court's decision, Ocean argued in opposition to defendants' motion to leave for appeal, and reiterates again on appeal, that the Contamination Exclusion does not bar coverage because the Louisiana Endorsement AGLIC included in its policy "deleted and replaced" the Contamination Exclusion and contamination definition.  The endorsement defines "contamination" as "the actual presence of any [c]ontaminant(s)" and removes "pollutants or contaminant" from the definition of "contaminant."

Defendants argue this is a state-specific endorsement applicable only to Ocean's property under its contract located in Louisiana.  However, Ocean asserts this endorsement also applies in New Jersey.  As mentioned, the endorsement is titled "Amendatory Endorsement – Louisiana."  Ocean highlights the difference in prefatory language in the Louisiana Endorsement, "THIS ENDORSEMENT CHANGES THE POLICY," versus the language in the Connecticut Endorsement,[7] which states "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN

---

[7] The relevant endorsement is similarly titled, "Amendatory Endorsement – Connecticut" (Connecticut Endorsement).

A-1824-21

CONNECTICUT."  Ocean argues this difference in language demonstrates AGLIC's intent to make the Louisiana endorsement a generally applicable endorsement.  Notably, in addition to the Connecticut Endorsement, the New York Endorsement[8] is the only other amendatory endorsement to use the same prefatory language.  The remaining twenty-nine of thirty-one state-titled amendatory endorsements use the same general prefatory language found in the Louisiana Endorsement.

Applying Ocean's analysis, several state-titled endorsements present conflicting amendments to various sections.  For example, multiple endorsements delete and replace "SECTION VI-GENERAL POLICY CONDITIONS, CANCELLATIONS/NON-RENEWAL" in its entirety, including the Louisiana Endorsement.  However, some endorsements present different and conflicting replacement terms from each other despite using the same general prefatory language found in the Louisiana Endorsement that Ocean relies on.

---

[8]  The relevant endorsement is similarly titled, "Amendatory Endorsement – New York" (New York Endorsement).  The endorsement precedes with "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK."

Had AGLIC intended for state-titled endorsements using the general prefatory language to ignore geographical boundaries, then it would not put forth geographic identifiers with conflicting terms between endorsements unless the endorsements were meant to be state-specific.  See Couch on Insurance § 18:20 ("[T]he policy [and its endorsements] must be considered as a whole and the caption read in connection with the remainder of the contents.").  Because a court may not interpret an insurance contract in a way that leaves part of the contract meaningless, we reject plaintiff's claim the Louisiana Endorsement applies to the Contamination Exclusion because it would render the geographic identifier of all the state-titled endorsements meaningless.  Cypress Point Condo., 226 N.J. at 416.

The Federal District Court of New Jersey, among other courts, have faced the same dilemma in COVID-19 insurance actions involving identical language and have held the Louisiana Endorsement amending the Contamination Exclusion is state-specific to Louisiana.  See, e.g., Manhattan Partners, slip op. at 6 n.3. ("Had the parties intended to remove 'virus' from the Contamination provision, they could have done so with a general endorsement that was not limited to a single state.")  We agree and reject Ocean's argument. We conclude Ocean's remaining arguments—to the extent we have not

46

addressed them—lack sufficient merit to warrant any further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

For these reasons, we reverse the matter under review.  The matter is remanded to the Law Division for entry of an order dismissing Ocean's complaint as to all defendants.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

47