# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILADELPHIA EAGLES LIMITED PARTERSHIP,** *Plaintiff,*  v.  **FACTORY MUTUAL INSURANCE COMPANY,** *Defendant.* | **CIVIL ACTION NO. 21-1776** |

**Baylson, J.**                                                                                                                **December 13, 2024**

## MEMORANDUM RE: MOTION FOR RECONSIDERATION

Plaintiff Philadelphia Eagles Limited Partnership (the "Eagles") was forced to close down and modify the operation of numerous insured properties due to COVID-19. The Eagles suffered financial losses and sought coverage from its insurance provider, Defendant Factory Mutual Insurance Company ("FM"). FM denied the Eagles' coverage claim. The Eagles filed suit against FM, seeking declaratory judgments that its losses are covered by the FM Policy and that FM is estopped from representing to the Court and the Eagles that communicable diseases do not trigger coverage under the Policy requiring physical loss or damage to property.

This Court dismissed the Eagles' claims following decisions by the Pennsylvania Supreme Court and Third Circuit. The Eagles move for reconsideration of the Court's Dismissal, ECF 96. For the reasons explained below, the Court **DENIES** the Eagles' Motion for Reconsideration.

### I.        FACTUAL ALLEGATIONS

#### A.  The FM Insurance Policy

FM sold the Eagles an insurance policy (the "Policy" or "FM Policy"), effective June 29, 2017, to June 29, 2020. Am. Compl. ¶ 33, ECF 44. The Policy covers insured properties "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE." Ex. 1 to Am. Compl. ("FM Policy") at 4,

1

ECF 44-1. The Policy provided for "Time Element" insurance for loss "directly resulting from physical loss or damage of the type insured" as follows:

> **1. LOSS INSURED**
>
>> A. This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured
>>
>>> 1) to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;
>>>
>>> 2) used by the Insured, or for which the Insured has contracted use;
>>>
>>> 3) while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or
>>>
>>> 4) while in transit as provided by this Policy, and
>>>
>>> 5) during the Periods of Liability described in this section,
>>
>> provided such loss or damage is not at a contingent time element location.

Id. at 33.

Under the Policy, the Insured may make a claim for Time Element coverage in the form of Gross Profit, defined as the actual loss sustained by the insured during the "Period of Liability." Id. at 36.[1] The Policy defines the "Period of Liability" as follows:

> **3. PERIOD OF LIABILITY**
>
> . . .
>
>> B. The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:
>>
>>> 1) The period:
>>>
>>>> a) starting from the time of physical loss or damage of the type insured; and

---

[1] The Policy defines Gross Profit as "the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing Business." Ex. 1 to Am. Compl. ("FM Policy") at 36, ECF 44-1.

          b)   ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

          c) not to be limited by the expiration of this Policy

Id. at 42.

### B. COVID-19 and the Insured Properties

In March 2020, as a result of the COVID-19 pandemic, Pennsylvania Governor Tom Wolf required all non-life sustaining businesses to close, and the City of Philadelphia prohibited the operation of non-essential businesses. Am. Compl. ¶¶ 156, 160, 161. In March 2020, the Eagles closed its insured properties including, Lincoln Financial Field ("the Linc"). Id. ¶¶ 164–165.

During the 2020-21 National Football League ("NFL") season, the Eagles were "forced to cancel or significantly restrict in-person attendance" at games held at the Linc and restrict access to other insured properties, leading to financial loss. Id. ¶¶ 5, 168–72. In July 2020, the NFL cancelled all pre-season games. Id. ¶ 168. In fall 2020, the Eagles were permitted to conduct in-person games during the regular NFL season—though fans initially could not attend. Id. ¶ 170. Then, beginning in October 2020, 7,500 fans were permitted to attend each Eagles game at the Linc.[2] Id. ¶ 171. But, in mid-November 2020, COVID-19 surged and fans were no longer permitted to attend Eagles games. Id. ¶ 172. These forced cancellations and restrictions during the 2020-21 season caused the Eagles substantial financial loss.

---

    [2] This is compared to the Linc's approximately 67,000 seats and "Standing Room Only" sections. Am. Compl. ¶¶ 3, 171, ECF 44.

The Eagles claim that COVID-19 viral droplets expelled from infected individuals could have been present in the air on the properties, and landed on, attached, and adhered to surfaces, thus "physically chang[ing] the airspace" and surfaces of the insured properties. Id. ¶ 129. And indeed, despite the Eagles' attempts to guard against the risks of COVID-19, "incidents of COVID-19 were detected at" the insured properties. Id. ¶ 173.

### C. FM's Denial of the Eagles' Desired Insurance Coverage

The Eagles timely reported its losses to FM and sought coverage under the Policy. Id. ¶ 209. On July 27, 2020, FM denied the insurance coverage. Id.; see Ex. 6 to Am. Compl., ECF 44-6. The Eagles disputed this denial. Am. Compl. ¶ 210. On April 21, 2021, FM issued another letter reiterating its denial. Id. ¶ 211; Ex. 26 to Am. Compl. At 5, ECF 44-26. FM stated that "[u]nder the Policy, Time Element loss must directly result from physical loss or damage of the type insured. Because the location did not sustain any physical loss or damage, this threshold Policy requirement is absent. The presence of COVID-19, even if established, would not constitute 'physical loss or damage,' and it would be excluded as 'contamination' . . . ." Ex. 26 to Am. Compl. at 5, ECF 44-26.

### II. PROCEDURAL HISTORY

The Eagles filed the instant lawsuit in the Court of Common Pleas of Philadelphia County in March 2021. ECF 1-1. On April 15, 2021, FM removed the case to the United States District Court for the Eastern District of Pennsylvania on the basis of diversity jurisdiction. ECF 1. On January 19, 2022, the Eagles filed an Amended Complaint. ECF 44. On April 21, 2022, FM moved to dismiss the Amended Complaint. ECF 48. On December 15, 2022, the Court delayed a decision on the Motion to Dismiss and permit limited discovery. ECF 73 at 18–19. On January 17, 2023, the Parties submitted supplemental briefing in light of the Third Circuit's decision in

Wilson v. USI Ins. Serv. LLC, 57 F.4th 143, 146 (3d Cir. 2023). ECFs 75–77. On February 6, 2023, this Court suspended the case, ECF 80, which was then stayed on April 10, 2024, ECF 92.

On October 2, 2024, following the decision in Ungarean v. CAN & Valley Forge Ins. Co., 323 A.3d 593 (Pa. 2024), FM filed a Notice of Supplemental Authority in Support of its Motion to Dismiss. ECF 95. On October 16, 2024, the Court granted FM's Motion to Dismiss. ECF 96. On November 14, 2024, the Eagles filed a Motion for Reconsideration. ECF 101. On November 27, 2024, FM filed its Response Brief in opposition to the Motion for Reconsideration. ECF 103. On December 6, 2024, the Eagles filed a Reply Brief. ECF 104.

### III. STANDARD OF REVIEW

The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council, 964 F.3d 218, 230 (3d Cir. 2020) (citing Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). A court should grant a motion for reconsideration under Federal Rule of Procedure 59(e) only based on one of three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." In re Processed Egg Prods. Antitrust Litig., 962 F.3d 719, 729 (3d Cir. 2020) (citing Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013)). "Courts should grant these motions only 'sparingly' and do so in consideration of the court system's interests in 'finality and conservation of scarce judicial resources.'" Gok v. Roman Catholic Church, 2021 WL 3054793, at *5 (E.D. Pa. July 20, 2021) (Baylson, J.).

IV.     **PARTIES' CONTENTIONS**

   **1. The Eagles' Motion for Reconsideration**

The Eagles argue it has made a clean pass for coverage, while Ungarean and Wilson fumbled under narrower terms, and that the Amended Complaint crosses the goal line for "physical loss or damage."

First, the Eagles argue that Ungarean does not govern this case because the policy language in Ungarean—in which the decision "rest[ed] solely on the language of" that policy, 323 A.3d at 610—is different and more specific than the FM Policy language. Mot. Recons. at 2–4, ECF 101. The Eagles assert that the policy in Ungarean expressly required physical alterations necessitating repairs, rebuilding, or replacement of property ("Restoration Language"). The Eagles argue because the FM Policy does include Restoration Language, Ungarean does not govern. Mot. Recons. at 2–3, ECF 101.

Second, the Eagles argue that federal appellate cases from other Circuits do not support dismissing the Amended Complaint. Id. at 4.

Third, the Eagles argue that, unlike Ungarean, the Eagles' Amended Complaint establishes "physical loss or damage" that is covered by the Policy based on Third Circuit precedent, see Port Authority of New York & New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002) & Motorists Mut. Ins. Co. v. Hardinger, 131 F. App'x 823 (3d Cir. 2005) (non-precedential), which established that coverage for losses caused by substances unnoticeable to the naked eye exist even when: (1) there is no "actual" damage; (2) the property is not rendered wholly unusable because of the threatened release of the substance but rather, "substantially" reduced; and (3) the impact

on use results from the threat to human health, not structural harm to property.[3] Mot. Recons. at 7, ECF 101. The Eagles assert that its losses were tied to the physical conditions of the Linc, which was rendered nearly non-functional, unlike in Ungarean and Wilson. Id. at 9. This, the Eagles assert, satisfies the Third Circuit standard for "physical loss or damage" by alleging that a physical condition nearly eliminated the Linc's core function. Id. at 8. Additionally, the Eagles argue that the decision in Wilson also involved more restrictive policy terms requiring "repair" or "replacement." 57 F.4th at 146 (citing Port Authority, 311 F.3d); Mot. Recons. at 7, ECF 101.

Finally, the Eagles argue that FM has contradicted its own position. Mot. Recons. at 10, ECF 101. FM stated to state regulators that the presence and spread of communicable disease and its causative viral agent at insured property can cause "physical damage or loss," in contrast to the position it takes in this case. Id. at 10 (citing Am. Compl. ¶¶ 57–64). The Eagles cite evidence outside the pleadings, which it believes are properly considered as evidence of industry custom and practice which further demonstrates this contradiction. Id. at 12.

### 2. FM's Opposition to Motion for Reconsideration

FM argues that the Eagles fumbled its reconsideration attempt, maintaining that Ungarean and Wilson have already called the play: no physical alteration or near-dispossession, no coverage touchdown.

---

[3] The Eagles maintain that Ungarean v. CNA & Valley Forge Ins. Co., 323 A.3d 593 (Pa. 2024) did not modify this standard and instead acknowledged limited circumstances where loss of use of physical property could trigger "physical loss or damage" coverage. Mot. Recons. at 7, ECF 101.

First, FM argues that this Court already correctly determined that this case warrants dismissal under Ungarean and that the Eagles have failed to show any change in the law, new evidence, or clear error that justifies reconsideration. Opp. Mot. Recons. at 1, ECF 103.

Second, FM contends that the Eagles misread Ungarean. FM argues that the decision in Ungarean is premised on the meaning of "physical loss or damage"—which requires a physical alteration—not of the Restoration Language. Id. at 4–5. FM argues that the Restoration Language merely provided additional support for the court's conclusion in Ungarean. Id. at 3–4 (citing Ungarean, 323 A.3d at 607–08). Additionally, FM argues that the Eagles misread and ignore the terms of the Policy, which require "physical loss or damage" for each provision. Id. at 5.

Third, FM argues that the Eagles cannot plead physical loss or damage under the Third Circuit standard. Id. at 6. Rather, FM argues that Third Circuit precedent requires near-total dispossession of the property and that the Court should not consider whether the property could be used for its intended purpose. Id. at 8–9 (citing and quoting Wilson, 57 F.4th at 145). Rather, FM argues that the Eagles "continued to use its properties when permitted to do so by governmental authorities . . . despite the alleged presence of COVID-19" and also used the properties for some purpose (even if not the intended pre-COVID-19 purpose), and thus do not meet this standard. Opp. Mot. Recons. at 9, 11, ECF 103.

FM also argues that Third Circuit precedent requires that COVID-19 was present in the properties to "such a degree that it became physically dangerous . . . rendering [it] useless . . . ." Id. at 8–9 (citing and quoting Wilson, 57 F.4th at 145). According to FM, the Amended Complaint does not sufficiently allege that the condition of the properties themselves rendered them inherently unusable. Opp. Mot. Recons. at 8–9, ECF 103.

8

Fourth, FM argues that the Eagles' extrinsic evidence should be excluded. Id. at 12. According to FM, the Pennsylvania Supreme Court and Third Circuit have provided clear guidance to interpret "physical loss or damage," leaving no ambiguity that requires extrinsic evidence. Id. Also, FM asserts that the unambiguous meaning of "physical loss or damage" governs because the Eagles are not claiming the insurance industry has a unique interpretation of the term. Id. at 13.

V. **ANALYSIS**

**A. Third Circuit and Pennsylvania Supreme Court Precedent Govern This Case**

Ungarean and Wilson govern this case because the operative policy language at issue in those cases is nearly identical to the language in the FM Policy. Thus, the FM Policy requires physical alteration to "trigger" physical loss or damage coverage.

**1. Ungarean and Wilson Focused on "Physical Loss or Damage," and Any Analysis of "Restoration Language" Was Non-Dispositive**

**a. Pennsylvania Supreme Court**

The Pennsylvania Supreme Court held that the terms "physical," "loss," and "damage," if not defined in a policy, are governed by the terms' plain meaning. See Ungarean, 323 A.3d at 607; infra § A(1)(b). In Ungarean, the Pennsylvania Supreme Court held that the plain meaning of the policy's operative language—"direct physical loss of or damage to property"—required "physical alteration to the subject property as a result of a direct physical loss or damage necessitating repairs, rebuilding, or entirely replacing the property" to trigger coverage for physical loss or damage. 323 A.3d at 607–08. While Ungarean discusses the CNA policy's Restoration Language, the Restoration Language was not central to determining coverage for physical loss or damage, but rather was merely "further support" for the court's conclusion based on the operative

9

language.[4]  Id. at 608 (emphasis added).  While the Pennsylvania Supreme Court noted that its decision in Ungarean "rests solely on the language of the CNA Policy," the operative language—"direct physical loss of or damage to property"—is near identical to the language in the FM Policy, as discussed infra.  Id. at 610.  The Restoration Language is simply an additional requirement for coverage under the CNA policy.

### b. Third Circuit Precedent

The Third Circuit has held that an insurance policy that does not define "physical loss or damage" is governed by the terms' plain meaning.[5]  The Third Circuit has provided guidance for cases involving physical damage to property caused by sources unnoticeable to the naked eye. Wilson, 57 F.4th at 142.  Under Port Authority, physical loss or damage can be caused by a source unnoticeable to the naked eye—in that case, asbestos—"only if an actual release of asbestos fibers from asbestos containing materials has resulted in <u>contamination of the property such that its function is nearly eliminated or destroyed</u>, or the structure is made <u>useless or uninhabitable</u>, or if

---

[4] The basis of CNA's appeal was that CNA claimed the Superior Court erred in interpreting the operative language "direct physical loss of or damage to property" in the policy.  Ungarean, 323 A.3d at 606.  Indeed, the Pennsylvania Supreme Court granted CNA's petition for review of the Superior Court's interpretation of the policy language "direct physical loss of or damage to." Id. at 604 (citing Ungarean v. CNA, 301 A.3d 862 (Pa. 2023)).  The Petition for Allowance of Appeal is silent as to Restoration Language.  Ungarean, 301 A.3d 862.

[5] Physical damage "means 'a distinct, demonstrable, and physical alteration' of its structure."  Wilson v. USI Ins. Serv. LLC, 57 F.4th 131, 142 (3d Cir. 2023) (citing Port Authority of New York & New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 235 (3d Cir. 2002) (internal quotations removed)).  Physical loss means "a failure to maintain tangible possession of the structure."  Id. at 142.  These definitions apply to the FM Policy, which does not define "physical loss or damage."  See FM Policy, ECF 44-1.

there exists an <u>imminent threat</u> of the release of a quantity of asbestos fibers that would cause such loss of utility." 311 F.3d at 236 (emphasis added).  In <u>Wilson</u>, the Third Circuit applied this standard to COVID-19 and resultant closure orders.

The Third Circuit noted that physical loss or damage from COVID-19 requires proof "that the functionalities of their properties were nearly eliminated or destroyed, that the structures were made useless or uninhabitable, or that there was an imminent risk of either of those things happening." <u>Wilson</u>, 57 F.4th at 142.  Importantly, the Third Circuit rejected the premise that a loss of the ability to use property for its intended purpose meets this standard, as it does not "render the properties useless or inhabitable" such that the "insured will have lost tangible possession . . . ." <u>Id.</u>  Specifically, "loss of use caused by government edict and untethered to the physical condition of the premises is not a physical loss or damage to the properties."[6] <u>Id.</u> at 143. As the Pennsylvania Supreme Court did in <u>Ungarean</u>, the Third Circuit in <u>Wilson</u> analyzed "period of restoration" language, but noted that such "other" terms "support[ed] our conclusion that loss of use must involve physicality." <u>Id</u>

### 2. <u>Ungarean</u> and <u>Wilson</u> Govern The FM Policy

The Eagles argue that <u>Ungarean</u> and <u>Wilson</u> were decided based on more restrictive policy terms that included Restoration Language.  Mot. Recons. at 2–4, 7, ECF 101.  But the operative language in the policies in <u>Ungarean</u> and <u>Wilson</u> is nearly identical to the language in the FM

---

[6] The Third Circuit noted that "every other Court of Appeals and all but one state supreme court to have considered this issue also has held that loss of use caused by closure orders issued in response to the COVID-19 pandemic does not constitute physical loss or damage sufficient to trigger property insurance coverage." <u>Wilson</u>, 57 F.4th at 143 n.6 (listing cases).

Policy. The operative policy language in Ungarean and Wilson which led the Pennsylvania Supreme Court and the Third Circuit to conclude that coverage requires physical alteration was some variation of "physical loss of or damage to property." 323 A.3d at 607 (operative language was "direct physical loss of or damage to property"); 57 F.4th at 144 (operative language was "physical loss of or damage to property"). The FM Policy is no different, providing coverage for losses "directly resulting from physical loss or damage." FM Policy at 4, 33, ECF 44-1.

The Eagles' argument that Ungarean and Wilson do not govern because the FM Policy does not require physical repair or replacement to trigger coverage fails. Mot. Recons. at 2–3, 7, ECF 101. As discussed supra, the Ungarean and Wilson courts' analyses of Restoration Language was merely supplemental to their conclusions reached on the basis of the operative language related to physical loss or damage. See Ungarean, 323 A.3d at 608 (noting that the Restoration Language "further support[s]" the court's conclusion); Wilson, 57 F.4th at 143 (noting that "[o]ther terms in the policies," including Restoration Language, "support our conclusion that loss of use must involve some physicality). The Eagles' argument that Ungarean and Wilson do not govern the FM Policy because of the absence of non-dispositive Restoration Language is like saying two recipes are not the same because one includes a garnish while the other does not—the main ingredients are identical. Ungarean and Wilson govern. Physical alteration to the Eagles' insured properties is required to seek coverage for physical loss or damage under the FM Policy.

**B. The Eagles Fail to Demonstrate Physical Alteration Under Pennsylvania Law**

The Eagles fail to meet the requirement for physical alteration under Pennsylvania law. Coverage for physical loss or damage requires "either (1) a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property (loss), or (2) a physical harm or injury to the property (damage). In other words, a physical alteration to the

12

subject property is a threshold requirement for coverage to apply under the CNA Policy." Ungarean, 323 A.3d at 608 (emphasis in original).

The Eagles have not plausibly pled physical disappearance, physical deterioration, or absence of physical function of the insured properties. Id. Rather, as in Ungarean, the Eagles sustained economic loss, not physical loss. Id. at 609. Any cancellation of or restriction of attendance at games at the Linc "had nothing to do with the physical attributes" of the Linc itself. Id.; see infra. Rather, the fact that the Linc began reopening, albeit with mitigating measures limiting attendance, Am. Compl. ¶ 171, "demonstrates that the government orders addressing the virus rather than the virus itself was the source seriously affecting the property's functionality." Moody v. Hartford Fin. Grp., Inc., 513 F. Supp. 3d 496, 506 (E.D. Pa. 2021), aff'd sub nom. Wilson v. USI Ins. Serv. LLC, 57 F.4th 131 (3d Cir. 2023).

Nor have the Eagles plausibly pled physical harm or injury to the insured properties. Ungarean, 323 A.3d at 608. The Pennsylvania Supreme Court noted that the losses in Ungarean were caused by government-ordered shutdown, not a physical condition based on the property's "physical attributes." Id. at 609. The Eagles argue its losses are tied to physical condition of the Linc because "a physical condition—the actual or threatened presence of COVID-19 at its stadium—nearly eliminated or destroyed the stadium's core function," Mot. Recons. at 8, ECF 101, and that COVID-19 was present on the surfaces and in the air of the properties in a way that did or would have physically altered the airspace within its premises and its surfaces, Am. Compl. ¶¶ 12, 125, 129. But this does not plausibly plead that its losses are tied to "physical attributes" of the properties through the presence of COVID-19. Ungarean, 323 A.3d at 609.

In sum, the Eagles have failed to demonstrate physical alteration which would trigger coverage for physical loss or damage under Pennsylvania law.

13

### C. The Eagles Have Not Established Physical Loss or Damage Under the Third Circuit Standard

The Eagles do not establish physical loss or damage under the Third Circuit standard. In the Third Circuit, physical loss or damage from COVID-19 requires proof "that the functionalities of [the insured] properties were nearly eliminated or destroyed, that the structures were made useless or uninhabitable, or that there was an imminent risk of either of those things happening." Wilson, 57 F.4th at 142. The Eagles failed to plead "that the functionalities" of the properties were nearly eliminated or that the properties were made "useless." Id.

The Third Circuit rejected the precise argument that the Eagles make—that "the stadium's function of safely seating fans in its stands would have been reduced to a substantial degree" had the Linc been open for full use, rendering the Linc's function nearly eliminated or destroyed, Mot. Recons. at 8, ECF 101—as insufficient to meet the Third Circuit standard. See Wilson, 57 F.4th at 142. The loss of the ability to use properties for their intended purpose does not "render the properties useless or inhabitable" such that the "insured will have lost tangible possession of property . . . ." Id. The Eagles loss of the ability to use the Linc for its intended purpose—entertaining fans in its stands—does not render it useless or its functionality nearly eliminated.

Nor were the Eagles' losses tied to the physical conditions of the Linc. See Mot. Recons. at 9, ECF 101. In Wilson, the Third Circuit noted that the insured businesses in that case "lost the ability to use their properties for their intended business purposes because the governors of the states in which they operate issued orders closing or limiting the activities of nonessential businesses, not because there was anything wrong with their properties. The properties were not destroyed in whole or in part; their structures remained intact and functional." 57 F.4th at 142. Indeed, the Linc reopened in October 2020 with limited attendance, Am. Compl. ¶ 171, which

"demonstrates that the government orders," not COVID-19 itself, "w[ere] the source seriously affecting the property's functionality." Moody, 513 F. Supp. 3d at 506.

Nonetheless, the Eagles assert that its losses are tied to physical condition of the Linc by arguing that COVID-19 was present on the surfaces and in the air of the properties in a way that did or would have physically altered the properties. Am. Compl. ¶¶ 12, 125, 129; Mot. Recons. at 8, ECF 101. But this does not comport with Third Circuit precedent on the relationship between loss and a property's physical conditions. The Eagles do not plausibly plead the presence of COVID-19 "to such a degree that it became physically dangerous to be inside of the building, rendering the building useless until there was some kind of remediation." Wilson, 57 F.4th at 145 (citing Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014)); W. Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52, 55 (1968). In Gregory Packaging, Inc., the court found "physical loss of or damage to property" where ammonia is released in a property "physically transformed the air . . . so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." 2014 WL 6675934, at *6. The Third Circuit has rejected an extension of this logic to the presence of COVID-19 and declined to adopt an interpretation of COVID-19 that equates it to other harmful substances, like asbestos. Wilson, 57 F.4th at 145; see Moody, 513 F. Supp. 3d at 507 (determining that the presence or threatened presence of COVID-19 on surfaces did not meet the requirements of Port Authority because "surfaces would merely need to be cleaned"). And the facts pled by the Eagles are not notably different from those in Wilson, where this argument was rejected.

The Eagles also do not establish imminent risk that the functionalities of the properties would be nearly eliminated or destroyed or that the structures would be rendered useless. Wilson,

57 F.4th at 142. And even if the Eagles could prove that COVID-19 caused imminent danger to the Linc's functionality and use, the Eagles have failed to plead that any such threat rendered the function of the Linc nearly eliminated or made the Linc useless based on the discussion supra.

In sum, the Eagles have failed to demonstrate physical loss or damage by a substance unnoticeable to the naked eye which would trigger coverage for physical loss or damage under Third Circuit precedent.

### D. The External Evidence Presented By the Eagles is Inapposite

Because the external evidence presented by the Eagles in inapposite, this Court need not reach an evaluation of whether it is properly admitted nor consider it because its impact on this Motion for Reconsideration is non-dispositive.

## VI. CONCLUSION

This Court's Order of Dismissal, ECF 96, does not warrant reconsideration. The Motion is not based on any change in the law, new evidence, or clear error that justifies reconsideration. In re Processed Egg Prods. Antitrust Litig., 962 F.3d at 729 (citing Wiest, 710 F.3d at 128). The Eagles' Motion for Reconsideration is **DENIED**. An appropriate Order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 21\21-1776 Philadelphia Eagles Limited Partnership v. Factory Mutual Ins Co\21-1776 Memo re Motion for Reconsideration.docx